7IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

RICHARD JEWELL,  et al,                    )
                                           )
        Plaintiffs,                        )
                                           )
        v.                                 )
                                           )        C.A. No. 97-408E
ALBERTO  R. GONZALES, et al,               )        Judge McLaughlin
                                           )        Magistrate Judge Baxter
        Defendants.                        )
                                           )
_____)

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants hereby

respectfully move this Court for judgment as a matter of law.  The reasons for this motion are set

forth in defendants' Memorandum of Points and Authorities in Support of the Motion for

Summary Judgment filed herewith.

Dated: July 1, 2005                        Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           MARY BETH BUCHANAN
                                           United States Attorney

                                           CHRISTY C. WIEGAND
                                           Assistant U.S. Attorney


                                           _____/s/_____
                                           VINCENT M. GARVEY
                                           MARSHA S. EDNEY
                                           Attorneys, Department of Justice
                                           Civil Division
                                           20 Massachusetts Ave, N.W., Room 7148
                                           Washington, D.C.  20530
                                           Telephone: (202) 514-4520

                                           Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

RICHARD JEWELL, et al,                    )
                                          )
        Plaintiffs,                       )
                                          )
            v.                            )
                                          )     C.A. No. 97-408E
ALBERTO  R. GONZALES, et al,              )     Judge McLaughlin
                                          )     Magistrate Judge Baxter
        Defendants.                       )
_____)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

<u>INTRODUCTION</u>

Plaintiffs, a class of federal prisoners housed at the Federal Correctional Institution at

McKean County, Pennsylvania, currently challenge the constitutionality of a Bureau of Prison

(BOP) Policy which implemented a federal statute known as the "Zimmer Amendment." The

Zimmer Amendment prohibits the use of federal funds for the viewing and showing of R, NC-17

and X-rated movies in federal prisons. The Supreme Court has established a test for determining

the constitutionality of statutory prison policy and regulations.   See Thornburgh v. Abbott, 490

U.S. 401 (1989); Turner v. Safley, 482 U.S. 78 (1987).   Under this test, the BOP Policy

implementing the Zimmer Amendment must be upheld because it is "reasonably related to

legitimate penological interests." Thornburgh, 490 U.S. at 413; Turner, 482 U.S. at 89. As will

be explained below, there are no genuine issues of material fact and therefore defendant is

entitled to judgment as a matter or law.

PROCEDURAL BACKGROUND

This class action lawsuit by federal prisoners in the Federal Correctional Institution (FCI)

at McKean, Pennsylvania was originally brought as a challenge to two federal statutes

prohibiting the use of federal funds to (a) distribute or make available to the prisoners

commercial publications that are sexually explicit or feature nudity (Ensign Amendment) and (b)

provide prisoners with certain amenities, including the viewing of R-, X-, or NC-17-rated movies

(Zimmer Amendment).  In a decision dated March 15, 2001, this Court upheld the

constitutionality of these two statutes and their implementing policies.

Plaintiffs appealed, but expressly limited the appeal to their challenge to the Zimmer

Amendment and its implementing policy.  During the appeal, plaintiffs abandoned their statutory

challenge and only challenged the constitutionality of the BOP Policy implementing the Zimmer

Amendment.  The Court of Appeals then proceeded to address the constitutionality of the BOP

Policy as if it were legally distinct from the Zimmer Amendment.  Finding that this Court had not

correctly applied the Turner factors to the BOP Policy, the Third Circuit reversed the Court's

dismissal and remanded for further proceedings.[1]  Wolf v. Ashcroft, 297 F.3d 305, 310 (3d Cir.

---

[1] The Third Circuit faulted the district court's Turner analysis but failed to recognize that
the district court had applied the Turner factors to the Zimmer Amendment, not just to the BOP
policy.  On appeal, however, plaintiffs abandoned their statutory challenge, and therefore the
Court of Appeals was only looking at the application of the Turner factors to the BOP policy.
The Turner analysis varies slightly depending on whether the court is looking at a statute or a
regulation.  When analyzing a statute, the appropriate analysis under Turner is whether Congress,
not the BOP, could have reasonably believed that the statute would further legitimate penological
interests.  See FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993); Waterman v.
Farmer, 183 F.3d 208, 215 (3d Cir. 1999).  Factual proof of the link between the statute and its
goals is not required.  Beach Comm., 508 U.S. at 313.

On the other hand, when the challenge is to a regulation adopted by BOP, the
(continued...)

