IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD JEWELL, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | C.A. No. 97-408E |
| ALBERTO R. GONZALES, et al., ) | Judge McLaughlin |
| ) | Magistrate Judge Baxter |
| Defendants. ) | |
| ) | |

## DECLARATION OF JOHN M. VANYUR, Ph.D.

I, John M. Vanyur, hereby declare as follows:

1. I am currently the Assistant Director of the Correctional Programs Division, for the Federal Bureau of Prisons ("BOP") of the United States Department of Justice. I have held this position since June 2004. My career with the BOP began in 1979. I have held a number of positions within the BOP, including Research Analyst, Deputy Assistant Director of the Human Resource Management Division, Associate Warden at the Administrative Maximum Penitentiary at the Federal Correctional Complex in Florence, Colorado, Warden at the Federal Correctional Institution in Butner, North Carolina, Warden at Federal Detention Center in Philadelphia, Pennsylvania, and Deputy Assistant Director of the Correctional Programs Division.

2. I graduated from the University of Scranton with a Bachelor of Science degree in psychology and sociology in 1977. I have a Masters and Doctorate in psychology from University of Maryland which I received in 1980 and 1985, respectively.

3. As Assistant Director for the BOP's Correctional Programs Division, I am responsible for the safe, humane care and custody of federal inmates in BOP facilities, including security, prisoner transportation, central inmate monitoring, inmate discipline, case management, psychology and religious services. My division also maintains records of all violent incidents involving inmates and oversees disciplinary hearings concerning those incidents.

4. The statements in this declaration are based upon my personal knowledge, belief and experience, and upon information made available to me in the course of my official duties as Assistant Director for the BOP's Correctional Programs Division and my prior positions in the BOP.

5. I am familiar with the Zimmer Amendment which prohibits, among other things, the use of federal funds to show R, X, and NC-17 rated movies in prisons. In response to the Zimmer Amendment, BOP updated its Program Statement regarding recreation programs to incorporate the Zimmer Amendment's prohibitions. PS 5370.10 (Feb. 23, 2000). I am aware that the Federal Correctional Institution in McKean, Pennsylvania updated its Institutional Supplement, IS 5370.08. The policy statements permit institutions to show R and NC-17 rated movies that have been edited for general public viewing. According to the Motion Picture Association of America, an R-rating means that the movie "may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse

or other elements, or a combination of some of the above."

6. There are legitimate penological interests for restricting inmates access to R-rated movies, such as security and order of the prison, rehabilitation, punishment, deterrence of criminal behavior, and a non-hostile work environment for prison staff.

7. The prison population is very different from the population at large. Some inmates in the prison system are anti-social, violent, have mental health problems, and/or are sex offenders. The prison system contains a higher concentration of persons who have anti-social personalities, are violent, have mental health problems and/or are sex offenders. Many of these inmates have trouble controlling their impulses.

8. The Zimmer Amendment and the implementing BOP policy are related to the penological interests of rehabilitation and deterrence, as well as to enhance the safety of staff and inmates. Over the past decade, research has ascertained that there are a number of criminogenic risk factors that should be taken into account when designing programing for inmates. Criminogenic risk factors are those factors that increase the likelihood that an individual will be involved in criminal behavior. The theory is that if you design programming that reduces these factors when inmates are in prison, then there will be less recidivism. Research on correctional programs has demonstrated that programs which directly target and reduce these risk factors during prison confinement, result in lower recidivism rates upon return to the community. Some inmates bring into the prison

system a cultural milieu that is fundamentally criminogenic - they have engaged in other criminal behaviors, chronically bent and broken rules, collaborated with other criminals and antisocial peers in criminal endeavors, and have been immersed in "cultures" that support the criminal lifestyle. While incarcerated, some inmates continue and further develop the cultural milieu of criminal behavior.

9. The three most common criminogenic risk factors are (1) anti-social, pro-criminal belief or value systems; (2) exposure to criminals/lack of positive role models; and (3) temperament or personality flaws such as excessive risk-taking, impulse control, psychopathy and egocentric behavior. R-rated movies often contain messages that feed into these criminogenic risk factors by exposing inmates to depictions of graphic violence, substance abuse, criminal behavior, victimization and devaluation of others, violation of societal norms and the rights of others, and other themes which reinforce pro-criminal value systems and anti-social behaviors and beliefs.

10. R-rated movies provide visual stimuli which reinforce violence, substance abuse, racial stereotypes, and misogynist attitudes, and promote negative role models that reinforce gang or criminal reference group ideas and norms.

11. Showing R-rated movies negatively affects security and order in a prison in a number of specific ways. First, repeated exposure to violence can lead to desensitization to aspects of violent behavior which would otherwise be unpleasant or abhorrent. As persons

become more desensitized to violent behavior, inhibitions to violence are more readily overcome. Stated differently, exposure to violent behavior increases the risk of impulsive violence toward others. Research has shown that exposure to depictions of violence increases the likelihood of violent behavior in teens and young adults, a population known to be at greater risk of violence toward others in a correctional setting. Second, for persons who have engaged in repetitive violent acts over time, viewing depictions of violence can lead to mental and emotional rehearsal of their violent histories. Prison populations contain a higher incidence of persons with histories of violence than normally found in society at large. For this population, repeated exposure to graphic violence, criminal behavior, victimization and devaluation of others, entrenches mental rehearsal of past violence, criminal acts, and victimization, and reinforces an anticipatory mind set regarding future violence, crime, and victimization. Third, for persons who have histories of substance abuse, research has shown simply viewing depictions of others using drugs can trigger heightened activity in pleasure centers in the brain and associated cravings for substances.

12. Punishment is another legitimate penological interest served by the Zimmer Amendment. Prisons are designed to be an undesirable place. Prisons often take away various amenities and privileges one would ordinarily have if not in prison, to both punish the inmates and deter them, and those in the larger community, from committing crimes in the future.

13. Another legitimate concern is the safety of the work environment of BOP employees, who are all considered correctional workers first. A staff member may be placed in a very dangerous situation if he or she is required to control an area in which inmates with a history of violence or sexual offenses are watching a movie that has violent or sexually explicit scenes. In addition, a BOP employee, whether it be a Correctional Officer, Recreation Specialist, or anyone else assigned to the task of monitoring the areas in which movies are being shown, may find R-rated movies offensive.

14. The current BOP policy also benefits the administration of the federal prisons because there is uniformity among all federal prisons as to the types of movies that are shown. Prior to the Zimmer Amendment, when decisions concerning which movies would be shown was left to the individual institutions, a disparity and variance occurred between institutions.

15. Finally, during this period of budgetary limitations, the Zimmer Amendment's prohibition on the use of appropriated money to fund R-rated materials in federal prisons benefits the administration of the federal prisons. Staff no longer pre-screen R-rated

movie titles and contents, nor view videos sent by mail; tasks which were time-consuming and staff intensive.

In accordance with 28 U.S.C. §1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: June 29, 2005

                              John M. Vanyur, Ph.D.
                              Assistant Director
                              Correctional Programs Division