**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RICHARD JEWELL, et al,

               Plaintiff,

      v.

ALBERTO GONZALEZ, et al,

               Defendants.

C.A.  97-408 Erie

Judge McLaughlin
Magistrate Judge Baxter

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

### I.  INTRODUCTION

The Bureau of Prisons censorship policy at issue in this case -- which

<u>categorically</u> prohibits the showing of all R-rated films to federal inmates -- has no

reasonable relationship to legitimate penological interests.  It is a policy predicated on a

movie industry standard that was designed to prevent children under seventeen years

of age from viewing certain films without parental consent and rooted in a congressional

appropriations amendment whose stated purpose was to eliminate "frills" from federal

prisons and, thus, end the purported "pampering" of inmates.  It is a measure that was

originally imposed on the Bureau, against its wishes, to replace a decade-long policy

that had categorically banned only X-rated movies and permitted the showing of R-rated

movies unless they posed a risk to institutional security or order.

---

[1] This brief responds only to defendants' argument on the merits, predicated on the *Turner v. Safley*
calculus.  It does not address the Article III jurisdictional argument because that contention was
previously rejected by this court.

The summary judgment record confirms that the across-the-board banning of R-rated films in the federal prison system prevents the 1600 men who are confined in the Federal Correctional Institution at McKean from viewing a substantial body of films that contain significant political discourse, historical depictions, serious drama, and other constitutionally protected speech for reasons that are neither rationally related to legitimate penological objectives within the meaning of the *Turner v. Safley* calculus nor reasonably related to such objectives.  Among the hundreds of such R-rated films that are arbitrarily prohibited from being shown at FCI McKean are ***All the President's Men, Schindler's List, The Pianist, Angela's Ashes, Fahrenheit 9/11, Sophie's Choice, Hotel Rwanda, and The Passion of the Christ.***

When the material facts are examined under the illumination of the relevant case law, it becomes clear that there is no principled basis to grant the Bureau's motion for summary judgment.  As the court engages in its analysis, it should not lose sight of the fact that this litigation does not challenge the prerogative of Bureau of Prison officials to prohibit (as they did before the policy change) the showing of particular films that are deemed to pose a risk to institutional order or security.  What is challenged is the government's authority, in the framework of prison recreational programs, to censor a long-recognized form of protected speech in such a grossly over-inclusive and irrational way -- so that films that pose no risks to legitimate penological interests are automatically excluded.

## II.  THE MATERIAL FACTS

On September 16, 1986 -- nine years before the Bureau of Prisons was required

by the Zimmer Amendment to categorically ban all R-rated films in its penitentiaries --

the Bureau published a written policy to govern its inmate recreation programs,

including the showing of films to prisoners.  [Ex. 1].  In the policy, the Bureau listed the

objectives that underpinned those programs.  [Ex. 1].  Among the objectives were **"to**

**help reduce idleness and to keep inmates constructively occupied; to reduce**

**personal stress and institutional tension; to increase physical fitness and**

**positive lifestyles both in prison and after release; and to contribute to personal**

**and institution stability through maximum participation in formal and informal**

**programs."** [Ex. 1, p. 1].  The only films that were categorically banned under the

recreation policy were those which were X-rated.  [Ex. 1, p. 3].  R-rated and other non-

X-rated movies were permitted to be shown unless a Warden or the Warden's designee

"determine[d] that showing/viewing them would pose a threat to the security or good

order of the institution."  [Ex. 1, p. 3].  As a result, the determination of whether a

particular R-rated film could be screened was to be made on an individualized basis, not

on the basis of a conclusive, categorical presumption that all R-rated films inherently

posed such threats.

The fact that R-rated movies were permitted in the framework of a Bureau

recreation policy that aspired to reduce idleness in federal prisons, to keep inmates

constructively occupied, to diminish personal stress, to relieve institutional tension, to

increase positive lifestyles, and to contribute to personal as well as institutional stability

reflects the Bureau did not believe, at the time, that showing of R-rated films to

prisoners was antithetical to those objectives. The stated objectives remained in place over the next nine years, as did the showing of R-rated films in the federal prison system. [Ex. 2, pp. 1, 7]. It was only with the passage of the Zimmer Amendment [Ex. 3], in April of 1996, that the policy regarding R-rated films changed.

Consistent with the pre-Zimmer policy, R-rated movies were routinely shown to FCI McKean inmates as part of the prison's inmate recreation program. The record reflects that during the five years immediately preceding the Zimmer Amendment, an estimated 300 to 400 R-rated films were shown at McKean. [Ex. 3, pp. 44-46]. R-rated films containing nudity were permitted at the prison unless the nudity occurred in the context of a rape scene. [Ex. 4, p. 52]. R-rated films having extensive profanity were allowed at the prison unless the language involved racial slurs or degradation of racial groups. [Ex. 4, p. 53]. R-rated films with significant violence were also approved to be shown at McKean prior to Zimmer. [Ex. 4, p. 56]. The rental costs of those and other films were paid through the prison's Inmate Trust Fund from revenues generated by commissary, vending, and inmate telephone services. [Ex. 5, p. 3].

There is no evidence in the record that the screening of R-rated films at FCI McKean had a negative impact on institutional security, prison stability, inmate stability, rehabilitative objectives, or any of the other objectives identified in the Bureau's pre-Zimmer recreation policy. Nor is there any evidence that allowing McKean prisoners to view R-rated films approved by prison officials under its former policy impacted in a negative way on any of the penological objectives cited by the Bureau in support of its motion.

