IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

RICHARD JEWELL,        \*

et al.,                \*

    Plaintiffs    \* Case No.

    vs.           \* C.A. 97 408 Erie

ALBERT O. GONZALEZ,\*

et al.,                \*

    Defendants    \*

\* \* \* \* \* \* \* \*


DEPOSITION OF

DENNIS FLATT

April 21, 2005





PLAINTIFF'S
EXHIBIT
4

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

1                    DEPOSITION

2                        OF

3    DENNIS FLATT, taken on behalf of the

4    Plaintiffs herein, pursuant to the

5    Rules of Civil Procedure, taken

6    before me, the undersigned, Tamara Y.

7    Doxey, a Court Reporter and Notary

8    Public in and for the Commonwealth of

9    Pennsylvania, at the Federal

10   Correctional Institution of McKean,

11   Lewis Run Road, Bradford,

12   Pennsylvania, on Thursday, April 21,

13   2005, beginning at 8:25 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2

3       JERE KRAKOFF, ESQUIRE

4       1705 Allegheny Building

5       Pittsburgh, PA   15219

6            COUNSEL FOR PLAINTIFFS

7

8       MARSHA STELSON EDNEY, ESQUIRE

9       U.S. Department of Justice

10      Civil Division

11      20 Massachusetts Avenue, N.W.

12      Room 7148

13      Washington, DC   20530

14           COUNSEL FOR DEFENDANTS

15

16

17

18

19

20

21

22

23

24

25

4

1                    I N D E X

2

3    WITNESS:   DENNIS FLATT

4    EXAMINATION

5        By Attorney Krakoff           7 - 70

6    EXAMINATION

7        By Attorney Edney            70 - 71

8    DISCUSSION AMONG PARTIES         71 - 72

9    CERTIFICATE                          73

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    EXHIBIT PAGE

2

3                                              PAGE

4    NUMBER    DESCRIPTION              IDENTIFIED

5    Two       Excerpt from

6              Interrogatories              67

7    Ten       11/92 Movie Log             42

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1          OBJECTION PAGE

2

3    ATTORNEY                          PAGE

4    Edney                            55, 57

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3    DENNIS FLATT, HAVING FIRST BEEN DULY

4    SWORN, TESTIFIED AS FOLLOWS:

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6    EXAMINATION

7    BY ATTORNEY KRAKOFF:

8    Q.      Mr. Flatt, I'm here today to

9    ask you some questions that relate to

10   --- primarily to the inmate --- what

11   I call the inmate film viewing

12   program.  If you don't understand a

13   question that I pose to you, please

14   tell me that and I'll rephrase it

15   until you're satisfied that you

16   understand the question.  If you

17   don't hear a question, similarly, let

18   me know that you didn't hear it and

19   I'll repeat it.  Allow me to finish

20   my question, even if you anticipate

21   how it's going to end, so that the

22   court reporter can take my entire

23   question down.  And I'll attempt to

24   do the same when you're answering,

25   refrain from interrupting you.  If

8

1   you want to take a break at some

2   point, just let me know and we can

3   break.    What is your name?

4   A.        Dennis Flatt.

5   Q.        And are you the Supervisor of

6   Recreation at FCI-McKean?

7   A.        No.    I'm the Supervisor of

8   Education.

9   Q.        Okay.    Let me refer you to

10  Plaintiff's Exhibit Two, which would

11  be the second exhibit on the file,

12  and return --- and I'll identify what

13  this document is for the record.

14  These are Defendants' responses to

15  Plaintiffs' first set of

16  Interrogatories and Request for

17  Production of Documents.    And what

18  that is is simply that I put a number

19  of questions to the Defendants, which

20  are called Interrogatories, they

21  answer them, and I also requested

22  certain documents from the

23  Defendants, which they responded to

24  in hearing and produced.

25            If you look at the second

9

1   question, which is on page 2 of the

2   Interrogatories, it asks, quote,

3   state the name and position of the

4   FCI-McKean official who determines

5   which movies will be leased for

6   showing at the inmate film program

7   that is the subject of this lawsuit.

