43

1   A.      That looks like my writing.

2                  ATTORNEY EDNEY:

3                     The whole page, or just

4         part?

5   A.      Just at the bottom, beginning

6   with 'Mo Better Blues, I guess.

7   BY ATTORNEY KRAKOFF:

8   Q.      Is that the same thing with

9   the previous, the April of '93?  Was

10  that beginning with Runaway Train?

11  Is that your handwriting?

12  A.      It looks like it.

13  Q.      And what about at the top,

14  beginning with Digstown down to ---?

15  A.      I cannot say for sure.

16  Q.      In any event, some of the

17  entries are yours.  I suppose, as you

18  look through this, most of them are

19  somebody else's; is that correct?

20  A.      Most of them, yes, that's

21  correct.

22  Q.      Okay.  And is there any way

23  that I could determine at this

24  juncture, as we look through this

25  catalogue exhibited in Number Ten,

44

1  whether the version of a particular

2  movie might have been both R-rated

3  and non R-rated, something less than

4  R-rated?  Is there any way that I

5  would be able to determine, from any

6  of the recreation department's

7  records, whether it was the R-rated

8  version or PG-13 or some lesser

9  version than an R-rated movie?

10  A.      No.

11  Q.      Do you have a recollection ---

12  for example, if you look at February

13  of '93, you'll see Taxi Driver on

14  February 17.  Do you know whether

15  that was an R-rated version, or

16  something else?

17  A.      I do not.

18  Q.      Prior to Zimmer, were R-rated

19  movies --- and when I use the term

20  R-rated movies, I mean movies that

21  were still R-rated and hadn't been

22  diluted to something less than

23  R-rated.  Were R-rated movies shown

24  at FCI-McKean as part of the inmate

25  viewing program?

45

1   A.      Yes.

2   Q.      And can you give me your ---

3   can you give me a ballpark estimate

4   of how many R-rated movies were shown

5   during the time that you were the

6   supervisor of the recreation

7   department prior to Zimmer, during

8   the period of a little bit in excess

9   of four years?  Are you talking about

10  dozens?  Are you talking about

11  scores?  Are you talking about

12  hundreds?  I'd like to get a sense of

13  how many.  And I'm not going to hold

14  you to a specific figure, which I

15  assume you don't have.

16  A.      In five years?

17  Q.      Yes.  During the period of

18  time from the time you became the

19  supervisor --- and so that we have

20  that, when was that again?

21  A.      I believe it was '91.

22  Q.      In approximately May of '91;

23  correct?

24  A.      I believe it was.

25  Q.      You made it clear that you're

46

1    not sure of that. Zimmer would have

2    come in January of '96. During that

3    period of time, I'd like you to give

4    me your best estimate of

5    approximately how many R-rated movies

6    were shown at FCI-McKean as part of

7    the recreation program. And you can

8    look through Exhibit Ten, if that

9    helps to refresh your recollection at

10    all. There's also Exhibit 22. I

11    don't know whether anything in these

12    documents would help you, beginning

13    with Swank Motion Pictures, Inc. ---

14    I'm sorry, those are --- that's a

15    post. I think those are, if not

16    exclusive, primarily, post-Zimmer.

17    That won't help you.

18    A.    I'd say 300 to 400 probably.

19    Q.    Okay. Now, who, during the

20    time --- and if it changed, let me

21    know that. Who, during the time that

22    you were supervisor of the recreation

23    department, prior to Zimmer, had the

24    responsibility for determining what

25    movies were appropriate to show to

47

1   the inmates and what movies were

2   inappropriate to show, under the

3   OP/FCI-McKean policy?

4   A.    I'm not sure what you mean as

5   far as who determined the actual

6   ruling.

7   Q.    I meant at McKean --- let me

8   begin with another question.

9   A.    Okay.

10  Q.    Did somebody at McKean,

11  whoever that person was, or people

12  were, have the discretion to say no,

13  this isn't appropriate to show the

14  inmates, I'm not going to show this

15  movie to the prisoners?

16  A.    Yes.

17  Q.    And that applied to R-rated

18  movies as well; correct?

