1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - -x
                           :
RICHARD JEWELL, et al.,    :
                           :  Civil Action No.
       Plaintiffs,     :    97-408
                           :
    v.                  :
                           :
ALBERTO GONZALEZ, et al.,  :
                           :
       Defendants.     :
                           :
- - - - - - - - - - - - - -x

Washington, D.C.

Wednesday, April 6, 2005

The 30(b)6 deposition of JOHN M. VANYUR called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, at the offices of United States Department of Justice, 20 Massachusetts Avenue, N.W., Room 7400, Washington, D.C., convened, pursuant to notice, at 10:01 a.m., before Catherine B. Crump, a notary public in and for the District of Columbia, when were present on behalf of the parties:

PLAINTIFF'S
EXHIBIT

7

PENGAD 800-631-6989

2

APPEARANCES:

On behalf of the Plaintiffs:

JERE KRAKOFF, ESQ.
1705 Allegheny Building
Pittsburgh, Pennsylvania  15219
(412) 232-0276

On behalf of the Defendants:

MARSHA EDNEY, ESQ.
United States Department of Justice
20 Massachusetts Avenue, N.W.
Washington, D.C.
(202) 514-4520

MICHAEL J. PYBAS, ESQ.
U.S. Department of Justice
Federal Bureau of Prisons
320 First Street, N.W.
Washington, D.C.  20534
(202) 307-3872

3

# C O N T E N T S

EXAMINATION BY COUNSEL FOR

| WITNESS | PLAINTIFFS | DEFENDANTS |
|---------|------------|------------|
| John M. Vanyur | 7 | 130 |

# E X H I B I T S

| PLAINTIFF'S EXHIBIT | MARKED FOR IDENTIFICATION |
|---------------------|---------------------------|
| No. 1 | 11 |
| No. 2 | (Previously) |
| No. 3 | 31 |
| No. 4 | 32 |
| No. 5 | 42 |
| No. 6 | 83 |
| No. 7 | 117 |
| No. 8 | 120 |
| Nos. 9 through 10 | (Previously) |
| No. 11 | 33 |
| Nos. 12 through 18 | (Previously) |
| No. 19 | 70 |
| No. 20 | 99 |
| No. 21 | 100 |

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003
(202) 546-6666

7

1  Q Would you state your full name, please?

2  A My name is John Martin Vanyur.

3  Q Would you spell your last name?

4  A Sure.  V-A-N-Y-U-R.

5  Q Are you employed by the Federal Bureau of

6 Prisons?

7  A I am.

8  Q What is your position with the Bureau?

9  A I'm the Assistant Director of the

10 Correctional Programs Division.

11  Q How long have you held that position?

12  A Since June of 2004.

13  Q What are your basic functions and

14 responsibilities in that position?

15  A I have policy oversight for the majority

16 of prison operations throughout the Bureau, including

17 intelligence, emergency planning, security, mental

18 health delivery, inmate transportation, community

19 corrections, privatization, private correctional

20 management, and religious services.

21  Q Does any of your work involve

22 recreational programs in prisons?

8

1      A    I don't have direct oversight of

2 recreation.

3      Q    Who has direct oversight over that area?

4      A    The Assistant Director of Industries,

5 Education, and Vocational Training?

6      Q    who is that person?

7      A    That's Steve Schwalb.

8      Q    Were you employed by the Federal Bureau

9 of Prisons prior to the time you assumed your

10 position in June of 2000?

11     A    I was.

12     Q    In what capacity?

13     A    Prior to that, I was the Deputy Assistant

14 Director of Correctional Programs Division, and then

15 prior that, I was the warden at the Federal Detention

16 Center in Philadelphia, Pennsylvania.

17     Q    How long did you hold your position as

18 the Deputy Assistant Director?

19     A    Three and a half years.

20     Q    Do you recall the year that you began in

21 that position?

22     A    January 2001.

9

1      Q    Did you have any involvement in that

2 position with respect to inmate recreational

3 programs?

4      A    No.

5      Q    Okay.  And who at the time you became the

6 Deputy Assistant Director was responsible for

7 overseeing recreational programs?

