**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RICHARD JEWELL, et al, <br><br>              Plaintiff, <br><br>   v. <br><br>ALBERTO GONZALEZ, et al, <br><br>              Defendants. | C.A. 97-408 Erie <br><br> Judge McLaughlin <br> Magistrate Judge Baxter |

## RESPONSE TO THE BUREAU OF PRISONS' REPLY TO INMATES' CROSS-MOTION FOR SUMMARY JUDGMENT

In its reply to the plaintiffs' cross-motion for summary judgment, the Bureau of Prisons has made several assertions that warrant a response. What follows is a point-by-point discussion of the assertions, each of which lacks merit from the standpoint of the pending motions.

### 1. The Jurisdiction Contention

In its reply, the Bureau of Prisons does not dispute the fact that this court previously rejected its Article III lack of jurisdiction argument. The Bureau suggests, however, that the argument can be resurrected because standing "is a jurisdictional requirement that cannot be waived and may be raised at any time in the proceeding." [Reply Br. at p. 1, n. 1] While it is true that the absence of jurisdiction may be raised at any time in a lawsuit, this does not mean that the issue can be revisited when jurisdiction has already been found to exist and circumstances have not changed since the finding.

The record confirms that Bureau's challenge to Article III jurisdiction was not only rejected <u>by this court</u> following remand from the Third Circuit Court of Appeals; it shows that the challenge was rejected by the <u>Court of Appeals</u> prior to remand in the context of the Bureau's petition for a panel rehearing. As reflected in that petition (attached as Exhibit 13 to this brief), the Bureau urged the Third Circuit panel to vacate its decision and to affirm this court's dismissal of this case on jurisdictional ground. The Bureau argued that there was no longer a case or controversy because the inmates (in the framework of their appeal) had abandoned their challenge to the Zimmer Amendment and were challenging only the BOP censorship policy that implemented Zimmer. The panel declined to grant a rehearing.

Given the fact that the Bureau's jurisdictional challenge has twice been rejected in this case and the reality that circumstances have not changed since the rejections, there is no principled basis to resurrect the issue at this juncture.

**2. The Hard Statistical Proof/Specific Security Incidents Assertion**

The inmates' original brief argued that "[t]he lack of evidence in the record of R-rated films having created security or internal order problems at McKean (or elsewhere, for that matter) can be considered when addressing whether there is a rational connection between the ban on such movies and the security concerns put forward by prison officials." [Br. at p. 19] *Banks v. Beard*, 399 F.3d 134 (3 cir. 2005), was cited in support of that proprosition. Rather than replying to that argument, the Bureau interposed another proposition not advanced by the inmates. The Bureau also ignored the pertinent analysis in *Banks*. In doing so, the Bureau has handed the court a red herring to dissect.

In its reply, the Bureau contended that "**hard statistical proof** is fundamentally inconsistent with *Turner* and, therefore, it is irrelevant that neither the deposition testimony

2

nor the declarations **detail any specific security incidents** relating to movies." [Reply Br. at p. 2]  A review of the inmates original brief will confirm that they did not suggest that *Turner* requires either "hard statistical proof" or the "detailing of specific incidents" related to the impact of showing R-rated movies during the time period preceding the banning of such films.

The Third Circuit's analysis in *Banks*, makes it clear that the <u>absence of security-related problems prior to the establishment of a challenged policy is relevant</u> to *Turner's* rational connection analysis.  When addressing whether the banning of newspapers, magazines, and photographs in a maximum security segregation unit was rationally connected to the security concerns put forward by prison officials, the <u>Banks</u> opinion illustrates the propriety of reviewing the record to see whether there is evidence of security breaches under the policy that preceded the challenged policy.  The Court wrote:

