No. 01-1869

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

CARL WOLF, JOSEPH CRAVEIERO, JR., and DOUGLAS NYHUIS,
for themselves and all other inmates of the Federal Correctional Institution at McKean,

Plaintiffs-Appellants,

v.

JOHN ASHCROFT, in his official capacity as Attorney General of the United States,
KATHLEEN HAWK SAWYER, in her official capacity as Director, Bureau of Prisons, and JOHN
HAHN, in his official capacity as Warden of the Federal Correctional Institution at McKean,

Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

PETITION FOR PANEL REHEARING

---

ROBERT D. McCALLUM, Jr.
Assistant Attorney General

MARY BETH BUCHANAN
United States Attorney

BARBARA L. HERWIG
(202) 514-5425
EDWARD HIMMELFARB
(202) 514-3547
Attorneys, Appellate Staff
Civil Division, Room 9142
Department of Justice
601 D Street, N.W.
Washington, D.C. 20530-0001

PLAINTIFF'S
EXHIBIT
13

PENGAD 800-631-6989

## TABLE OF CONTENTS

**Page**

QUESTION PRESENTED· . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    THIS COURT, HAVING CONCLUDED THAT THE PLAINTIFFS HAD
    ABANDONED THEIR CONSTITUTIONAL CHALLENGE TO THE
    ZIMMER AMENDMENT, WAS REQUIRED TO AFFIRM DISMISSAL OF
    THE ACTION, SINCE THE STATUTE INDEPENDENTLY PROHIBITS BOP
    EMPLOYEES FROM ALLOWING PRISONERS TO VIEW R-RATED MOVIES
    AND THERE IS NO REMAINING CASE OR CONTROVERSY . . . . . . . . . . . . . . . . 7

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CERTIFICATE OF SERVICE

ADDENDUM – PANEL DECISION

## TABLE OF AUTHORITIES

**Cases:**                                                             **Page(s)**

Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998), cert. denied,
    527 U.S. 1035 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 8, 11

Babbitt v. Oglala Sioux Tribal Public Safety Dept., 194 F.3d 1374
    (Fed. Cir. 1999), cert. denied, 530 U.S. 1203 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 10

Environmental Defense Ctr. v. Babbitt, 73 F.3d 867 (9th Cir. 1995) . . . . . . . . . . . . . . . . 4, 10

Fraise v. Terhune, 283 F.3d 506 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nordlinger v. Hahn, 505 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

OPM v. Richmond, 496 U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . 11

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . 11

Turner v. Safley, 482 U.S. 78 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 9, 11

Vermont Agency of Natural Resources v. United States ex rel. Stevens,
529 U.S. 765 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6,8, 9, 11

## **Constitution:**

Article III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

## **Statutes:**

Antideficiency Act:

    31 U.S.C. 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    31 U.S.C. 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, § 612,
113 Stat. 1537-52 (Nov. 29, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

D.C. Appropriations, FY 2001, § 1(b), Pub. L. No. 106-553, 114 Stat.
2762A-249 (Dec. 21, 2000) (incorporating H.R. 5548, § 611,
114 Stat. 2762A-250) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Departments of Commerce, Justice, and State, the Judiciary, and Related
Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 611,
111 Stat. 2517 (Nov. 26, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Departments of Commerce, Justice, and State, the Judiciary, and Related
Agencies Appropriations Act, 2002, Pub. L. No. 107-77, § 611,
115 Stat. 800 (Nov. 21, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ensign Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

Omnibus Consolidated and Emergency Supplemental Appropriations Act,
1999, Pub. L. No. 105-277, § 611, 112 Stat. 2681-132 (Oct. 21, 1998) . . . . . . . . . . . . . 1

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208,
§ 611, 110 Stat. 3009-66 (Sept. 30, 1996) ........................................ 1

Zimmer Amendment ................................................................ passim

## Regulations:

28 C.F.R. 544.33 ................................................................ 2

PS 5370.08 (June 13, 1994) .................................................... 2, 8
PS 5370.10 (Feb. 23, 2000) .................................................... 3
MCK 5370.10 (May 2, 2000) .................................................... 3

## Legislative Materials:

141 Cong. Rec. H7768 (daily ed. July 26, 1995) ................................ 2

## QUESTION PRESENTED

The Zimmer Amendment, a federal statute, prohibits the Bureau of Prisons (BOP) from using federal funds to make available to federal prisoners certain "amenities or personal comforts," including the viewing of R-, X-, and NC-17-rated movies. In response to the Zimmer Amendment, BOP added a provision to its relevant policy prohibiting the showing of such movies and giving guidance to BOP employees in following the statutory mandate. The plaintiffs brought a First Amendment challenge to the statute and the BOP policy focusing on the prohibition of R-rated movies. The district court dismissed the action, but this Court reversed and remanded for further proceedings.

The question presented is:

Whether the Court, having held that the plaintiffs had abandoned their challenge to the constitutionality of the statute on appeal, erred in not simply affirming on the ground that there was no remaining case or controversy given that the statute independently prohibits BOP employees from allowing federal prisoners to view such movies.

## STATEMENT

1. In 1996, Congress first enacted an appropriations rider known as the Zimmer Amendment, after its sponsor, Rep. Dick Zimmer, which barred the use of federal funds to provide, among other "amenities or personal comforts," "(2) the viewing of R, X, and NC-17 rated movies, through whatever medium presented; . . . ." 110 Stat. 1321-64. Substantially identical versions of this amendment have been enacted in annual appropriations bills since then.[1] Rep. Zimmer explained the reasons for his amendment:

---

[1]    See Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 611, 110 Stat. 3009-66 (Sept. 30, 1996); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 611, 111 Stat. 2517 (Nov. 26, 1997); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 611, 112 Stat. 2681-132 (Oct. 21, 1998); Consolidated Appropriations Act, 2000, Pub. L. No. 106-
(continued...)

