**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RICHARD JEWELL, et al.,**<br>　　　　**Plaintiff**<br><br>　　　　v.<br><br>**ALBERTO GONZALEZ, et al.,**<br>　　　　**Defendants.** | **C.A. 97-408 ERIE**<br>**District Judge McLaughlin**<br>**Magistrate Judge Baxter** |

**MAGISTRATE'S REPORT AND RECOMMENDATION**

**I.     RECOMMENDATION**

It is respectfully recommended that Defendants' motion for summary judgment [Document # 69] be denied and Plaintiffs' cross-motion for summary judgment [Document # 73] be granted.

**II.    REPORT**

This is a class action brought by federal prisoners incarcerated in the Federal Correctional Institution at McKean, Pennsylvania ("FCI McKean"). The Complaint was originally filed in December 1997 [Document #1] and challenged the constitutionality of two federal statutes prohibiting the use of federal funds to (i) distribute or make available to prisoners commercial publications that are sexually explicit or feature nudity ("Ensign Amendment")[1] and (b) provide prisoners with certain amenities, including the viewing of R, X,

---

[1] The "Ensign Amendment" to the Omnibus Consolidated Appropriations Act for the fiscal year 1997, Act of 1997, Pub.L.No. 104-208, § 614, 110 Stat. 3009 (Sept. 30, 1996), provided that "[n]one of the funds made available in this Act to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity."

or NC-17 rated movies ("Zimmer Amendment").² Additionally, the Plaintiffs challenged the constitutionality of the Bureau of Prisons' ("BOP") regulations and program statements implementing these statutes.³

Initially, Plaintiffs' challenge to the Ensign Amendment was stayed by this Court pending a decision from the Court of Appeals for the District of Columbia ("DC") Circuit in the case of Amatel v. Reno, 156 F.3d 192 (D.C.Cir. 1998), cert. denied, 527 U.S. 1035 (1999), in which the D.C. Circuit was considering a similar constitutional challenge. The D.C. Circuit subsequently upheld the constitutionality of the Ensign Amendment in Amatel, holding that, despite the absence of an evidentiary record, common sense was sufficient to verify the rational connection between the Ensign Amendment's proscriptions and the government's asserted penological interest in rehabilitation. Based on the Amatel decision, the Defendants moved for judgment on the pleadings in this case, seeking dismissal of the Plaintiffs' challenges to both the Ensign and Zimmer Amendments and their implementing policies and regulations. (See Document #34).

On March 15, 2001, District Judge Sean J. McLaughlin issued a Memorandum Order [Document #41] granting Defendants' motion in its entirety and dismissing Plaintiffs' constitutional challenges to both Amendments and their implementing policies and regulations.

---

² The "Zimmer Amendment" to the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L.No. 104-134, § 611, 110 Stat. 1321 (April 26, 1996) provided, in pertinent part, that "[n]one of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system --... (2) the viewing of R, X, and NC-17 rated movies, through whatever medium presented...." The Zimmer Amendment has since been regularly incorporated into appropriations acts in identical form. See Pub.L.No. 107-77, 115 Stat. 748 (fiscal year 2002); Pub.L.No. 106-113, 113 Stat. 1501, § 611 (fiscal year 2000); Pub.L.No. 105-277, 112 Stat. 2681, § 611 (fiscal year 1999); Pub.L.No. 104-134, 110 Stat. 1321, § 611 (fiscal year 1998).

³ According to BOP's Rules Administrator, "[b]ecause the provisions of the Zimmer Amendment do not allow the BOP any discretion in the provisioning of specific amenities, there is no need to initiate rulemaking under the Administrative Procedures Act." See Kimberlin v. United States Dept of Justice, 150 F.Supp2d 36, 40 (D.D.C. 2001). As a result, there are no BOP regulations pertaining to the Zimmer Amendment. Instead, the BOP has implemented the Zimmer Amendment through Program Statement 5370.10 and internal memoranda. The regulations and program statement implementing the Ensign Amendment are found at 28 C.F.R. § 540.72 and Program Statement 5266.09, respectively.

In doing so, Judge McLaughlin found that no evidentiary record was necessary because the Third Circuit had endorsed Amatel's "common sense" approach in Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999). Accordingly, Judge McLaughlin summarily concluded that the challenged restrictions were "neutral and reasonable" under Turner v. Safley, 482 U.S. 78 (1987).

