# ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
- - - - - - - - - - - - - -x
                           :
RICHARD JEWELL, et al.,    :
                           :  Civil Action No.
        Plaintiffs,        :      97-408
                           :
    v.                     :
                           :
ALBERTO GONZALEZ, et al.,  :
                           :
        Defendants.        :
                           :
- - - - - - - - - - - - - -x
```

Washington, D.C.

Wednesday, April 6, 2005

The 30(b)6 deposition of JOHN M. VANYUR called

for examination by counsel for the Plaintiffs in the

above-entitled matter, pursuant to notice, at the

offices of United States Department of Justice, 20

Massachusetts Avenue, N.W., Room 7400, Washington,

D.C., convened, pursuant to notice, at 10:01 a.m.,

before Catherine B. Crump, a notary public in and

for the District of Columbia, when were present on

behalf of the parties:

2

APPEARANCES:

       On behalf of the Plaintiffs:

              JERE KRAKOFF, ESQ.
              1705 Allegheny Building
              Pittsburgh, Pennsylvania  15219
              (412) 232-0276


       On behalf of the Defendants:

              MARSHA EDNEY, ESQ.
              United States Department of Justice
              20 Massachusetts Avenue, N.W.
              Washington, D.C.
              (202) 514-4520

              MICHAEL J. PYBAS, ESQ.
              U.S. Department of Justice
              Federal Bureau of Prisons
              320 First Street, N.W.
              Washington, D.C.  20534
              (202) 307-3872

3

# C O N T E N T S

|  | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| WITNESS | PLAINTIFFS | DEFENDANTS |
| John M. Vanyur | 7 | 130 |

# E X H I B I T S

| PLAINTIFF'S EXHIBIT | MARKED FOR IDENTIFICATION |
|---|---|
| No. 1 | 11 |
| No. 2 | (Previously) |
| No. 3 | 31 |
| No. 4 | 32 |
| No. 5 | 42 |
| No. 6 | 83 |
| No. 7 | 117 |
| No. 8 | 120 |
| Nos. 9 through 10 | (Previously) |
| No. 11 | 33 |
| Nos. 12 through 18 | (Previously) |
| No. 19 | 70 |
| No. 20 | 99 |
| No. 21 | 100 |

4

1                  P R O C E E D I N G S

2   Whereupon,

3                     JOHN M. VANYUR

4   was called to testify and, having first been duly

5   sworn by the notary public, was examined and

6   testified as follows:

7        Q    A few preliminaries before I start to

8   question you:  I learned on Monday that we had sent

9   the notice of the 30(b)6 deposition to the former

10  address of Ms. Edney and it had only arrived, I think

11  either that day or shortly before that day, and for

12  that reason, I understand that--and it certainly

13  wasn't deliberate on our part.  I understand that

14  it's possible that you may not be prepared to address

15  each of the issues that are listed in the notice, and

16  as I told Ms. Edney when we spoke on Monday, that if

17  that happens, I'll certainly understand and we'll

18  reconvene either at a later time to examine you about

19  those questions or to examine some other person who

20  is designated to testify with respect to those

21  issues.  And I apologize again for the mistake.

22              I don't know whether you've been deposed

5

1  before, but I'll give you just a few very brief

2  suggestions.  I guess the most important thing is for

3  you to wait until I finish my question before you

4  begin to answer.  In common parlance, we're

5  accustomed to if we know what the question is before

6  it's completed, often we begin to answer, but that's

7  very difficult for the court reporter and it's not

8  good for record.  So wait until you think I have

9  completed my question, and I'm going to the same or

10 at least I'll endeavor to do the same so we're not

11 speaking over each other.

12          The other thing is if I put a question to

13 you where you can respond with a yes or a no, try to

14 refrain from saying uh-huh or huh-uh or just nodding

15 your head because that really creates the possibility

16 that the response that's taken down won't be

17 accurate, won't be meaningful.  So try to remember to

18 say either yes or no, and if there is a question that

19 I put to you that you can't answer with a yes or a

20 no, then answer it as you choose to, or if you can

21 answer with a yes or no but feel you want to add

22 something to it, you're free to do that as well.  If

6

1  you want to take a break at any point in the

2  deposition, just let me know or let your counsel know

3  and she'll let me know and we'll break.