-2-

2002). Defendants moved for panel rehearing on the grounds that the appellate court was required to affirm dismissal of the action once it concluded that plaintiffs had dropped their statutory challenge. That motion was denied without comment.[2]

Following remand, defendants moved to dismiss for lack of jurisdiction asserting that once plaintiffs dropped their statutory challenge there was no longer a case or controversy because even if application of the BOP policy was enjoined, the Zimmer Amendment independently prohibits BOP employees from allowing federal prisoners to view R-rated movies. The Magistrate Judge denied defendants' motion and her decision was adopted by this Court. Defendants now move for summary judgment.

<u>STATUTORY BACKGROUND</u>

For at least 15 years, the BOP has prohibited the showing of X-rated movies at its institutions. Its regulation, last amended in 1993, provides that "[i]f there is a program to show movies, the Supervisor of Education shall ensure that X-rated movies are not shown." 28 C.F.R. 544.33. In 1996, Congress passed and the President signed into law the Omnibus Consolidated

---

[1](...continued)

Administrative Procedure Act requires the agency to provide the grounds upon which it acted in order for the court to evaluate the agency's rationale at the time of the decision. <u>See</u> <u>PBGC v. LTV Corp</u>, 496 U.S. 633, 654 (1990); <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.</u>, 463 U.S. 29, 43 (1983). Significantly, following the Third Circuit's decision, the Supreme Court in upholding prison regulations regarding visitation rights, clarified that in a challenge to prison regulations "[t]he burden,[], is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003). The Court also appeared to recognize that under <u>Turner</u>, a regulation's connection to the BOP's interest could be "self-evident." <u>Id</u>.

[2] Denials of rehearing are a pure exercise of discretion and such actions make no statement on the court's view of the merits of a claim it declines to hear. <u>See</u> <u>Irving v. U.S.</u>, 162 F.3d 154, 161 n.7 (1st Cir. 1998), <u>cert. denied</u>, 528 U.S. 812 (1999); <u>Missouri v. Jenkins</u>, 515 U.S. 70, 85 (1995).

Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996).

Section 611 of that Act, commonly known as the Zimmer Amendment, after its sponsor, Rep.

Dick Zimmer, provided:

> None of the funds made available in this Act shall be used to
> provide the following amenities or personal comforts in the Federal
> prison system –
> * * *
> (2)     the viewing of R, X, and NC-17 rated movies,
> through whatever medium presented; . . . .

110 Stat. 1321-64. Substantially identical versions of this amendment have been enacted in

annual appropriations bills since then.[3]

Rep. Zimmer explained the reasons for his amendment:  "Prisons should be places of

detention and punishment; prison perks undermine the concept of jails as deterrence.  * * *  We

must make sure we are spending public funds wisely – not using them on amenities that have

little bearing on institutional security."  141 Cong. Rec. H7768 (daily ed. July 26, 1995).

According to the Motion Picture Association of America, an NC-17 rating means that the

movie may contain "violence or sex or aberrational behavior or drug abuse" even if it is "not

---

[3]  See e.g.,  Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208,
§ 611, 110 Stat. 3009-66 (Sept. 30, 1996); Departments of Commerce, Justice, and State, the
Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 611, 111 Stat.
2517 (Nov. 26, 1997); Omnibus Consolidated and Emergency Supplemental Appropriations Act,
1999, Pub. L. No. 105-277, § 611, 112 Stat. 2681-132 (Oct. 21, 1998); Consolidated
Appropriations Act, 2000, Pub. L. No. 106-113, § 612, 113 Stat. 1537-52 (Nov. 29, 1999); D.C.
Appropriations, FY 2001, § 1(b), Pub. L. No. 106-553, 114 Stat. 2762A-249 (Dec. 21, 2000)
(incorporating H.R. 5548, § 611, 114 Stat. 2762A-250); Departments of Commerce, Justice, and
State, the Judiciary, and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-77, § 611,
115 Stat. 748 (Nov. 28, 2001).  This last appropriations bill changed the previous language,
adding the phrase "Hereafter, none of the funds appropriated . . . may be used to . . . ." making
the Zimmer Amendment's prohibitions permanent.  This provision has also been codified in the
historical and statutory notes of 18 U.S.C. § 4042.

necessarily . . . 'obscene or pornographic' in the oft-accepted or legal meaning of those words."

The NC-17 rating is the same as the old X rating.  See

http://www.mpaa.org/movieratings/about/index.htm at 5.  An R rating means that the movie

"may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse or

other elements, or a combination of some of the above."  Id.