The underline weak relationship between the origins of the challenged censorship policy and legitimate penological interests as well as the raw political reasons (as opposed to actual penological objectives) that gave rise to the policy are reflected in a press release issued on July 27, 1995 by Congressman Dick Zimmer, the sponsor of the Zimmer Amendment. The press release, under the bold-letter heading, "HOUSE ADOPTS ZIMMER 'NO FRILLS PRISON AMENDMENT'" announced that the House of Representatives had just approved the attachment of his proposed amendment to an appropriations bill that was then pending in the House. [Ex. 6, p. 4]. The amendment, among other things, would prohibit the showing of R-rated films in federal prison facilities. [Ex. 6, p. 4]. In the press release, Zimmer stated:

> Prisoners should not have better accommodations in the inside than they would have had on the outside . . . If you break the law, you should pay the price, instead of being awarded with a **vacation watching X-rated movies on your personal TV set** . . . There is no reason why a criminal should be treated to state-of-the-art gyms or be permitted to watch **premium cable television** . . . and there is certainly no reason why taxpayers should foot the bill for such luxuries . . . At a time when many Americans are struggling to make ends meet and we in Congress are working to eliminate the deficit, we should not be spending public money to pamper those who neither respect nor obey our laws[.]

[Pls. Ex. 5, pp. 4-5].

Congressman Zimmer's statement, in connection with the movie issue, either deliberately misrepresented the facts or reflected a profound ignorance of practices in the federal prison system. Contrary to his assertions, federal inmates had not been permitted to watch X-rated movies for at least a decade and typically, did not have personal television sets in their cells. [Ex. 7, pp. 88-89; Ex. 9, p. 2]. The difference between the Congressman's version of the facts and the actual facts is not surprising since Congress neither consulted with nor obtained the opinion of the Bureau of Prisons

regarding the penological merits of Zimmer's proposal to preclude the use of federal funds for R-rated films and the other components of his amendment.[2]  [Ex. 7, pp. 96-98].

The record reflects that had the Director of the Bureau been asked by Congress whether the banning of all R-rated films was either reasonably linked to any legitimate penological interest or consistent with the Bureau's stated objectives at the time, she would have replied "no" to both questions.  These facts are implicit in a November 15, 1995 memorandum from Bureau of Prison Director Kathleen Hawk to Bureau administrators in which she established guidelines for implementation of the Zimmer Amendment after concluding that its passage was "inevitable."  [Ex. 9, p. 1].  In the memorandum, Hawk indicated that the phasing out of various recreational activities pursuant to Zimmer -- including the showing of R-rated movies -- would have a negative impact on the operation of federal prisons because "these activities added variety to our recreation programs which helped to keep our inmate population constructively occupied."  [Ex. 9, p. 5].  Nevertheless, as required by the statute, Hawk announced that, as a matter of policy, no R-rated films were to be shown in any federal prison beginning in Fiscal Year 1997.  [Ex. 9, p. 3].  That censorship policy has remained in effect since that time.  [Ex. 7, pp. 98-99].

On September 15, 1997, in conformity with the Bureau's revised movie policy, the Warden of FCI McKean issued a directive which provided the following:  "Only contracted movies rated PG-13, PG, G and airline edited will be shown."  [Ex. 10, p. 2].

---

[2] John Vanyur, who testified as a 30(b)(6) witness, testified that he had no knowledge of any communication (oral or written) between Congress and the Bureau.  Item 10 in the Notice of Deposition to Vanyur stated that one of the topics would be whether "the BOP administration or other BOP officials were consulted by Representative Zimmer or other federal legislators prior to the inclusion in [the] Zimmer Amendment of a ban against the showing of R-rated movies."  [Ex. 8, p. 2]

In July of 2002, the Bureau of Prisons issued a revised Program Statement related to movies (the current policy) which stated:

> The Recreation Supervisor will exercise good judgment and follow statutory restrictions when selecting video movies rentals.  No movies rated R, X, or NC-17 may be shown to inmates.
>
> Institutions may show R and NC-17 movies that have been edited for general public viewing.
>
> Spanish movies that are not rated may be shown if they do not include profanity, graphic violence, or nudity.
>
> Not all edited movies may be appropriate for the correctional setting; each institution must use caution in selecting movies.

[PS 5370.10].

Because the Bureau of Prisons now adheres to a censorship policy that no longer requires individualized determinations by prison officials as to whether a particular R-rated film is appropriate for inmate viewing, there are numerous films of informational and artistic worth which pose no risk to penological objectives that cannot be shown at FCI McKean.  Among those films are satires such as *M\*A\*S\*H, Catch-22, The Bonfire of the Vanities, . . . And Justice for All, Bullets Over Broadway, Wag the Dog, The World According to Garp, Bulworth, Easy Rider, and Dogville*; historical or biographical dramas such as *Schindler's List, Amistad, Patton, All the President's Men, The Pianist, Raging Bull, Angela's Ashes, The Passion of the Christ, Braveheart, Pollock, Serpico, and The Motorcycle Diaries;* documentaries like *Bowling for Columbine, Stanley Kubrick: A Life in Pictures, Born Into Brothels,* and *Roger & Me;* war-related films such as *Saving Private Ryan, Full Metal Jacket, Apocalypse Now, Black Hawk Down, The Killing Fields,* and *Coming*

*Home; underline serious dramas* like **Sophie's Choice, Easy Rider, Hotel Rwanda, Maria Full of Grace, Glengarry Glenn Ross, Five Easy Pieces, 21 Grams, Garden State, Midnight Cowboy, Wall Street, In America, American Buffalo, Europa Europa, Waking Life, The Quiet American, Deliverance, All About My Mother, Nuovo Cinema Paradiso, Midnight Express, Marathon Man, Boiler Room, Affliction, Breaking the Waves, Merchant of Venice, Othello;** and underline comedic films such as **Sideways, The Full Monty, Manhattan, Monsoon Wedding, Take the Money and Run, Affliction, About Schmidt, Clerks, Diner, Being John Malkovich,** and **Fanny and Alexander.**[3]

### III.  GOVERNING LEGAL PRINCIPLES

#### A.  Free Speech Jurisprudence

It is well established that motion pictures, like pure political and ideological speech, enjoy the full protection of the First Amendment.  *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).  One reason that films have constitutional protection is that they comprise a "significant medium for the communication of ideas" which "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or a social doctrine to the subtle shaping of thought which characterizes all artistic expression."  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).  The fact that films are designed to entertain as well as to inform does not lessen the "importance of films as an organ of public opinion."  *Id.*

Although speech is often viewed from the perspective of the person who utters it, the scope of First Amendment protection extends, in equal measure, to the listener.