8   Response, Dennis J. Flatt, Supervisor

9   of Recreation.   Were you Supervisor

10  of Recreation when this was answered

11  in 1999, May of 1999?  Was that your

12  position at the time, or was this

13  just a mistake?

14  A.      That was my position at the

15  time.

16  Q.      Okay.  How long had you been

17  Supervisor of Recreation, beginning

18  when and ending when?

19  A.      I believe it was '91.

20  Q.      Do you remember what month?

21  A.      I think it was May.  I'm not

22  100 percent sure, though.

23  Q.      You think it was in the

24  spring, though, of 1991?

25  A.      Yes.

10

1    Q.        Okay.  And when did you assume

2    your current position as Supervisor

3    of Recreation?

4    A.        December 2004.

5    Q.        Were you Supervisor of

6    Recreation until December of 2000 ---

7    did I say recreation?  Were you ---?

8                    ATTORNEY EDNEY:

9                    I think 2004 he became

10          education.

11                    ATTORNEY KRAKOFF:

12                    I understand that.

13    BY ATTORNEY KRAKOFF:

14    Q.        Immediately prior to the time

15    that you became the Supervisor of

16    Education, what was your position?

17    A.        I was still Supervisor of

18    Recreation.

19    Q.        So you were Supervisor of

20    Recreation from approximately May of

21    1991 through November of 2004; is

22    that right?

23    A.        That's correct.

24    Q.        When did you first begin to

25    work at the Federal Correctional

11

1    Institution at McKean?

2    A.        September 1989.

3    Q.        What was your position at that

4    time?

5    A.        Recreation specialist.

6    Q.        Is recreation a department

7    within FCI-McKean?  Is it called a

8    department?

9    A.        Recreation is a component of

10   education.

11   Q.        Okay.  What name is given to

12   it, division, agency, department?  Is

13   there a name that's used?

14   A.        It's the recreation

15   department.

16   Q.        Okay.  What were your

17   functions and responsibilities while

18   you were recreation specialist?

19   A.        Coordinating inmate events,

20   such as sporting events, hobbycrafts.

21   Q.        Movies?

22   A.        Movies, tournaments.

23   Q.        Anything else?

24   A.        The music program, unit

25   activities.

12

1    Q.      That means activities on the

2    housing units?

3    A.      Uh-huh (yes).

4    Q.      You have to say yes or no.

5    A.      Yes.

6    Q.      Okay.  Can you think of

7    anything else?

8    A.      At this time, no.

9    Q.      How long did you hold the

10    position as recreation specialist?

11    A.      Roughly about ten months.

12    Q.      And then what position did you

13    go to?

14    A.      Assistant Supervisor of

15    Recreation.

16    Q.      Were you involved in the

17    various areas that you just

18    identified you had been involved in

19    as a recreation specialist?

20    A.      Yes, on a supervisory level.

21    Q.      Who was the Supervisor of

22    Recreation at the time you became a

23    recreation specialist?

24    A.      Kenneth Jones.

25    Q.      And was Mr. Jones the

13

1    Supervisor of the Recreation

2    department when you became the

3    assistant supervisor?

4    A.      Yes.

5    Q.      Okay.  And did you hold the

6    position of Assistant Supervisor of

7    Recreation until you became the

8    supervisor in 1991?

9    A.      Yes.

10   Q.      What training or background

11   did you have prior to coming to work

12   here?  And that could include college

13   or on-the-job training.

14   A.      I have a Bachelor's Degree in

15   Recreation.

16   Q.      From where?

17   A.      Slippery Rock University.

18   Q.      Had you worked at any other

19   penal facility prior to coming to

20   FCI-McKean?

21   A.      No.  Law enforcement.  I was a

22   state law enforcement officer in

23   Florida.

24   Q.      Where?

25   A.      In Florida.

14

1   Q.      Is that --- were you a police

2   officer?

3   A.      Uh-huh (yes).  Yes.

4   Q.      When you began to work at the

5   prison in September of 1989 as a

6   recreational specialist, was that

7   when the prison opened, or did you

8   come after the prison had opened?