19  A.    That's correct.

20  Q.    Now, was there a person or

21  were there persons who had the

22  responsibility and the authority to

23  say no, we're not going to allow the

24  inmates to see this R-rated movie, we

25  don't think it's appropriate?

48

1    A.        Yes.

2    Q.        Was that one person or more

3    than one person who had that

4    authority?

5    A.        There was a recreation

6    specialist who gathered information,

7    which he would present it to the

8    supervisor, my supervisor.

9    Q.        And who is your supervisor?

10    A.        It depends which year you're

11    talking about.

12    Q.        No.  I mean what position.

13    A.        Supervisor of Education up to

14    Superintendent of Industries or

15    Associate Warden of Operations and

16    Programs.

17    Q.        It could go all the way up

18    just below the Warden; is that

19    correct?

20    A.        It could.

21    Q.        Were there occasions when it

22    did go all the way up to an Associate

23    Warden during the time period that

24    we're talking about?

25    A.        I believe so.

49

1    Q.    If a specialist came to you

2    and said, I have questions about this

3    movie, do you think we should

4    show --- and I'm talking about R-

5    rated movies --- should we show this

6    R-rated movie, and you looked at it

7    and you decided no, I don't think

8    it's appropriate, would it go any

9    higher than you? Did you have to

10   pass it on to the person in charge of

11   the education department, the

12   supervisor of the education

13   department, or could you make that

14   decision if you said no?

15   A.    I would provide guidance.

16   Q.    And then if it went --- you'd

17   provide guidance to the Supervisor of

18   Education if the Supervisor of

19   Education said no, I don't think this

20   should be shown. Did it end there,

21   or would it have to go above ---?

22   A.    It could end there.

23   Q.    But if the supervisor had some

24   questions about the propriety and

25   wasn't sure either way, he could then

50

1  take it to his supervisor; is that

2  fair?

3  A.      Correct.

4  Q.      Okay.  Were there occasions

5  that you took it to the supervisor

6  and said, in effect, do you think

7  this is an appropriate R-rated movie

8  to show to the prisoners?

9  A.      I believe there was.

10  Q.      Okay.  Do you have a sense of

11  how many times you did that during

12  this time period?  Did you do it a

13  couple times?  Did you do it a dozen

14  times?  Did you do it 100 times, 50

15  times?

16  A.      I believe it was less than

17  half a dozen times.

18  Q.      Okay.  Now, I believe your

19  testimony was that --- and correct me

20  if I'm wrong, I believe you said that

21  you estimated, and we recognize it's

22  an estimate, that between 200 and 300

23  R-rated movies were shown during the

24  time that you were the supervisor

25  prior to Zimmer's enactment; is that

51

1  correct?

2  A.      Correct.

3  Q.      Now, during that period of

4  time, do you have a sense of how many

5  movies were not permitted to be shown

6  to inmates, whether you made the

7  decision or the head of the education

8  department made the decision or

9  somebody above the head made the

10 decision?

11 A.      I don't recall that.

12 Q.      What criteria, if there was

13 any, or what standard would you use

14 when one of your subordinates came to

15 you and said, do you think this

16 R-rated movie is appropriate to show

17 to the inmates?  Did you have a

18 standard, something that you weighed,

19 something you looked at?

20 A.      A lot of times it was based on

21 prison escapes, violence towards law

22 enforcement officers, anything that

23 could incite inmates at the housing

24 unit.

25 Q.      So you looked at, is this

52

1    something that could affect the

2    security of the institution, in a

3    broad sense?

4    A.        Correct.

5    Q.        Okay.  Did you look at issues

6    of nudity at all prior to Zimmer?

7    Was that a factor that you used?  And

8    by nudity, I'm referring to explicit

9    nudity, where the breasts were shown

10   or the genitalia were shown or the

11   buttocks were naked, things of that

12   sort.  Was that a factor that you

13   looked at prior to Zimmer?

14   A.        Yes.  Rape scenes, I believe,

15   were not permitted.

16   Q.        What about nudity without rape

17   scenes?  What about scenes where it

18   was a consensual lovemaking, quote,

19   between adults and ---?