8      A    Steve Schwalb.

9      Q    Do you know approximately how long Mr.

10 Schwalb has held that position in industries?

11     A    I'm not sure.  Probably since, you know,

12 mid-nineties, '96, '97 possibly.

13     Q    Are you familiar, generally familiar,

14 with the Zimmer Amendment?

15     A    I am.

16     Q    Was Mr. Schwalb in charge of overseeing

17 recreational programs prior to Zimmer or did he come

18 in after, if you recall?

19     A    I don't know.  The timing is close.

20     Q    Do you recall who held Mr. Schwalb's

21 position prior to the time Mr. Schwalb assumed his

22 position?

12

1    at Plaintiff's Exhibit 1, which is a three-page

2    document, not including the certificate of service,

3    titled "Notice of Deposition".  Have you seen this

4    document prior to now?

5           A    Yes, briefly.

6           Q    When did you see the document for the

7    first time?

8           A    Yesterday.

9           Q    Did you read the entire text of the

10   document?

11          A    Yes.

12          Q    Okay.

13          A    Quickly.

14          Q    And are you appearing today as the Rule

15   30(b)6 designee on behalf of the Federal Bureau of

16   Prisons?  And by 30(b)6, I'll translate that into

17   laypersons terms.

18          A    Thank you.

19          Q    30(b)6 essentially with respect to a

20   government party allows for a notice to be sent to

21   the governmental entity asking the entity to

22   designate a person or persons to testify on behalf of

13

1 the governmental entity, and my question is whether

2 you've been designated by the Bureau of Prisons to

3 testify at this deposition on behalf of the Bureau.

4     A   Yes.

5     Q   Okay.  And what I'd like you to do so

6 that I'll know what the parameters are, I'd like you

7 to read to yourself through each of the 11 items, and

8 I'm going to ask you after you read whether there are

9 any items that you are not prepared today to testify

10 about so that I'll try my best not to ask you about

11 those matters .

12           [Witness peruses exhibit.]

13           THE WITNESS:  There would be two

14 questions that would be difficult for me to answer.

15           BY MR. KRAKOFF:

16     Q   Could you just by number tell me which

17 those are?

18     A   No. 8.

19     Q   Okay.

20     A   I'm not sure what an exaggerated response

21 is.  I don't know if that's a legal term or not, but

22 it doesn't have meaning to me.

14

1          Q     All right.

2          A     And No. 11, I would be able to discuss

3    the questions in the context of the Bureau of

4    Prisons, but in terms of my knowledge of what's

5    specifically going on at FCI McKean, I wouldn't have

6    knowledge of that.

7          Q     Understood.  Given the fact that Mr.

8    Schwalb had direct oversight on the matter, over

9    matters involving inmate recreation.  I assume

10   including but not limited to showing movies to

11   inmates, do you know why--and I'm not asking you to

12   divulge anything that either of your attorneys might

13   have told you with respect to--if it was their

14   decision, I'm not asking you to go into that, but do

15   you know why independent of divulging any

16   confidential information Mr. Schwalb is not

17   testifying about the movie issue and why you are?

18         A     I would be--my expertise in day-to-day

19   prison operations would stronger than his.

20   Recreation is small part of their mission.  I have

21   all the security and the day-to-day operations.  I'm

22   basically the chief operating officer for the agency.

26

1        A     That's Dr. John Baxter.

2        Q     Can you spell the last name?

3        A     B-A-X-T-E-R.

4        Q     And why did you speak with him?

5        A     We were talking about an issue that will

6 probably come up later on criminogenic risk factors,

7 and we just had an academic discussion, if you will.

8        Q     What does that mean?

9        A     There is a lot of literature over the

10 last decade that people involved in criminal behavior

11 are at risk with their attitudes, with their

12 decision-making, with flaws in their value systems,

13 and those risk factors contribute to probability that

14 they'll be involved in criminal behavior, and so when

15 we design programming for inmates to prepare them for

16 re-entry, we'll increase their success at recidivism

17 if we can deal with those criminogenic risk factors

18 and bring those risk factors down.

19       Q     Are movies related to risk factors?

20       A     They possibly are.

21       Q     Is there literature reflecting that?

22       A     I'm not aware of literature specifically

27

1  addressing the issue of movies and criminogenic risk

2  factors, but the messages that are in a variety of

3  media would be related to a number of these factors.