> With respect to security, the District Court held that there was a valid rational connection between the ban on periodicals and photographs in LTSU Level 2 and the constellation of security concerns put forth by the DOC.  We cannot conclude from the record that such a connection exists. . .
>
> [T]here is no evidence in the record of the misuse of periodicals or photographs in any of the ways described by the DOC.  In fact, matches are not allowed in the LTSU.  *See also* <u>Gregory, 768 F.2d at 289</u> ("cellblock fires have been eliminated entirely … by new regulations prohibiting inmates from possessing matches").  There was no testimony as to the frequency of fires in the LTSU, nor testimony about any particular fires, in or out of LTSU segregation, and how and with what materials they were set and fueled.  [FN11]  The same is true for the materials' potential use as weapons.
>
> Furthermore, there was no testimony as to the effect such a ban has had on the frequency of fires, be it in the LTSU or elsewhere.  In fact, Banks points out that inmates on Death Row, in Administrative Custody, and in the Special Management Unit are routinely permitted to have these items, and the DOC

3

>   presented no evidence that the security or operations of these
>   units are negatively affected to any palpable degree by the
>   presence of these items.

<u>Id</u>. at 142-43.

### 3.  The Consultation Assertion

After noting in its reply brief that the inmates "take issue with the fact that Congress did not appear to consult with BOP prior to enacting the Zimmer Amendment," the Bureau went on to say that Congress has the authority to legislate prison policy, is not required to consult with the Bureau before passing legislation related to prison conditions, and is not required to engage in a fact-finding process to enact valid legislation.  [Reply Br. at p. 6]  These contentions, although true, are canards.

The obvious reason the plaintiffs' highlighted the fact that neither representative Zimmer nor Congress consulted with the Bureau prior to enacting the Zimmer Amendment was <u>not</u> to suggest that the failure to consult with or to ascertain the facts invalidated the statute; it was to illustrate that the Zimmer Amendment was an <u>ill-informed</u> decision made by a <u>third party</u> -- facts that support the contention that the censorship policy either has no <u>rational connection</u> to legitimate penological interests or is an <u>exaggerated response</u> to such interests.

### 4.  The Telephone Monitoring Assertion

In its reply brief, the Bureau suggested that Dr. John Vanyur testified in his deposition that time spent reviewing R-rated movies "could be used by staff to conduct **other activities,** such as telephone monitoring."  [Reply Br. p. 8, fn. 6]  Vanyur actually testified that the time could be utilized for "phone monitoring and **other intelligence**."  [Pls. Ex. 7 at 62-63]  this is an important distinction.  Donald Reich, a Security Captain at FCI

4

McKean, testified that the monitoring of inmate telephone calls at McKean is not conducted by members of the Recreation Department staff but by uniformed officers. [See pp. 25-27 of Reich transcript, attached as Exhibit 14] In addition, there is no evidence in the record that Recreation Department personnel are involved in the <u>gathering of intelligence or any other intelligence function</u>.

### 5. The Aggregation Assertion

In its reply brief, the Bureau of Prison argued that the inmates "are looking at the [R-rated movie] restriction out of context" because the restriction must be viewed as part of an <u>aggregation or spectrum of restrictions</u> that were imposed by the Zimmer Amendment to deter criminal activities in society-at-large. [Reply Br. at pp. 5-6] Those restrictions included the banning of in-cell televisions; the prohibition against instruction in boxing, wrestling, weightlifting, and the martial arts; the banning of equipment for boxing, wrestling, weightlifting and the martial arts; the proscription of coffee pots, hot pots, and heating equipment in cells; and the banning of electrical music instruments. According to the Bureau, the rationality of the R-rated film policy becomes clear if assessed in this larger context rather than in isolation. This aggregation approach, however, is at odds with Third Circuit jurisprudence, as reflected in the opinion rendered in this case.

When addressing the Bureau's argument that the banning of R-rated movies has a deterrent effect, the Court of Appeals did <u>not</u> consider the policy as part of an <u>aggregate</u>. When asking whether it was a matter of common sense, as argued by the Bureau, that "prohibiting movies rated R…deters the general public from committing crimes, lest they be sent to prison where they are not permitted to watch R-rated movies," the panel looked at the censorship policy in <u>isolation</u>. See *Wolf v. Ashcroft*, 297 F.3d 305, 309 (3 Cir. 2002).