"Prisons should be places of detention and punishment; prison perks undermine the concept of jails as deterrence. * * * We must make sure we are spending public funds wisely – not using them on amenities that have little bearing on institutional security." 141 Cong. Rec. H7768 (daily ed. July 26, 1995). According to the Motion Picture Association of America, an NC-17 rating means that the movie may contain "violence or sex or aberrational behavior or drug abuse" even if it is "not necessarily . . . 'obscene or pornographic' in the oft-accepted or legal meaning of those words." App. 58. The NC-17 rating is the same as the old X rating. See http://www.mpaa.org/movieratings/about/index.htm at 2. An R rating means that the movie "may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse or other elements, or a combination of some of the above." App. 58. The plaintiffs do not challenge the prohibition of X- and NC-17-rated movies; it is only the prohibition of R-rated movies that they contest here.

At the time the Zimmer Amendment was first enacted, BOP had in place not only a regulation prohibiting the showing of X-rated movies, 28 C.F.R. 544.33, but also a Program Statement, PS 5370.08 (June 13, 1994), that directed the Supervisor of Education or his or her designee to "exercise good judgement" when selecting movie video rentals. PS 5370.08, § 7.

The statute's prohibition of the use of federal funds to show such movies to prisoners acted directly upon BOP's employees. Accordingly, BOP issued guidance to its employees in implementing this portion of the Zimmer Amendment. FCI McKean updated its Institutional Supplement to provide: "Movies are

---

[1](...continued)
113, § 612, 113 Stat. 1537-52 (Nov. 29, 1999); D.C. Appropriations, FY 2001, § 1(b), Pub. L. No. 106-553, 114 Stat. 2762A-249 (Dec. 21, 2000) (incorporating H.R. 5548, § 611, 114 Stat. 2762A-250); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-77, § 611, 115 Stat. 800 (Nov. 21, 2001).

shown each weekend. Only contracted movies rated PG-13, PG, G and airline edited will be shown."

MCK 5370.10 (May 2, 2000) (current version). BOP itself updated the Program Statement, which now

provides:

> The Recreation Supervisor will exercise good judgment and follow
> statutory restrictions when selecting video movies rentals. No movies
> rated R, X, or NC-17 may be shown to inmates.
> Institutions may show R and NC-17 movies that have been edited
> for general public viewing.
> Spanish movies that are not rated may be shown if they do not
> include profanity, graphic violence, or nudity.
> Not all edited movies may be appropriate for the correctional
> setting; each institution must use caution in selecting movies. (See
> Attachment A).

PS 5370.10 (Feb. 23, 2000).

"Attachment A" provides a series of questions and answers to help the institutions understand the

rules of the Policy Statement. For example, the questions and answers make clear that some edited

versions of the movies may be shown:

> Yes, institutions may show edited movies. Many video public per-
> formance license providers have available popular video titles in special
> "edited" versions created especially for airline or television showings. The
> edited versions have had profanity, graphic violence and nudity edited out.
> Not all edited movies may be appropriate for the correctional setting, each
> institution must use caution in selecting edited movies. Discretion [as] to
> how many edited movies may be shown will be left up to the institution, as
> the cost may vary from title to title and company to company depending
> on the type of agreement.

Id., Viewing of R, X, or NC-17 Rated Movies, Answer to Question 2. Similarly, if an R-rated movie is

shown on regular prime-time TV, it is acceptable in that format: "Movies shown on regular network

stations are acceptable for inmate viewing." Id., Answer to Question 7.

These questions and answers also clarify that the ban in the Zimmer Amendment and the Policy

3

Statement do not depend on the source of funds used to provide the movies. Id., Answer to Question 12 ("No[.] R, X, NC-17 rated movies will not be shown regardless of funding source."); id., Answer to Question 16 ("R-rated movies cannot be donated to the institution for viewing by the inmate population."). Moreover, R-rated movies already in the prison libraries must be removed. Id., Answer to Question 15. As with appropriations riders generally, it is understood that payment of the salaries of prison personnel to "provide" such amenities to prisoners is enough to run afoul of the funding ban. See Environmental Defense Ctr. v. Babbitt, 73 F.3d 867, 871-72 (9th Cir. 1995) ("The use of any government resources – whether salaries, employees, paper, or buildings – to accomplish a final listing would entail government expenditure.").

2.    The named plaintiffs in this class action, Carl Wolf, Joseph Craveiero, Jr., and Douglas Nyhuis, were inmates at the Federal Correctional Institution at McKean, Pennsylvania.[2] App. 8. They filed this action on behalf of all inmates at FCI McKean, challenging both the Ensign Amendment, which prohibits the use of federal funds to distribute or make available to federal prisoners commercial publications that are sexually explicit or feature nudity, see Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998), cert. denied, 527 U.S. 1035 (1999) (upholding constitutionality of Ensign Amendment), and the Zimmer Amendment, as well as the BOP program statements implementing those statutes. App. 9-14.