Plaintiffs appealed Judge McLaughlin's Order to the Third Circuit Court of Appeals, but limited their challenge on appeal to the Zimmer Amendment and its implementing policy found at BOP Program Statement 5370.10 ("P.S. 5370.10").[4] Sometime during the appeal, Plaintiffs abandoned their statutory challenge to the Zimmer Amendment itself and challenged only the constitutionality of its implementing policy embodied in P.S. 5370.10. The Third Circuit Court of Appeals ultimately reversed the District Court's dismissal of Plaintiff's constitutional challenge to P.S. 5370.10, finding that, while a court "need not necessarily engage in a detailed discussion" of the connection between a prison policy and the government's asserted penological interests, a "brief, conclusory statement" is insufficient for such an evaluation. Wolf v. Ashcroft, 297 F.3d 305, 308 (3d Cir. 2002). As a result, the Third Circuit Court remanded the case for further proceedings, directing the District Court to "describe the interest served, consider whether the connection between the policy and interest is obvious or attenuated – and, thus, to what extent some foundation or evidentiary showing is necessary – and, in light of this determination, evaluate what the government has offered." Wolf, 297 F.3d at 309.

---

[4] P.S. 5370.10 provides as follows:

> The Recreation Supervisor will exercise good judgment and follow statutory restrictions when selecting video movies rentals. No movies rated R, X, or NC-17 may be shown to inmates.
>
> Institutions may show R and NC-17 movies that have been edited for general public viewing.
>
> Spanish movies that are not rated may be shown if they do not include profanity, graphic violence, or nudity.
>
> Not all edited movies may be appropriate for the correctional setting; each institution must use caution in selecting movies.

3

On remand, Defendants filed a motion to dismiss for lack of jurisdiction asserting that Plaintiffs lacked Article III standing to continue their lawsuit because their alleged injuries could no longer be redressed. Defendants based this assertion on the fact that Plaintiffs abandoned their challenge to the constitutionality of the Zimmer Amendment and confined their challenge to the BOP's implementing policy, arguing that "[e]ven if this Court enjoins application of the BOP policy, the Zimmer Amendment still independently prohibits BOP employees from allowing federal prisoners to view R-rated movies and, therefore, the relief plaintiffs seek in this action will not redress their alleged injury." (See Document # 49, Defendants' Memorandum in Support of Motion to Dismiss, at p. 1).

On January 13, 2004, this Court issued a Report and Recommendation recommending that Defendants' motion to dismiss be denied [Document # 52], finding that there is no evidence of record to suggest that the Zimmer Amendment has been or will be applied directly to Plaintiffs to prohibit them from viewing R-rated movies in the same manner as P.S. 5370.10 and thus, for standing purposes, a challenge to the BOP's implementing policy is the only means currently available to Plaintiffs to seek redress from the constitutional injuries they claim to have suffered. By Memorandum Order dated October 8, 2004, District Judge McLaughlin adopted this Court's recommendation and denied Defendants' motion to dismiss challenging the District Court's jurisdiction.

The parties have since conducted additional discovery and have now filed cross motions for summary judgment, based on differing applications of the four-prong test set forth in <u>Turner v. Safley</u>, 482 U.S. 78 (1987).[5] [Document ## 69 and 73]. This matter is now ripe for consideration.

**B.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

---

[5] Defendants have also reasserted the same jurisdictional challenge that was asserted in their motion to dismiss. Since this argument has already been rejected by this Court, there is no need to address it further here.

4

if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under

applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### C. Discussion

Under the first amendment to the United States Constitution, regulations or policies that infringe upon a prisoner's right to free speech must pass a reasonableness standard, rather than the usual strict scrutiny standard.[6] Turner v. Safley, 482 U.S. 78, 89 (1987). "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. Courts generally accord great deference to prison officials' adoption and execution of policies, regulations, and practices relating to the preservation of internal order, discipline, and security within the prison environment. Thornburgh v. Abbott, 490 U.S. 401, 407-08 (1989); Turner, 482 U.S. at 85.

The Turner reasonableness test includes four factors for consideration:

1. Whether there is a valid, rational connection between the prison regulation and the governmental interest(s) put forward to justify it;

2. Whether the prisoners have alternative means of exercising the constitutional right at hand;

3. The impact that accommodation of the constitutional right would have on other prisoners, guards, and prison resources in general; and

4. The availability of alternatives to the regulation.

---

[6] Strict scrutiny is not required because courts need to "afford appropriate deference to prison officials" so that they may "anticipate security problems and adopt innovative solutions to the intractable problems of prison administration." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) quoting Turner v. Safley, 482 U.S. at 89.

482 U.S. at 89-90. See also Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999).

The first Turner factor considers the relationship between the policy and the government's asserted penological interest(s). "A prison regulation fails this prong if it promotes an interest that is illegitimate or not neutral, or ... bears no valid, rational connection to the asserted interest." Fraise v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002). This factor "'looms especially large' because it 'tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions.'" Waterman, 183 F.3d at 213-14, quoting Amatel, 156 F.3d at 196. If the connection between a prison policy and the government's asserted interests is too tenuous, the policy is "arbitrary or irrational" and "fails irrespective of whether the other factors tilt in its favor." Wolf, 297 F.3d at 310. See also Asker v. California Dept. Of Corrections, 350 F.3d 917, 923 (9th Cir. 2003)(holding that, if a policy fails the first Turner factor, the court need not address the other factors).