4              This lawsuit, as you're probably aware of

5  involves the issue of the Zimmer Amendment and its

6  implications on the showing of our R-rated movies to

7  inmates at FCI McKean.  It doesn't involve the

8  showing of NC-17 movies or X-rated movies, so that

9  many of the questions I put to you are going to be

10 related to policies that date back to at least 1986

11 with respect to the showing of R-rated movies and any

12 changes that came about as a result of the Zimmer

13 Amendment.  You're not a party to this.  The suit

14 seeking declaratory and injunctive relief--no money

15 damages are a being sought--is pending in the Western

16 District of Pennsylvania and only relates to the

17 class of inmates, directly relates to the class of

18 inmates, who are confined at F.C.I. McKean.

19             So with that said, I'll begin to question

20 you.

21      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

22             BY MR. KRAKOFF:

7

1          Q      Would you state your full name, please?

2          A      My name is John Martin Vanyur.

3          Q      Would you spell your last name?

4          A      Sure.  V-A-N-Y-U-R.

5          Q      Are you employed by the Federal Bureau of

6    Prisons?

7          A      I am.

8          Q      What is your position with the Bureau?

9          A      I'm the Assistant Director of the

10   Correctional Programs Division.

11         Q      How long have you held that position?

12         A      Since June of 2004.

13         Q      What are your basic functions and

14   responsibilities in that position?

15         A      I have policy oversight for the majority

16   of prison operations throughout the Bureau, including

17   intelligence, emergency planning, security, mental

18   health delivery, inmate transportation, community

19   corrections, privatization, private correctional

20   management, and religious services.

21         Q      Does any of your work involve

22   recreational programs in prisons?

1      A      I don't have direct oversight of

2  recreation.

3      Q      Who has direct oversight over that area?

4      A      The Assistant Director of Industries,

5  Education, and Vocational Training?

6      Q      who is that person?

7      A      That's Steve Schwalb.

8      Q      Were you employed by the Federal Bureau

9  of Prisons prior to the time you assumed your

10 position in June of 2000?

11     A      I was.

12     Q      In what capacity?

13     A      Prior to that, I was the Deputy Assistant

14 Director of Correctional Programs Division, and then

15 prior that, I was the warden at the Federal Detention

16 Center in Philadelphia, Pennsylvania.

17     Q      How long did you hold your position as

18 the Deputy Assistant Director?

19     A      Three and a half years.

20     Q      Do you recall the year that you began in

21 that position?

22     A      January 2001.

9

1       Q       Did you have any involvement in that
2  position with respect to inmate recreational
3  programs?
4       A       No.
5       Q       Okay.  And who at the time you became the
6  Deputy Assistant Director was responsible for
7  overseeing recreational programs?
8       A       Steve Schwalb.
9       Q       Do you know approximately how long Mr.
10 Schwalb has held that position in industries?
11      A       I'm not sure.  Probably since, you know,
12 mid-nineties, '96, '97 possibly.
13      Q       Are you familiar, generally familiar,
14 with the Zimmer Amendment?
15      A       I am.
16      Q       Was Mr. Schwalb in charge of overseeing
17 recreational programs prior to Zimmer or did he come
18 in after, if you recall?
19      A       I don't know.  The timing is close.
20      Q       Do you recall who held Mr. Schwalb's
21 position prior to the time Mr. Schwalb assumed his
22 position?

1      A    Rick Seiter, I believe was just prior to

2 him.

3      Q    Can you spell his last name, please

4      A    S-E-I-T-E-R.  He's retired from the

5 Bureau.

6      Q    Do you know where he is located, in what

7 state?

8      A    Rick Seiter.

9      Q    Yes.

10     A    He is an employee of Corrections

11 Corporation of America in Nashville, Tennessee.

12     Q    Did he hold that position for a number of

13 years?

14     A    Yes.

15     Q    By that position, I don't mean with--

16     A    No.  The Assistant Director of IEVT, is

17 the acronym.

18     Q    Who is the Director of the Federal Bureau

19 of Prisons now?

20     A    Harley G. Lappin.

21     Q    Would you spell his name?

22     A    L-A-P-P-I-N.

1      Q    Do you know when Mr. Lappin became
2  director?