At the time the Zimmer Amendment was first enacted, BOP had in place not only its

regulation prohibiting the showing of X-rated movies but also a Program Statement, PS 5370.08

(June 13, 1994), that directed the Supervisor of Education or his or her designee to "exercise

good judgement" when selecting movie video rentals.  PS 5370.08, § 7.  In light of the Zimmer

Amendment, FCI McKean updated its Institutional Supplement, IS 5370.08, which currently

provides:  "Movies are shown each weekend.  Only contracted movies rated PG-13, PG, G and

airline edited will be shown."  IS 5370.08 (Sept. 15, 1997).  BOP itself updated the Program

Statement to incorporate the Zimmer Amendment,[4] which now provides:

> The Recreation Supervisor will exercise good judgment and follow
> statutory restrictions when selecting video movies rentals.  No
> movies rated R, X, or NC-17 may be shown to inmates.
>
> Institutions may show R and NC-17 movies that have been edited
> for general public viewing.
>
> Spanish movies that are not rated may be shown if they do not
> include profanity, graphic violence, or nudity.

---

[4]  Because the Zimmer Amendment was a statutory mandate, BOP had no discretion in
this regard and it did not engage in rulemaking on this issue.  Instead, the BOP implemented the
statute through its internal Program Statements and memoranda, which guide BOP staff in
carrying out federal prison programs.  See Kimberlin v. U.S. Department of Justice, 150
F.Supp.2d 36, 40 (D.D.C. 2002), aff'd, 318 F.3d 228 (D.C. Cir. 2003).

> Not all edited movies may be appropriate for the correctional
> setting; each institution must use caution in selecting movies.  (See
> Attachment A).

PS 5370.10 (July 17 2002).  It is this BOP Program Statement that is the subject of this lawsuit.

## FACTS

FCI McKean is a medium security federal correctional institution which currently houses

approximately 1600 individuals convicted of federal offenses.  Declaration of Dennis Flatt ("Flatt

Decl.") at ¶ 4 (Attachment 1).  The FCI McKean inmate population is a diverse group comprised

of a individuals convicted of a wide range of criminal offenses with over 200 inmates serving

sentences in excess of 20 years, including 16 serving life sentences.  Id.  As an example, the

inmates serving life sentences have been convicted of  murder, armed bank robbery, assault with

the intent to kill, mayhem while armed, rape, and drug possession and distribution offenses.  Id.

Furthermore, over 100 inmates at FCI McKean have been classified as having a public safety

factor of sex offender based on current or prior offenses.  Id.  Moreover, approximately 200

inmates at FCI McKean have mental health issues for which they receive treatment.  Id.  Inmates

assigned to general population housing units at FCI McKean are not segregated into any

particular housing unit based on their background (race, criminal history, nature of offense, etc)

due to security concerns.  Id. at ¶ 6.  The BOP does not assign or segregate inmates to a housing

unit by virtue of the nature of the offense as to do so could affect their personal safety and

security by identifying to other inmates this sometimes sensitive information.  Id.

The Movie Program at FCI McKean consists of the showing of movies over an internal

television system to the common areas in the four inmate housing units housing general

population inmates at FCI McKean.  Id. at ¶ 7.  The institution does not exclude any particular

class of inmates from watching any particular movie. Flatt Decl. at ¶ 8. As a result of the change

in BOP policy required by the Zimmer Amendment, the movies currently selected consist of

movies rated as G, PG, PG-13, and airline edited. Id. at ¶ 7. Each weekend, from approximately

5:00 o'clock on Friday to 12:00 noon on Sunday, two movies are shown to the inmate

population.   The movies are selected from a list or catalogue provided by a local video store. Id.

In addition to the availability of movies through the FCI McKean movie program, inmates at FCI

McKean have access to programming available on cable television, including non-premium

channels such as the American Movie Classics. Furthermore, in addition to movies and

television programs, inmates have access to reading materials from the institution's leisure

library and through incoming publications such as magazines and hard cover books. Id. at ¶ 12.

     The Zimmer Amendment and the implementing BOP Policy have resulted in fewer

administrative burdens. Prior to the Zimmer Amendment, when select R-rated movies were still

permitted to be shown, the decision to show a movie involved a multi-level review process to

determine the appropriateness of showing such a movie at FCI McKean. Id. at ¶ 9. Since the

Zimmer Amendment and the reduction in the discretion of the movie titles available, although

such a process is still in place, it is infrequently utilized, thus saving significant staff resources.

Id. at ¶ 11.

APPLICABLE LEGAL STANDARD

     Summary judgment is appropriate when there is "no genuine issue as to any material fact

and [if] the moving party is entitled to judgment as a mater of law." Fed. R. Civ. P. 56©. An

issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, (1986); Equimark

-7-

Comm. Fin. Co. v. C.I.T. Fin. Serv. Corp., 812 F.2d 141, 144 (3d Cir. 1987). If evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-51; Equimark, 812 F.2d at 144. That is, where the record, taken as a whole, could not lead a "rational trier of fact to find for the nonmoving party, summary judgment is proper." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 585-86 (1986); see also Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987).