---

[3] A more comprehensive list of some R-rated films that have not been edited by the licensing company that FCI McKean deals with (and thus are not able to be shown in an edited format at McKean) is contained in plaintiff's Exhibit 11.  The subjects of the films are also summarized there.

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756-757 (1976).  Freedom of speech necessarily "protects the right to **receive** information and ideas."  *Stanley v. Georgia*, 394 U.S. at 564 (emphasis added); *Kleindienst v. Mandel,* 408 U.S. 753, 762-763 (1972)*; Martin v. Struthers,* 318 U.S. 141, 143 (1943).  "[T]he State may not consistent with the spirit of the First Amendment, **contract the spectrum of available knowledge**.  The right of freedom of speech . . . includes not only the right to utter or to print, but the right to distribute, **the right to receive** . . . ."  *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (emphasis added).  "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them.  It would be a barren marketplace of ideas that has only sellers and no buyers."  *LaMont v. Postmaster Gen. of the United States,* 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

In the area of free speech involving movies, radio, and other mass means of communication, the rights of viewers and listeners are even more important than the rights of the broadcasters.  Cf. *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969).  "It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas which is crucial here."  *Id.*

One of the fundamental principles of free speech jurisprudence is that expression should not be censored even if viewed by some as profane and vulgar.  See *Berger v. Battaglia*, 779 F.2d 992, 1000 (4th Cir. 1985).  Non-obscene sexual speech is protected by the First Amendment.  See *Z.J. Gifts v. City of Aurora*, 932 F.Supp. 1256, 1259 (D.Col. 1996).  The use of vulgar or profane language in film is not devoid of First Amendment protection.  Cf. *Aiello v. City of Wilmington,* 523 F.2d 845, 857 n.24 (3d Cir.

1980), *Wiegand v. Seavers*, 504 F.2d 303, 306 (5th Cir. 1974). Nor are visual images not stripped of First Amendment protection merely because they convey <u>sexual messages or ideas</u>. *Sable Comm. Of California v. F.C.C.*, 492 U.S. 115, 126 (1989).

Although the fact of imprisonment and the needs of prison facilities necessarily impose limitations on free speech, the men and women who pass through prison gates are not stripped of that right. See *Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999). They continue to have a right to receive <u>information and ideas</u>. See *Crofton v. Roe*, 170 F.3d 957, 959 (9th Cir. 1999); *Mann v. Smith*, 796 F.2d 79, 83 n.3 (5th Cir. 1996); *Aikens v. Jenkins*, 534 F.2d 751, 755 (7th Cir. 1976); *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1033-34 (2d Cir. 1985).

Prison regulations that categorically prohibit access to a broad range of materials "should be viewed by a district court with caution . . . ." *Ashker v. California Dept. of Corrections*, 224 F.Supp.2d 1253, 1259 (N.D. Cal. 2002) aff'd. 350 F.3d 917 (9th Cir. 2003). The imposition of "blanket prohibitions" in connection with published materials (rather than conducting individual reviews) has the scent of unconstitutionality. See *Owen v. Wille,* 117 F.3d 1235, 1237 (11th Cir. 1997); *Pepperling v. Crist*, 678 F.2d 787, 791 (9th Cir. 1982). <u>Categorical censorship</u> is often inconsistent with the strictures of the First Amendment, a provision that ordinarily contemplates (even in a prison setting) a review of the <u>content</u> of particular materials. See *Williams v. Brimeyer*, 116 F.3d 351, 353 (8th Cir. 1997). As the Supreme Court noted in *Thornburgh v. Abbott,* 490 U.S. 404 (1989), it was "comforted by the **individualized** nature of the determinations required by the regulation" and by the regulation's rejection of "shortcuts that would lead to

**needless exclusions**." *Id.* at 416-17 (emphasis added). See also *Shakur v. Selsky*, 391 F.3d 106, 115 (2d Cir. 2004); *Kikumura v. Turner*, 28 F.3d 592, 598 (7th Cir. 1994).

### B. Analytical Framework

The analytical framework for determining the constitutionality of a prison policy that impinges on free speech rights is the four-prong test established by the Supreme Court in *Turner v. Safley,* 482 U.S. 78 (1987). See *Wolf v. Ashcroft*, 297 F.3d 305, 307 (3d Cir. 2002). Under *Turner*, a policy must be "reasonably related to legitimate penological interests" to pass constitutional muster. *Turner,* 482 U.S. at 89. A policy that is an "exaggerated response" to legitimate penological interests -- one that "sweeps more broadly than can be explained by the stated objectives . . . fail[s] the reasonable relationship test." *Banks v. Beard,* 399 F.3d 134, 139-40 (3d Cir. 2005) (citation and internal quotation omitted).