9   A.      When it opened.

10  Q.      Okay.  And so you've worked at

11  FCI-McKean throughout the time period

12  that McKean has been open; is that

13  correct?

14  A.      Yes.

15  Q.      Now, how many persons are

16  employed, at the present time --- how

17  many positions are there, whether

18  they're filled or unfilled --- how

19  many positions are there in the

20  recreation department; do you know?

21  A.      I believe it's seven.

22  Q.      Are they all filled at this

23  time, to your knowledge?

24  A.      Seven are filled.  There's one

25  vacancy.

15

1    Q.      And does that include these

2    supervisory positions that you

3    identified?

4    A.      One supervisory position.  The

5    rest are recreation specialists.

6    Q.      Okay.  And in 1989, when you

7    began to work in the recreation

8    department, how many positions were

9    there?

10   A.      I don't recall.

11   Q.      There was a director; correct?

12   A.      Director of prisons?

13   Q.      No, no.  A director of the ---

14   A.      Recreation Supervisor.

15   Q.      --- recreation?

16   A.      Yes.

17   Q.      The Supervisor of Recreation,

18   was that Jones at the time?

19   A.      Yes.

20   Q.      Was there an Assistant

21   Supervisor of Recreation when you

22   began to work ---?

23   A.      Not in '89, no.

24   Q.      Okay.  Were there --- you were

25   a recreation specialist; correct?

16

1    A.        Yes.

2    Q.        Was there any other recreation

3    specialists at that time?

4    A.        Yes.  Yes.

5    Q.        More than two?

6    A.        Yes.

7    Q.        More than five?

8    A.        In '89, I believe there was

9    three or four people that we detailed

10   to recreation, correction officers.

11   After '89, there was five to six.

12   Q.        Okay.  Now, are the recreation

13   specialists, at this point, uniformed

14   officers, or are they civilians?

15   A.        They're full-time ---

16   Q.        No.  I mean ---.

17   A.        --- staff members.

18   Q.        Does that mean that they're

19   officers?

20   A.        Everyone's an officer, yes.

21   They're recreation specialists that

22   work in the recreation department.

23   We don't just detail correction

24   officers.  They're trained recreation

25   specialists that have a background

17

1   for that.

2   Q.      But they're also considered

3   what used to be referred to as guards

4   or corrections officers; is that what

5   your testimony is?

6   A.      No.  All staff have an area of

7   expertise.  Recreation specialists,

8   that's where they work in recreation.

9   A correction officer usually works

10  the housing unit or post.  My staff

11  can work --- recreation staff can

12  work at a post, but they're assigned

13  to the recreation department.

14  Q.      So it's not a security

15  position as such; correct?

16  A.      Yes.

17  Q.      I am right?

18  A.      Yes.

19  Q.      Are you familiar with the

20  Zimmer Amendment?

21  A.      Yes.

22  Q.      Do you recall the Zimmer

23  Amendment went into effect in the

24  federal prison system in

25  approximately the early part of 1996?

18

1    A.      Yes.

2    Q.      And at that time, do you

3    recall how many persons were --- I

4    think you used the word detailed ---

5    to the recreation department?

6    A.      In '96, nobody was detailed.

7    By then, we opened up --- '89/'90 we

8    were just hiring recreation

9    specialists.  In '96 --- actually, in

10   '90, we already had all our rec specs

11   on line.  So '96, at that time, there

12   was probably six to seven recreation

13   specialists.

14   Q.      And was there also an

15   assistant supervisor?

16   A.      Yes.

17   Q.      And also a supervisor?

18   A.      Yes.

19   Q.      So there would have been a

20   total of how many when Zimmer came

21   into effect?

22   A.      Eight.  Eight to ten.

23   Q.      Now, did they all work on a

24   particular shift, or did they overlap

25   on shifts?

19

1    A.       Overlap.

2    Q.       What shifts were the

3    recreation employees assigned to?