20   A.        That was permitted.

21   Q.        Okay.  That wasn't something

22   prior to Zimmer that would have

23   concerned you to the point that you

24   wouldn't allow the movie; is that

25   correct?

53

1   A.      That's correct.

2   Q.      Okay.  Now, what about

3   explicit language, graphic language,

4   where people were using extreme

5   profanities, that sort of thing?  Is

6   that a factor that you utilized in

7   considering whether a movie would or

8   would not be permitted to be shown

9   prior to Zimmer?

10  A.      As far as I can recall, only

11  when --- movies with racial slurs,

12  degrading the other racial groups,

13  were not shown.

14  Q.      Okay.  Now, did you watch ---

15  to what extent, if any, did you

16  actually see the movies that were

17  shown to the inmates?

18  A.      I watched a number of them.

19  Q.      Did a number of those contain

20  graphic language of a non-racial

21  nature?

22  A.      Yes.

23  Q.      Did the language that you

24  heard in those films --- and again,

25  I'm talking about R-rated films; you

54

1  understand that?

2  A.      Yes.

3  Q.      Did that language vary to any

4  extent from the kinds of language

5  that you hear in the institution, you

6  hear inmates using in the

7  institution?

8  A.      No.

9  Q.      Now, during the time that you

10 were supervisor of the recreation

11 department, did FCI-McKean house any

12 people who were convicted sex

13 offenders?

14 A.      I don't have the statistics on

15 that.

16 Q.      Do you know whether sex

17 offenders were housed in this

18 institution?

19 A.      They have been housed here in

20 the past, yes.

21 Q.      Okay.  And do you feel fairly

22 comfortable that there at least were

23 a few sexual offenders housed in the

24 institution throughout the period

25 that you were supervisor of the

```
                                              55
1   recreation department?

2   A.      Yes.

3   Q.      Now, during that time period,

4   were there films that contained

5   graphic sexual scenes?  And by that

6   I'm not talking about copulation, I'm

7   talking about two naked bodies lying

8   there and maybe mimicking sex, but

9   nothing like you'd see in an X-rated

10  movie.

11              ATTORNEY EDNEY:

12              Asked and answered.

13        Didn't you ask him this

14        already?

15              ATTORNEY KRAKOFF:

16              I think he said ---.

17  BY ATTORNEY KRAKOFF:

18  Q.      You said that there were;

19  right?

20  A.      Yes.

21  Q.      Did you or did anybody in the

22  recreation department, to your

23  knowledge, ever exclude sex offenders

24  from watching films of that nature?

25  A.      No.
```

56

1  Q.      To your knowledge, did the

2  administration ever tell you or ask

3  you to exclude sex offenders from

4  watching movies that contained

5  graphic sexual scenes?

6  A.      No.

7  Q.      During the time that you were

8  supervisor of the recreation

9  department, did FCI-McKean house

10  people who were convicted of violent

11  crimes?

12  A.      Yes.

13  Q.      I take it that --- and I think

14  you testified before --- some of the

15  R-rated movies that were shown to the

16  inmate population had scenes in them

17  where there was graphic violence; is

18  that correct?

19  A.      Violence.  I'm not sure what

20  you mean by graphic, but there's

21  violence.

22  Q.      People thrusting knives into

23  other people?

24  A.      Yes.

25  Q.      And I noted that Wise Guys had

57

1    been shown at one time, that scene

2    where a gun was taken to the back of

3    a driver's head and he was shot.

4    That was shown, wasn't it?

5    A.     I'd have to check the records.

6    Q.     Do you have a recollection of

7    Wise Guys being shown?

8    A.     No, I do not.

9    Q.     Okay.  Let me put it this way.

10   Were there movies where guns were put

11   to another person's head and a shot

12   was fired and the person was shot in

13   the head?

14   A.     I don't recall any specific

15   movies like that, but with an R-rated

16   movie, there's a good chance.

17   Q.     Sorry?

18   A.     With an R-rated movie, there's

19   violence in them.

20   Q.     Okay.  Pretty substantial

21   violence?