4      Q     What kind of messages are you referring

5  to?

6      A     Messages that are--I'll give you the

7  three most common, the biggest criminogenic risk

8  factors that are out there.  The first is antisocial

9  pro-criminal belief system or value system, and

10 that's a system that glorifies criminal behavior,

11 drug use, violence.

12     Q     Okay.

13     A     The second major criminogenic risk factor

14 that we find with a lot of our inmates is that

15 they're only exposed to other people that are

16 criminals and that they don't have associates or role

17 models that are non-criminal.

18     Q     Okay.

19     A     And the last of what they call the big

20 three of these factor--and there's a number of these

21 criminogenic risk factors--are temperament or

22 personalty flaws, and a number of those are excessive

28

1  risk-taking, egocentric personalities where you

2  believe the world in essence revolves around you,

3  impulse control, psychopathy, and there's a number of

4  other ones.

5            So when we design programs, we try to

6  attack those risk factors and bring them down.

7      Q    The first one you mentioned, the

8  antisocial pro-criminal value system, I think.

9      A    Yes.

10     Q    Is that something that was not understood

11  more than 10 years ago?

12     A    No.   These criminogenic risk factors

13  really didn't come into play in the literature until

14  the mid-nineties and really over the last probably

15  five to seven years with some of the work done at the

16  University of Cincinnati and so forth.

17     Q    So they didn't exist at the time the

18  Zimmer Amendment was enacted?

19     A    They would have been around--the earliest

20  article I recall, and there could be earlier ones,

21  dates back to about 1994.

22     Q    Okay.   So that's about 10 years ago?

1        A       Um-hum.

2        Q       And the second one was exposure to other

3    people who are not criminals?

4        A       Correct.

5        Q       In a sense, it's a way of saying that a

6    lot of the people in prisons are people who grew up

7    in an environment where there were lots of criminals

8    around?

9        A       And other associates, their peers, will

10   have a criminal lifestyle, and so they don't in

11   essence have the feel for what a non-criminal

12   lifestyle would be like.

13       Q       So showing a prisoner a movie about

14   somebody who is a noble figure who is not a criminal

15   and who has been--who has done some good things of a

16   non-criminal nature could be a positive thing for

17   such prisoners?

18       A       That could be.

19       Q       Or their reading books about such people?

20       A       Yes.

21       Q       Have you spoken with anybody other than

22   Dr. Baxter outside of the attorneys in order to

1 respective regions, it would be expected that they

2 would receive a copy of the program directive too; is

3 that correct?

4          A    Yes.

5          Q    And most of my work is within the state

6 prison system, so I'm asking you this because I

7 really don't know the answer.  I'm assuming, and tell

8 me if I'm wrong, by using the nomenclature "regional

9 directors" that the Bureau of Prisons is divided into

10 various geographical regions?

11         A    That's correct.

12         Q    And which region would FCI McKean fall

13 within?

14         A    Northeast region.

15         Q    How many regions are there?  Seven?

16         A    There's currently six.  There were five

17 in 1986.

18         Q    Okay.  And when the warden received a

19 program statement such as the inmate recreation

20 program statement of September 16, 1986, was he

21 expected--in fact, was he required to comply with the

22 program statement?

38

1     A    Yes.

2     Q    And were the personnel within a given

3 prison under the warden expected and, in fact,

4 required to comply with the program statement?

5     A    Yes.

6     Q    Now, this particular program statement,

7 would this have applied--let me ask you specifically

8 so we can narrow it down somewhat.  If you look at

9 Item 4 on the first page, it gives--it lists a number

10 of leisure activities that inmates could participate

11 in when not performing assigned duties, and then they

12 list informal sports, physical fitness, table games,

13 and then eventually down to movies and stage shows.

14     With respect to movies, Item 7 on page 3,

15 I'll read that before putting a question to you.  It

16 says movies and then it gives a section, 544.33.

17     "The warden or designee may approve the

18 showing of movies at the institution.  X-rated movies

19 are not permitted.  Where the institution receives

20 premium movie channels through cable television

21 subscription, regular movie rental ordinarily will be

22 limited to special events or holidays."