5

Assuming, for the sake of argument, that it <u>is</u> necessary to assess the deterrence objective of the film policy as part of an aggregation of restrictions, it is <u>irrational</u> to believe that the denial of access to coffee pots, weight equipment, electrical music instruments, instruction in boxing (in addition to R-rated films) would have any palpable deterrent effect on the commission of crimes outside the prison walls.

### 6. The Criminogenic Risk Factor Assertion

In the Bureau's original memorandum in support of summary judgment, it stated:

> **R-rated movies often contain messages that feed into these criminogenic risk factors** by exposing inmates to depictions of graphic violence, substance abuse, criminal behavior, victimization and devaluation of others, violation of societal norms and the rights of others, and other themes which reinforce pro-criminal value systems and anti-social behaviors and beliefs.  Vanyur Decl. at ¶ 9.  **R-rated movies also provide visual stimuli which reinforce violence, substance abuse, racial stereo types, and misogynist attitudes, and promote negative role models** that reinforce gang or criminal reference group ideas and norms.  <u>Id</u>. at ¶ 10.  Therefore, it makes sense that restricting access to these types of movies is reasonably related to the legitimate penological goals of rehabilitation and deterrence. [Mem. At pp. 13-14]

As reflected in the text of the statement quoted above, the assertions were based on John Vanyur's written declaration, a document that was attached to the memorandum as an exhibit.  Plaintiffs' original brief underscored the fact that the broad argument that <u>R-rated movies</u> often contain messages that feed into criminogenic risk factors and provide visual stimuli that reinforce violence, etc. conflicted with Vanyur's <u>deposition testimony</u> that there is a "**possible connection**" between the showing of movies to prisoners and criminogenic risk factors.  [Br. At 20-21]  In its reply brief, the Bureau denied that there is an inconsistency between Vanyur's <u>declaration</u> and his <u>deposition testimony</u>. Its explanation is that "Dr. Vanyur was limited [at his deposition] to answer the questions posed by plaintiffs'

6

counsel … In his declaration, [he] was able to fully explain the connection between rehabilitation and the restriction on R-rated movies." [Reply Br. at pp. 4-5] The deposition questions and answers recited below belie this contention.

> Q. Are movies related to [criminogenic] risk factors?
>
> A. **They possibly are**.
>
> Q. Is there literature reflecting that?
>
> A. I**'m not aware of literature specifically addressing the issue of movies and criminogenic risk factors**, but the messages that are in a variety of media would be related to a number of these factors.

[Ex. 7, at 26-27]

Vanyur's testimony that the showing of movies "possibly" has a relationship to criminogenic risk factors is hardly consistent with the assertion in Vanyur's declaration that "R-rated movies provide visual stimuli which reinforce violence, substance abuse, racial stereotypes, and misogynist attitudes, and promote negative role models that reinforce gang or criminal reference group ideas and norms." It is also fundamentally at odds with Vanyur's broad statement that showing R-rated movies negatively affect security and order in a prison because "repeated exposure to violence can lead to desensitization to aspects of violent behavior which would otherwise be unpleasant or abhorrent" and that "for persons who have engaged in repetitive violent acts over time, viewing depictions of violence can lead to mental and emotional rehearsal of their violent histories." [Vanyur Decl. ¶ 11)

Even assuming that this is a link between the showing of R-rated movies to inmates and factors that can negatively affect security, order and/or deterrence, the uncontradicted record shows that there are many R-rated movies that do not contain visual messages and

7

depictions that would have a negative impact on prisoners.  The banning of all R-rated movies ignores that reality and treats this constitutionally protected activity like the banning of coffee pots and weight lifting equipment which, of course, do not implicate any constitutionally guaranteed right.

Dated:  August 19, 2005                    /s/ Jere Krakoff
                                                                         Jere Krakoff
                                                                         PA ID No. 13701
                                                                         1705 Allegheny Building
                                                                         Pittsburgh, PA  15219
                                                                         (412) 232-0276

                                                                         *Attorney for Plaintiffs*