Once the D.C. Circuit had decided Amatel in favor of the government, the defendants moved for judgment on the pleadings to dismiss the challenges to both statutes. The Magistrate issued a report and recommendation, concluding that the motion to dismiss the plaintiffs' facial challenges to both statutes should

---

[2]    Wolf has since been transferred to a halfway house. App. 18. Since he is not subject to the challenged statute or BOP policy in a halfway house and is no longer a member of the class, he should have been removed as a named plaintiff. According to BOP, Craveiero and Nyhuis are now in institutions other than FCI McKean. They are no longer appropriate class representatives.

be granted but that the facial challenges to BOP's implementing regulations and program statements and

the as-applied challenges to the statutes should be denied. On objections filed by both sides, the district

court rejected the Magistrate's recommendation that the motion be denied in part, and it entered an order

granting the motion in its entirety. Citing Turner v. Safley, 482 U.S. 78 (1987), as the "landmark case"

setting forth the factors to be used in analyzing inmates' claims under the First Amendment, the court set

forth the factors as follows:

> The first factor is whether there is a "valid, rational connection" between
> the prison regulation and the legitimate governmental interest offered as a
> reason for the regulation. Second, alternative means of exercising the right
> by prisoners is to be examined. Third, a court should consider the
> "impact" that the exercise of the right by prisoners would have on guards
> and other prisoners, and prison resources in general. Finally, the Supreme
> Court reasoned that "the absence of ready alternatives is evidence of the
> reasonableness of a prison regulation."

App. 2 (citing Turner, 482 U.S. at 89-90). It upheld the Ensign Amendment based on the analysis of the

D.C. Circuit in Amatel, which applied those factors in detail. The court noted that both Amatel and this

Court's decision in Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999), stood for the proposition that

"expert testimony, however scientific or convincing, must not supplant contrary common sense policy

decisions of the legislature when enacting a statute." App. 3. It added that every court to have faced

challenges to "these and similar enactments" has upheld them. App. 3-4 (citing cases). Thus, "[a]pplying

the Turner factors here," and for the reasons set forth in Amatel and Waterman, the court found that the

two statutes and their implementing regulations were "neutral and reasonable, and rationally related to

legitimate penological interests." App. 4.

    3.    This Court reversed and remanded for further proceedings. It observed that the plaintiffs

had abandoned their challenge to the constitutionality of the Zimmer Amendment: "Although the Complaint

5

attacks the underlying legislation, on appeal the prisoners attack only the [BOP] policy." Slip op. at 3. Nevertheless, the Court proceeded to address the constitutionality of the BOP policy as if it were legally distinct from the Zimmer Amendment. It criticized the district court for "not perform[ing] the necessary analysis" under Turner, because that court "never stated or described the interest purportedly served by the prison policy, nor did it determine whether the interest was neutral and legitimate." Slip op. at 4. Thus, this Court stated that it could not tell whether the district court credited the government's reliance on prison security, deterrence, or rehabilitation, and noted that the district court did not discuss how such interests were rationally related to the movie restrictions. Id.

The Court rejected the government's argument and the district court's holding that "common sense" supported the policy and that no evidentiary record was required. While explicitly refusing to reach the government's argument that the first Turner factor is equivalent to rational-basis review in the equal-protection context, id. at 5 n.2, the Court nevertheless concluded that an evidentiary record may be required in order to "'demonstrate' that the policy's drafters 'could rationally have seen a connection' between the policy and the interests" asserted by the government. Id. at 5 (quoting Waterman v. Farmer, 183 F.3d at 217, 218 n.9). Although the Court rejected the inmates' categorical approach of always requiring evidence, it held that "there may be situations in which the connection is not so apparent and does require factual development." Id. The Court expressed its skepticism of the "common sense" behind one of the three independent rationales for the Zimmer Amendment policy: "But is it a matter of common sense, as was argued here, that prohibiting movies rated R or NC-17 deters the general public from committing crimes, lest they be sent to prison where they are not permitted to watch R-rated movies? We are not so sure." Id. at 6. It did not address the common sense behind the other two.

Ultimately, the Court reversed and remanded to the district court to "describe the interest served",

6

decide whether the connection between the policy and the interest is "obvious or attenuated," and "evaluate what the government has offered." Id. It also instructed the district court to consider the final three Turner factors, noting that if "the Turner analysis cannot be undertaken on an undeveloped record," the district court should "rule only after considering the factual basis developed by affidavits or depositions." Id. at 8.

## ARGUMENT

### THIS COURT, HAVING CONCLUDED THAT THE PLAINTIFFS HAD ABANDONED THEIR CONSTITUTIONAL CHALLENGE TO THE ZIMMER AMENDMENT, WAS REQUIRED TO AFFIRM DISMISSAL OF THE ACTION, SINCE THE STATUTE INDEPENDENTLY PROHIBITS BOP EMPLOYEES FROM ALLOWING PRISONERS TO VIEW R-RATED MOVIES AND THERE IS NO REMAINING CASE OR CONTROVERSY.

This case was litigated as a challenge to the constitutionality of the Zimmer Amendment, a statute enacted by Congress and signed by the President. In the panel opinion, however, this Court concluded that the plaintiffs had abandoned their challenge to the statute on appeal and were challenging only the BOP policy that implemented the statute. Once it reached that conclusion, the Court was compelled to affirm the dismissal of the case by the district court. The Zimmer Amendment independently prohibits BOP employees from allowing federal prisoners to view R-rated movies, and the relief the plaintiffs seek in this action will not redress their alleged injury. There is no case or controversy.