The second Turner factor "requires a court to assess whether inmates retain alternative means of exercising the circumscribed right." Fraise, 283 F.3d at 518, quoting Turner, 482 U.S. at 90. Under this factor, the court is asked to "focus on the burden that the regulation imposes on an inmate's ability to engage in constitutionally protected activity." DeHart v. Horn, 227 F.3d 47, 53 (3d Cir. 2000)(en banc). "If other avenues are open for the inmate to exercise the right in question, the court should exhibit deference to the judgment of corrections officials, while if no other avenues are available, the inmate's right is given greater weight in the Turner balancing process." Banks v. Beard, 399 F.3d 134, 144 (3d Cir. 2005), citing DeHart, 227 F.3d at 53.

Under Turner's third factor, this Court must examine the impact of an accommodation on other inmates, prison staff, and the available resources within the prison, but "should defer to prison officials when the accommodation 'will have a significant ripple effect on fellow inmates or on prison staff ....'" Fraise, 283 F.3d at 520 quoting Turner, 482 U.S. at 90.

The fourth Turner factor requires this Court to assess whether there are alternatives to the regulation that would impose only "*de minimus* cost to valid penological interests." Turner, 482 U.S. at 91. "The absence of ready alternatives is evidence of the reasonableness of a prison

7

regulation." Id.  However, if the inmate plaintiff can point to "ready alternatives" to the regulation that "fully accommodates the prisoners' rights at *de minimis* cost to valid penological interests," a court may consider that as "evidence that the regulation is an exaggerated response to prison concerns." Id.

### 1. Rational Connection to a Legitimate and Neutral Objective

Under the first prong of the Turner test, this Court must determine whether the BOP's policy at issue bears a "valid, rational connection" to a legitimate and neutral government objective. Turner, 482 U.S. at 89-90, quoting Black v. Rutherford, 468 U.S. 576, 586 (1984).  A policy "fails to satisfy this prong if [it] promotes an interest that is illegitimate or not neutral, or if the [policy] bears no 'valid, rational connection' to the asserted interest." Waterman, 183 F.3d at 214, citing Turner, 482 U.S. at 89-90.

In this case, Defendants have asserted a number of "legitimate penological interests" to justify the BOP policy's ban on showing R-rated movies to inmates, including prison security and order, rehabilitation, deterrence, and the preservation of a non-hostile work environment for prison staff.[7] In support of this assertion, Defendants have submitted the Declarations of Dennis Flatt ("Flatt"), Supervisor of Education for the BOP, and John M. Vanyur, Ph.D. ("Vanyur"), a psychologist and Assistant Director of the Correctional Programs Division for the BOP. (See Flatt and Vanyur Declarations attached as Attachments 1 and 2, respectively, to Document # 69, Defendants' Brief).

Plaintiffs have conceded that the preservation of order and security, rehabilitation, and deterrence are all valid penological objectives in a prison setting and are, thus, legitimate. (See Document # 71, Plaintiffs' Brief, at pp. 13-14, citing DeHart v. Horn, 227 F.3d 47, 50 (3d Cir.

---

[7] Although the Court acknowledges that P.S. 5370.10 also prohibits the showing of NC-17 movies to inmates, the Plaintiffs' challenge is primarily aimed at the policy's prohibition on showing R-rated movies and, therefore, this Court's discussion will likewise focus on the policy's ban on R-rated movies.

2000); Procunier v. Martinez, 416 U.S. 396, 412 (1974)).[8] Plaintiffs have also chosen not to challenge the neutrality of the BOP policy at issue. Instead, Plaintiffs have focused their challenge on the rational connection between the BOP policy and the legitimate penological interests asserted by Defendants. In particular, Plaintiffs argue that the link between the BOP policy's blanket prohibition of R-rated movies and the interests put forth by Defendants is "too attenuated to be rational," and is "so weak as to be arbitrary within the meaning of Turner and its progeny." (See Document # 71, Plaintiff's Brief, at p. 16). For the reasons set forth below, this Court agrees with Plaintiffs.