3      A    It would have been--

4      Q    You can give me the year.

5      A    Yeah.  2003.

6      Q    Was Ms.  Hawks his immediate predecessor?

7      A    Correct.

8      Q    Is Ms. Hawks no longer employed by the
9  Bureau?

10     A    That's correct.  She retired.

11     Q    Do you know her whereabouts, either
12  employment-wise or residential-wise?

13     A    She lives in Virginia.

14     Q    In the Arlington or Alexandria--

15     A    I'm not sure.

16     Q    Okay.  Is it in Northern Virginia?

17     A    Yes.

18              [Plaintiff's Exhibit No. 1 was.

19              identified for the record.]

20         BY MR. KRAKOFF:

21     Q    You have a pile of exhibits that I gave
22  to you just a few moments ago.  I'd like you to look

12

1    at Plaintiff's Exhibit 1, which is a three-page

2    document, not including the certificate of service,

3    titled "Notice of Deposition".  Have you seen this

4    document prior to now?

5          A    Yes, briefly.

6          Q    When did you see the document for the

7    first time?

8          A    Yesterday.

9          Q    Did you read the entire text of the

10   document?

11         A    Yes.

12         Q    Okay.

13         A    Quickly.

14         Q    And are you appearing today as the Rule

15   30(b)6 designee on behalf of the Federal Bureau of

16   Prisons?  And by 30(b)6, I'll translate that into

17   laypersons terms.

18         A    Thank you.

19         Q    30(b)6 essentially with respect to a

20   government party allows for a notice to be sent to

21   the governmental entity asking the entity to

22   designate a person or persons to testify on behalf of

13

1  the governmental entity, and my question is whether

2  you've been designated by the Bureau of Prisons to

3  testify at this deposition on behalf of the Bureau.

4      A    Yes.

5      Q    Okay.  And what I'd like you to do so

6  that I'll know what the parameters are, I'd like you

7  to read to yourself through each of the 11 items, and

8  I'm going to ask you after you read whether there are

9  any items that you are not prepared today to testify

10  about so that I'll try my best not to ask you about

11  those matters .

12              [Witness peruses exhibit.]

13              THE WITNESS:  There would be two

14  questions that would be difficult for me to answer.

15              BY MR. KRAKOFF:

16      Q    Could you just by number tell me which

17  those are?

18      A    No. 8.

19      Q    Okay.

20      A    I'm not sure what an exaggerated response

21  is.  I don't know if that's a legal term or not, but

22  it doesn't have meaning to me.

14

1     Q    All right.

2     A    And No. 11, I would be able to discuss

3 the questions in the context of the Bureau of

4 Prisons, but in terms of my knowledge of what's

5 specifically going on at FCI McKean, I wouldn't have

6 knowledge of that.

7     Q    Understood.  Given the fact that Mr.

8 Schwalb had direct oversight on the matter, over

9 matters involving inmate recreation.  I assume

10 including but not limited to showing movies to

11 inmates, do you know why--and I'm not asking you to

12 divulge anything that either of your attorneys might

13 have told you with respect to--if it was their

14 decision, I'm not asking you to go into that, but do

15 you know why independent of divulging any

16 confidential information Mr. Schwalb is not

17 testifying about the movie issue and why you are?

18     A    I would be--my expertise in day-to-day

19 prison operations would stronger than his.

20 Recreation is small part of their mission.  I have

21 all the security and the day-to-day operations.  I'm

22 basically the chief operating officer for the agency.

1  I also have more extensive experience actually

2  running prisons than Mr. Schwalb.

3        Q    What year did you begin to work--I

4  believe you said you were the warden in Philadelphia.

5        A    Yes, and in Butner, North Carolina.

6        Q    North Carolina preceded Philadelphia?

7        A    Correct.

8        Q    What year did you begin to work in

9  Philadelphia as the warden?

10       A    In 1978.

11       Q    Okay.  And prior to 1998, where were you?

12       A    I was the warden in Butner, North

13 Carolina from '96.

14       Q    Can you spell Butner?

15       A    B-U-T-N-E-R.

16       Q    So you were warden in North Carolina FOR

17 approximately two years?

18       A    A little over, closer to three.

19       Q    And you were the warden at the

20 Philadelphia BOP facility for approximately?

21       A    Just under three.

22       Q    Where you were before coming to Butner?

16

1        A    I was the associate warden at the

2   administrative maximum penitentiary in Florence,

3   Colorado.

4        Q    Was that a federal facility?

5        A    That's correct.

6        Q    During what period of time were you

7   associate warden?