The Third Circuit has clarified that district courts should not view summary judgment motions as "a disfavored procedural shortcut," but as "the first opportunity to dispose of meritless cases." Big Apple BMW, Inc. v. BMW of N. Am., 974 F.2d 1358, 1362 (3d Cir. 1992). Indeed, a district court is no longer required to "turn a blind eye" to the weight of the evidence. Id. Rather, to survive summary judgment, the non-moving party must actually come forward with affirmative evidence in order to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 248 (emphasis added).

<u>ARGUMENT</u>

I.    PLAINTIFFS' INJURIES CANNOT BE REDRESSED BY THIS LAWSUIT

Once plaintiffs abandoned their statutory challenge on appeal, there was no longer an ongoing case or controversy. There are two independent prohibitions on prisoners viewing R-rated movies: (1) the Zimmer Amendment; and (2) the BOP Policy that implements the Zimmer Amendment. Currently, plaintiffs are only challenging the BOP Policy and, therefore, even if this Court were to enjoin the BOP Policy, BOP still could not show R-rated movies because the Zimmer Amendment, which this Court previously found constitutional, independently prohibits BOP employees from using federal funds to show prisoners R-rated movies. Hence, there is no

longer a case or controversy because plaintiff's alleged injury is not redressable.  See  Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (plaintiff lacks standing without showing of "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact") (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 45 (1976)); Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."); Simon, 426 U.S. at 38 (absent redressability of alleged injury, "exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation").  In short, there is no possible outcome on remand that can give plaintiffs the ultimate relief they seek – an order that permits BOP to show R-rated movies. Absent such an ongoing case or controversy, this case should be dismissed of lack of jurisdiction. See Donovan ex rel. Donovan v. Punxsutawney Area School Bd., 336 F.3d 211, 216 (3d Cir. 2003)(The Constitution limits this court's jurisdiction to the adjudication of actual cases and controversies); Clarke v. United States, 915 F.2d 699, 700-01 (D.C. Cir. 1990)("The mootness doctrine, deriving from Article III, limits federal courts to deciding 'actual, ongoing controversies.'") (quoting Honig v. Doe, 484 U.S. 305, 317 (1988).

II.    THE ZIMMER AMENDMENT DOES NOT VIOLATE THE FIRST AMENDMENT
       BECAUSE IT IS REASONABLY RELATED TO LEGITIMATE PENOLOGICAL
       INTERESTS

       The test for evaluating a statute or regulation that restricts the First Amendment rights of prisoners has been established in two Supreme Court cases, Turner v. Safley, 482 U.S. 78 (1987), and Thornburgh v. Abbott, 490 U.S. 401 (1989).  Those cases hold that a restriction is valid if it is "reasonably related to legitimate penological interests."  Thornburgh, 490 U.S. at 413; Turner,

482 U.S. at 89. Thus, the Supreme Court has established a "rational basis" type standard for

reviewing prison regulations affecting First Amendment interests. See Waterman v. Farmer, 183

F.3d 208, 215 (3rd Cir. 1999)(asserting that Turner standard is similar to rational-basis review).

Among the interests commonly cited as legitimate penological interests are security, order, and

rehabilitation. See, e.g., Procunier v. Martinez, 416 U.S. 396, 413 (1974); Banks v. Beard, 399

F.3d 134, 138 (3rd Cir. 2005) (citing institutional security and prisoner rehabilitation as

legitimate penological interests); DeHart v. Horn, 390 F.3d 262, 268 (3rd Cir. 2004) (citing

security, rehabilitation and administrative concerns as legitimate penological interests); Williams

v. Morton, 343 F.3d 212, 217 (3rd Cir. 2003) (citing simplified food service, prison security, and

budgetary constraints as legitimate penological interests); Payne v. Commonwealth Dept. of

Corrections, 871 A.2d 795, 810-811(Pa. 2005) (preventing predatory behavior; preventing both

consensual and non-consensual homosexual liaisons; preventing the spread of sexually

transmitted diseases; and protecting the safety and authority of prison staff).

Turner sets forth four factors by which to evaluate whether a restriction meets the

"reasonably related" standard. First, there must be a rational connection between the restriction

and a legitimate and neutral government objective. Second, whether there are alternative means

by which prisoners can exercise the asserted right in question. Third, whether accommodation of

the asserted right will have an impact on guards, other inmates, and the allocation of prison

resources. And, fourth, whether there are alternatives to the policy that fully accommodate the

prisoner's rights at de minimis cost to valid penological interests. Turner, 482 U.S. at 89-91.