The *Turner* framework directs courts to assess the "overall reasonableness" of a prison policy that impinges on a constitutional right by determining and weighing four factors: (1) whether there is a "valid, rational connection" between the prison policy and the legitimate governmental interest(s) put forward to justify the policy or such a remote connection that the policy is arbitrary or irrational; (2) whether the plaintiff prisoner has other means of exercising the circumscribed right apart from the means prohibited by the challenged policy; (3) the costs that accommodating the right would have on other inmates, guards, and prison resources generally; and (4) whether there are alternatives to the policy that would fully accommodate the inmate's rights at little cost to valid penological interests. *Banks*, 399 F.3d at 139. "The first two *Turner* factors focus on the prison's [policy] decision -- to what extent is it justified by legitimate and neutral

concerns and what options does it leave open to the inmate . . . ." *Dehart*, 227 F.3d at 57 (3d Cir. 2000). The third and fourth *Turner* factors focus on the inmate interest affected by the challenged policy and the consequences accommodating the interest would have on guards, other inmates, and the allocation of prison resources. *Id.* Under the latter two factors, a court must determine whether the constitutional right at issue "can be accommodated without significant negative consequences in terms of efficiency and security [and] whether the prison can serve its interests with alternative means without infringing upon the rights of prisoners." *Banks*, 399 F.3d at 146 (citations and internal quotations omitted). The "existence of obvious, easy alternatives may be evidenced that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* (quoting *Thornburgh*, 490 U.S. at 418).

The existence of a rational connection between a challenged policy and the legitimate penological interests put forward by prison officials to justify the policy is the "foremost factor" because it is a "threshold requirement." *Wolf,* 297 F.3d at 309. A rational nexus between policy and asserted governmental interests is "essential" to the validity of a prison policy that implicates constitutional rights. *Dehart*, 227 F.3d at 53. If the connection between policy and asserted interests is too tenuous, the policy is "arbitrary or irrational" and "fails irrespective of whether the other factors tilt in its favor." *Wolf,* 297 F.3d at 310. See also *Asker v. California Dept. of Corrections*, 350 F.3d 917, 923 (9th Cir. 2003) (If a policy fails the first *Turner* element, the court need not address the other factors.)

If a rational connection is found to exist, the court must then consider the three remaining *Turner* factors in order to determine the policy's "overall reasonableness."

*Wolf*, 297 F.3d at 310.  This is because "the determination that there is a rational relationship between the policy and the interest [said to justify the policy] commences rather than concludes [the] inquiry as not all prison regulations that are rationally related to such an interest pass *Turner's* overall reasonableness standard." *Id.* at 309 (internal quotations and citation omitted).  The final three prongs of the *Turner* calculus are "fact-intensive inquiries," requiring "a contextual record-sensitive analysis." *Id.* at 310; *Dehart*, 227 F.3d at 53.  In the end, the court must determine whether the policy bears a "reasonable relationship" to legitimate penological concerns or is an "exaggerated response" to such concerns.  See *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 878 (9th Cir. 2002); *Williams*, 116 F.3d at 354.  When a prison policy "sweeps more broadly than can be explained by the stated objectives" and amounts to an "exaggerated response" to legitimate penological interests, the policy crosses the constitutional line.  See *Banks*, 399 F.2d at 140.  Although a district court "may not invalidate a regulation because [it] can imagine a more refined one," constitutional rights must be accommodated and a prison policy should not be sustained if it is "clearly broader in scope and significantly more burdensome in effect than reasonable alternatives." *Sallaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir. 1990).  See also *Abu-Jamal v. Price,* 154 F.3d 128, 135 (3d Cir. 1998) (application of policy appeared to be too broad to be justified by the concerns articulated by the Department of Corrections).

An assessment of a policy's reasonableness focuses on the prison administration's penological concerns and the inmate's interest in engaging in the constitutionally protected activity.  *Dehart,* 227 F.3d at 59.  Valid penological objectives in a prison setting include the preservation of institutional order and security,

punishment, rehabilitation, and deterrence.  *Id.* at 50; *Procunier v. Martinez*, 416 U.S.

396, 412 (1974).  Although the reasonableness standard "requires a court to respect the

security, rehabilitation and administrative concerns underlying a prison regulation,

without requiring proof that the regulation is the least restrictive means of addressing

those concerns, it also requires a court to give weight, in assessing the overall

reasonableness of regulations, to the inmate's interest in engaging in constitutionally

protected activity."  *Dehart,* 227 F.3d at 51.  The *Turner* calculus contemplates a

determination by the district court as to the reasonableness of a policy "under all of the

circumstances reflected in the record" and a policy that represents an "exaggerated

response" to legitimate penological concerns will not justify an infringement of First

Amendment rights even when other avenues exist for an inmate to exercise the right.

See *Id.* at 59.

Although significant judicial deference is to be given to prison officials in the

fashioning of institutional policies, it does not follow that federal courts are "relinquishing

the policing of prison policy to prison administrators."  *Banks*, 399 F.3d at 139.  The

"traditional deference" due prison officials "does not mean that courts have abdicated

their duty to protect those constitutional rights that a prisoner retains."  *Id.* at 140.

(citation omitted).  The *Turner* reasonable standard is neither "toothless" nor a "license

for [prison officials] to short change the constitutional rights that the Supreme Court has

insisted prisoners continue to possess . . . ."  *Ramirez*, 379 F.3d at 129.  Prison officials

are required to weigh institutional interests against the constitutional rights of prisoners

when making decisions, and despite the judicial deference that must be accorded to

such decisions, a federal court must, nevertheless, "review the balance struck by prison

officials" to assure that constitutional dictates are not abridged.  See *Bieregu v. Reno,* 59 F.3d 1445-50 (3d Cir. 1995).  The First Amendment rights of prisoners may only be curtailed if legitimate penological objectives outweigh preservation of their rights.  *Davis v. Norris*, 249 F.3d 800, 801 (8th Cir. 2001).  A district court's obligation to defer to certain judgments of prison officials does not mean it may <u>ignore</u> its responsibility to protect the constitutional rights that survive incarceration and a "meaningful limit on the discretion of prison administrators" requires a court to <u>diligently weigh the competing interests</u>.  See *Banks*, 399 F.3d at 140.  If a prison policy offends a constitutional guarantee, "no policy of judicial restraint can justify a failure to vindicate constitutional claims."  *Norris v. Frame,* 585 F.2d 1183, 1187 (3d Cir. 1928).  The deference accorded to prison officials does not relieve federal courts of their duty, when the constitutionality of a policy is called into question, to "make sure after an independent review of the evidence that the regulation is not an exaggerated response to prison concerns." *Sallaam v. Lockhart,* 905 F.2d 1168, 1171 (8th Cir. 1990).  In the final analysis, "prison officials do not set constitutional standards by fiat."  *Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989).