4    A.       There was three different

5    shifts that were rotated.

6    Q.       Tell me what the shift hours

7    were.

8    A.       9:00 to 6:00, I believe 6:00

9    to 2:30, 7:30 to 4:00, 12:30 to 9:00.

10   Q.       The 6:00 was 6:00 a.m. to

11   12:30 in the afternoon?

12   A.       6:00 to 2:30 p.m., yeah.  6:00

13   a.m.

14   Q.       To 2:30 in the afternoon?

15   A.       Yes.

16   Q.       And then 7:30 in the evening

17   until ---

18   A.       4:00 p.m.

19   Q.       --- 4 p.?

20   A.       7:30 a.m.

21   Q.       So there was overlapping --- I

22   see.  There was some overlapping

23   on --- is that the first shift?

24   A.       Yeah.  Recreation is open from

25   6:00 a.m. to 8:45 at night.

20

1  Q.      Okay.  I'm going to be asking

2  you in more detail about the movies.

3  A.      Okay.

4  Q.      Immediately prior to Zimmer

5  coming into effect, were movies being

6  shown as part of the ongoing

7  recreation activities that your

8  department was providing to McKean

9  prisoners?

10  A.      Yes.

11  Q.      And was there any particular

12  time period within which the movies

13  were shown?

14              ATTORNEY EDNEY:

15              Are you asking a time

16      frame?

17              ATTORNEY KRAKOFF:

18              Yes.  I'm trying to

19      determine whether the movies

20      were shown in the afternoon,

21      whether they were shown in the

22      evening, whether they were

23      shown in the morning.

24  BY ATTORNEY KRAKOFF:

25  Q.      Was there a particular time of

21

1    the day when movies were usually

2    shown?

3    A.        Most of the time, they were

4    shown in the evening hours.

5    Q.        Okay.   Roughly what time?

6    A.        From five o'clock on Friday to

7    roughly noon on Sunday.   Back in '96,

8    we also showed them --- I don't

9    recall if we showed them during the

10   weekday or not.   We did at a time,

11   then we cut that back.

12   Q.        There would be continuous

13   movies from five o'clock on Friday

14   until noon on Sunday?

15   A.        Yes.

16   Q.        How many movies --- are we

17   talking about the same movie being

18   replayed during that time period, or

19   different movies?

20   A.        We've gone through a series of

21   adjustments as far as the movies go.

22   Currently we show two movies on a

23   weekend.   In the early '90s, we

24   showed sometimes, you know, one or

25   two movies during the week and up to

22

1  five or six on the weekends.  I don't

2  recall in '95 or '96 whether we were

3  showing two on weekends or if we were

4  showing four to six.  I don't --- I'd

5  have to check my records.

6  Q.       But you think at the time of

7  Zimmer that it was mostly on

8  weekends, Friday night until noon on

9  Sunday that movies were being shown?

10  A.       I believe.  I can check the

11  logs if you ---.

12  Q.       Why don't you, if you have

13  them.  I don't know that I have logs.

14  A.       What was the date you asked

15  me?

16  Q.       I was trying to determine, say

17  during the period of 1995, the

18  year --- you know, throughout the

19  12-month period leading up to Zimmer,

20  I was trying to get a sense of when

21  movies were shown and how many movies

22  were being shown.

23  A.       In November of '95, we showed

24  two movies on weekends.

25  Q.       Okay.

23

1    A.       And it's been that since that

2    time period.  It's been two movies a

3    weekend.

4    Q.       You said November of 1995?

5    A.       Yes.

6    Q.       Will you identify, by exhibit

7    number, what you were referring to?

8    A.       Ten (a).

9    Q.       And is that a log?

10   A.       Yes.

11   Q.       This particular log, some of

12   it --- at least the first page has

13   handwriting.  Much of it seems to be

14   typed.  Do you know whose handwriting

15   is on the first page?

16   A.       No, I don't.

17   Q.       Do you know who was

18   responsible for preparing the various

19   pages in this log?

20   A.       No, I don't.  That

21   responsibility would rotate amongst

22   the recreation specialists.