22                  ATTORNEY EDNEY:

23                  Asked and answered.

24          We're getting argumentative.

25          Let's move on.

58

1          ATTORNEY KRAKOFF:

2              Okay.

3   BY ATTORNEY EDNEY:

4   Q.      Were there any instructions or

5   directions given to you from up

6   above, all the way up to the Warden,

7   down to the supervisor of the

8   education department, that inmates

9   who were in the prison for violent

10  crimes should not see R-rated movies

11  that contained serious violence in

12  them?

13  A.      No.

14          ATTORNEY KRAKOFF:

15              I have to take a break.

16          ATTORNEY EDNEY:

17              Okay.

18  SHORT BREAK TAKEN

19  BY ATTORNEY KRAKOFF:

20  Q.      If I can refer you back to

21  Plaintiffs' Exhibit Two.

22              (Plaintiffs' Exhibit

23              Two marked for

24              identification.)

25  BY ATTORNEY KRAKOFF:

59

1   Q.      If I can refer you to the 9th

2   Interrogatory on page 3.  This asks

3   the name and address of the company

4   which

5   FCI-McKean currently leases movie

6   cassettes for the showing of films to

7   McKean inmates.  And that question

8   was put to the Defendants in 1999.

9   Movie World, they're still currently

10  ordering from Movie World in

11  Bradford?

12  A.      Yes.

13  Q.      What about Swank Motion

14  Pictures that's listed here?  Do you

15  know whether the recreation

16  department still orders films from

17  Swank Motion Pictures?

18  A.      They do.

19  Q.      Had you dealt with Swank

20  Motion Pictures in conjunction with

21  the inmate film program at any point

22  prior to Zimmer, or is that something

23  that occurred after Zimmer?

24  A.      I believe we dealt with Swank

25  through a licensing agreement to show

60

1    movies.  I don't recall the exact

2    dates, but I believe Films,

3    Incorporated and Swank were both

4    utilized as licensed agreements to

5    show movies.

6    Q.      Now, with Movie World being

7    here, and at one point there was

8    another relatively local outlet that

9    you testified about in --- I forget

10   the name of the small town.  Kane.

11   What was the reason for dealing with

12   Swank?  Did Swank have something that

13   they could offer that wasn't

14   available at the local outlets?

15   A.      I believe Swank and Films,

16   Incorporated are both licensing

17   agreement vendors, and certain movies

18   --- Films, Incorporated --- were not

19   available through them.  So Swank was

20   also used as a licensing vendor.

21   Q.      What does the licensing vendor

22   mean exactly?  What was the practical

23   import of that?

24   A.      You have to buy the rights of

25   the production studio to show a

61

1   movie ---

2   Q.      Okay.

3   A.      --- to a large group.  You

4   just can't rent a movie.  You have to

5   buy the rights to it.

6   Q.      And so you used Swank and then

7   --- was it Movies, Unlimited or

8   Films, Incorporated?

9   A.      Films, Incorporated.

10  Q.      The prison had to deal with

11  them even to be able to order films

12  locally; is that correct?

13  A.      Yes.

14  Q.      And that still is the case?

15  A.      That's correct.

16  Q.      Why don't you tell me how

17  films are actually shown, the

18  process?  My understanding is that

19  they're shown in common areas over TV

20  sets, but I want you to tell me,

21  pre-Zimmer first, what was the --- in

22  a physical sense, how were films show

23  to inmates?

24  A.      Once we receive the movie?

25  Q.      Yes.

62

1   A.    We have a video cassette

2   player that's in the recreation

3   department. The movie is inserted

4   into the VCR. And then we have

5   television sets throughout the units

6   throughout the institution.

7   Q.    That are linked up to the VCR?

8   A.    Yes. And they're shown that

9   way. And that remains --- that's how

10   they're shown to this day.

11   Q.    That's how they've always been

12   shown?

13   A.    That's the way they've always

14   been shown, yes.

15   Q.    And you say throughout the

16   institution. Does that mean only in

17   the housing units, or in other places

18   as well?

19   A.    The inmates at the housing

20   units, yes.

21   Q.    Are the housing units in this

22   institution referred to as pods?