39

1          And then in the implementing information

2    section, it says:  "This selection authority may not

3    be delegated below the level of supervisor of

4    education.  Movies will be disapproved when the

5    warden determines that showing, slash, viewing them

6    would pose a threat to the security or good order of

7    the institution."

8          When the warden at FCI McKean received

9    this, and I'm just using him as the example, any of

10   the wardens, was he required to comply with this

11   provision?

12        A    Yes.

13        Q    And if, in fact, an X-rated movie to be

14   shown in the face of Item 7, he would, the warden

15   would, be violating Bureau of Prisons policy, would

16   he not?

17        A    Yes, sir.

18        Q    Now, with respect to inmates who are in

19   the general prison population, I assume that's a--is

20   that a term that is used in the federal system to

21   distinguish it from inmates who are in some sort of

22   administrative segregation or disciplinary--

40

1  A  Yes. General population.

2  Q  Would this program statement have applied

3 to inmates who were in the general population?

4  A  Yes.

5  Q  Okay. And by that, I mean it would have

6 routinely been applied to general population inmates

7 across the board. Correct?

8  A  Yes.

9  Q  Do you know whether the showing of movies

10 was available in 1986 to inmates who were in

11 segregated confinement?

12  A  They wouldn't have--I can only speak to

13 my experience at Terminal Island.

14  Q  Right.

15  A  No. They would have no access to that.

16  Q  Okay. I refer you to Plaintiff's Exhibit

17 4, which is not titled program statement. If you

18 read through this, does this appear to be a program

19 statement with the exception of the heading?

20  A  Yes. The "P.S." at the beginning of the

21 top number means program statement.

22    MR. KRAKOFF: Okay. Before I ask another

48

1  assigned duty trumps the viewing of a movie?

2       A    Yes.

3       Q    Now, I read earlier to you the

4  implementing, the non-bold, text of Item 7 which said

5  that the selection authority may not be delegated

6  below the level of the supervisor of education.  As

7  you sit here today, is that still a requirement, that

8  somebody no lower than the supervisor of education

9  approve movies, or has that been changed?

10      A    I'm not sure.

11      Q    Okay.  What about the next line, the fact

12  that the warden was authorized to--more than

13  authorized.  I think he was--the warden was told that

14  movies will be disapproved when he determines that

15  showing or viewing them would pose a threat to the

16  security or good order of the institution.  Is that

17  proposition still in play within the Federal Bureau?

18      A    Yes.  The warden would have the authority

19  and responsibility to control anything that would be

20  a threat to the security and order of the

21  institution.

22      Q    So in 1986 prior to the Zimmer Amendment,

49

1 the warden had the authority if he saw a movie,

2 whether it was P.G. or R-rated, he had the authority

3 to say, no, we're not going to show this movie

4 because I think it could have a detrimental impact on

5 security or good order.  Correct?

6        A    That's correct.

7        Q    Am I correct, including from Item 7, that

8 R-rated movies under this program statement were not

9 categorically prohibited from being seen by inmates

10 in the Bureau of Prisons institutions?

11        A    Yes.  That is correct.

12        Q    And am I correct that R-rated movies that

13 were unedited--and I'll define that in a minute--were

14 not categorically prohibited from being shown to

15 inmates?  And by edited, I mean, and I think I might

16 have defined this earlier in conjunction with another

17 question, but by edited, I mean the deletion of

18 graphic violence, sex, and language.  Under the 1986

19 program statement, R-rated movies that were not

20 edited could be shown if the warden did not determine

21 that they would pose a risk to security or good

22 order; isn't that true?

61

1     A    Yes.

2          MR. KRAKOFF:  Okay.  What time is it?

3 Off the record.

4          [Recess.]

5          MR. KRAKOFF:

6     Q    Do you have any reason to believe that

7 the director in 1986 when issuing a program statement

8 that did not categorically bar R-rated movies did not

9 consider the security, internal order, punishment,

10 and rehabilitative objectives of the Bureau of

11 Prisons?

12     A    I have no reason to believe that.

13     Q    And the same answer with respect to the

14 1993 and 1994 program statements that are embodied in

15 Exhibits 4 and 5?

16     A    Yes.

17     Q    Why as a matter of policy prior to the

18 enactment of the Zimmer Amendment did the Bureau of

19 Prisons allow R-rated movies to be seen in the

20 federal institutions?