A.    This action was originally brought as a challenge to the Zimmer Amendment, to a second federal statute known as the Ensign Amendment, and to the BOP program statements that implemented those two statutes. See Supp. App. 3-6 (Magistrate's opinion); App. 4 (district court opinion). The plaintiffs dropped their challenge to the Ensign Amendment on appeal. Pls. Br. 5 n.2. Thus, the government litigated this appeal as a challenge to the constitutionality of the Zimmer Amendment, a statute prohibiting the use of federal funds to make available to federal prisoners certain "amenities and personal comforts,"

7

including the viewing of R-, X-, or NC-17-rated movies.

The government's brief on appeal focused on the fact that this prison policy was enacted as a federal statute. First, it argued that the deference required in reviewing a statute was at least as great as that ordinarily given to a prison policy. Govt. Br. 16-17. Second, the brief argued that the government was not required to produce evidence to support the constitutionality of a statute under Turner. The brief cited Amatel and Waterman, which were statutory cases; it explained that the first Turner factor was equivalent to rational-basis review under equal protection, a standard under which a court must uphold the statute if there is any conceivable basis for it; and the brief also distinguished cases requiring evidentiary support for a prison policy as involving challenges not to statutes but to prison regulations, consistent with fundamental principles of administrative law. Govt. Br. 29-32.

Accordingly, when the government's brief analyzed the justifications for the statute, it explained why Congress reasonably could have believed the statute would further the legitimate penological interests in rehabilitation, prison security, and deterrence, not why BOP officials could have believed that. Govt. Br. 24-28. The reason for this approach was that it was Congress that passed the statute, not BOP. Congress has abundant constitutional authority to enact legislation addressing the rehabilitation of federal prisoners, security within federal prisons, and the deterrence of federal crime. It is not required to wait for a specific request from BOP, nor is it even required to agree with BOP's position on those matters; to the contrary, BOP is required to accept Congress's position once it is enacted into law. And that is exactly what happened here. Congress passed the Zimmer Amendment, and BOP was required to comply with the statute.

When BOP modified its Program Statement, PS 5370.08, in light of the Zimmer Amendment, and when FCI McKean modified its own institution policy, there was one reason for doing so – to ensure that

8

BOP employees would know how to comply with the statute. The Zimmer Amendment by itself prohibited

BOP employees from using federal funds to let federal prisoners view R-rated movies. The changes to the

BOP policy merely tracked the Zimmer Amendment's rule and explained to BOP employees how they

were required to implement the statutory policy. In making those changes, BOP did not take any position

on the underlying policy; it was simply carrying out what Congress told it to do.

This Court's opinion, however, did not analyze the statute at all. In a footnote, slip op. at 5 n.2,

it expressly avoided the question whether Turner's first factor – whether the policy is rationally related to

a legitimate and neutral penological interest – requires a rational-basis analysis, an issue that is especially

relevant to a statutory case.[3] Instead, it concluded that the plaintiffs had abandoned their attack on the

statute: "Although the Complaint attacks the underlying legislation, on appeal the prisoners attack only the

policy." Id. at 3. The Court went on to consider whether "the policy" – the prison policy that BOP

modified to comply with the Zimmer Amendment – satisfied Turner. Because the Court determined that

the district court's analysis was deficient, it reversed and remanded for further proceedings on whether "the

policy" was constitutional under Turner. Id. at 3-8.

**B.**    Assuming this Court was correct that the plaintiffs abandoned their challenge to the Zimmer

Amendment on appeal (the plaintiffs' appeal briefs being at best ambiguous on this point), it erred in failing

to affirm dismissal of the case.

---

[3]    Waterman already held that the standard in the first Turner factor "is similar to rational-basis review, under which a statutory classification can be declared unconstitutional only where the relationship of the classification to its asserted goal is 'so attenuated as to render the distinction arbitrary or irrational.'" 183 F.3d at 215 (quoting Nordlinger v. Hahn, 505 U.S. 1, 11 (1992)). The author of the Court's opinion in this case has previously expressed agreement with that holding. Fraise v. Terhune, 283 F.3d 506, 524 (3d Cir. 2002) (Rendell, J., dissenting) ("We went on to explain [in Waterman]: 'This standard is similar to rational-basis review * * *.'").

9

1.      First, the Zimmer Amendment is independently binding on BOP, and it directly prohibits

the use of appropriated federal funds to permit the viewing of R-rated movies by federal prisoners. When

an appropriations rider prohibits the use of federal funds for specified purposes, the payment of federal

salaries is included in that prohibition as well: "The use of any government resources – whether salaries,

employees, paper, or buildings – to accomplish a final listing would entail government expenditure."

Environmental Defense Ctr. v. Babbitt, 73 F.3d at 871-72. Appropriated funds must "be spent according

to the letter of the difficult judgments reached by Congress as to the common good and not according to

the individual favor of Government agents or the individual pleas of litigants." OPM v. Richmond, 496 U.S.

414, 428 (1990). Thus, even without the BOP policy implementing the Zimmer Amendment, BOP

employees are directly prohibited by the statute itself from allowing federal prisoners to view R-rated

movies. Indeed, contravention of such an appropriations rider could constitute a violation of the Antidefici-

ency Act, 31 U.S.C. 1341, a statute that prohibits the expenditure or obligation of unappropriated funds.

See Environmental Defense Ctr. v. Babbitt, 73 F.3d 871-72 ("The government cannot make expenditures,

and therefore cannot act, other than by appropriation. 31 U.S.C. §§ 1341-1342. Pursuant to Public Law

No. 104-06, no appropriated funds are available to the Secretary to make a final listing that a species is

disabled. Accordingly, the Secretary may not take final action on the California red-legged frog listing

proposal at this time.") (footnote omitted); see also Babbitt v. Oglala Sioux Tribal Public Safety Dept., 194

F.3d 1374, 1378 (Fed. Cir. 1999), cert. denied, 530 U.S. 1203 (2000) ("an agency can only spend as

much money as has been appropriated for a particular program").