### a.      MPAA Rating System

The primary difficulty with P.S. 5370.10 is its use of the movie rating system established by the Motion Picture Association of America (MPAA) as the benchmark for determining what films may or may not be viewed by inmates.[9] Several courts have recognized that the MPAA ratings lack any definable standards or criteria and, thus, are inappropriate measures for determining whether a prohibition on showing certain films passes constitutional scrutiny. See, e.g., Swope v. Lubbers, 560 F.Supp. 1328, 1334 (W.D. Mich. 1983)(holding unconstitutional a college resolution that prohibited the college from funding the showing of all "X"-rated movies on campus, because "it is well-established that the Motion Picture ratings may not be used as a standard for a determination of constitutional status"); Engdahl v. City of Kenosha, Wisc., 317 F.Supp. 1133, 1134-36 (E.D. Wisc. 1970)(holding unconstitutional a city ordinance banning the admission of minors to "any motion picture which is rated under the Rating Program of the Motion Picture Association of America in a category recommending that minors,

---

[8] Plaintiffs have disputed that providing a non-hostile work environment for prison staff is a legitimate penological interest. (See Document # 71, Plaintiffs' Brief, at p. 16, n. 4). This dispute is discussed in further detail in Section C.1.e of this Report and Recommendation.

[9] The film rating symbols G, PG, PG-13, R, and NC-17 are federally registered certification marks of the MPAA.

9

unaccompanied by a parent or guardian, be denied admission"); <u>Motion Picture Association of America, Inc. v. Specter</u>, 315 F.Supp. 824 (E.D.Pa. 1970)(holding that a Pennsylvania statute imposing criminal sanctions against any film exhibitor who represented to the public that certain films were suitable for family or children's viewing, when such films were rated by the MPAA as being unsuitable for family or children's viewing, was unconstitutionally vague because the MPAA did not have defined standards or criteria against which to measure its ratings). Although these cases are not dispositive of the issue at hand, they do provide judicial support for the proposition that the BOP's blind reliance upon the MPAA's ratings system to determine whether certain films may be shown to inmates is not rationally related to the legitimate penological interests sought to be served.

This lack of a rational relationship between the use of the MPAA ratings system and the BOP's asserted penological interests is evident from the limited purpose of the ratings system, which is explained by the MPAA's President, Jack Valenti ("Valenti"), in an article entitled "MPAA Rating History and How it Works," as follows:[10]

> The basic mission of the rating system is a simple one: to offer to parents some advance information about movies so that parents can decide what movies they want their children to see or not to see.... **Indeed, if you are 18 or over, or if you have no children, the rating system has no meaning for you. Ratings are meant for parents, no one else.**
>
>     *              *              *
>
> The ratings are decided by a full-time Rating Board located in Los Angeles. There are 8-13 members of the Board who serve for periods of varying length.... There are no special qualifications for Board membership, except the members must have a shared parenthood experience, must be possessed of an intelligent maturity, and most of all, have the capacity to put themselves in the role of most American parents so they can view a film and **apply a rating that most parents would find suitable and helpful in aiding their decisions about their children's moviegoing**.
>
>     *              *              *
>
> The Board views each film. **Each member present estimates what**

---

[10] The original version of this article was attached as an Appendix to <u>Swope</u>, 560 F.Supp. at 1335-1341.

> **most parents would consider to be that film's appropriate rating**. After group discussion, the Board votes on the rating. Each member completes a rating form spelling out his or her reason for the rating.
>
> Each rating is decided by majority vote.

Jack Valenti, "MPAA Rating History and How it Works" (last revised in December 2000), published at http://www.filmratings.com, at pp. 3-4 (emphasis added).

Two major points are evident from the foregoing article: (i) the MPAA ratings system is designed solely to guide parents' decisions regarding the type of movies their children should be allowed to see; and (ii) ratings decisions are wholly subjective and merely represent estimates of what "most parents" would consider to be appropriate. Neither of these points provides any logical basis for the BOP's imposition of a blanket ban on the showing of R-rated movies to adult inmates. As noted above, the ratings have no meaning for anyone over the age of 18. Thus, the rational relationship between a movie's rating and the penological interests sought to be served by Defendants is tenuous at best. This is particularly true given the "ratings creep" that has occurred during the past several years, which blurs the line of distinction between the content of R-rated movies released over a decade ago and the content of PG-13 movies released today.[11]

In fact, the BOP's categorical denial of R-rated films, when viewed together with its tacit allowance of PG-13 movies, can often lead to absurd results. A vivid illustration of this absurdity is offered by the recent remake of the movie, THE LONGEST YARD. The original version of THE LONGEST YARD (Paramount Pictures 1974), was originally released with an R-rating, but can be seen virtually unedited today on network television. In 2005, the remade and "updated" version of THE LONGEST YARD (Paramount Pictures 2005) was released with far