8        A    '94 to '96.

9        Q    Did you work in any capacity for the

10  Bureau prior to 1994?

11       A    I did.  I've worked for the Bureau since

12  1979.

13       Q    What was your first position with the

14  Bureau?

15       A    I was a research analyst.

16       Q    Was that in the area of security or was

17  it in--

18       A    No.  Inmate programming and staff issues.

19       Q    Okay.

20       A    I'm a psychologist by training.

21       Q    Should I be referring to you as doctor?

22       A    You don't need to, but I do have a Ph.D.

17

1   in psychology.

2        Q    Did any of your role as a research

3   analyst involve the showing of movies to prisoners?

4        A    It did not.

5        Q    And then after--how long did you hold

6   that position?

7        A    Until 1982.

8        Q    Where did you go from there?

9        A    I went over to the Human Resource

10  Management Division of the Bureau of Prisons where I

11  was the chief of personnel program analysis.

12       Q    Just briefly, what did that involve?

13       A    I designed how the agency selected and

14  trained and evaluated employees.

15       Q    How long did you hold that position?

16       A    Until 1986.

17       Q    Where did you go in '86?

18       A    I went to the Federal Correctional

19  Institution in Terminal Island, California where I

20  was the executive assistant to the warden.

21       Q    Did they show movies at that facility?

22       A    They did.

18

1   Q  Were R-rated movies shown?

2   A  I believe on occasion, they were.

3   Q  Were unedited R-rated movies shown at

4 that time?  By unedited, I'll define that to mean the

5 original version without editing out graphic

6 violence, sex, or language.

7   A  I don't recall.

8   Q  But in any event, R-rated movies at that

9 time as best you can recall at that facility were not

10 categorically banned?

11   A  That's correct.

12   Q  Was it left to the discretion of the

13 warden of the facility or some other person at the

14 facility to determine whether a particular R-rated

15 movie should not be shown?

16   A  Back then, I think we had a committee of

17 staff that would view the movies and make

18 recommendations to the warden who would make the

19 final decision.

20   Q  Did you ever participate in that?

21   A  I did not.

22   Q  Do you know what standards governed their

19

1  selection and determination?

2        A    The broad standard would be the safe and

3  orderly running of the institution.

4        Q    How long were you at Terminal Island?

5        A    Two years.

6        Q    We probably covered that, but where did

7  you go in '88?

8        A    In '88, I worked for the Director of the

9  Bureau of Prisons.  I was the head of management

10 development.

11       Q    Was that in Washington, D.C?

12       A    Correct.

13       Q    Was that your first assignment in D.C.?

14       A    No.  When I was a research analyst, I was

15 in D.C.

16       Q    Okay.  How long did you hold that

17 position?

18       A    I held that position for two years, and

19 then I became the Deputy Assistant Director of Human

20 Resource Management.

21       Q    How long did you hold that position?

22       A    Until I went to Colorado.  You've closed

Case 1:97-cv-00408-SJM-SPB   Document 79   Filed 02/23/2006   Page 20 of 40

20

1 the loop now.

2      Q    I asked you about what your basic

3 functions and responsibilities are in your current

4 position.  Do you know what the basic functions and

5 responsibilities of the Director of the Bureau of

6 Prisons are?

7      A    Yes.

8      Q    And what are they?

9      A    They would be the oversight of 35,000

10 employees in 110 prisons nationwide and a $5 billion

11 budget and making sure that inmates are safe and

12 secure and programming for reintegration back in

13 society.

14      Q    And would it be accurate to say that the

15 Director of the Federal Bureau of Prisons is the

16 Chief Executive Officer of the Bureau?

17      A    Yes.

18      Q    Okay.  And immediately below the

19 Director, what is that position called?

20      A    There are eight Assistant Directors and

21 six Regional Directors.

22      Q    Is the assistant above the regional?

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003
(202) 546-6666

21

1          A     They're peers.

2          Q     Okay.  And under the regional, would the

3    warden be the next person?