The courts "must accord substantial deference to the professional judgment of prison

administrators, who bear a significant responsibility for defining the legitimate goals of a

corrections system and for determining the most appropriate means to accomplish them." <u>Overton</u>, 539 U.S. at 132.  As a result, "the burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it."  <u>Williams v. Morton</u>, 343 F.3d 212, 217 (3rd Cir. 2003) (*citing* <u>Overton</u>, 539 U.S. at 132) (applying <u>Turner</u> and upholding prison regulations limiting prisoner visitation rights).  The prisoner has a "heavy burden" to "overcome the presumption that the prison officials acted within their 'broad discretion.'" <u>Shaw v. Murphy</u>, 532 U.S. 223, 232 (2001) (quoting <u>Thornburgh</u>, 490 U.S. at 413). Applying these four factors to the BOP policy implementing the Zimmer Amendment demands the conclusion that the Policy is reasonable and should be upheld.

> A.    The First <u>Turner</u> Factor is Satisfied Because The Policy Is Rationally Related To Legitimate Penological Interests

The BOP Policy satisfies the first prong of the Turner test because restricting federal prisoners from viewing movies rated R, NC-17 and X is rationally related to legitimate penological interests.[5]   It is well established that prison security, order and rehabilitation are legitimate penological interests.  <u>See</u> <u>Turner</u>, 482 U.S. at 91; <u>Thornburgh</u>, 490 U.S. at 415; <u>Pell v. Procunier</u>, 417 U.S. 817, 823 (1974); <u>Martinez</u>, 416 U.S. at 413-14.  Moreover,  the Supreme Court has recognized that deterring crime by making prisons unpleasant is also a legitimate

---

[5]  This Court previously held that the Zimmer Amendment, which the BOP policy mirrors, was constitutional under a <u>Turner</u> analysis.  Under Supreme Court jurisprudence, when a Court is called upon to review a legislative decision, an adequate factual basis is presumed to exist and a Court must defer to the judgement of the legislative body.  <u>Plyer v. Doe</u>, 457 U.S. 202, 216 (1982).  Most importantly, the Supreme Court has clearly established that a statute is "not subject to fact-finding and may be based on rational speculation unsupported by evidence or empirical data." <u>Beach Comm.</u>, 508 U.S. at 313.  Because the BOP Policy was only adopted to implement the Zimmer Amendment, it should be accorded similar deference.

-11-

penological interest.  <u>See</u> <u>Pell</u>, 417 U.S. at 822 ("An important function of the corrections system is the deterrence of crime.  The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses.").

Even though, Congress, not the BOP, initiated the prohibition on R-rated movies, the BOP accepts that there are a number of legitimate penological interests for restricting inmates access to R-rated movies.  These legitimate penological interests include security, order, rehabilitation, punishment, deterrence and the provision of a safe and non-hostile work environment for prison staff.  Declaration of John M. Vanyur, Ph.D ("Vanyur Decl.") at ¶ 6 (Attachment 2).

Generally speaking, the prison population is very different from the population at large.  The prison system contains a higher concentration of persons who have anti-social personalities, are violent, have mental health problems and/or are sex offenders.  Many of these inmates have trouble controlling their impulses.  <u>Id.</u> at ¶ 7.  The FCI McKean inmate population is comprised of individuals convicted of a wide range of criminal offenses with over 200 inmates serving sentences in excess of 20 years, including 16 serving life sentences.  Flatt Decl. at ¶ 4.  For example, the inmates serving life sentences have been convicted of  murder, armed bank robbery, assault with the intent to kill, mayhem while armed, rape, and drug possession and distribution offenses.  <u>Id.</u>  Furthermore, over 100 inmates at FCI McKean have been classified as having a public safety factor of sex offender based on current or prior offenses and, approximately 200 inmates have mental health issues for which they receive treatment.  <u>Id.</u>  As supported by these facts, the prison population at FCI McKean is a very different population than what might be

-12-

encountered at a local movie theater.  The individuals watching movies at FCI McKean have been convicted of a felony offense,  many of whom are likely to have anti-social, violent histories with mental health problems and/or are sex offenders.  <u>Id</u>. at ¶ 5.