## IV.  APPLICATION OF FACTS TO THE LAW

### A.    Whether there is a Rational Connection to Penological Interests (Factor One)

As noted above, a <u>rational nexus</u> between a prison policy and a legitimate penological interest is essential to its validity.  *Dehart*, 227 F.3d at 53.  Without a rational connection, a policy cannot be reasonable within the meaning of *Turner*.  See *Turner,* 482 U.S. at 89-90.  If the "logical connection between [the policy] and the asserted goal" is too remote, the policy will be deemed arbitrary or irrational.  See

*Waterman*, 183 F.3d at 215.  Whether there is a rational connection between the proscription of constitutionally protected speech and the penological objectives asserted by prison officials is a contextual factual question.  See *Spellman v. Hopper*, 95 F. Supp.2d 1267, 1271-1274 (M.D. Ala. 1999).

The Bureau asserts that the challenged policy is linked to security, institutional order, punishment, rehabilitation, deterrence, and the preservation of a safe and non-hostile work environment for its employees.[4]  The record shows that the link between the policy and those interests is too attenuated to be rational.  The evidence demonstrates that any connection between a blanket ban of R-rated movies is so weak as to be arbitrary within the meaning of *Turner* and its progeny.

In an effort to imbue its movie policy with rationality, the Bureau has submitted written declarations from Dennis Flatt, a BOP employee who has held supervisory positions in FCI McKean's Recreation Department, and John M. Vanyur, the Assistant Director of the Bureau's Correctional Programs Division.  Their declarations fall far short of accomplishing that end.

### 1.   The Security/Order Nexus

With respect to the issue of the asserted connection between the R-rated film policy and the institutional security and order, Flatt's declaration states, in substance, that FCI McKean is a medium-security federal prison that houses approximately 1600 convicted inmates; that the inmates population is a diverse group comprised of individuals who have committed a wide range of criminal offenses; that more than 200 of the 1600 inmates are serving sentences in excess of twenty years (including sixteen

---

[4] The concern that some prison personnel might find some R-rated films offensive (the hostile work environment contention) has not been recognized as a valid penological objective for purposes of the *Safley* equation.

who are serving life sentences); that some of the inmates serving life sentences have committed murder, armed bank robbery, assault with intent to kill, rape, drug possession and other offenses; that more than a hundred inmates have been classified as sex offenders; that about two hundred inmates at McKean have mental health issues for which they receive treatment; that many of the inmates who watch movies at the prison "are likely to have anti-social violent histories with mental health problems and/or are sex offenders;" and that the statistics cited in his affidavit show that "the prison population at FCI McKean is a very different population than what might be encountered in a local movie theatre." [¶¶ 4-5].  According to Flatt, "staff members required to control an area in which inmates with a history of violence or sexual offenses are watching a movie which includes violence or sexually explicit scenes are placed in a potentially dangerous situation."  [¶ 9] (emphasis added).

Flatt's deposition testimony, however, refutes the proposition that permitting some R-rated films to be shown in the prison has any rational relationship with the security/institutional order concerns identified in his affidavit.  Flatt testified that he was the Supervisor of FCI McKean's Recreation Department from May of 1991 (when R-rated movies were routinely shown at the prison) through September of 1996 (when R-rated movies were banned).  [Ex. 4, p. 10].  He estimated that as many as four hundred R-rated films were approved by the Recreation Department, under his supervision, to be shown to the inmate population.  [Ex. 4, pp. 44-46].  A number of those films contained violence, nudity and/or hard language. [pp. 51-57; see also Ex. 12].  When asked what standard or criteria he used to determine whether it would be appropriate to show a particular R-rated film to inmates, Flatt stated that he would not approve movies dealing

with "prison escapes, violence toward law enforcement officers, anything that could incite inmates at the hosing unit." [Ex. 4, p. 54]. He testified that R-rated films containing significant violence (including scenes where actors thrust knives into other actors) were shown under his supervision [Ex. 4, p. 56]. Flatt testified that there were instructions or directions given to him under the pre-Zimmer policy, from the Warden or any other administrators, that inmates who were in prison for violent crimes should not see R-rated films containing serious violence. [Ex. 4, p. 56]. As a general approach, Flatt assessed whether there was something in a particular movie that could affect the security of the institution. [Ex. 4, pp. 51-52]. He testified that nudity in the context of scenes involving "consensual lovemaking" was permitted under his supervision prior to the Zimmer Amendment and that such nudity did not concern him to point where he would not allow an R-rated film to be shown. [Ex. 4, p. 52]. He only disapproved of films where nudity occurred in the context of a rape scene. [Ex. 4, p. 52]. Flatt also testified that he did not preclude the showing of R-rated films that contained serious, profanities. [Ex. 4, p. 53]. Only movies containing slurs that degraded racial groups were rejected on profanity grounds. [Ex. 4, p. 53]. He acknowledged that the profane language in R-rated films shown at McKean was no different than the profanities uttered by the inmates. [Ex. 4, pp. 53-54].