23   Q.       Would the log be sent to you?

24   Would you be furnished the log, or

25   was that log in your office?  Was

24

1    that log accessible to you?  Why

2    don't you tell me ---.

3    A.      Yes.

4    Q.      Okay.  There was one log that

5    was maintained?

6    A.      There was a --- you're talking

7    about basically two different logs.

8    This is a log here.  This is out of a

9    book.  This is a typewritten --- that

10   I typed --- schedule, furnished to

11   inmate population.

12   Q.      So the first page is something

13   that would have been in a log book?

14   A.      Yes.

15   Q.      Beginning with the second page

16   on through which is typed, these are

17   copies of documents --- I guess

18   memos, they're called, that were sent

19   into the inmate population?

20   A.      Yes.

21   Q.      They were posted?

22   A.      On bulletin boards, yes.

23   Q.      Okay.  And if I were to look

24   at this log, I could determine at

25   least --- strike that.

25

1        If I were to look at these

2    memoranda, these would reflect the

3    days that movies were shown, the

4    times that movies were shown to the

5    inmate population, and the names of

6    the movies that were shown to the

7    prisoners; is that correct?

8    A.      That's correct.

9    Q.      Okay. While we're on this

10   document, if you can --- if you look

11   at the previous document, which is

12   marked Plaintiffs' Exhibit Ten, if

13   you look through this, ---

14   A.      Okay.

15   Q.      --- does this document consist

16   of pages from the log book?

17   A.      Yes.

18   Q.      Okay. And this document

19   reflects the names of movies that

20   were shown to the population on given

21   dates, and it doesn't --- this one

22   does not reflect the times that they

23   were shown, though; is that correct?

24   A.      That's correct.

25   Q.      And the log pages that are

26

1  reflected in Plaintiffs' Exhibit Ten,

2  would they have been prepared on a

3  contemporaneous basis, meaning at the

4  time on the day that the movies were

5  shown or within a day or two, or is

6  this something that was prepared, say

7  once a month or once a year?

8  A.      No.  Usually they were done

9  within a week of when the movies are

10  going to be shown.

11  Q.      Okay.  The first page, for

12  example, Plaintiffs' Exhibit Ten,

13  would this have been filled out

14  before the movies were actually

15  shown?

16  A.      Yes.

17  Q.      And if the movie wasn't

18  actually shown, would that have been

19  reflected in the log?  Would it have

20  been crossed out or something, if the

21  movie wasn't actually shown?

22  A.      It should have been.  If the

23  supplier was unable to provide us

24  with that movie, we'd have to make

25  compliments.

27

1    Q.      Okay.  Now, looking at

2    Plaintiffs' Exhibit Ten, you'll see

3    that this begins in November of 1992.

4    Were logs maintained that reflected

5    the movie titles and the dates that

6    the movies were going to be shown

7    back in 1989 and 1990 and 1991?  Is

8    this something that had been

9    done ---?

10   A.      This log here?

11   Q.      The same type of ---.

12   A.      Yes.  Yes.

13   Q.      Okay.  And the same thing with

14   respect to the memoranda that are

15   contained in Plaintiffs' Exhibit Ten

16   A.  Would memos be sent into the

17   inmate population generally, tacked

18   on the bulletin boards, back in, say

19   1990 through 1995?  Was that also the

20   practice?

21   A.      Yes.

22   Q.      Now, the recreation

23   specialists, those were people who

24   had specific training in the

25   recreational area; is that correct?

28

1    A.        That's correct.

2    Q.        Were they people who had

3    college degrees in recreation?

4    A.        Some had college, others had

5    recreation experience which equated

6    to a college education.

7    Q.        Now, during the time period

8    that you were Supervisor of

9    Recreation, were X-rated movies

10   categorically prohibited, meaning as

11   a category, ---

12   A.        Yes.

13   Q.        --- under BOP policy?

14   A.        Yes.

15   Q.        Okay.  So personnel at McKean

16   had no discretion with respect to

17   X-rated movies?  Those were

18   absolutely prohibited; correct?