23   A.    No.

24   Q.    How are they referred to?

25   A.    Housing units.

63

1    Q.      Just housing units?

2    A.      Yes.

3    Q.      Okay.  And the TV will be in

4    kind of a common area?

5    A.      Correct.

6    Q.      And the inmates would be

7    outside of their cells, I take it,

8    sitting what, at benches?

9    A.      Chairs.

10   Q.      Chairs.  Okay.  And at

11   FCI-McKean, are inmates currently

12   permitted to have television sets in

13   their cells?

14   A.      No.

15   Q.      Has that always been the case?

16   A.      Yes.

17   Q.      And the television sets that

18   the films are shown over, are those

19   sets also utilized to allow inmates

20   in the housing units to watch

21   television programs?

22   A.      Yes.  There's televisions that

23   are designated for sports versus

24   movies.  There's Spanish televisions

25   where movies are shown.  Those

64

1    televisions are dedicated for movies

2    only.

3    Q.      I understand that.  But on

4    days that they're not shown, can

5    inmates see movies over the

6    television?

7    A.      A regular network program?

8    Q.      Yes.

9    A.      Yes.

10   Q.      Okay.  Are they allowed to

11   watch movies on HBO or any of the

12   other cable outlets?

13   A.      No.

14   Q.      And are there any particular

15   hours and days of the week that

16   inmates are allowed to watch regular

17   television programming?

18   A.      I believe the televisions are

19   turned on at 7:30, 8:00, and they're

20   turned off around 10:00 at night.

21   Q.      And is it some sort of a unit

22   direction or somebody who's in charge

23   of the unit who decides what's going

24   to be watched in that unit at a given

25   time?

65

1    A.      I believe it has to be

2    approved by a manager.  But the

3    televisions are all clearly marked,

4    you know, sports, TV, music TV, movie

5    television.

6    Q.      So is there more than one

7    television in each unit?

8    A.      Yes.

9    Q.      Okay.  So for those inmates

10   who want to watch movies, they go and

11   look at a particular television set;

12   is that correct?

13   A.      That's correct.

14   Q.      Okay.  And they can do that

15   whenever they're not working or

16   otherwise not in school or not

17   otherwise occupied; is that correct?

18   A.      That's correct.

19   Q.      And the movies that they see

20   are the ones that have been modified

21   in order to --- strike that.

22          The movies that they see which

23   had at one time been R-rated have

24   been modified so they could be shown

25   over the general networks; is that

66

1    correct?

2    A.    You're talking about the

3    movies that the recreation department

4    shows?

5    Q.    No.  I'm talking about the

6    ones that inmates can see on the unit

7    when they want to watch CBS or NBC or

8    ABC.

9    A.    That's correct, yes.

10   Q.    Okay.  Now, you mentioned a

11   Spanish language television network

12   that is available to inmates here.

13   A.    Yes.

14   Q.    Prior to Zimmer, did you have

15   Hispanic prisoners in the

16   institution?

17   A.    Yes.

18   Q.    And were there ever any

19   occasions when you leased or rented

20   Spanish-language movies to show

21   prisoners?

22   A.    I don't recall.

23   Q.    What about currently?  By

24   currently --- let me define that.

25   Subsequent to Zimmer and before you

67

1    became head of the education

2    department, do you have any

3    recollection of any Spanish-language

4    movies being shown?

5    A.    No.

6    Q.    What about other --- once

7    again, post-Zimmer, do you have a

8    recollection of any other

9    foreign-language films, non-Spanish

10   I'm talking about, being shown as

11   part of the program?

12   A.    No.

13   Q.    Are there any categories of

14   inmates, such as inmates in

15   segregation status, who are not

16   permitted to watch --- while they're

17   in that status, to watch movies as

18   part of the recreation program?

19   A.    Yes, segregation inmates.

20   Q.    Does that include

21   administrative custody as well as

22   disciplinary custody?

23   A.    Yes.

24   Q.    Are there any other categories

25   of prisoners who are not permitted to

68

1   see movies in the institution?