21     A    Well, they didn't categorically allow all

22 of them.  They set a standard of individual review

64

1   not showing, and there were some movies that I

2   wouldn't have shown.

3          Q    Those particular movies--those particular

4   wardens had to, were expected to, make a

5   determination of whether there was a security or

6   internal order problem associated with showing the

7   movie.  Correct?

8          A    That's correct.

9          Q    And isn't that something that they still

10  have to take into consideration with respect to the

11  movies, the categories of movies that are permitted

12  to be shown under the current post-Zimmer policy?

13         A    Yes.

14         Q    So to some extent, they're going to still

15  have to review specific movies to make some

16  determination as to whether they're appropriate to

17  show or not.  Correct?

18         A    Yes.  That universe would be much

19  smaller, but yes.

20         Q    Are you familiar with how they would

21  review a movie to determine whether it was something

22  that would be appropriate for showing?  Did the

66

1  length?

2       A     Yes.

3       Q     I don't even know if two hours is the

4  normal length of a movie.

5       A     Yes.

6       Q     An hour and a half, maybe two hours.  And

7  you're saying that doing that once a week or twice a

8  week or even three times a week, that that would have

9  a significant impact within a given prison on prison

10 resources?

11      A     What I'm saying is those resources could

12 be better spent.  Inmates on average--let me give you

13 an example.  The longest phone call they can make is

14 15 minutes.  We know they're running criminal

15 enterprises, some inmates, from inside institutions.

16 If I had a staff member available for three hours,

17 I'd rather have them listen to 12 or 15 more phone

18 calls that we've targeted them to listen to than

19 watching movies and making determinations as to

20 whether it's appropriate or not.

21      Q     Now, the things that the inmates are more

22 concerned about, would those be things like

79

1  selecting video movie rentals.  By exercising good

2  judgment, was that another way of saying that they

3  were to look at such things as security and general

4  order?

5          A    Yes.

6          Q    Were they to look at anything else?  Were

7  there any other standards?  Would they look at how

8  this might impact on rehabilitation or how this might

9  affect punishment?

10         A    Yes.  I think all of the above.

11         Q    All those.  Is that right?

12         A    Yes.

13         Q    The GS-9 level, what does that mean?  Is

14 that some sort of a ranking officer, or what is a

15 GS-9?  How high do you have to be?

16         A    That is the general schedule grade level.

17 That's the federal equivalent to rank, if you will.

18         Q    Right.  Is that fairly high on the

19 pecking order?

20         A    In an Education Department, it would be a

21 supervisory level individual.

22         Q    Okay.  What is a licensing agreement,

80

1  generally speaking, in connection with movies?  Do

2  you understand that?

3         A     Um-hum.

4         Q     That term.  What did that entail?

5         A     In broad terms.  There's some questions

6  of whether--and I'll give you a perfect example.  If

7  you rent a movie from Blockbuster, do you have the

8  permission to show that to 1200 people over a

9  distributed system or over a number of days?  And the

10 attorneys have been involved in that.  That's what I

11 think they're getting into, licensing agreements, I

12 think.

13        Q     So some sort of an authorization from a

14 distributor to show it to like a group rather than

15 just you and your wife or your children?

16        A     That's my understanding.

17        Q     Okay.  And do you still have page 4 of

18 Exhibit 5?

19        A     Yes.

20        Q     This says, the fourth paragraph:

21 "Institutions are not to use salaries and expenses,

22 parentheses, S & E, closed paren, appropriations or

88

1      Q    Why don't you suppose?

2      A    I would suppose that our director was

3  getting very clear guidance from either the

4  Department of Justice or from the Hill on what the

5  expectation was.

6      Q    Okay.  Now, do you know what the security

7  classification of FCI McKean is?

8      A    Yes.  It's medium.

9      Q    Medium?

10     A    With a camp attached.

11     Q    Which would be less than--

12     A    Which would be minimum.

13     Q    And the first item under the in-cell

14  television viewing, the BOP typically does not

15  provide in-cell television viewing for inmates, you

16  explained at least in the maximum security facility

17  in Florence, there was television, because those

18  inmates--I suppose because those inmates weren't

19  released from their cells.  If they were going to see

20  something, it was going to be on a television inside

21  the cell.  Correct?