Once the Court concluded that the plaintiffs abandoned their statutory challenge on appeal, that

should have been the end of this case. Given that the Zimmer Amendment itself was no longer under

attack, BOP employees would remain statutorily prohibited from allowing federal prisoners to view R-rated

movies. This would be true no matter what happened to the BOP policy that implemented the statute. The

Zimmer Amendment itself would bar the showing of R-rated movies to federal prisoners even if BOP

unilaterally rescinded its policy or even if the court ultimately held the BOP policy to be unconstitutional on

remand. In short, there is no longer a case or controversy here, because the plaintiffs' alleged injury is not

redressable in this action. Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S.

765, 771 (2000) (plaintiff lacks standing without showing of "a 'substantial likelihood' that the requested

relief will remedy the alleged injury in fact") (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426

U.S. 26, 45 (1976)); Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 107 (1998) ("Relief that

does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence

of the redressability requirement."); Simon, 426 U.S. at 38 (absent redressability of alleged injury, "exercise

of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation"). There

is no possible outcome on remand that can give the plaintiffs the ultimate relief they seek – an order that

requires BOP to allow them to view R-rated movies.

        The conclusion that the plaintiffs abandoned their challenge to the Zimmer Amendment may have

allowed the Court to avoid addressing our argument about rational-basis review, slip op. at 5 n.2; it may

have allowed the Court to distinguish Waterman and Amatel, two statutory cases providing the correct

framework for analysis under Turner, slip op. at 6; and it may have allowed the Court to authorize and even

encourage the district court to demand "evidence" from the government to support a policy that suddenly

was administrative and not statutory, id. at 5-6. But the result was that this became a totally artificial case

infused with an air of unreality. No case or controversy existed once the Court concluded that the plaintiffs

had abandoned their statutory challenge.

        **2.**      The second reason the Court erred in sending the case back for further proceedings is that

the inquiry it directed the district court to conduct on remand was incorrect. Contrary to the Court's opinion, the inquiry cannot be whether the BOP policy was supported by common sense, slip op. at 5, nor can it be "the interest served" by the BOP policy, the obviousness of the "connection between the policy and the interest," and, in light of these and some "evidentiary showing" by the government, the constitutional validity of the BOP policy. Id. at 6. That cannot the correct inquiry, because the only reason for the BOP policy was that Congress enacted the Zimmer Amendment. BOP modified the policy to explain to its employees how to comply with the statute. The Court's opinion has forced the parties and the district court on remand to address two irrelevant and unreal questions – what penological interests justified the BOP policy and what penological evidence BOP officials had for adopting it. The only proper issues in this case are what interests might have justified the Zimmer Amendment and whether Congress could reasonably have believed the statute would further those interests. Those issues were addressed at length in the government's brief on appeal. Once the Court took those issues out of the case by concluding that the plaintiffs had abandoned their challenge to the statute, there was no basis whatsoever for a remand.

In light of the plaintiffs' abandonment of their statutory challenge, the Court was bound to affirm the dismissal of the case.

## CONCLUSION

For the foregoing reasons, the panel should rehear the case, vacate its opinion, and instead affirm

the judgment of the district court.

Respectfully submitted,

ROBERT D. McCALLUM, Jr.
 Assistant Attorney General

MARY BETH BUCHANAN
 United States Attorney

BARBARA L. HERWIG
 (202) 514-5425
EDWARD HIMMELFARB
 (202) 514-3547
 Attorneys, Appellate Staff
 Civil Division, Room 9142
 Department of Justice
 601 D Street, N.W.
 Washington, D.C.  20530-0001

SEPTEMBER 2002

13

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2002, I served the foregoing Petition for Panel Rehearing by causing two copies to be sent by Federal Express, for overnight delivery, to the following counsel for the plaintiffs-appellees:

> Jere Krakoff, Esq.
> Pennsylvania Institutional Law Project
> 1705 Allegheny Building
> Pittsburgh, PA 15219

I also certify that I filed the Petition by causing an original and three copies to be sent by Federal Express, for overnight delivery, to the Clerk, United States Court of Appeals for the Third Circuit.

Edward Himmelfarb
Attorney for the Appellees

**ADDENDUM – PANEL DECISION**

PRECEDENTIAL

Filed July 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 01-1869

———————

CARL WOLF; JOSEPH CRAVEIERO, JR.; DOUGLAS
NYHUIS, for themselves and all other inmates of the
Federal Correctional Institution at McKean,
Appellants

v.

JOHN ASHCROFT, ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF THE UNITED
STATES; KATHLEEN M. HAWK, DIRECTOR-BOP, IN HER
OFFICIAL CAPACITY AS DIRECTOR OF THE FEDERAL
BUREAU OF PRISONS; JOHN E. HAHN, WARDEN, IN HIS
OFFICIAL CAPACITY AS THE WARDEN OF THE FEDERAL
CORRECTIONAL INSTITUTION AT MCKEAN

———————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 97-cv-00408E)
District Judge: Honorable Sean J. McLaughlin

———————

Argued January 7, 2002

Before: MANSMANN,* RENDELL and FUENTES,
*Circuit Judges*

(Filed July 24, 2002)

———————

* The Honorable Carol Los Mansmann participated in the oral argument
and conference in this case, but died before she could join or concur in
this Opinion.