---

[11] According to a recent study conducted by researchers from the Kids Risk Project at the Harvard School of Public Health, the amount of violence, sex, and profanity increased significantly in movies between 1992 and 2003, such that today's PG-13 rating approaches 1992's R-rating. Kimberly M. Thompson, ScD, *Violence, Sex, and Profanity in Films: Correlation of Movie Ratings with Content,* MEDSCAPE GENERAL MEDICINE 6(3) (July 12, 2004) at http://www.medscape.com/viewarticle/480900. Dr. Thompson further cautions that "[p]arents and physicians should be aware that **movies with the same rating can differ significantly in the amount and types of potentially objectionable content. Age-based ratings alone do not provide good information about the depiction of violence, sex, profanity, and other content, and the criteria for rating movies became less stringent over the last decade.**" Id. at p. 2 (emphasis added).

more graphic violence and sexuality than its predecessor, yet it was rated PG-13.[12]  Ironically, under the BOP's existing policy, inmates would not be restricted from viewing the more graphic remake of this film, but would be barred from viewing the comparatively innocuous original version (unless, of course, it is shown on network television).  This illogical result would lead to the inexplicable consequence of showing inmates a movie that is more likely to adversely impact the penological interests advanced by Defendants than would the original version, simply because it bears an "acceptable" PG-13 rating.

Furthermore, by imposing a blanket ban on all R-rated movies under the guise of serving legitimate penological interests, the BOP is prohibiting the viewing of films that contain none of the negative elements Defendants cite in support of the ban.  Such movies include, for example, WALL STREET (20th Century Fox 1987), ...AND JUSTICE FOR ALL (Columbia Pictures Corp. 1979), CADDYSHACK (Orion Pictures Corp. 1980), M*A*S*H (20th Century Fox 1970), and CATCH-22 (Filmways Productions 1970), among many other movies that would likely be rated PG-13 by today's standards.

In short, MPAA ratings are imposed by a group of private individuals who are asked to assign ratings based solely on their subjective "estimate" of what parents would deem suitable for their children.  Such ratings necessarily reflect society's prevailing moral standards at the time they are assigned, thus rendering them unstable and ill-defined.  As a result, the MPAA rating system is an inappropriate and illogical standard to measure a film's suitability for

---

[12]

A summary of the content of the 2005 release of THE LONGEST YARD is provided on the website, http://www.moviereports.com, in pertinent part, as follows:

> The MPAA has rated this movie "PG-13" for crude and sexual humor, violence, language and drug references.  Strong, crude language including some profanity occurs throughout the movie. Women are dressed provocatively and portrayed as superficial and interested in sexual exploitation of men.  Violence includes a high-speed police chase that ends in a multi-car pile-up.  Prison violence includes brutality by guards who use batons to beat prisoners as a means of control.  A main character is murdered in a fiery explosion in a jail cell.  Physical violence on the football field includes the intentional attacks on weak points, including formerly broken bones.  Most of the humor relates to prison sex, with veiled verbal references to sodomy.  Several inmates are transvestites and their sexual relationships with other prisoners is implied.  The main character is placed in solitary confinement and given scraps of food with maggots....

viewing by an audience of inmates over the age of 18, and bears no rational relationship to the legitimate penological interests advanced by Defendants.

Even if one were to accept that there is some logical connection between the MPAA ratings and the BOP's asserted penological interests, an absolute ban on all R-rated movies constitutes an exaggerated response to such interests and, thus, runs counter to Turner. See, Turner, 482 U.S. at 91 (regulation prohibiting marriages between inmates and civilians found to be "exaggerated response to [prison's] rehabilitation and security concerns" because it "[swept] much more broadly" than could be explained by the prison's stated objectives); Bazzetta v. McGinnis, 286 F.3d 311, 320 (6th Cir. 2002)(state law prohibiting all former inmates from making non-contact visits with current prisoners held to be unconstitutional as an "exaggerated response" to the potential problems associated with visits by ex-convicts); Mann v. Smith, 796 F.2d 79, 82-83 (5th Cir. 1986)(ban on newspapers and magazines represented exaggerated response to legitimate need to preserve discipline and maintain security).

Although the foregoing discussion is dispositive, this Court has been directed by the Third Circuit Court of Appeals to describe and evaluate the penological interests sought to be served in this case and their relationship to the BOP policy's ban on R-rated movies.