4          A     That's correct.

5          Q     Did you know Dennis Luther, the former

6    warden at FCI McKean?

7          A     I did.

8          Q     How did you come to know him?

9          A     I knew all the wardens.  In the positions

10   I was in, I had contact with virtually every warden

11   on a fairly recent basis or common basis, and I also

12   from 1988 on attended every national warden's

13   conference.

14         Q     Okay.  And your office is located where?

15         A     320 First Street, Northwest.

16         Q     You described the basic responsibilities

17   of the director, and I probably asked you that in the

18   present sense.  Would those have been the basic

19   responsibilities of the Director going back to '86?

20         A     Yes.  Just an issue of scale.

21         Q     Who appoints the Director of the Federal

22   Bureau of Prisons?

22

1          A     The Attorney General.

2          Q     And is the Bureau of Prisons--is that

3     part of the Justice Department?

4          A     Yes.

5          Q     Who would be immediately above the

6     Director of the Bureau of Prisons in the

7     administrative hierarchy?

8          A     The way the current org chart is, it

9     would be the Deputy Attorney General.

10         Q     Do you know whether it was like that

11    during any portion of the time Ms. Hawks was the

12    Director?

13         A     There was--at one point, there was an

14    Associate Attorney General, No. 3 person, which there

15    is again, and I don't know.  At one point, we were in

16    that line, and then we moved over to the Deputy

17    Attorney General.

18         Q     So it would have been either the second

19    in command in the Attorney General's Office or the

20    third?

21         A     Or the third, correct.

22         Q     What, if anything, have you done to

1 prepare for this deposition?  And I want you to

2 understand when I ask you this, I don't want you to

3 tell me the substance of any conversations that you

4 had with either an attorney, Ms. Edney or some other

5 attorney, or agent of hers within the Department

6 of--the Justice Department or with counsel who is

7 here today from the BOP or any other BOP counsel.

8 Have you done anything to prepare for this

9 deposition?

10          A    Yes.

11          Q    What have you done?

12          A    Met with counsel and read a number of

13 documents.

14          Q    If you can leaf through--and I'm not

15 asking you to read line by line or paragraph by

16 paragraph or page by page, but if you could just

17 identify which--I believe there are 21 exhibits that

18 you have in front of you.  If you can just tell me

19 which of those exhibits you reviewed prior to this

20 deposition.

21               MS. EDNEY:  Objection.  That's

22 privileged.  What documents I had him look at would

24

1 be privileged, I believe.  He looked at documents,

2 and you're entitled to know that, but I don't think

3 you're entitled to know exactly which documents I

4 thought were appropriate for him to have.

5        MR. KRAKOFF:  So are you instructing him

6 not to answer?

7        MS. EDNEY:  I would instruct him not to

8 tell you.

9        BY MR. KRAKOFF:

10       Q    Did you do anything other than confer

11 with counsel and review--were those Bureau of Prisons

12 documents that you reviewed?  Were they my documents,

13 the Notice--I think you did say you looked at the

14 Notice of Deposition.  Most of the documents, were

15 they Bureau of Prisons documents?

16       A    No.

17       Q    Okay.  Why don't you tell me what kind of

18 documents, generically speaking, you reviewed so that

19 I'll know what you did to prepare for this?  Did you

20 review--what did you review?

21           I think I can him generically.  I'm

22 trying to determine how familiar he is with the

25

1  subject matter.

2          MS. EDNEY:  I mean, I think you can get

3  to that by asking him questions and determining

4  whether or not he can answer your question.  I don't

5  know the real specifics.  He's been able to answer

6  all your questions today.  I realize they're

7  preliminary, and I think he's looked through the depo

8  notice and said that he could probably respond to

9  most of your questions.  So I think if we go through

10 the questions you actually have, you'll get a better

11 sense.

12         MR. KRAKOFF:  We'll try that.

13         MS. EDNEY:  Okay.

14         BY MR. KRAKOFF:

15     Q    Did you have any discussions with anybody

16 other than counsel in order to prepare for this

17 deposition?

18     A    Yes.

19     Q    Who did you speak with?

20     A    I spoke with the chief psychologist of

21 the Bureau.