The Zimmer Amendment and the implementing BOP policy are reasonably related to the legitimate penological interests of rehabilitation and deterrence.  Vanyur Decl. at ¶ 8.  Over the past decade, research has ascertained that there are a number of criminogenic risk factors that should be taken into account when designing programing for inmates.  <u>Id</u>.  Criminogenic risk factors are those factors that increase the likelihood that an individual will be involved in criminal behavior.  <u>Id</u>.  The three most common criminogenic risk factors are (1) anti-social, pro-criminal belief or value systems; (2) exposure to criminals/lack of positive role models; and (3) temperament or personality flaws such as excessive risk-taking, impulse control, psychopathy and egocentric behavior.  <u>Id</u>. at ¶ 9.   Research on correctional programs has demonstrated that programs which directly target and reduce these risk factors during prison confinement, result in lower recidivism rates upon return to the community.  <u>Id</u>. at ¶ 8.  Some inmates bring into the prison system a cultural milieu that is fundamentally criminogenic -  they have engaged in other criminal behaviors, chronically bent and broken rules, collaborated with other criminals and antisocial peers in criminal endeavors, and have been immersed in "cultures" that support the criminal lifestyle.  <u>Id</u>.  While incarcerated, some inmates continue and further develop the cultural milieu of criminal behavior.  <u>Id</u>.

R-rated movies often contain messages that feed into these criminogenic risk factors by exposing inmates to depictions of graphic violence, substance abuse, criminal behavior, victimization and devaluation of others, violation of societal norms and the rights of others, and

other themes which reinforce pro-criminal value systems and anti-social behaviors and beliefs. Vanyur Decl. at ¶ 9.  R-rated movies also provide visual stimuli which reinforce violence, substance abuse, racial stereotypes, and misogynist attitudes, and promote negative role models that reinforce gang or criminal reference group ideas and norms.  Id. at ¶ 10.  Therefore, it makes sense that restricting access to these types of movies is reasonably related to the legitimate penological goals of rehabilitation and deterrence.

The Zimmer Amendment and the implementing BOP Policy is also reasonably related to prison security and order.  Showing R-rated movies negatively affects security and order in a prison in a number of specific ways.  First, repeated exposure to violence can lead to desensitization to aspects of violent behavior which would otherwise be unpleasant or abhorrent. Id. at ¶ 11.  As persons become more desensitized to violent behavior, inhibitions to violence are more readily overcome.  Stated differently, exposure to violent behavior increases the risk of impulsive violence toward others.  Research has shown that exposure to depictions of violence increases the likelihood of violent behavior in teens and young adults, a population known to be at greater risk of violence toward others in a correctional setting.  Id.

Second, for persons who have engaged in repetitive violent acts over time, viewing depictions of violence can lead to mental and emotional rehearsal of their violent histories.  Id. Prison populations contain a higher incidence of persons with histories of violence than normally found in society at large.  For this population, repeated exposure to graphic violence, criminal behavior, victimization and devaluation of others, entrenches mental rehearsal of past violence, criminal acts, and victimization, and reinforces an anticipatory mind set regarding future violence, crime, and victimization.  Id. Third, for persons who have histories of substance abuse,

-14-

research has shown simply viewing depictions of others using drugs can trigger heightened activity in pleasure centers in the brain and associated cravings for substances. Id.

Punishment is another legitimate penological interest served by the BOP policy implementing the Zimmer Amendment. Prisons are designed to be undesirable places. Prisons often take away various amenities and privileges one would ordinarily have if not in prison, to both punish inmates and deter them, and those in the larger community, from committing crimes in the future. Vanyur Decl. at ¶ 12.

Restricting R-rated movies also furthers the BOP's legitimate penological interest in the safe and non-hostile work environment of BOP employees. Id. at ¶ 13. As supported by the research referenced above, a staff member may be placed in a very dangerous situation if he or she is required to control an area in which inmates with a history of violence or sexual offenses are watching a movie that has violent or sexually explicit scenes. In addition, a BOP employee, whether it be a Correctional Officer, Recreation Specialist, or anyone else assigned to the task of monitoring the areas in which movies are being shown, may find R-rated movies offensive. Id; Flatt Decl. at ¶ 9.

The current BOP policy also benefits the administration of the federal prisons. During this period of budgetary limitations, the Zimmer Amendment's prohibition on the use of appropriated money to fund R-rated materials in federal prisons conserves staff resources. Staff is no longer needed to pre-screen R-rated movie titles and contents, nor view videos sent by mail – tasks which were time-consuming and staff intensive. Vanyur Decl. at ¶15; Flatt Decl. at ¶ 11. Additonally it has created a more uniform policy that is easier to administer. Prior to the Zimmer

-15-

Amendment, decisions concerning which movies would be shown was left to the individual institutions which resulted in  disparities in the movies shown at different institutions.  Vanyur Decl. at ¶ 14.

For all of the reasons explained above, the BOP Policy implementing the Zimmer Amendment is rationally related to the legitimate penological interests of security, order, rehabilitation, punishment, deterrence and the provision of a safe and non-hostile work environment for prison staff.