In the course of discovery, the Bureau produced FCI McKean movie logs spanning the period from November of 1992 through the 1996 enactment -- the era when R-rated movies were exhibited to prisoners. [Ex. 12]. The documents reveal that films containing the violence Flatt now baldly asserts could place McKean employees "in a potentially dangerous situation" were repeatedly shown at the prison. Among

those movies were:  ***Chinatown, Cape Fear, Goodfellas, In Cold Blood, Scarface,
Sea of Love, Reservoir Dogs, Boyz-n-the-Hood, Fatal Attraction, Prizzi's Honor,
Texas Chainsaw Massacre, Silence of the Lambs, Terminator II, The Onion Field,
Helter Skelter,*** **and** ***Taxi Driver.***  [Ex. 12]  Significantly, neither Flatt's declaration nor
any other evidence in the record shows that there was ever a disturbance among
inmates or violent acts toward prison personnel associated with exhibiting R-rated films
at the prison.  The lack of evidence in the record of R-rated films having created security
or internal order problems at McKean (or elsewhere, for that matter) can be considered
when addressing whether there is a rational connection between the ban on such
movies and the security concerns put forward by prison officials.  See *Banks*, 399 F.3d
at 142.

      The Bureau relies primarily on John Vanyur's declaration to make the case that
there is a <u>rational link</u> between the total ban of R-rated films and internal security and
order interests.  In his declaration, Vanyur asserts that R-rated films negatively affect
<u>security</u> and <u>order</u> in a prison because "repeated exposure to violence can lead to
desensitization to aspects of violent behavior which would otherwise be unpleasant or
abhorrent" and that "for persons who have engaged in repetitive violent acts over time,
viewing depictions of violence can lead to mental and emotional rehearsal of their
violent histories."  [¶ 11]  In addition, he asserts that "[a] staff member may be placed in
a very dangerous situation if he or she is required to control an area in which inmates
with a history of violence or sexual offenses are watching a movie that has violent or
sexually explicit scenes."  [¶ 13]

When asked at his deposition whether seeing movies are related to the criminogenic risk factors associated with criminal behavior, his response was: "They possibly are." [Ex. 7, p. 26] He testified that he was not aware of literature specifically addressing the issue of movies and criminogenic risk factors. [Ex. 7, pp. 26-27] He was not able to cite any studies three months ago when deposed and, significantly, he identified no specific studies in his declaration drawing such a connection.

### 2. The Rehabilitation Nexus

In his declaration, Vanyur attempts to link the ban of R-rated films to rehabilitation as well. He states that R-rated movies often contain messages that "feed into" the most common criminogenic risk factors (anti-social/pro-criminal belief or value systems; exposure to criminals/lack of positive role models; and such personality flaws as excessive risk-taking, impulse control, psychopathy, and egocentric behaviour) by exposing inmates to depictions of graphic violence, substance abuse, criminal behavior, victimization and devaluation of others, violation of societal norms and the rights of others and themes which reinforce pro-criminal value systems and antisocial behavior and beliefs. [¶¶ 8-9] He also asserts that "R-rated movies provide visual stimuli which reinforce violence, substance abuse, racial stereotypes, and misogynist attitudes, and promote negative role models that reinforce gang or criminal reference group ideas and norms." [¶ 10]

As noted above, in Vanyur's recent deposition testimony, he stated no more than there is a "possible connection" between movies and the criminogenic factors. This is hardly a rational basis to predicate a total ban on R-rated films.

3.   <u>The Purported Punishment/Deterrence Connections</u>

Finally, Vanyur attempts to link the prohibition against R-rated films to the objectives of <u>punishment</u> and <u>deterrence</u>.  According to his declaration, "[p]risons often take away various amenities and privileges one would ordinarily have if not in prison, to both punish the inmates and deter them, and those in the larger community, from committing crimes in the future."  [¶ 12]

It is absurd to believe there is any <u>meaningful</u> connection between the categorical banning of R-rated films and the objective of <u>punishment</u>.  First, McKean inmates are permitted each week to watch other categories of movies in the context of the prison's recreational programming.  While prohibiting <u>all</u> R-rated movies deprives them of a substantial body of <u>ideas and information</u> they would otherwise have access to, this hardly qualifies as <u>punishment</u> when they are able to see other movies.  Second, the infliction of punishment occurs in an overwhelming degree from the loss of freedom and personal liberty; the loss of virtually all contact with spouses, children, and others who live outside the prison walls; confinement in a cell; and other such things inherent in incarceration.  The inability to view R-rated films is so <u>negligible</u> from the aspect of <u>punishment</u> that Vanyur's characterization of it as such is foolish.

When addressing the Bureau's <u>deterrence</u> argument in the appeal of this case, the Circuit Court expressed skepticism.  The Court asked:  "[I]s it a matter of common sense, as argued here, that prohibiting movies rated R or NC-17 deters the general public from committing crimes, lest they be sent to prison where they are not permitted to watch R-rated movies?  We are not so sure."  *Wolf v. Ashcroft,* 297 F.3 at 309.  The

insertion of the proposition in Vanyur's declaration adds no merit to it now.  If anything, common sense demolishes such a contention.

*     *     *     *

At bottom, what makes use of the MPAA rating system in the federal prison system so misguided is that the ratings were designed to guide the parents of children – they are merely estimates culled from parents as to what movies they believe are appropriate for children of certain ages to see, and were never intended to serve as a barometer for what films are appropriate for viewing by adult federal prisoners.

The MPAA Rating Board criteria always assess how language, nudity, sex and violence are "treated in each individual film."  *Swope v. Lubbers,* 560 F.Supp. 1328, 1337 (W.D. Mich. 1983) (Appendix to decision providing background of Rating System). The inherent difficulty of settling on a given rating by the Ratings Board and its reliance on an "estimate" of how most parents would perceive the appropriateness of a particular film for their children, make the rating model a grossly inappropriate one to utilize as a censorship standard in an adult prison.  As a Board representative stated in *Swope*,

> *In any appraisal what is "too much" becomes a controversial issue.  How much is too much violence?  Are classic war-type films too violent; marines storming the beaches of Iwo Jima killing and wounding the enemy, is that too much?  Is the dirt-street duel between the cattle rustler and sheriff too violent, or does it require the spilling of blood to draw a more severe rating?  How does one handle a fist fight on the screen, where is the dividing line between "all right" and "too much" for a particular classification?*
>
> *The same vexing doubts occur in sex scenes or those where language rises on the Richter scale.  The result is controversy, inevitable, inexorable, and that is what the rating system has to endure.*

> *The raters try to* ***estimate what most American parents*** *think about the appropriateness of film content so that parents at the very least are cautioned to think seriously about what films they may wish their* ***children*** *to see.*

*Id*. at 1340.  (emphasis added).