19   A.        That's correct.

20   Q.        And isn't it also true that

21   the Warden at FCI-McKean

22   categorically prohibited NC-17 movies

23   from being shown at the prison, even

24   prior to the Zimmer Amendment?

25                    ATTORNEY EDNEY:

29

1          He's not the Warden, so

2      only what he knows.

3              ATTORNEY KRAKOFF:

4          I know.  Obviously.

5              ATTORNEY EDNEY:

6              Well, you asked if the

7      Warden.  Only if you know.

8  A.      I don't recall.

9  BY ATTORNEY KRAKOFF:

10  Q.      Do you have a recollection of

11  an NC-17 movie being shown at the

12  prison during the time that you were

13  the Supervisor of Recreation?

14  A.      I do not.

15  Q.      Now, let me show you --- I

16  refer you to Plaintiffs' Exhibit 11,

17  which is an institution supplement

18  dated May 15, 1990.  The subject is

19  Inmate Recreation Programs.  Are you

20  familiar with this kind of document?

21  A.      Yes.

22  Q.      What is your understanding of

23  the purpose of an institution

24  supplement?

25  A.      To give direction on the

30

1 implication of programs.

2 Q. Is that necessarily direction

3 pursuant to a BOP policy coming out

4 of Washington, or could it also apply

5 to direction on something --- a

6 policy adopted at FCI-McKean? Could

7 it be either?

8 A. The policy is from the BOP.

9 This just gives further direction.

10 Q. Okay. If you turn to the

11 third page of this document, you'll

12 see in item 8, with respect to

13 movies, this reflects that as of May

14 15, 1990, that X-rated movies were

15 not permitted at FCI-McKean; correct?

16 A. Correct.

17 Q. Now, turn to the next exhibit,

18 which is 12. This is an institution

19 supplement dated July 26, 1991. And

20 if you turn to the eighth item, which

21 relates to movies, this reflects that

22 as of that time, not only X-rated,

23 but also NC-17 were not allowed to be

24 shown as a category inside

25 FCI-McKean; isn't that true?

31

1    A.        That's true.

2    Q.        Okay.  And you'll see on the

3    last page of this exhibit, it seems

4    to say, Craig Hahn, I believe.  Can

5    you recognize that signature?

6    A.        Yes.

7    Q.        And what does it say?

8    A.        Craig Apkei.

9    Q.        Apkei.  Okay.  There's a

10   Warden Hahn; is that correct?  There

11   was a Warden Hahn?

12   A.        There was a Warden Hahn, yes.

13   Q.        Would you spell his last name?

14   A.        A-P-K-E-I.

15   Q.        And this indicates that he

16   signed this institution supplement on

17   behalf of Warden Luther; correct?

18   A.        Correct.

19   Q.        What was his position in the

20   institution at that time?

21   A.        Assistant Warden.

22   Q.        Does that refresh your

23   recollection that NC-17 movies,

24   during the time that you were the

25   Supervisor of Recreation, were not

32

1  shown under the local, meaning

2  FCI-McKean, policy?

3  A.      Yes.  But I would like to see

4  the operations memorandum from that

5  time.

6  Q.      By the operations

7  memorandum ---?

8  A.      Program statement.  I stand

9  corrected

10  Q.      For what?

11  A.      Program statement.

12  Q.      We have --- and you can look

13  over Plaintiffs' Exhibit Three and

14  Plaintiffs' Exhibit Four --- one

15  which is dated October 27, 1986 and

16  Exhibit Four is December 16, 1993.

17  And I can represent to you that we've

18  had deposition testimony in this case

19  that the program statement that was

20  in effect between October 27, 1986

21  and December 16, 1993 was the 1986

22  program statement.  Do you have a

23  recollection either way, whether

24  there was another ---?

25  A.      No, I don't.

33

1   Q.      Do you want to review the

2   statement to see the 1986 statement

3   for some reason?