2   A.      No.

3   Q.      At the time of Zimmer, just

4   prior to Zimmer, pre-Zimmer --- let

5   me refer you to item 6 of Plaintiffs'

6   Exhibit Two.  I'm going to read the

7   question to you and then you can

8   confirm whether, if you know, that's

9   accurate, and ask about current

10  funding.  The question was, quote,

11  identify the funding source of the

12  movies that are used to lease

13  videocassettes for showing in the

14  inmate film program.  Example,

15  Inmates Benefit Fund, et cetera.

16  That was in parenthesis.  And

17  describe, with specificity, how the

18  monies are generated, parenthesis,

19  i.e., commissary purchased by

20  inmates, purchases from vending

21  machines in the inmate visiting area,

22  et cetera, closed parent.  Your

23  response was the Inmate Trust Fund,

24  which is funded through revenue from

25  commissary vending and inmate

69

1    telephone services.  As of 1999, was

2    that accurate?

3    A.      Which paragraph are you

4    reading?

5    Q.      I'm sorry, paragraph 6.  Why

6    don't you read that to yourself.

7    A.      What exhibit was that again?

8    Q.      Exhibit Two.  It's the

9    Interrogatories, coupled with the

10   Request for Production of Documents.

11   It's on page 3, at the top of page 3.

12   Do you see it?

13   A.      Yes.

14   Q.      Okay.  Why don't you read that

15   to yourself.  And I just read it out

16   loud.  I won't repeat it.  And tell

17   me whether that was accurate as of

18   1999.

19   A.      That's correct.

20   Q.      Has that changed since 1999?

21   A.      I do not know.

22   Q.      Had that changed prior to the

23   time you became supervisor of the

24   education department?

25   A.      I don't believe so.

70

1    Q.      I take it that as supervisor

2    of the education department, you

3    don't have too much involvement with

4    the movie program at this point; is

5    that correct?

6    A.      That's correct.

7    Q.      Referring you to Plaintiffs'

8    Exhibit 23.  I think this is the one

9    that might not be --- you might not

10   have the first page of --- which is a

11   --- I'll represent to you that this

12   is a printout that was obtained in

13   July of 1998 Plaintiffs' Counsel,

14   from Blockbuster Video on Baum

15   Boulevard in Pittsburgh.  And this is

16   an inventory status report reflecting

17   titles and ratings of movies that

18   were available from that outlet.  Did

19   you have anything similar to this

20   from Movie World or from the Kane

21   outlet that you didn't recall the

22   name of?

23   A.      No.

24                 ATTORNEY KRAKOFF:

25                 I don't have any other

71

1          questions.

2     SHORT BREAK TAKEN

3               ATTORNEY EDNEY:

4               I just have one

5          question for Redirect.

6     EXAMINATION

7     BY ATTORNEY EDNEY:

8     Q.     Mr. Flatt, you indicated

9     earlier in response to a question by

10    Mr. Krakoff that the institution

11    didn't exclude certain categories of

12    prisoners such as sex offenders or

13    violent prisoners from watching

14    movies.  Can you explain why that

15    wasn't the practice, to exclude those

16    specific individuals?

17    A.     If you start excluding

18    inmates, it's like segregation where

19    the inmates are not allowed to see

20    the TV, other inmates would know why

21    we took them out of there.  And their

22    security would --- it would basically

23    be affecting their personal safety

24    and security.

25    Q.     Are there other reasons?

72

1    A.      As far as locating them now

2    exactly being specific what sex

3    crimes, you know, did they commit,

4    how many --- where would we put that

5    many.  But the main reason was their

6    personal safety.

7                    ATTORNEY EDNEY:

8                    Thank you very much.  I

9          have nothing else.

10                    ATTORNEY KRAKOFF:

11                    I have nothing else.  I

12          appreciate it.

13    A.      Okay.

14                    ATTORNEY KRAKOFF:

15                    Thank you.

16    A.      Thank you.

17                    ATTORNEY EDNEY:

18                    He wants to read and

19          then sign.

20                * * * * * * * *

21    DEPOSITION CONCLUDED AT 9:58 A.M.

22                * * * * * * * *

23

24

25