22     A    That's correct.

89

1       Q   Has that changed?  Do inmates at

2  facilities such as FCI--and I know you told me at the

3  outset you can't really answer specific questions

4  about McKean, but in a medium security institution,

5  do they have television sets in their cells?

6       A   No.

7       Q   So when inmates see movies in a medium

8  security facility such as McKean, are those movies

9  shown over television sets that are in common areas?

10      A   There's probably a variety of ways that

11  they pipe them out, if you will.

12      Q   Generally, it will be a group of inmates

13  as opposed to an individual inmate sitting in a cell?

14      A   Yes, and my experience has been that most

15  of them are pushed over the televisions that are out

16  in the common area in the units.

17      Q   Okay.  If you would turn to page 3,

18  please.  Okay.  Under this policy, then, X-rated

19  remained categorically prohibited as it had been

20  before Zimmer.  True?

21      A   Yes.

22      Q   Okay.  And Item 3, it says:  "In FY 1996,

96

1  videotaped or recorded in some fashion, like with a

2  stenographer or whatever?

3        A    Not the entire conference.  There are

4  times when the director gives a state of the Bureau

5  address, and sometimes those are recorded.

6        Q    Okay.  Was anybody from the Bureau

7  administration--by that, I define to mean based in

8  Washington, D.C., the director, the associate

9  director or assistant director--

10       A    Assistant director.

11       Q    The regional directors.  I realize

12 they're not in Washington, I suppose.

13       A    No, they're not.

14       Q    I'm not here to testify, but in any

15 event, but anybody from the director on down speaking

16 on behalf of the director, anybody asked by either

17 Representative Zimmer or by other member of Congress

18 to state the Bureau of Prisons' position with respect

19 to the Zimmer Amendment?

20       A    Not to my knowledge.

21       Q    Okay.  In that question, I want to be

22 clear.  That would include the amendment's impact on

97

1  the showing of movies.  To your knowledge, did

2  anybody from Congress request input from the Bureau

3  of Prisons with respect to the advisability or the

4  need for that policy?

5        A     Not that I'm aware of.

6        Q     To your knowledge, did anybody from the

7  Bureau present the Bureau's position either to

8  Representative Zimmer or other members of Congress

9  with respect to the Zimmer Amendment?

10       A     Not that I know of.

11       Q     The same question, more specifically with

12 respect to the issue of movies:  Same answer?

13       A     Yes.

14       Q     So that we understand, when I'm talking

15 about somebody from the Bureau presenting this, I

16 mean somebody that could be either the director, the

17 assistant director, or somebody on their behalf.

18 You're not aware of anybody presenting the Bureau's

19 position to Congress; is that correct?

20       A     Yes.  It could have occurred.  I'm not

21 aware of it.

22       Q     I understand that.  My question relates

98

1  not only to an oral communication, but it would also

2  include anything in writing.  Are you aware of either

3  going from the Bureau to Zimmer or other members of

4  Congress with respect to the Bureau's position on the

5  Zimmer Amendment?

6          A    No.

7          Q    Okay.  And since 1996 up to the present

8  fiscal year, has Zimmer, either the exact language of

9  Zimmer or some reasonably close facsimile of Zimmer,

10 been enacted in each of the fiscal years since then?

11         A    Yes.

12         Q    And so as a matter of the--strike that.

13 And has the policy, the written policy of the Bureau

14 of Prisons, remained the same since Zimmer with

15 respect to the sowing of NC-17, which this case

16 doesn't concern, and R-rated, unedited R-rated,

17 movies?

18         A    Is your question is that the Bureau's--

19         Q    Has that remained the same--has the

20 written policy as embodied in the program statements,

21 has that remained the same since Zimmer, i.e.,

22 prohibiting the showing of NC-17 and R-rated movies?

99

1    A    Well, I don't have the latest program

2 statement to confirm that, but certainly at least

3 from the director's--from Exhibit 6, the director's

4 directive, I would--it certainly has continued to be

5 followed.

6    Q    Let me refer you to--the most recent

7 policies that I have are the September 15, 1997.  I'm

8 sorry.  That's an institution supplement.