2

Jere Krakoff, Esq. [ARGUED]
Pennsylvania Institutional
 Law Project
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219
*Counsel for Appellants*

Laura S. Irwin, Esq.
Office of U.S. Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA 15219

Edward Himmelfarb, Esq. [ARGUED]
U.S. Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, DC 20530-0001
*Counsel for Appellees*

---

## OPINION OF THE COURT

---

RENDELL, *Circuit Judge*:

A class of federal prisoners challenges a prison policy that prevents them from viewing movies rated R or NC-17. The District Court granted the government's motion for judgment on the pleadings, reasoning that the prison policy met the requirement that restrictions on First Amendment rights of inmates be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). However, we conclude that the District Court did not conduct a proper, thorough analysis under *Turner* in that it did not articulate the relevant penological interest or the prohibition's relationship to it, and, further, it considered only *Turner*'s first prong. Also, the Court found that it could rely on "common sense" in determining whether *Turner*'s first prong had been satisfied, but we conclude that this approach may not always "fit" and an evidentiary showing may be required in certain situations. Accordingly, we will reverse and remand for further consideration in accordance with this opinion.

3

We have jurisdiction under 28 U.S.C. § 1291 and our review of a dismissal under Rule 12(c) is plenary. We will view the facts in the complaint and any reasonable inferences that can be drawn from them in favor of the non-moving party, here the class of prisoners, and will affirm the dismissal only if no relief could be granted under any set of facts that could be proved. *E.g.*, *Allah v. Al-Hafeez*, 226 F.3d 247, 249-50 (3d Cir. 2000).

At issue here is a prison policy that provides that "[n]o movies rated R, X, or NC-17 may be shown to inmates." Program Statement 5370. Only the ban on movies rated R and NC-17 represented a recent change in policy; X-rated movies have long been banned. *See* 28 C.F.R. § 544.33. The policy was designed to implement the Zimmer Amendment, which prevents the expenditure of funds for the viewing of movies rated R, X, or NC-17 in prison. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 611, 110 Stat. 3009 (1996). Although the Complaint attacks the underlying legislation, on appeal the prisoners attack only the policy. In their Complaint, the prisoners also challenged the Ensign Amendment, which bars the expenditure of federal funds to distribute or make available to prisoners any commercially published material that is sexually explicit or features nudity. *See id.* at § 614. The District Court granted the government's motion for judgment on the pleadings regarding plaintiffs' attack on the Ensign Amendment. The inmates' Ensign Amendment claims are not part of this appeal.

Whether the policy restricting R-rated and NC-17-rated movies imposes permissible limitations on the inmates' First Amendment rights depends on the four factors set forth in *Turner*.[1] There, the Supreme Court directed courts first to assess whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. If the interest is legitimate and neutral, and the connection is valid and rational, then courts should engage in the inquiries under the succeeding

---

1. The government has conceded the First Amendment implications of this prohibition.

4

three prongs: whether "alternative means of exercising the right . . . remain open to prison inmates," "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and, finally, whether there are "ready alternatives" to the rule that would accommodate prisoners' rights at *de minimus* cost to penological interests. *Id.* at 90-91.

It is our view that, while the District Court acknowledged that *Turner* established the applicable standard and recited all four *Turner* factors, it did not perform the necessary analysis. The Court's four-page order discussed the facial challenges to the Ensign Amendment, to the Zimmer Amendment, and to the Amendments' implementing regulations and policies, as well as the as-applied challenges to all of these. Focusing on *Turner*'s first factor and on *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999), in which we cited *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998), *cert. denied*, 527 U.S. 1035 (1999), with approval, the District Court concluded that no evidentiary record was required because we endorsed a "common sense" approach in *Waterman*. It then proceeded to rule in conclusory fashion that the Amendments and their implementing regulations were "neutral and reasonable, and rationally related to legitimate penological interests."

In relation to the first factor, the Court's opinion was deficient in that it never stated or described the interest purportedly served by the prison policy, nor did it determine whether the interest was neutral and legitimate. The government offered several theories in general terms at different times, but the District Court opinion did not mention or discuss any such theories or interests. We cannot tell, for instance, whether the Court credited the government's assertion that the movies posed security risks, or that the absence of such movies deterred people from committing crimes, or that denial of such movies fosters rehabilitation. Moreover, the District Court did not discuss how any of the particular interests offered by the government were "rationally connected to" the restrictions on movies rated R or NC-17.

5

We have noted that the party defending the policy should "demonstrate" that the policy's drafters "could rationally have seen a connection" between the policy and the interests, and that this burden, though slight, must "amount[] to more than a conclusory assertion." *Waterman*, 183 F.3d at 217, 218 n.9.[2] Part of the court's inquiry under *Turner* is whether the government has satisfied this requirement. While we recognize that the court need not necessarily engage in a detailed discussion, still the brief, conclusory statement set forth in the District Court's opinion falls short, and makes it difficult for us to conclude that its approach to the first *Turner* prong passes muster.

The inmates also attack the District Court's ruling that the connection between the prohibition and the interests to be advanced was a matter of "common sense," arguing, instead, that evidence is necessary to support such a finding and the Court erred in ruling based on the pleadings alone. Declining to follow the Magistrate Judge's recommendation that an evidentiary record should be developed before ruling based on *Turner*, the District Court stated, somewhat categorically, that a "common sense approach to the *Turner* reasonableness test has been accepted by the Third Circuit." The inmates seek a similarly categorical ruling that evidence must be presented to establish the necessary connection.