### b. Security

The first interest advanced by Defendants in support of the ban on R-rated movies is the BOP's concern for prison security and order. Citing Vanyur's Declaration, Defendants claim that "[s]howing R-rated movies negatively affects security and order in a prison in a number of specific ways." (See Document # 69, Defendants' Brief, at p. 14; Vanyur Declaration at ¶ 11). These "specific ways" are detailed by Vanyur as follows: (i) "exposure to violent behavior increases the risk of impulsive violence toward others;" (ii) "for persons who have engaged in repetitive violent acts over time, viewing depictions of violence can lead to mental and emotional rehearsal of their violent histories;" and (iii) "for persons who have histories of substance abuse, research has shown simply viewing depictions of others using drugs can trigger heightened activity in pleasure centers in the brain and associated cravings for substances." (See

13

Document # 69, Defendants' Brief, at pp. 14-15; Vanyur Declaration at ¶ 11). Accordingly, Vanyur opines that "[a] staff member may be placed in a very dangerous situation if he or she is required to control an area in which inmates with a history of violence or sexual offenses are watching a movie that has violent or sexually explicit scenes." (See Vanyur Declaration at ¶ 13).

Plaintiffs counter that, before the enactment of the Zimmer Amendment in April 1996, and the subsequent implementation of P.S. 5370.10, R-rated movies were allowed to be shown to inmates unless the Warden or the Warden's designee "determine[d] that showing/viewing them would pose a threat to the security or good order of the institution." (See Document # 71, Plaintiffs' Brief, at p. 3). Under this individualized screening process, R-rated movies were frequently shown to FCI-McKean inmates as part of the institution's inmate recreation program. In fact, the record reflects that during the five years immediately preceding the Zimmer Amendment, an estimated 300 to 400 R-rated films were shown to inmates at FCI-McKean. (See Flatt Deposition transcript attached as Exhibit 4 to Document # 71, Plaintiffs' Brief, at p. 46). According to Flatt, R-rated films containing nudity were permitted during such time, unless the nudity occurred in the context of a rape scene; R-rated films having extensive profanity were allowed unless the language involved racial slurs or degradation of racial groups; and R-rated films with significance violence were often approved for screening. (See Flatt Deposition transcript at pp. 52-56).

According to FCI-McKean's movie logs for the period from November 1992 to April 1996, the list of R-rated films shown at FCI-McKean under the pre-Zimmer policy included: GOODFELLAS (Warner Bros. 1990), SCARFACE (Universal Pictures 1983), RESERVOIR DOGS (Live Entertainment 1992), BOYZ-N-THE-HOOD (Columbia Pictures Corp. 1991), TEXAS CHAINSAW MASSACRE (Vortex 1974), SILENCE OF THE LAMBS (Orion Pictures Corp. 1991), MOBSTERS (Universal Pictures 1991), NEW JACK CITY (Warner Bros. 1991), and BLOODFIST IV (California (Brazil) 1992). It is beyond dispute that all of these movies depict the type of violent behavior both Flatt and Vanyur now opine would increase the risk of impulsive violence toward others and would place staff members in a potentially dangerous situation; yet, there is no evidence in the record to suggest that there was ever a disturbance among inmates or violent acts

toward prison staff associated with showing such R-rated movies at the prison prior to the implementation of the BOP's restrictive policy. The absence of such evidence belies Defendants' claim that P.S. 5370.10's blanket ban on the showing of all R-rated movies is reasonably related to prison security and order. See Banks, 399 F.3d at 142-144 (holding that a blanket ban on allowing certain inmates access to newspapers, magazines and photographs, based on an asserted security concern that such items could be used to fashion crude weapons or feed cell fires, was not rationally related to the stated security concern because there was "no evidence in the record of the misuse of periodicals or photographs in any of the ways described" by the government).

Furthermore, although one may well argue that a number of R-rated movies contain objectionable material that promote or glorify the type of abhorrent behavior that may pose a threat to prison order and security, there are a like number of R-rated movies that are devoid of any material that would likely incite violent or threatening behavior among inmates. For instance, one can hardly imagine prison security being threatened by the showing of such R-rated movies as: ABOUT SCHMIDT (New Line Cinema 2002); BLAZING SADDLES (Warner Bros. 1974); THE BLAIR WITCH PROJECT (Haxan Films 1999); BROADCAST NEWS (20th Century Fox 1987); CADDYSHACK (Orion Pictures Corp. 1980); THE ENGLISH PATIENT (Miramax Films 1996); THE JERK (Aspen Film Society 1979); or AN OFFICER AND A GENTLEMAN (Lorimar Film Entertainment 1982). Furthermore, as noted earlier, there are many recently released PG-13 movies that contain as much graphic violence, substance abuse, and sexuality as films that received "R" ratings in the past, which inmates are not restricted from viewing under the BOP's policy.[13] Thus, the connection between the BOP's blanket ban on all R-rated movies and its