22     Q    Okay.  Who is that?

26

1        A      That's Dr. John Baxter.

2        Q      Can you spell the last name?

3        A      B-A-X-T-E-R.

4        Q      And why did you speak with him?

5        A      We were talking about an issue that will

6    probably come up later on criminogenic risk factors,

7    and we just had an academic discussion, if you will.

8        Q      What does that mean?

9        A      There is a lot of literature over the

10   last decade that people involved in criminal behavior

11   are at risk with their attitudes, with their

12   decision-making, with flaws in their value systems,

13   and those risk factors contribute to probability that

14   they'll be involved in criminal behavior, and so when

15   we design programming for inmates to prepare them for

16   re-entry, we'll increase their success at recidivism

17   if we can deal with those criminogenic risk factors

18   and bring those risk factors down.

19       Q      Are movies related to risk factors?

20       A      They possibly are.

21       Q      Is there literature reflecting that?

22       A      I'm not aware of literature specifically

1 addressing the issue of movies and criminogenic risk

2 factors, but the messages that are in a variety of

3 media would be related to a number of these factors.

4         Q    What kind of messages are you referring

5 to?

6         A    Messages that are--I'll give you the

7 three most common, the biggest criminogenic risk

8 factors that are out there.  The first is antisocial

9 pro-criminal belief system or value system, and

10 that's a system that glorifies criminal behavior,

11 drug use, violence.

12        Q    Okay.

13        A    The second major criminogenic risk factor

14 that we find with a lot of our inmates is that

15 they're only exposed to other people that are

16 criminals and that they don't have associates or role

17 models that are non-criminal.

18        Q    Okay.

19        A    And the last of what they call the big

20 three of these factor--and there's a number of these

21 criminogenic risk factors--are temperament or

22 personalty flaws, and a number of those are excessive

28

1  risk-taking, egocentric personalities where you

2  believe the world in essence revolves around you,

3  impulse control, psychopathy, and there's a number of

4  other ones.

5          So when we design programs, we try to

6  attack those risk factors and bring them down.

7          Q    The first one you mentioned, the

8  antisocial pro-criminal value system, I think.

9          A    Yes.

10         Q    Is that something that was not understood

11 more than 10 years ago?

12         A    No.  These criminogenic risk factors

13 really didn't come into play in the literature until

14 the mid-nineties and really over the last probably

15 five to seven years with some of the work done at the

16 University of Cincinnati and so forth.

17         Q    So they didn't exist at the time the

18 Zimmer Amendment was enacted?

19         A    They would have been around--the earliest

20 article I recall, and there could be earlier ones,

21 dates back to about 1994.

22         Q    Okay.  So that's about 10 years ago?

1          A     Um-hum.

2          Q     And the second one was exposure to other

3    people who are not criminals?

4          A     Correct.

5          Q     In a sense, it's a way of saying that a

6    lot of the people in prisons are people who grew up

7    in an environment where there were lots of criminals

8    around?

9          A     And other associates, their peers, will

10   have a criminal lifestyle, and so they don't in

11   essence have the feel for what a non-criminal

12   lifestyle would be like.

13         Q     So showing a prisoner a movie about

14   somebody who is a noble figure who is not a criminal

15   and who has been--who has done some good things of a

16   non-criminal nature could be a positive thing for

17   such prisoners?

18         A     That could be.

19         Q     Or their reading books about such people?

20         A     Yes.

21         Q     Have you spoken with anybody other than

22   Dr. Baxter outside of the attorneys in order to

1  prepare for this deposition?

2       A    No.

3       Q    Okay.  Have you read any transcripts of

4  any legal proceedings in order to prepare for this

5  deposition?

6       A    No.

7       Q    Have you been deposed in any lawsuits

8  involving the Zimmer Amendment?

9       A    No.

10       Q    Have you given any testimony in court in

11  any lawsuits involving the Zimmer Amendment?

12       A    No.

13       Q    Have you prepared any affidavits or

14  written declarations in any lawsuits involving the

15  Zimmer Amendment?

16       A    No.

17       Q    Same question with respect to the Ensign

18  Amendment, which this case doesn't concern.  It's

19  different subject matter.

20            MS. EDNEY:  I'm going to object as to

21  relevance.