In turning to the "neutrality" of the challenged BOP Policy, the Supreme Court has explained that neutral means no more than that "the regulation or practice in question must further an important or substantial government interest unrelated to the suppression of expression." Thornburgh, 490 U.S. at 415.  For example, in Thornburgh, the Supreme Court found neutrality in a regulation which barred certain publications simply because in application of the regulations the prison administrators drew distinctions between publications solely on the basis of their potential implications for prison security.  Id.  In Martinez, however, the Court struck down a policy that barred writings that "unduly complain[ed]" or magnif [ied ]grievances or expressed "inflammatory" views as decidedly not neutral because the regulation invited prison officials to apply their own prejudices and opinions as standards for censorship.  416 U.S. at 415.

Here, like the regulations upheld in Thornburgh, the policy implementing the Zimmer Amendment operates "without regard to the content of expression" since the policy prohibits all movies rated R, NC-17 and X .  Accord Glasshofer v. Jeffes, 1989 WL 95360 *3 (E.D. Pa.

-16-

1989)(finding that policy restricting all X rated movies was content neutral), aff'd, 897 F.2d 521 (3d Cir. 1990) (table).

In sum, as described above, there are legitimate penological interests served by the BOP Policy and therefore, this Court should find that the BOP Policy that implements the Zimmer Amendment satisfies the first factor of the Turner test. Wolf, 297 F.3d at 309. (stating that on remand, district court must describe the interest served and the connection between the policy and the interest).

B.    The Second Turner Factor is Satisfied Because There Are Alternative Means of Exercising the Right In Question

The second Turner factor -- whether there are alternate means by which inmates can exercise the right in question -- "must be viewed sensibly and expansively." Thornburgh, 490 U.S. at 417. For example, in Turner, the Court upheld a regulation that restricted correspondence between inmates at different state prisons. In doing so, the Court rejected the argument that inmates should be afforded other means of communicating with inmates at state institutions, finding that the correspondence regulation did not deprive inmates of other means of expression. 482 U.S. at 92. In Thornburgh, the Court held that a regulation that barred subscription publications which the warden determined posed a threat to the security, good order or discipline of the institution or facilitated criminal activity satisfied the second Turner factor because the regulations "permit a broad range of publications to be sent, received, and read . . . ." 490 U.S. at 418.

Under this analysis, the BOP policy implementing the Zimmer Amendment must be upheld because there are other means of expression available to the inmates. Id. at 417-18.

-17-

Plaintiffs still have access to a broad range of movies that do not violate the statute. The Zimmer Amendment only restricts certain movies and inmates can still watch many, if not all, television shows as well as movies which are rated G, PG or are airline edited. Flatt Decl. at ¶ 7; see PS 5370.10 at 8 and Attachment A at 1-4. The statute does not ban all movies, just movies with certain ratings. Accord Glasshofer, 1989 WL 95360 * 3 (holding that ban on X-rated movies on the prison cable channel did not deny inmates first amendment rights because they could see other movies and watch television.). In addition to the availability of movies through the FCI McKean movie program, inmates at FCI McKean have access to programming available on cable television, including non-premium channels such as the American Movie Classics. Furthermore, in addition to movies and television programs, inmates have access to reading materials from the institution's leisure library and through incoming publications such as magazines and hard cover books. Flatt Decl. at ¶ 12. Thus, the BOP Policy does not prevent inmates from receiving comparable written materials, such as the screenplays or the novels on which the movies are based (so long as they are permissible under other relevant BOP regulations). Because a broad range of expression is still available to the inmates, the second Turner factor is clearly satisfied.

        C.      The BOP Policy Satisfies the Third Turner Factor Because Accommodation of Plaintiffs' Asserted Rights Would Impact Other Inmates and Guards

The BOP Policy implementing the Zimmer Amendment is also supported by consideration of the third Turner factor — how accommodation of the inmates' asserted right would impact on others in the prison environment, such as guards or other inmates. Turner, 482

-18-

U.S. at 90.  In the prison environment, "few changes will have no ramifications on the liberty of others or on the uses of the prison's limited resources for preserving the institutional order." Id.

Showing R-rated movies can pose a threat to the safety of guards and other inmates.  The BOP Policy implementing the Zimmer Amendment restricts movies that are rated R, NC-17 or X which means that they contain violence, drug abuse, aberrational behavior  and\or are sexually explicit.  See www.mpaa.org/movieratings/about/index.htm at 5.  A prison population is typically filled with individuals who may be violent, are drug abusers, have displayed aberrational behaviors and/ or are sex offenders.  Vanyur Decl. at ¶ 7.  As explained above, FCI McKean houses over 200 inmates that are serving sentences in excess of 20 years, including 16 serving life sentences for crimes such as murder, armed bank robbery, assault with the intent to kill, mayhem while armed, rape, and drug possession and distribution offenses.  Flatt Decl. at ¶ 4.  And more than 100 inmates have been classified as sex offenders based on current or prior offenses and, another approximately 200 inmates receive treatment for mental health issues.  Id.  Therefore, the prison population at FCI McKean is a very different population than what might be encountered at a local movie theater.  The individuals watching movies at FCI McKean have been convicted of a felony offense,  many of whom are likely to have anti-social, violent histories with mental health problems and/or are sex offenders.  Id. at ¶ 5.  Inmates are not segregated into particular housing units based on the nature of their offense and movies are shown over a television system in common areas in each housing unit.  Id. at ¶¶6, 7.  Correctional Officers and other Staff are assigned to the task of monitoring the areas where the movies are shown and having to control an area in which violent criminals are watching movies depicting violence can place these BOP employees in a potentially dangerous situation.  Id. at ¶ 9.