The rating system, in the words of the Rating Board, was "designed to serve [the] **parents of America**."  *Id*. at 1341.  (emphasis added).

In contrast to an R-rated movie, an X-rated film is "**patently** an adult film and no children are allowed to attend."  *Id*. at 1340.  "The reason for not admitting children to X-rated films can relate to the accumulation of brutal or sexually connected language, or of explicit sex or excessive and sadistic violence."  *Id.*  "[M]ost directors have chosen, on their own, to revise the extremely violent sequences in order to receive an R-rating."  *Swope,* 560 F.Supp. at 1338.

Utilizing this utterly inappropriate short-cut to determine what movies can be seen by federal inmates, the challenged policy leads and will continue to lead to the exclusion of films that have little connection to the penological objectives concerns expressed by Vanyur.  Vanyur and the policy he endeavors to defend illogically treat all R-rated films as fungible items; as a homogeneous body of work.  He and the policy he aspires to justify lose sight of the fact that there exist more than eleven thousand R-rated films, and many do not even arguably portray the violence and other negative behavior for which Vanyur attempts to systematically tar all R-rated films.[5]  [See Montoya Declaration, Ex. 11 and list attached thereto].  For example:

---

[5] A more complete list of such films, culled from Websites at the request of plaintiff's counsel, is incorporated in Exhibit 11.  There are 175 listed derived from a very limited search of the 11,000 R-rated films listed in the websites.

- **All the President's Men.** This movie portrays Woodward and Bernstein's investigation into the Watergate scandal.  The criminal behavior there was on the part of the President and his staff.  The violations of societal norms was not by "typical" street criminals, but by those in the highest ring of governmental authority.  The film contained no violence.  And one of its central messages is that even the most powerful in our society are not above the law.

- **Roger and Me.**  This documentary by Michael Moore has nothing to do with violence.  Its focus is on the economic hardships created by the closing of a General Motors Plant in Flint, Michigan.

- **Bowling for Columbine**.  This documentary, also by Moore, searches for answers to why our country has become so violent in the past few decades.  The film covers topics ranging from possible reasons for the Columbine shootings, to the National Rifle Association's views on gun control.

- **The Pianist.**  This movie chronicles the odyssey of a Polish Jew (a concert pianist) during the Holocaust to avoid capture during the Nazi occupation of his country. Although the film portrays graphic violence by Nazis against Jews, it hardly meets he anti-rehabilitative, pro-criminal, racial stereotyping nomenclature of Vanyur's declaration, at least not in any constitutionally appropriate sense.

- **M*A*S*H**.  This satirical Korean War era movie pokes fun at practices and characters in an army medical unit as well as the war itself.  Although it might be viewed as ridiculing certain societal conventions and not giving due respect to one's peers, allowing inmates to view it is unlikely to be counter-rehabilitative or a threat to internal order and security in any realistic sense.

- **Catch-22**.  This satire of World War II troops based in Italy, derived from Joseph Heller's classic novel, would present none of the security, order, or rehabilitative problems asserted in Vanyur's declaration.

- **Schindler's List**.  This movie lauds the efforts of a Czechoslovakian businessman to save the lives of hundreds of Jews from concentration camp genocide during Word War II.  Although it contains graphic brutality of Nazi soldiers toward Jews, it does so in a condemnatory way.  It cannot realistically be argued that this movie undermines the Bureau's security, internal order, and rehabilitative objectives.

- **About Schmidt**.  This movie, based on a novel, depicts a middle-aged man's efforts to salvage happiness in the wake of his wife's death.  It depicts none of the negative elements Vanyur cites to support a logical link between the categorical banning of R-rated movies and legitimate penological objectives.

- **Angela's Ashes**.  This movie, based on an autobiography, depicts the oppressive life of poverty experienced by the protagonist as a child in Ireland.

Its content would not adversely affect the prison security, security, institutional order, or rehabilitation objectives said to be connected to the ban of this and <u>all other</u> R-rated movies.

- ***Wall Street***. A critical, unsympathetic look at the corrupt practices of a Wallstreet broker who, in the end, is arrested for his misdeeds. It has none of the footrints cited in Vanyur's declaration for banning <u>all</u> R-rated movies.

### B.    Whether there are Other Means of Exercising the Right to Receive Information and Ideas through Movies (Factor Two)

As noted, if the court finds that there is no rational nexus between the policy at issue and legitimate penological objectives, there is no reason to address this or the other remaining *Turner* factors. See *Ashker*, 350 F.3d at 923. However, for purposes of this brief, this factor (as well as the third and fourth factors) will be discussed.

This element in the *Turner* analysis requires a court to "focus on the burden that the regulation imposes on an inmate's ability to engage in constitutionally protected activity." *Dehart*, 227 F.3d 47. If a policy leaves no other avenues open to exercise the constitutionally protected right, the prisoner's interest in engaging the activity is entitled to greater weight in the *Turner* balancing process. *Id.* at 53. The converse is true if there are other avenues available to inmates. *Id.* The fact, however, that inmates have an alternative means of engaging in protected activity is not conclusive proof that the policy in question is reasonable. It only "tends" to support reasonableness. See *id.* at 57.

Although it is true that inmates under the challenged policy have access to <u>non-R-rated</u> films in the McKean recreation film program (and through televisions located in the respective housing units), they have <u>no</u> access, <u>through any avenue</u>, to <u>R-rated</u> films. Thus, as reflected in the list attached as Appendix Exhibit 11, the ability of

McKean inmates to access ideas and information through movies is <u>significantly</u> burdened by the censorship policy.