4   A.      What number is that?

5   Q.      That's Exhibit Three.

6                   ATTORNEY EDNEY:

7                   I'm not really sure

8           where your questioning is

9           going here, but these

10          documents speak for

11          themselves.

12                  ATTORNEY KRAKOFF:

13                  It's not going

14          anywhere.

15                  ATTORNEY EDNEY:

16                  All right.

17                  ATTORNEY KRAKOFF:

18                  The witness had said he

19          wanted to look at

20          programs ---.

21                  ATTORNEY EDNEY:

22                  But I mean, you were

23          asking if the policy was what

24          it was, and I'm just saying,

25          for the record, the document

34

1          speaks for itself.  If it says

2          that's what the policy was,

3          that's what the policy was.

4                    ATTORNEY KRAKOFF:

5                    Right.  I understand

6          that.  But I'm asking him now

7          about the practice.

8                    ATTORNEY EDNEY:

9                    Okay.

10   BY ATTORNEY KRAKOFF:

11   Q.       During the time that you were

12   the Recreation Specialist Supervisor

13   --- I think I fumbled that name.

14   During the period of time that you

15   were the Recreation Supervisor, as a

16   matter of practice, do you recall an

17   NC-17 movie ever being shown as part

18   of the inmate film viewing program?

19   A.       I do not recall.

20   Q.       Do you feel comfortable that

21   an NC-17 movie was not shown during

22   the time period from the time you

23   became the Supervisor of Recreation

24   until the enactment of Zimmer?

25   A.       I can't comment.  I don't

35

1    know.  I do not recall whether one

2    was shown or not.

3    Q.       Now, back to Plaintiffs'

4    Exhibit Ten, which was the log, this

5    log, this reflects the title, it

6    reflects the date that a particular

7    film was supposed to be shown.  This

8    doesn't reflect, does it, what the

9    rating of the respective films were;

10   is that correct?

11   A.       That's correct.

12   Q.       Did you maintain, meaning you

13   personally or those under your

14   supervision, during the time period

15   that you were the supervisor of the

16   recreation department, any sort of a

17   list that reflected the rating of the

18   various movies that were shown prior

19   to Zimmer?

20   A.       A list?  No.

21   Q.       Okay.  Why don't you describe

22   how films were ordered from the

23   prison (sic)?  Describe the process,

24   who you were dealing with and how you

25   made arrangements for obtaining films

36

1    to show in a context of the inmate

2    movie program.

3                    ATTORNEY EDNEY:

4                    Is this pre-Zimmer or

5            post-Zimmer?

6    BY ATTORNEY KRAKOFF:

7    Q.     All of my questions, unless I

8    say otherwise, sir, are pre-Zimmer.

9                    ATTORNEY EDNEY:

10                   So before January of

11           '96.

12   A.     We have catalogues which

13   reflect ---.

14   BY ATTORNEY KRAKOFF:

15   Q.     You say we have.  You mean you

16   had?  We're talking about pre-Zimmer.

17   A.     We still have them.

18   Q.     Okay.  Go ahead.

19   A.     The books reflect that, the

20   movie titles and the ratings.  Once a

21   decision is made we want to show that

22   movie, we contact the local vendor

23   and see whether that movie is

24   available or not.  We check the

25   rating from the vendor.  And then

37

1    once we secure that, the movies were

2    picked up and they were shown to the

3    inmate population.

4    Q.        Okay.  Why did you check the

5    rating with the vendor if the

6    catalogue itself indicated a rating?

7    Was that just to be absolutely sure

8    that it wasn't either X or NC-17?

9    A.        Certain movies have two or

10   three different ratings.  It's

11   possible to have an NC movie, an

12   R-rated movie and a PG movie of the

13   same movie.

14   Q.        Okay.  Now, who was the vendor

15   or who were the vendors from the time

16   you became the supervisor in 1991

17   through the time period leading up to

18   and ending with the enactment of

19   Zimmer?

20   A.        Movie World.

21   Q.        And where is Movie World

22   located?