9 Plaintiff's Exhibit 20, maybe we can have an

10 agreement.  This appears to be a program statement,

11 although it doesn't have the title, but it says PS

12 5370.10.  This appears to be a program statement,

13 which I gather was issued on February 23rd of the

14 year 2000.

15           [Plaintiff's Exhibit No. 20 was

16           identified for the record.]

17        BY MR. KRAKOFF:

18    Q    Does this appear to be a program

19 statement on recreation?

20    A    Yes.

21    Q    Are you aware of any program statement

22 since February 23, 2000 being issued in conjunction

101

1  clarification on statutory requirements affecting

2  recreation."  And this goes through--I just have

3  through A-11, and then Plaintiff's Exhibit 21,

4  contains what appears to be the questions and answers

5  document was referring to in 20.

6         Are you familiar with this question and

7  answer document?

8         A    I've seen them before.  It's been a

9  while.

10        Q    Okay.  To your knowledge, does this

11 represent the policy of the Federal Bureau of Prisons

12 with respect to the viewing of R, X, or NC-rated

13 movies, the current policy?

14        A    Yes.  I believe it does.

15        Q    Okay.  Now, would it be accurate to say

16 that at the time Zimmer was originally enacted in

17 1996, that the Federal Bureau of Prisons

18 administration had not reached a conclusion that

19 R-rated movies categorically--and that would include

20 unedited R-rated movies--posed enough of a danger to

21 penological interests to bar them categorically?

22 Would that be a fair and accurate statement?

102

1  A  Yes.

2  Q  Okay.  And are you aware of any document

3 since 1996, since Zimmer was enacted, in which the

4 Bureau of Prisons administration expresses a belief

5 that showing unedited R-rated movies under the

6 procedure that existed prior to Zimmer, which allowed

7 a review by the warden or the education director,

8 posed a significant risk to any of the legitimate

9 penological interests, such as security, internal

10 order, rehabilitation, or punishment?

11  A  Well, the document would be the program

12 statement.  As we discussed earlier when we were

13 talking about what was added to program statements,

14 when we add things to it, we always look at them with

15 an eye towards correctional management and

16 penological interests.

17  Q  Well, is it your testimony that the 2002

18 program statement was something that was put together

19 with respect to movies independent of Zimmer?

20  A  No.

21  Q  Okay.  And do you have any reason to

22 believe as the designee of the Bureau of Prisons that

107

1  we can confirm what I believe to be the case, but I'm

2  not certain, that Exhibit 21 was part of the program

3  statement that's embodied in Exhibit 20, so we'll

4  know whether that was the questions and answers that

5  we referred to.

6          MS. EDNEY:  Okay.  No problem.

7          BY MR. KRAKOFF:

8      Q    Okay.  In connection with the subsequent

9  what I'll refer to as the Zimmer Amendments, even

10 though I don't think they refer to it as the Zimmer

11 Amendments anymore, the ones that came after the

12 original 1996, to your knowledge, beginning in '97

13 and continuing up to the present, has Congress sought

14 input from the Federal Bureau of Prisons as to

15 whether the prohibitions of the Zimmer Amendment

16 should be continued?

17     A    Not that I'm aware.

18     Q    Same question, more specifically with

19 respect the movies:  Same answer?

20     A    Yes.

21     Q    And to your knowledge, has the Federal

22 Bureau of Prisons expressed a position to Congress,

108

1 either in writing or orally, as to whether the Zimmer

2 Amendment should continue to be enacted?

3      A    Not that I'm aware of.

4      Q    Same answer specifically with respect to

5 the showing of movies?

6      A    Yes.

7      Q    And by movies, I meant R-rated.

8      A    Yes.

9      Q    You understood that?

10      A    Yes.

11      Q    Okay.  Now if I can take your back to the

12 Hawk memo which is Plaintiff's Exhibit 6--by the way,

13 before answering this, you certainly are free to read

14 the entire memo to yourself.  I don't want to take

15 anything out of context or confuse you.  Let me read

16 something and then put a question to you, and then if

17 you need time to review the entire memo, let me know.

18 You can do so.

19      The next to the last paragraph, it's

20 referring to--well, let me just read it.  It says:

21 "The detail and examples provided in this memo are

22 intended to address as many questions as possible and