We eschew both categorical approaches and hold, instead, that while the connection may be a matter of common sense in certain instances, such that a ruling on this issue based only on the pleadings may be appropriate, there may be situations in which the connection is not so apparent and does require factual development. Whether the requisite connection may be found solely on the basis of "common sense" will depend on the nature of the right, the nature of the interest asserted, the nature of the prohibition, and the obviousness of its connection to the

---

2. We do not reach the issue pressed by the government in its brief as to how the "reasonable relationship" aspect compares to the "rational basis" test for equal protection, nor do we see the need to elaborate on the nature of the government's burden, as our statement in *Waterman* that it must "demonstrate" the necessary relationship should suffice.

6

proffered interest. The showing required will vary depending on how close the court perceives the connection to be.[3] A prohibition on inmate gatherings in prison common areas after 11-o'clock at night might have an obvious relationship to security concerns, as would a prohibition on publications that featured escape plans, *Amatel*, 156 F.3d at 206 (Wald, J., dissenting), or instructions on assembling weapons, *Giano v. Senkowski*, 54 F.3d 1050, 1059-60 (2d Cir. 1995) (Calabresi, J., dissenting). Likewise, the connection between the goal of rehabilitation and a ban on distributing sexually explicit magazines to "repetitive and compulsive" sexual offenders may well be, as we stated in *Waterman*, sufficiently obvious to be evaluated as a matter of common sense. But is it a matter of common sense, as was argued here, that prohibiting movies rated R or NC-17 deters the general public from committing crimes, lest they be sent to prison where they are not permitted to watch R-rated movies? We are not so sure. On remand, the District Court must describe the interest served, consider whether the connection between the policy and the interest is obvious or attenuated — and, thus, to what extent some foundation or evidentiary showing is necessary — and, in light of this determination, evaluate what the government has offered.

We also note that while a court can bolster its finding of a connection by reference to decisions of other courts on the same issue, here the District Court referenced how other courts had viewed one of the two types of restriction — namely, the Ensign Amendment and its prohibitions on

---

3. *See, e.g., Bazzetta v. McGinnis*, 286 F.3d 311 (6th Cir. 2002) (striking down prison restrictions on visitors in absence of evidence justifying restriction on First Amendment rights); *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002) ("minimal showing" required to demonstrate relationship between restriction on special Kosher meals and prison budgetary and inmate relations goals); *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001) (striking down requirement that prisoners receive only first or second class incoming mail in absence of evidence demonstrating rational connection between postage rate and risk of contraband). In *Fraise v. Terhune*, 283 F.3d 506, 518 (3d Cir. 2002), we found that the "expert judgment" of correctional officers regarding the threat to security posed by the Five Percent Nation provided adequate grounds for purposes of the "rational connection" test.

7

distributing sexually explicit publications in prison.[4] Therefore, the District Court's conclusion that "other Courts have tackled the precise regulations presented here" and "every court facing challenges to these and similar enactments have upheld them" does not really support a finding as to the policy implementing the Zimmer Amendment.

Further, although the District Court recited the final three *Turner* factors, it never applied them to the circumstances presented by the claims of the inmate class. Instead, its ruling turned exclusively on *Turner*'s first factor. We have stated clearly that the determination that there is a rational relationship between the policy and the interest "commences rather than concludes our inquiry" as "not all prison regulations that are rationally related to such an interest pass *Turner*'s 'overall reasonableness standard.' " *DeHart v. Horn*, 227 F.3d 47, 53 (3d Cir. 2000) (en banc). The first factor is "foremost" in the sense that a rational connection is a threshold requirement — if the connection is arbitrary or irrational, then "the regulation fails, irrespective of whether the other factors tilt in its favor." *See Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001). But, as we made clear in *DeHart*, we do not view it as subsuming the rest of the inquiry. On remand, if the District Court again concludes that the first factor is satisfied, it must then proceed to consider the remaining *Turner* factors in order to draw a conclusion as to the policy's overall reasonableness.[5]

---

4. The one case that involved the Zimmer Amendment turned on grounds not at issue here. *See Cuoco v. Hurley*, 2000 WL 1375273 (D. Colo. Sept. 22, 2000).

5. The government's argument that Appellants waived argument based on the three other *Turner* factors by failing to press it on appeal is without merit. Appellants devoted a section of their brief to the argument that "there is no indication that the District Court actually applied the *Turner* factors to the facts of this case." Clearly this raises — and does not waive — the issue. Appellants do not need to argue that the District Court *misapplied* the factors to their case and that, actually, they should be applied in some other way, when the District Court clearly *did not apply* the factors at all. Moreover, we are not weighing these factors on appeal, but rather remand for the District Court to do so in the first instance.

8

As to the need for a foundation for these three prongs, it is worth noting that we have historically viewed these inquiries as being fact-intensive. We have said that evaluations of prison restrictions under *Turner* require "a contextual, record-sensitive analysis." *DeHart*, 227 F.3d at 59 n.8 (remanding "so that the parties may more fully develop the record"). We have also indicated that courts of appeals ordinarily remand to the trial court where the *Turner* factors cannot be assessed because of an undeveloped record. *Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001). If the District Court concludes that the *Turner* analysis cannot be undertaken on an undeveloped record, then the Court should treat the matter as on summary judgment, and rule only after considering the factual basis developed by affidavits or depositions.

For the above reasons, we will REVERSE and REMAND for further consideration and proceedings in accordance with this opinion.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

RICHARD JEWELL,      \*

et al.,              \*

    Plaintiffs    \* Case No.

    vs.          \* C.A. 97 408 Erie

ALBERT O. GONZALEZ,\*

et al.,              \*

    Defendants    \*

        \* \* \* \* \* \* \* \*

DEPOSITION OF

DONALD REICH

April 21, 2005



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
14

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

1          D E P O S I T I O N

2                  O F

3     DONALD REICH, taken on behalf of the

4     Plaintiffs herein, pursuant to the

5     Rules of Civil Procedure, taken

6     before me, the undersigned, Tamara Y.