---

13

Examples of such PG-13-rated movies include: THE IMPOSTER (Dimension Films 2002)("Gun violence includes scenes showing multiple people being shot with automatic weapons and blood spraying and pouring out of their bodies. Stabbings, blunt object beatings, and hand-to-hand combat occur with blood being shown and deaths occurring. A large explosion also takes many lives. A particularly graphic scene shows a restrained man with rotating knives moving toward his chest. A cut-away scene then shows the man's heart dangling above his chest. Another man is restrained, injected and electrocuted"); THE INTERPRETER (Universal Pictures 2005)("The film features frequent and graphic images of murdered, bloodied corpses, The film opens to politically motivated mass

stated interest in maintaining prison security and order "is so remote as to render [it] arbitrary and irrational." Turner, 482 U.S. at 89-90; Banks, 399 F.3d at 144 (finding that "[e]ven if the policy need not be 'narrowly tailored' to the stated interests, if the prohibition of [constitutionally-protected materials] has only a minimal effect on security ... because of the other materials that [inmates] are permitted [to have], the relationship between the policy and the penological interest may be too attenuated to be reasonable").

### b.     Rehabilitation

Defendants next attempt to link the ban of R-rated films to the BOP's interest in rehabilitation, based upon Vanyur's opinion that R-rated movies often contain messages that "feed into" the most common criminogenic risk factors by exposing inmates to depictions of graphic violence, substance abuse, criminal behavior, victimization, and devaluation of others, violation of societal norms and the rights of others, and themes that reinforce pro-criminal value systems and antisocial behavior and beliefs. (See Vanyur Declaration at ¶¶ 8-9). Defendants further cite Vanyur's assertion that "R-rated movies provide visual stimuli which reinforce violence, substance abuse, racial stereotypes, and misogynist attitudes, and promote negative role models that reinforce gang or criminal reference group ideas and norms." (See Vanyur Declaration at ¶ 10).

Once again, Defendants paint all R-rated movies with the same broad brush that this Court has already found objectionable. As emphasized earlier, a film's rating is not a reliable indicator of that film's suitability for viewing by adult inmates. An "R" rating is simply intended to connote that a film contains material that is unsuitable for children under the age of

---

murder in Africa, including the graphic depiction of young boys murdering two men at close range with machine gunfire. Numerous scenes of violence include a man shot dead in a closet, another man suffocating a man to death and a suicide victim found in a bloody bathtub. One scene graphically depicts a bomb exploding on a crowded bus killing everyone inside...."); ORANGE COUNTY (MTV Films 2002)("Prescription and recreational drugs are abused heavily throughout the film.... Sexuality is displayed in a number of scenes, usually featuring high school students in both heterosexual and homosexual relationships."); LOSER (Columbia Pictures 2000)("Heavy alcohol and drug use is shown, with an off-screen incident of a drug overdose. College parties involve drug-induced date rape"). (Movie summaries are provided by http://www.moviereports.com).

17. Thus, an R-rating may indicate the presence of excessive nudity, sexuality, and/or profanity, which are deemed inappropriate for children, but are not among the "visual stimuli" targeted by Vanyur. As a result, while many R-rated movies contain "visual stimuli" that may fall within the parameters of Vanyur's generic content description, many other R-rated movies contain a negligible amount of such stimuli. Moreover, a great number of PG-13 movies, which are not restricted by the BOP's policy, also contain messages and visual stimuli that Vanyur would undoubtedly find unacceptable for the same reasons he flatly rejects R-rated movies. In short, the connection between a movie's R-rating and the rehabilitation interest sought to be served is attenuated at best and fails to satisfy the first prong of the Turner analysis.

### c.  Punishment/Deterrence

Defendants cite punishment/deterrence as another legitimate penological interest served by P.S. 5370.10, asserting that "[p]risons are designed to be undesirable places. Prisons can often take away various amenities and privileges one would ordinarily have if not in prison, to both punish inmates and deter them, and those in the larger community, from committing crimes in the future." (See Document # 69, Defendants' Brief, at p. 15, citing Vanyur Declaration at ¶ 12). In making this argument, Defendants contend that the blanket prohibition of R-rated movies must be considered in the context of the "broad spectrum of amenities" that are banned by the BOP's policy, including: in-cell televisions; instruction in boxing, wrestling, weightlifting, and the martial arts; coffee pots, hot pots, and heating equipment in cells; and electrical music instruments. P.S. 5370.10. According to Defendants, the lack of all these amenities, when viewed together, "make prisons less desirable thereby punishing inmates and deterring them and others from committing crimes in the future." (See Document # 74, Defendants' Reply Brief, at p. 5, citing Vanyur Declaration at ¶ 12).