22            You can answer.

31

1          BY MR. KRAKOFF:

2      Q    You can answer?

3      A    No.

4      Q    Are you aware of any lawsuits involving

5  the Federal Bureau of Prisons other than the lawsuit

6  I'm here about today dealing with the Zimmer

7  Amendment within a prison context?

8      A    No.

9                    [Plaintiff's Exhibit No. 3 was.

10                   identified for the record.]

11         BY MR. KRAKOFF:

12     Q    Okay.  I refer you to Exhibit 3, which is

13  a September 16, 1986 program statement and the

14  subject is inmate recreation programs.  Have you seen

15  this document before today?

16     A    Probably 20 years ago.  Yeah.  It looks

17  familiar.

18     Q    Okay.  I'd like you to turn to the

19  last--are you familiar, though, generically speaking

20  with the form known as Program Statement?

21     A    Yes, absolutely.

22     Q    I refer you to the last page of this

32

1 exhibit, which is page 4, and it has the name Norman

2 A. Carlson, Director, and apparently is his

3 signature, although I don't know that to be a fact.

4 Was Mr. Carlson the Director of the Federal Bureau of

5 Prisons in September of 1986?

6          A    Yes.

7                          [Plaintiff's Exhibit No. 4 was

8                          identified for the record.]

9                 BY MR. KRAKOFF:

10         Q    And if you can turn briefly to Exhibit 4

11 just to give you another example, the last page of

12 that, you'll see that there is not a signature, but

13 you'll see the name Kathleen M. Hawk, Director, on

14 the last page, and I think if you go through each of

15 these program statements, you'll see on the last page

16 a typed name with the director's name on it.

17                What does that indicate when you see the

18 name of the director either typed or signed at the

19 end of a program statement?  Does that mean

20 something?

21         A    That means that it's a national policy.

22         Q    Does that mean that this is a policy that

33

1  is being issued by the director?

2       A    Yes.

3       Q    And is the implication of that that the

4  director is approving that program, the substance of

5  the program statement?

6       A    Yes.

7       Q    Generically speaking, what is a program

8  statement?

9       A    It's a policy directive.

10      Q    And do some program statements, are some

11 of those issued on a regional basis as opposed to out

12 of the Washington, D.C. Headquarters, or do they all

13 emanate from Headquarters, to the best of your

14 knowledge?

15      A    There's national policy, which are

16 program statements, and then some of the national

17 policies allow for institutions to issue local

18 interpretations of the policy.  Those are called

19 institution supplements.

20                [Plaintiff's Exhibit No. 11 was

21                 identified for the record.]

22            BY MR. KRAKOFF:

34

1          Q    Let me refer you to Plaintiff's Exhibit

2    11, for example.  That's an institution supplement

3    dated May 15, 1990, and the subject is inmate

4    recreation programs.  This would be an example of

5    something that was issued by a particular institution

6    as opposed to originating or emanating from or being

7    issued by the central office?

8          A    That's correct.

9          Q    So by definition, if I see the heading

10   "Program Statement", that would normally indicate

11   that it's a national policy?

12         A    That's correct.

13         Q    And when there is a program statement, is

14   it expected that there will be an institution

15   supplement dealing with the program statement, or is

16   that something that occurs sometimes but not

17   inevitably?

18         A    No.  In fact.  The number of institution

19   supplements would be very small compared to national

20   program statements.

21         Q    And this particular program statement in

22   Plaintiff's Exhibit 3, the 1986 program statement, is

1 this something that would have affected every penal

2 institution within the Federal Bureau of Prisons

3 system?

4      A    Yes.

5      Q    And that would have included FCI McKean.

6 Correct?

7      A    Correct.

8      Q    And I note on this particular program

9 statement, Exhibit 3, it begins to explain--if you

10 see at the very bottom of the first page, it says

11 bracketed in bold, dash, rules.  There appears to be

12 something under that which didn't come out on this

13 copy, but if you look at the first page of this

14 program statement, some of it is in bolder or darker

15 letters.  Some of it is in normal typed letters, not

16 bold, and am I correct that the bold language that is

17 bracketed represents the rules and the unbracketed

18 non-bold letters is just an interpretation of the

19 rules or an explanation about how to implement the

20 rules?