-19-

Based on these facts, there is little question that showing such movies could be potentially detrimental to the safety of guards and other inmates. Vanyur Decl. at ¶ 11, 13; Flatt Decl. at ¶ 9; see also  Laura B. Schneider, Comment,  Warning: Television Violence May Be Harmful to Children;  But the First Amendment May Foil Congressional Attempts to Legislate Against It, 49 U. Miami L. Rev. 477, 482 and n. 30 (1994) (noting studies which indicate a causal link between exposure to television violence and subsequent aggressive behavior). Because accommodating the asserted right can pose a threat to the safety of guards and other inmates, the third Turner factor is satisfied.  See Thornburgh, 490 U.S. at 418; Amatel v. Reno, 156 F.3d 192, 202 (D.C. Cir. 1998), cert denied, 527 U.S. 1035 (1999).

      D.      The Fourth Turner Factor Is Satisfied Because Plaintiffs Cannot Point to Any Alternatives That Would Accommodate Their Alleged Right at  De Minimis Cost

The fourth and final factor -- whether there are "obvious, easy alternatives" to the restriction in question,  is not a "least restrictive alternative" test.  Turner, 482 U.S. at 90. Rather, the burden is on the plaintiffs to "point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests," Turner, 482 U.S. at 91, and plaintiffs have not done so here.

The most obvious alternative — determining prisoner-by-prisoner who can watch certain movies so as not to disrupt security and order in the prison or damage their rehabilitation — involves costs that are "far from de minimis." Accord Amatel, 156 F.3d at 201;  Waterman, 183 F.3d at 219 (agreeing with Amatel court that costs of case-by-case alternative is "'far from de minimis'").  Such an alternative poses an administrative burden and has the potential for the improper exercise of discretion.  Amatel, 156 F.3d at 201.  Moreover, there are potential security

risks to excluding certain prisoners, such as, all sex offenders from watching particular movies as it could identify this sensitive information to the other inmates and impact their personal security. Flatt Decl. at ¶¶6, 8.  As explained earlier, inmates at FCI McKean are not segregated into housing units based on their background or the nature of their offense.  <u>Id</u>. at ¶6.  Other reasons for not excluding a particular class of inmates from any particular movie includes the difficulty of doing so based on the method of showing movies at this institution and the staff resources that would be needed to conduct such an intensive screening.  <u>Id</u>. at ¶ 8.

Because there are no obvious easy alternatives, the BOP Policy implementing the Zimmer Amendment  is not a "exaggerated response" to the problems sought to be addressed by the policy and must be upheld.  <u>Thornburgh</u>, 490 U.S. at 481; <u>see</u> <u>also</u> <u>Glasshofer</u>, 1989 WL 95360 *3.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should grant summary judgment in favor of defendants.

Dated: July 1, 2005                          Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             MARY BETH BUCHANAN
                                             United States Attorney

                                             CHRISTY C. WIEGAND
                                             Assistant U.S. Attorney

_____/s/_____
VINCENT M. GARVEY

MARSHA S. EDNEY

Attorneys, Department of Justice

Civil Division

20 Massachusetts Ave, N.W., Room 7148

Washington, D.C. 20530

Telephone: (202) 514-4520

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

RICHARD JEWELL,  et al,                )
                                       )
        Plaintiffs,                    )
                                       )
            v.                         )
                                       )        C.A. No. 97-408E
ALBERTO  R. GONZALES, et al,           )        Judge McLaughlin
                                       )        Magistrate Judge Baxter
        Defendants.                    )
_____)


ORDER


        AND NOW, this _____ day of _____, 2005, upon consideration of the

Motion for Summary Judgment filed by Defendant, and Plaintiff's response thereto,

        IT IS HEREBY ORDERED that Defendants' Motion is GRANTED and judgment be,

and hereby is, entered in favor of the Defendants.



                                _____

                                UNITED STATES MAGISTRATE JUDGE