### C.    The Costs of Accommodating the Right on Other Inmates, Guards and Prison Resources (Factor Three)

This factor addresses the specific activity at issue and "the consequences that accommodating the activity would have on guards and other inmates and on the allocation of prison resources." *Dehart*, 227 F.3d at 57. In conjunction with this inquiry, the court must determine the "size and quality" of the impact on the prison community. *Id.* at 58.

The relief sought in this case is an injunction prohibiting the Bureau of Prisons from enforcing its <u>blanket ban</u> on R-rated films and to establish a procedure under which there would be <u>individual</u> determinations regarding the propriety of showing a <u>particular</u> movie, consistent with security and institutional order. This procedure would be no different than the one that was in place at the Bureau and FCI McKean for several years. The Bureau argues that "[s]howing R-rated movies can pose a threat to the safety of guards and other inmates."[6] As noted, however, there is <u>no</u> evidence in the record of any <u>adverse impact</u> at the prison from exhibiting <u>several hundred R-rated films</u> at McKean under the previous policy. There is no explanation in the record as to <u>why</u>, if there was no negative impact on prison security and order when R-rated films were routinely shown at the prison, showing R-rated films <u>now</u> would pose a threat to the safety of guards or other inmates. Although a prison policy does not have to be "narrowly tailored" to stated penological interests to be constitutional, if a challenged prohibition has only a "minimal" beneficial effect on those interests, "the penological

---

[6] Page 19 of the Bureau's brief.

interest may be too attenuated to be reasonable."  See *Banks*, 399 F.3d at 144.  Here,

there is no reason to believe (based upon a long track record at McKean from showing

R-rated movies without negative consequences) that there would be <u>any beneficial</u>

<u>effect</u> on security or internal order at the prison through the policy's perpetuation.

### D.    Whether there are Acceptable Alternatives to the Policy (Factor Four)

The fourth *Turner* factor asks whether there are alternatives to the challenged

policy that would fully <u>accommodate the inmates' rights at little cost to valid institutional</u>

<u>interests</u> such as significant negative consequences on prison resources or security.

See *Dehart*, 227 F.2d at 58-59.  This element also asks "whether the prison can easily

serve its interests without infringing upon the rights of prisoners."  *Crofton*, 170 F.3d at

959.  "The existence of obvious, easy alternatives may be evidence that the regulation

is not reasonable, but is an exaggerated response to prison concerns."  *Turner*, 482

U.S. at 418.

There is an easy alternative to the <u>categorical ban</u> on R-rated films under the

facts of this case that would fully accommodate the interests the inmates without

significantly burdening the operation of the prison.  That alternative is to revert to the

Bureau's previous policy of evaluating movies on an <u>individual basis</u> to determine

whether they are appropriate for showing to inmates from a perspective of institutional

order and security.

In his declaration, Dennis Flatt states the following, in an effort to portray the

individual review of R-rated films as a burdensome task:

> During this period of budgetary limitations, the current BOP
> Policy benefits the administration of the federal prisons by
> removing the time-consuming and staff intensive task of

> requiring a staff member to pre-screen the movies titles and contents. Prior to the Zimmer Amendment, when select R-rated movies were still permitted to be shown, the decision to show a movie involved a multi-level review process. First, the Recreation Department staff member, usually a recreation specialist, would determine if the content of the movie was appropriate. If questionable, the approval of the movie could have been referred through various levels of supervisors, including correctional supervisors, to determine the appropriateness of showing such a movie at FCI McKean. Since the Zimmer Amendment and the reduction in the discretion of the movie titles available, although such a process [is] still in place, it is infrequently utilized, thus saving significant staff resources.

[¶ 11].

Flatt's <u>factually bald</u> assertion that the pre-screening of movies would be a "time-consuming and staff intensive task" is squarely contradicted by the evidence. The evidence reflects that the approximate running time of movies is between an hour and a half and two hours. [See Ex. 11, Movie Printouts]. Only <u>two</u> movies a week are shown at the prison. [Flatt Decl., ¶ 7]. Under the procedure in place when R-rated films were shown at McKean, the recreation specialists would gather information about a particular movie and present it to his or her supervisor. [Ex. 4, pp. 46-50]. The decision would usually be made by the supervisor of recreation and end there. [Ex. 4, p. 50]. On rare occasions, the decision would be made on a higher level. [Ex. 4, p. 50]. There are currently seven recreation specialists assigned to the prison's Recreation Department and a recreation supervisor. [Ex. 4, pp. 14-17]. They are all full time employees. [Ex. 4, p. 46].

The Bureau cites *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998) and *Waterman v. Farmer*, 208 F.3d 208 (3d Cir. 1999), as authority for the proposition that the costs of a case-by-case review is "far from *de minimus*." However, those cases dealt with the

review of magazines sent to inmates; not the review of perhaps <u>two</u> movies a week (and probably fewer because PG-13, PG, G, and airline edited films would also be shown to prisoners).  <u>At most</u>, the time needed to review a movie would be three to four hours a week.  The <u>typical</u> time is likely to be less than that.

## IV.    CONCLUSION

The total ban of R-rated films under the facts of this case is not <u>rationally</u> related to legitimate penological interests and, for that reason, in itself, is unconstitutional.  In addition, the categorical censorship policy is unconstitutional because it is an <u>exaggerated response</u> to the penological interests put forward by the Bureau to justify the policy and, thus, not <u>reasonably</u> related to any legitimate penological concerns.  Under these circumstances, the Bureau's motion for summary judgment should be rejected.


Dated:  July 21, 2005                                    /s/ Jere Krakoff
                                                                  Jere Krakoff
                                                                  PA ID No. 13701
                                                                  1705 Allegheny Building
                                                                  Pittsburgh, PA  15219
                                                                  (412) 232-0276

                                                                  *Attorney for Plaintiffs*