23   A.        Bradford, Pennsylvania.

24   Q.        Do you know its address?

25   A.        No, I don't.

38

1    Q.    Okay.

2    A.    And there's also a store in

3    Kane, Pennsylvania, which I do not

4    recall.  I do not recall the name of

5    that establishment.

6    Q.    You no longer deal with the

7    Kane store?

8    A.    No.

9    Q.    What about Movie World?

10   A.    Yes, we do.

11   Q.    The catalogue that you're

12   referring to, were these catalogues

13   that were published by Movie World

14   and/or by the distributor in Kane, or

15   were these catalogues published by

16   some other source?

17   A.    Both.

18   Q.    So you had catalogues

19   reflecting the movies that were

20   available from Movie World, a

21   catalogue that reflected what movies

22   were available at the store in Kane,

23   and you had some other catalogue or

24   catalogues reflecting titles; is that

25   correct?

39

1  A.      There's no catalogue from the

2  Kane store.

3  Q.      Okay.  Movie World had a

4  catalogue that reflected the titles

5  as well as the ratings?

6  A.      I don't recall.  It's not

7  actually a catalogue.  It's just

8  a ---.

9  Q.      Printout?

10  A.      It's just an upcoming

11  attraction-type thing.

12  Q.      For newer movies?

13  A.      Newer movies, yes.

14  Q.      Did you any sort of a

15  catalogue that you utilized that had

16  a broad listing, a lot of listings of

17  movies that were not necessarily new,

18  that could have been several years

19  old?

20  A.      Yes.  We had a catalogue we

21  used as a reference, not all the

22  time, but it was used from time to

23  time.

24  Q.      Okay.  And who produced that

25  catalogue?

40

1    A.       I believe it was Films,

2    Incorporated.

3    Q.       Do you remember where Films,

4    Incorporated was from?

5    A.       They're based out of Chicago.

6    Q.       Do you still receive that

7    catalogue?

8    A.       I believe they do.

9    Q.       Were you receiving that

10   catalogue between 1991 and Zimmer in

11   January of '96?

12   A.       I believe so.

13   Q.       And is that a catalogue that

14   was updated periodically?

15   A.       I believe yearly.

16   Q.       Yearly.  Was that catalogue

17   that we're talking about, the one out

18   of Chicago, Films, Incorporated ---

19   was that catalogue something that was

20   received in the recreation department

21   prior to you becoming the supervisor?

22   A.       I do not recall.

23   Q.       Do you have any of those ---

24   still have any --- strike that.

25           At the time you left your

41

1    position as the supervisor of the

2    recreation department, were the

3    catalogues for the various years

4    between 1991 through 1995 --- were

5    they still somewhere in the custody

6    of the department?

7    A.    No.

8    Q.    Do you know what happened to

9    those catalogues?

10   A.    I believe they were thrown

11   away, outdated.

12   Q.    Okay.  What about any of the

13   post-Zimmer catalogues, those for the

14   years 1996 up to the present?  Do you

15   know whether any of those catalogues

16   still exist from the Chicago Films,

17   Incorporated outlet?

18   A.    I believe 2005 is up there.

19   The other ones have been thrown away.

20   Q.    Did the Films, Incorporated

21   catalogue describe --- give a summary

22   or a synopsis of what the respected

23   films were about?

24   A.    Some of the movies, yes; some

25   of the movies, no.

42

1  Q.    Most of the movies, or just a

2  few of the movies, it would summarize

3  them?

4  A.    A few of them.

5  Q.    Now, looking at Plaintiffs'

6  Exhibit Ten, which begins --- is the

7  log of movies that begins in November

8  of 1992, do you recognize any of the

9  pages as being in your handwriting or

10 your printing?

11                    (Plaintiffs' Exhibit

12                     Ten marked for

13                     identification.)

14 A.    I believe at the bottom, April

15 '93.

16 BY ATTORNEY KRAKOFF:

17 Q.    Would that have been --- is

18 that the page that begins with

19 Caddyshack?

20 A.    Yes.

21 Q.    Okay.

22 A.    It looks like May, the

23 following --- I believe it's the next

24 page.

25 Q.    May of '93?