7     Doxey, a Court Reporter and Notary

8     Public in and for the Commonwealth of

9     Pennsylvania, at the Federal

10    Correctional Institution of McKean,

11    Lewis Run Road, Bradford,

12    Pennsylvania, on Thursday, April 21,

13    2005, beginning at 10:15 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

3

1              A P P E A R A N C E S

2

3    JERE KRAKOFF, ESQUIRE

4    1705 Allegheny Building

5    Pittsburgh, PA   15219

6          COUNSEL FOR PLAINTIFFS

7

8    MARSHA STELSON EDNEY, ESQUIRE

9    U.S. Department of Justice

10   Civil Division

11   20 Massachusetts Avenue, N.W.

12   Room 7148

13   Washington, DC   20530

14         COUNSEL FOR DEFENDANTS

15

16

17

18

19

20

21

22

23

24

25

4

1                    I N D E X

2

3    WITNESS:  DONALD REICH

4    EXAMINATION

5        By Attorney Krakoff            7 - 48

6    DISCUSSION AMONG PARTIES        48 - 49

7    CERTIFICATE                            50

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1  A.      Okay.

2  Q.      The other thing is that there

3  tends to be, in a lot of depositions,

4  kind of a pattern that sometimes

5  plagues them where I'll be asking a

6  question and the witness knows how

7  I'm going to finish the question and

8  therefore begins to answer it before

9  I completed the entire question.

10  It's very important, for purposes of

11  accuracy and actually a clean record,

12  that you allow me to complete my

13  questions, and then after I've

14  completed them, you begin your

15  answer.  And I will endeavor not to

16  speak over your answer.  Okay?

17  A.      Uh-huh (yes).

18  Q.      What is your full name?

19  A.      First name's Donald, middle

20  initial P, as in Paul, and last name

21  is Reich, R-E-I-C-H.

22  Q.      Are you an employee of the

23  Federal Bureau of Prisons?

24  A.      Yes, sir.

25  Q.      How long have you been

9

1    employed by the Bureau of Prisons?

2    A.      Since August of 1985.

3    Q.      What is your current position

4    with the Bureau?

5    A.      Captain.

6    Q.      Are you also known as the

7    Chief Corrections Supervisor?

8    A.      Yes.

9    Q.      How long have you held that

10   position?

11   A.      Since 1995.

12   Q.      Did you become a Captain at

13   FCI-McKean?

14   A.      No, sir.

15   Q.      Where were you when you became

16   a Captain?

17   A.      FCI-Danbury.

18   Q.      That's in Connecticut?

19   A.      Yes.

20   Q.      When did you come to

21   FCI-McKean?

22   A.      June 1997.

23   Q.      So you don't have any

24   firsthand knowledge of how the inmate

25   movie program, the part that was

25

1    Q.       Now, let me preface this

2    question with an explanation, for

3    your benefit and for Ms. Edney's

4    benefit.   There was testimony in

5    another deposition that was taken

6    about two weeks ago in Washington,

7    DC, of an administrator with the BOP,

8    and he made reference to the

9    monitoring of inmate telephone calls.

10   I'm not going to be asking you any

11   questions that relate to --- that I

12   think will compromise security.  I'm

13   not going to go into detail about

14   that.  But I do have a couple of

15   questions to ask you that are really

16   general questions.  Are telephone

17   calls at FCI-McKean monitored?

18                 ATTORNEY EDNEY:

19                 Objection, relevance.

20        Where is this going?

21                 ATTORNEY KRAKOFF:

22                 Well, there was

23        testimony by that witness that

24        he would rather have his

25        personnel focusing on the

26

1      monitoring of telephone calls

2      rather than on reviewing

3      movies, and that's where it's

4      going.

5                ATTORNEY EDNEY:

6           Okay.  I still object

7      as to relevance.  But you can

8      answer the question.

9                ATTORNEY KRAKOFF:

10          Okay.

11  A.      Your question was, do I have

12  staff that monitor telephone calls?

13  BY ATTORNEY KRAKOFF:

14  Q.      Yes.

15  A.      Yes, I do.

16  Q.      Are they uniformed officers?

17  A.      Yes.

18  Q.      And is the monitoring of phone

19  calls something --- is that something

20  that occurs on, essentially, an

21  ongoing basis?

22  A.      Yes, sir.

23  Q.      And the staff that you

24  referred to, are they dedicated just

25  to monitoring phone calls, or do they

27

1   have other functions?

2   A.      We're into security.

3   Q.      Is that something that you

4   feel would compromise security?

5   A.      They do other functions too.

6   Q.      Okay.  Does anybody --- and I

7   don't care if this is sealed.  I

8   think it's relevant if you're going

9   to raise that at all.  What I want to

10  know is whether anybody from the

11  recreation department is involved, as

12  part of his or her responsibilities,

13  in monitoring phone calls.

14  A.      No.

15  Q.      Okay.  What is the current

16  typical daily population at

17  FCI-McKean?  Approximately how many

18  inmates are housed in a given day at

19  the prison?

20  A.      We have an unsecured camp and

21  we have a secure institution.  Do you

22  mean both or individually?

23  Q.      Well, let me ask this to you.

24  We've had testimony --- this case is

25  about movies that are shown to the