Plaintiffs respond that the prohibition of R-rated films should not be considered as part of the aggregate of amenities banned by P.S. 5370.10 in determining whether such prohibition has a deterrent effect on the commission of crime. Instead, Plaintiffs argue that the BOP policy's ban on R-rated movies must be looked at in isolation, noting the following rhetorical

17

question raised on appeal by the Third Circuit Court: "[b]ut is it a matter of common sense... that prohibiting movies rated R or NC-17 deters the general public from committing crimes, lest they be sent to prison where they are not permitted to watch R-rated movies?"  Wolf v. Ashcroft, 297 F.3d 305, 309 (3d Cir. 2002).

This Court believes that the proper inquiry represents a blending of both parties' arguments:  does the inclusion of a ban on R-rated movies among the other amenities banned by P.S. 5370.10 effect a greater deterrent on the commission of crime than if such a ban was not included?  In other words, is it rational to conclude that, if not for the ban on R-rated movies, P.S. 5370.10 would have less of a deterrent effect on the commission of crime?

Defendants have failed to provide any evidence demonstrating a relationship between the banning of R-rated movies and the deterrence of crime, other than Vanyur's conclusory statement that the absence of various amenities makes prisons less desirable, thereby deterring individuals from committing crimes.  Yet, Defendants have acknowledged that inmates are allowed to watch "movies rated as G, PG, PG-13, and airline edited," and "have access to programming available on cable television, including non-premium channels such as American Movie Classics." (See Document # 69, Defendants' Brief, at p. 7).  Thus, it is difficult to imagine that a ban on R-rated movies imposes such a prospective hardship on an individual that he would think twice before committing a crime, lest he be prohibited from seeing an R-rated movie.  In fact, there is no evidence indicating that prisoners prefer R-rated movies.  To the contrary, a recent comprehensive study of film profits provides evidence that the general public prefers to see PG and PG-13 movies, rather that R-rated movies.[14]  Moreover, the narrowing gap between the content of PG-13 and R-rated movies ensures that an inmate with a hunger for violence may satisfy his craving by viewing a recent PG-13 release.

---

[14] Kerby Anderson, "Film Study," at http://www.probe.org/docs/c-film.html.  The study was conducted by U.C. Irvine economics professor Arthur DeVany and reviewed the gross receipts of "2015 movies released between 1985 and 1996." See also David Germain, "Family Flicks Outperform R-Rated Titles," at http://www/bloggingbaby.com/entry/1234000630036184, finding that, out of the top-25 moneymaking movies in 2004, only four were rated R.

18

Based on the foregoing, this Court concludes that the BOP's ban on R-rated movies bears no rational relationship to an individual's decision to commit a crime and, thus, it is irrational to conclude that, if not for the ban on R-rated movies, P.S. 5370.10 would have less of a deterrent effect on criminal behavior.

### d. Non-Hostile Work Environment

The last penological interest cited by Defendants in support of the BOP policy's prohibition of R-rated movies is the preservation of a safe and non-hostile work environment for prison staff. In particular, Defendants argue that "a staff member may be placed in a very dangerous situation if he or she is required to control an area in which inmates with a history of violence or sexual offenses are watching a movie that has violent or sexually explicit scenes." We find this interest to be substantially similar to the security concern advanced by Defendants, which has already been addressed by this Court. (See Section C.1.b. of this Report and Recommendation). Thus, there is no need for further discussion here.

With regard to their stated interest in preserving a non-hostile work environment, Defendants also claim that staff members "may find R-rated movies offensive." (See Document # 69, Defendants' Brief, at p. 15, citing Flatt Declaration at ¶ 9). In response, Plaintiffs contend that the "concern that some prison personnel might find some R-rated films offensive (the hostile work environment contention) has not been recognized as a valid penological interest for purposes of the [Turner] equation." (See Document # 71, Plaintiffs' Reply Brief, at p. 16 n. 4). This Court agrees, as prison staff is certainly not required to view the movies being shown to inmates. Moreover, R-rated movies were frequently shown to inmates prior to the passage of the Zimmer Amendment, yet Defendants have not provided any evidence of staff member complaints regarding the "offensive" content of such films.

### 2. Other Turner Factors

Because this Court concludes that there is no rational nexus between the BOP's prohibition of R-rated movies under P.S. 5370.10 and the legitimate penological interests

asserted by Defendants, there is no need to address the remaining three factors of the Turner test.  See Wolf, 297 F.3d at 309-10 (if the connection between the policy and the asserted penological interests is arbitrary or irrational, then "'the [policy] fails, irrespective of whether the other factors tilt in its favor'")(citing Shaw v. Murphy, 532 U.S. 223, 229-30 (2001)).

### III    CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' motion for summary judgment [Document # 69] be denied and Plaintiffs' cross-motion for summary judgment [Document # 73] be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

S/Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief U.S. Magistrate Judge

Dated: August 31, 2005

cc:     The Honorable Sean J. McLaughlin
        United States District Judge

        all parties of record (lw)