21      A    Yes.  That would be fair.

22      Q    Okay.  Assuming that the director of the

36

1  Bureau of Prisons was not debilitated or that there

2  was not an opening and therefore somebody under the

3  director was operating the Bureau, was the director

4  the only person who could issue a program statement,

5  or could somebody of lesser rank issue a program

6  statement?

7          A    Only the director.

8          Q    Was that also true as of September 16,

9  1986, the date of Exhibit 3?

10         A    Yes.

11         Q    Has that been true as long as you can

12 recall?

13         A    It has.

14         Q    And when a program statement was issued,

15 I take it that it would be distributed to the

16 regional directors; is that right?  I don't know if

17 they're called regional directors.  What are they

18 called?  The regional administrators?

19         A    Regional directors.

20         Q    Would they normally receive a copy?

21         A    Yes.

22         Q    And then the wardens within the

37

1 respective regions, it would be expected that they

2 would receive a copy of the program directive too; is

3 that correct?

4       A    Yes.

5       Q    And most of my work is within the state

6 prison system, so I'm asking you this because I

7 really don't know the answer.  I'm assuming, and tell

8 me if I'm wrong, by using the nomenclature "regional

9 directors" that the Bureau of Prisons is divided into

10 various geographical regions?

11       A    That's correct.

12       Q    And which region would FCI McKean fall

13 within?

14       A    Northeast region.

15       Q    How many regions are there?  Seven?

16       A    There's currently six.  There were five

17 in 1986.

18       Q    Okay.  And when the warden received a

19 program statement such as the inmate recreation

20 program statement of September 16, 1986, was he

21 expected--in fact, was he required to comply with the

22 program statement?

1     A    Yes.

2     Q    And were the personnel within a given

3 prison under the warden expected and, in fact,

4 required to comply with the program statement?

5     A    Yes.

6     Q    Now, this particular program statement,

7 would this have applied--let me ask you specifically

8 so we can narrow it down somewhat.  If you look at

9 Item 4 on the first page, it gives--it lists a number

10 of leisure activities that inmates could participate

11 in when not performing assigned duties, and then they

12 list informal sports, physical fitness, table games,

13 and then eventually down to movies and stage shows.

14     With respect to movies, Item 7 on page 3,

15 I'll read that before putting a question to you.  It

16 says movies and then it gives a section, 544.33.

17     "The warden or designee may approve the

18 showing of movies at the institution.  X-rated movies

19 are not permitted.  Where the institution receives

20 premium movie channels through cable television

21 subscription, regular movie rental ordinarily will be

22 limited to special events or holidays."

39

1            And then in the implementing information

2    section, it says:  "This selection authority may not

3    be delegated below the level of supervisor of

4    education.  Movies will be disapproved when the

5    warden determines that showing, slash, viewing them

6    would pose a threat to the security or good order of

7    the institution."

8            When the warden at FCI McKean received

9    this, and I'm just using him as the example, any of

10   the wardens, was he required to comply with this

11   provision?

12           A    Yes.

13           Q    And if, in fact, an X-rated movie to be

14   shown in the face of Item 7, he would, the warden

15   would, be violating Bureau of Prisons policy, would

16   he not?

17           A    Yes, sir.

18           Q    Now, with respect to inmates who are in

19   the general prison population, I assume that's a--is

20   that a term that is used in the federal system to

21   distinguish it from inmates who are in some sort of

22   administrative segregation or disciplinary--

40

1        A     Yes.  General population.

2        Q     Would this program statement have applied

3  to inmates who were in the general population?

4        A     Yes.

5        Q     Okay.  And by that, I mean it would have

6  routinely been applied to general population inmates

7  across the board.  Correct?

8        A     Yes.

9        Q     Do you know whether the showing of movies

10 was available in 1986 to inmates who were in

11 segregated confinement?

12       A     They wouldn't have--I can only speak to

13 my experience at Terminal Island.

14       Q     Right.

15       A     No.  They would have no access to that.

16       Q     Okay.  I refer you to Plaintiff's Exhibit

17 4, which is not titled program statement.  If you

18 read through this, does this appear to be a program

19 statement with the exception of the heading?

20       A     Yes.  The "P.S." at the beginning of the

21 top number means program statement.

22             MR. KRAKOFF:  Okay.  Before I ask another