41

1 question, I'm wondering.  This might be a good

2 opportunity or we could do it at the end of

3 deposition.  Would you have a problem stipulating to

4 the authenticity--and I'm directing this to opposing

5 counsel--to the authenticity of these various

6 documents, because I don't know that he's in a

7 position to--

8          MS. EDNEY:  We will have no objection to

9 the program statements and the institutional

10 supplements.

11          MR. KRAKOFF:  Right.  If you could just

12 very quickly look through--have you had an to

13 opportunity to look through the entire pile, because

14 I think they're all, with the exception of the first

15 two documents, Bureau of Prisons documents, generated

16 documents.

17          MS. EDNEY:  Right.  Well, 17 is a brief.

18          MR. KRAKOFF:  Yes.  I'm just going to ask

19 some questions on that.

20          MS. EDNEY:  Okay.  Right.  I mean, 18 and

21 19, I don't know--

22          MR. KRAKOFF:  Those are just summaries, I

42

1  think, of the language.

2          MS. EDNEY:  I haven't read the language.

3  I'm not going to stipulate that that's exactly

4  correct.  It's whatever the statute is.

5          MR. KRAKOFF:  Those are questions and

6  answers.  Those are part of the larger--I think that

7  might have been part of that entire--I broke it down.

8  I'm pretty sure those are attachments to the

9  appellate brief, I'll represent to you.

10          MS. EDNEY:  I mean, I didn't write the

11  appellate brief.  I would say I have no problem with

12  4, 5, 6, 7, 8, 9.

13          MR. KRAKOFF:  That's an FCI McKean

14  viewing of movies.

15          MS. EDNEY:  Right.  I'll stipulate that

16  we provided this to you.

17          MR. KRAKOFF:  I was just asking for

18  authenticity, not for the accuracy.

19          MS. EDNEY:  For authenticity purposes, I

20  have no problem.

21          MR. KRAKOFF:  Okay.  Thank you.

22                    [Plaintiff's Exhibit No. 5 was

43

1          identified for the record.]

2          BY MR. KRAKOFF:

3          Q     If you could look at Exhibit 4 and then

4    Exhibit 5, my question will be were these program

5    statements--Exhibit 4 is dated December 16, 1993 on

6    the subject of recreation programs, comma, inmate,

7    and Exhibit 5 is a June 13, 1994 program statement on

8    the same subject.  I'm going to ask you whether these

9    two documents also would have applied throughout the

10   Bureau of Prisons system, including to FCI McKean?

11         A     Yes.

12         Q     Okay.  And the same question with respect

13   to the December 16, 1993 and the June 13, 1994

14   program statements:  Would they have applied across

15   the board to general population prisoners with

16   respect to various recreational activities and movies

17   in particular?

18         A     Yes.

19         Q     Okay.  I apologize for kind of going back

20   and forth between the exhibits, but I'm focusing your

21   attention again to Plaintiff's Exhibit 3, and at the

22   very top of it, this is the 1986 program statement.

1 This reads:  One, and this is in brackets:  Purpose

2 and scope, Section 544.30, colon, the Bureau of

3 Prisons encourages inmates to make constructive use

4 of leisure time and offers movies, sports, and social

5 activities, arts and hobby crafts, and other group

6 and individual activities.  Recreational programs in

7 the Federal Bureau of Prisons are intended to help

8 reduce idleness and to keep inmates constructively

9 occupied; to reduce personal stress and institution

10 tension; to increase physical fitness and positive

11 lifestyles both in the prison and after release; and

12 to contribute to personal and institution stability

13 through maximum participation in formal and informal

14 programs.

15            Does the Bureau still encourage inmates

16 to make constructive use of their leisure time?  Is

17 that an objective of the Bureau?

18       A    Yes.

19       Q    And has that been an objective since at

20 least 1986?

21       A    Yes.

22       Q    Is the offering of movies still means

45

1  utilized by the Bureau to encourage inmates to make

2  constructive use of their leisure time?

3       A    At certain facilities.  I don't know if

4  it would be universal.  There is no mandate to show

5  movies at any facility.  That would be a decision

6  made locally by that warden and the staff.

7       Q    But is that something that a warden could

8  determine could be a means that that facility wants

9  to use in order to encourage inmates to make

10 constructive use of their leisure time?

11      A    Yes.

12      Q    Does the Bureau--given the fact that the

13 respective wardens can show movies as a means of

14 enabling inmates to make constructive use of their

15 leisure time, I take it, and tell me if I'm wrong,

16 that the Bureau at least--that the Bureau believes

17 that the movies can be a constructive use of leisure

18 time?

19      A    I would certainly believe it's a

20 constructive use of leisure time.

21      Q    I'm talking about generically speaking.

22 I'm not talking about whether a particular movie

46

1 would be.  Is that right?

2      A    Yes.

3      Q    Okay.  Does the Bureau continue to

4 believe that the showing of movies is one way of

5 reducing idleness in a prison?

6      A    Yes.

7      Q    And does the Bureau believe that showing

8 movies can be a way of keeping inmates constructively

9 occupied?

10     A    Yes.

11     Q    And does the Bureau continue to believe

12 that showing movies can be a means of reducing the

13 personal stress of inmates?

14     A    I don't know.  I don't recall that

15 language.  I'd have to look at the newer program

16 statements.  I've never seen any data that shows it

17 reduces personal stress.

18     Q    Do you have reason to believe that the

19 Bureau which did make that statement back in 1986,

20 and the documents will speak for themselves as to how

21 long that was reiterated, but has the Bureau

22 affirmatively concluded that it is--that movies are

47

1  not a way reducing personal stress?

2          A      No.

3          Q      What about movies as a means of reducing

4  institution tension and instability, helping with

5  institution stability?  Does the Bureau continue to

6  believe that movies can be a way to reduce tension

7  and to promote stability within an institution?

8          A      Yes.

9          Q      And with respect to the fact on page 3,

10 Item 7, is the showing of movies still as a matter of

11 Bureau of Prisons policy an approved leisure

12 activity?

13         A      Yes.

14         Q      And this can be an improved leisure

15 activity when inmates--which inmates may participate

16 in, and then it said when not performing assigned

17 duties.  Would assigned duties be such things as

18 working or going to school or participating in some

19 sort of counseling programming or that sort of thing;

20 is that what is meant by assigned duties?

21         A      Yes.

22         Q      And if there is an assigned duty, the

48

1  assigned duty trumps the viewing of a movie?

2       A    Yes.

3       Q    Now, I read earlier to you the

4  implementing, the non-bold, text of Item 7 which said

5  that the selection authority may not be delegated

6  below the level of the supervisor of education.  As

7  you sit here today, is that still a requirement, that

8  somebody no lower than the supervisor of education

9  approve movies, or has that been changed?

10      A    I'm not sure.

11      Q    Okay.  What about the next line, the fact

12 that the warden was authorized to--more than

13 authorized.  I think he was--the warden was told that

14 movies will be disapproved when he determines that

15 showing or viewing them would pose a threat to the

16 security or good order of the institution.  Is that

17 proposition still in play within the Federal Bureau?

18      A    Yes.  The warden would have the authority

19 and responsibility to control anything that would be

20 a threat to the security and order of the

21 institution.

22      Q    So in 1986 prior to the Zimmer Amendment,

49

1  the warden had the authority if he saw a movie,

2  whether it was P.G. or R-rated, he had the authority

3  to say, no, we're not going to show this movie

4  because I think it could have a detrimental impact on

5  security or good order.  Correct?

6      A    That's correct.

7      Q    Am I correct, including from Item 7, that

8  R-rated movies under this program statement were not

9  categorically prohibited from being seen by inmates

10 in the Bureau of Prisons institutions?

11     A    Yes.  That is correct.

12     Q    And am I correct that R-rated movies that

13 were unedited--and I'll define that in a minute--were

14 not categorically prohibited from being shown to

15 inmates?  And by edited, I mean, and I think I might

16 have defined this earlier in conjunction with another

17 question, but by edited, I mean the deletion of

18 graphic violence, sex, and language.  Under the 1986

19 program statement, R-rated movies that were not

20 edited could be shown if the warden did not determine

21 that they would pose a risk to security or good

22 order; isn't that true?

1          A     That's true.

2          Q     Now, this is the--I'll represent to you

3    that the 1986 program statement is the earliest

4    statement that was produced in the framework of

5    discovery in this case.  I know that you've been in a

6    Bureau--you were in the Bureau prior to 1986.  I

7    don't know whether you were in a position prior to

8    1986 to personally know the answer to my question,

9    but do you know whether prior to 1986, first of all,

10   movies were shown to inmates in Bureau of Prisons

11   facilities?

12         A     I believe they were.

13         Q     And do you know whether prior to 1986

14   there was a program statement that addressed the

15   question of what kinds of movies could not be

16   shown--here it was an X-rated movie--and under what

17   circumstances the warden would prohibit a particular

18   movie from being shown?  Do you know whether there

19   was a program statement that spoke to that prior to

20   1986?

21         A     I don't.

22         Q     Do you know--apart from whether there was

51

1  a written document called a program statement, do you

2  know what the practice was in the Federal Bureau of

3  Prisons with respect to the showing of inmate movies,

4  specifically whether R-rated movies were permitted to

5  be shown prior to 1986?

6          MS. EDNEY:  I think you asked and he

7  answered this question several times.

8          MR. KRAKOFF:  Did he answer it?  Prior to

9  '86?

10          MS. EDNEY:  He can answer it again.  I

11  believe you've asked that already.

12          MR. KRAKOFF:  I think he said that he

13  thought they were shown, but I wanted to know whether

14  there was a practice within the Bureau.

15          BY MR. KRAKOFF:

16      Q    Assuming that a particular warden might

17  do something or some wardens might do something, it

18  didn't necessarily mean that that was something that

19  was condoned by the Bureau?

20      A    Is your question did we categorically

21  prohibit R-rated movies prior to '86?

22      Q    Yes.

52

1        A    And I don't believe we did.

2        Q    You framed it better than I did.

3        A    Okay.

4        Q    In addition to recreational matters, what

5    kind of things--and you don't have to give me the

6    entire litany, but what kind of things would be

7    addressed by program statements?

8        A    I can tell you what I had in Butner, for

9    example.  That would probably be a good open

10   compound.  I had leather craft rooms.

11       Q    No.  I wasn't asking the types of

12   programs.

13       A    Okay.

14       Q    I wanted to know the kinds of subjects

15   that would be addressed by a program statement.  I'm

16   assuming that some things, there is no national

17   policy on.  I might be wrong.  Were program

18   statements issued for every aspect of Bureau of

19   Prisons operations?

20       A    Probably close to every aspect.  We're a

21   very policy-driven agency.

22       Q    Okay.  Are you familiar with how from a

53

1 procedural standpoint BOP program statements are

2 developed?

3        A     Yes.

4        Q     Could you--

5        A     In general terms.

6        Q     Yes.

7        A     Typically, they're drafted in

8 Headquarters.  Of course, they're based, as you can

9 tell, on what rules language exists first.  Any

10 changes in rules language is a complicated process

11 that can be better explained by attorneys with the

12 Department of Justice and OMB and other people.

13 Generally, they're drafted in Headquarters.  They're

14 sent to all the regions and institutions for comment.

15 There is comment period somewhat like you would have

16 with rules language, but internally.

17            Comments are sent back in.  They have to

18 be resolved.  Then the Director of the Bureau of

19 Prisons would receive the draft along with the

20 comments and the resolution of those comments.

21        Q     Okay.

22        A     Then there is union negotiations.  In

54

1  1986, we could issue the program statement and

2  negotiate with the union after the fact.  In the

3  early nineties, that process flipped, and now even

4  after the director signs the program statement, we

5  have to negotiate with the union before it's actually

6  issued.

7      Q    Because relationships with the union,

8  contractual relationships with the union, might have

9  an impact on whether or how a particular program

10  statement could be implemented?

11      A    Yes.  And the program statement could

12  affect conditions at work or other non-negotiable

13  issues.

14      Q    The Item 7 that we just reviewed in

15  Exhibit 3, so that I understand, is that--that's what

16  you meant by a rule?  The dark first paragraph of

17  Item 7 dealing with movies, is that what you meant by

18  rules, or did you mean something else?

19      A    Yes.  That's what I meant.

20      Q    If a rule--let's assume that there were

21  no--there was no rule on movies.  I'm assuming at

22  some point in time that probably was the case.  We

1  don't know whether it was in '86 or not.  When a rule

2  is created to cover an area where there is no

3  existing rule, is that something that would be

4  developed the way you described it, or would that

5  have to be approved over in the Justice Department in

6  the more difficult way that you alluded to?

7      A    It would be more complicated.  The Bureau

8  of Prisons would initiate if we wanted to change the

9  rule language with our General Counsel's Office, but

10  we would have to go through the process that takes

11  place outside the Bureau of Prisons.

12      Q    But if there were no rule covering the

13  subject, that's what I'm talking about.  I understand

14  you were saying, for example, Item 7, movies, if you

15  wanted to change some portion of that paragraph

16  that's in bold, that would be a more complicated

17  process that would have to go outside of the Bureau;

18  is that correct?

19      A    That's correct.

20      Q    But assuming that there were no No. 7,

21  there were no rule yet to cover movies, would that

22  have to go outside of the Bureau when you're creating

56

1  a new rule, or is that something that could be

2  developed internally?

3        A    If you're creating a new rule?

4        Q    A new rule that didn't--that area was

5  never covered before, that subject had never been

6  addressed in a rule before.  That's what I meant.

7        A    We do not have the authority to create

8  rules language internally.

9        Q    Okay.

10       A    The creation of new rules language has to

11  go through the same process as a modification.

12  You're getting a little bit out of my area.

13       Q    I understand.

14       A    Technical area.

15       Q    I understand.  So as you understand it,

16  at some point in time, the language that appears in

17  Item 7, which begins "the warden or designee may

18  approve", and it goes on from there.

19       A    Yes.

20       Q    At some point when that was created for

21  the first time or if that was modified to read that

22  way at some point in 1986 or previously, that would

57

1   have had to have been approved by somebody outside of

2   the Bureau as well as approved by the Director of the

3   Bureau; is that right?

4           MS. EDNEY:  If you know.

5           THE WITNESS:  I'm not sure.  I think

6   rules can come back to us from above also.  So I

7   don't believe it's a--I think we can have rules

8   imposed on us also.

9           BY MR. KRAKOFF:

10      Q    I see.

11      A    If that makes sense.

12      Q    And I take it as you're sitting here, you

13  don't know whether the movie rule that I read to you,

14  the 1986 version, whether that was something that was

15  created by the Bureau on its own initiative solely by

16  itself or whether that was something that imposed by

17  the Justice Department.

18      A    I don't know.

19      Q    Okay.  And the procedure that you

20  described, is that the procedure--for either

21  modifying a rule in a program statement or for

22  establishing a new rule, is that the procedure that

58

1  was in effect in 1986?  Did it operate more or less

2  the same way?

3        A    I think so.  I think there may have been

4  changes, whether they're expedite rules changes, but

5  the system is--

6        Q    The basic process.

7        A    Yes.

8        Q    Okay.  Based upon your knowledge and

9  understanding of how Bureau of Prisons program

10  statement rules are developed, would you expect that

11  a that a rule that had a potential impact on

12  institutional security would be looked at by the BOP

13  administration to determine what impact it might have

14  and the extent of that impact?  Is that something

15  that would be considered when promulgating a rule

16  that could potentially affect security?

17        A    I'm not sure what your question is.  Is

18  the question that we look at the impact of

19  institution security when we make modifications to

20  rules language?

21        Q    Or when you're create a new rule?

22        A    Yes.

59

1          Q    And the same question with respect to the

2    other penological interests that may be affected by a

3    rule:   Internal order, rehabilitation, punishment of

4    an inmate, are those things that could theoretically

5    be affected by a rule?   Are those things that would

6    be looked at by the BOP administration before issuing

7    a rule?

8          A    Yes.

9          Q    Do you have any reason to believe that

10   when the program statement of September 16, 1986 was

11   issued by the Bureau that the Bureau had not looked

12   at the potential implications of the movie policy

13   with respect to security, internal order,

14   rehabilitation and punishment, and/or punishment?

15         A    No.   I would believe those factors were

16   considered.

17         Q    And The same question with respect

18   to--I'm going to ask you the same question with

19   respect to the 1993 program statement.   If you look

20   on page 4 of Exhibit 4, the December 16, 1993 program

21   statement, here it says movies.   This is in bold,

22   Section 544.33.   "If there is a program to show

60

1  movies, the supervisor of education shall ensure that

2  X-rated movies are not shown." And then it goes on,

3  and this is not in bold. "As well, the supervisor of

4  education should exercise good judgment in showing

5  NC-17 movies."

6          The same question I put to you before

7  based upon your knowledge of how the rules are--how

8  programs statements are promulgated, changed. Do you

9  have any reason to believe the penological interests

10  that I referred to before were not considered before

11  issuing this rule?

12      A    I do not.

13      Q    In fact, wouldn't you assume that they

14  were?

15          MS. EDNEY:  Argumentative.

16          MR. KRAKOFF:  He can still answer it.

17          MS. EDNEY:  He can answer it.

18          BY MR. KRAKOFF:

19      Q    Wouldn't you assume that when they issue

20  a rule saying that the supervisor of education shall

21  exercise good judgment in showing NC-17, for example,

22  that they've looking at penological factors?

61

1      A      Yes.

2             MR. KRAKOFF:   Okay.   What time is it?

3  Off the record.

4             [Recess.]

5             MR. KRAKOFF:

6      Q      Do you have any reason to believe that

7  the director in 1986 when issuing a program statement

8  that did not categorically bar R-rated movies did not

9  consider the security, internal order, punishment,

10 and rehabilitative objectives of the Bureau of

11 Prisons?

12     A      I have no reason to believe that.

13     Q      And the same answer with respect to the

14 1993 and 1994 program statements that are embodied in

15 Exhibits 4 and 5?

16     A      Yes.

17     Q      Why as a matter of policy prior to the

18 enactment of the Zimmer Amendment did the Bureau of

19 Prisons allow R-rated movies to be seen in the

20 federal institutions?

21     A      Well, they didn't categorically allow all

22 of them.   They set a standard of individual review

62

1    based on safety and security.

2        Q    Right.

3        A    Because at that time, that was the

4    threshold that we thought was appropriate.

5        Q    Okay.  Has the Bureau changed its

6    position with respect to the threshold that would be

7    appropriate in determining what movies could be seen,

8    short of X-rated movies could be seen in the prison?

9        A    I think the question is if the Zimmer

10   Amendment were to go away, would we change our

11   policy.  I don't believe we would.  I think we would

12   keep our policy as it is.

13       Q    Why is that?

14       A    A couple of reasons:  One, the negative

15   impact of not showing "R" movies has been almost

16   nonexistence.  I've seen from practice of when we

17   made that change that it really has not had

18   significant impact.  I heard virtually nothing from

19   the inmate population when we made that change.

20   Other parts of the Zimmer Amendment were more

21   controversial by far.

22            Secondly, this individual review is

63

1  time-consuming.  It takes resource that could be

2  better dedicated toward other security issues.  Our

3  security issues have changed dramatically over the

4  last 10 years with the number of terrorists we have.

5  So if I were to take staff resources, I certainly

6  wouldn't dedicate them to reviewing R-rated movies.

7  I dedicate them to phone monitoring and other

8  intelligence.

9          I think it also allowing more

10 consistency.  I think when you look back at the

11 eighties, you'd probably find that our wardens are

12 all over the board on what they permitted and didn't

13 permit, and having that threshold and that standard,

14 whether it's the appropriate standard, I think adds

15 to the level of consistency of how we treat the

16 inmates and how we manage facilities.

17         Q    Now, what is the basis of your testimony

18 that they were over all over the board?  Have you

19 reviewed lists of titles that were shown, R-rated or

20 NC-17 titles that were shown?

21         A    I saw one list of movies, and I remember

22 talking to wardens about what they were showing or

64

1 not showing, and there were some movies that I

2 wouldn't have shown.

3        Q      Those particular movies--those particular

4 wardens had to, were expected to, make a

5 determination of whether there was a security or

6 internal order problem associated with showing the

7 movie.  Correct?

8        A      That's correct.

9        Q      And isn't that something that they still

10 have to take into consideration with respect to the

11 movies, the categories of movies that are permitted

12 to be shown under the current post-Zimmer policy?

13        A      Yes.

14        Q      So to some extent, they're going to still

15 have to review specific movies to make some

16 determination as to whether they're appropriate to

17 show or not.  Correct?

18        A      Yes.  That universe would be much

19 smaller, but yes.

20        Q      Are you familiar with how they would

21 review a movie to determine whether it was something

22 that would be appropriate for showing?  Did the

65

1 warden screen the movie?  Did he delegate it to the
2 Director of Education?  Did somebody else see the
3 movie?  Did they read movie reviews?  What did they
4 do to determine whether a particular movie was
5 appropriate or not when they used to--when R-rated
6 movies were not categorically banned?

7        A    As I mentioned, when I was in Terminal
8 Island, there was small committee, I believe of three
9 people who were recreation and education staff, that
10 would review some of the movies.  I'm sure there were
11 some even that were R-rated that we could read or
12 review, and if it dealt with white supremists and
13 Arian Brotherhood members, we wouldn't have to screen
14 that movie, but we would tie staff up in that movie
15 review.

16        Q    The committee would review, the
17 three-member committee?

18        A    Would make a recommendation to the
19 warden.

20        Q    Okay.  So at least theoretically, the
21 warden could delegate it to one person to
22 review--correct--for two hours if that's the normal

66

1  length?

2       A    Yes.

3       Q    I don't even know if two hours is the

4  normal length of a movie.

5       A    Yes.

6       Q    An hour and a half, maybe two hours.  And

7  you're saying that doing that once a week or twice a

8  week or even three times a week, that that would have

9  a significant impact within a given prison on prison

10  resources?

11      A    What I'm saying is those resources could

12  be better spent.  Inmates on average--let me give you

13  an example.  The longest phone call they can make is

14  15 minutes.  We know they're running criminal

15  enterprises, some inmates, from inside institutions.

16  If I had a staff member available for three hours,

17  I'd rather have them listen to 12 or 15 more phone

18  calls that we've targeted them to listen to than

19  watching movies and making determinations as to

20  whether it's appropriate or not.

21      Q    Now, the things that the inmates are more

22  concerned about, would those be things like

67

1  magazines?  Weights?  What were they more interested

2  in?

3        A      Weight-lifting was the major issue.

4        Q      Do you know whether any--I know I asked

5  you whether you were aware of anybody testifying in

6  any other proceedings related to the R-rated movie

7  issue, and I apologize if I asked you this before,

8  but I'd like it clarified.  Do you know one way or

9  another whether there are any other lawsuits out

10 there in court that are challenging the R-rated movie

11 policy in the federal system?

12       A      Not that I'm aware of.

13       Q      Is that something you would be aware of?

14       A      Not necessarily, no.

15       Q      How do you know that--to what extent are

16 inmates, if any, are inmates interested in seeing

17 unedited R-rated movies?  Have you or somebody else,

18 to your knowledge, within the Bureau attempted to

19 assess that?

20       A      No, but, you know, when I was a warden, I

21 walked and talked.  That's what I get paid to do, to

22 walk and talk to the men on my compound.  I had 1200

68

1  hundred men on my compound in Butner and another 1100

2  in Philadelphia.   In all my walking and talking, I

3  never got a demand, Geez, why can't you show this

4  movie.   It's an issue that didn't come on the

5  horizon.

6          Q     That was before Zimmer?

7          A     This goes to when I left Philadelphia.

8          Q     1998 in Philadelphia?

9          A     Right.

10         Q     In the Philadelphia system, were they

11  showing edited R-rated movies?

12         A     No.   In Butner, I did.   I showed the

13  swank movies, whatever term, the airline movies we

14  used to call them.

15         Q     In Philadelphia, was that a decision that

16  had been made by the administration, not to show

17  edited R-rated movies?

18         A     I didn't show movies in Philadelphia.   I

19  was the warden, and it was my call.

20         Q     And why didn't you show any movies?

21         A     I thought it was an inappropriate use of

22  government expenditures.   I thought there were plenty

1   of programming that we could pipe in, both

2   educational and then there were a number of regular

3   television channels that were such sufficient.

4        Q    Okay.  Isn't it true that NC-17 movies

5   were not categorically prohibited by the Federal

6   Bureau of Prisons to be shown to the inmates until

7   after Zimmer?

8        A    I'm not sure of that.

9        Q    Let me--

10       A    Because it appears to me that--I guess

11  you're right.  The language is to exercise good

12  judgment.

13       Q    Right.  Do you know why they weren't

14  categorically prohibited until Zimmer?

15       A    Because at that point, the threshold was

16  at the "X" level, and after that, we reviewed them on

17  an individual basis.

18       Q    I know that.  I recognize that there was

19  a difference in the way they were treated; only

20  X-rated were categorically prohibited.  Do you know

21  what the reasoning was with respect to why NC-17

22  movies would not be categorically prohibited?

70

1      A      I'll assume at that point, we didn't

2  think that they would cause that much of the problem

3  categorically to the security or running of the

4  institution.

5      Q      And are you aware of any determination by

6  the Bureau of Prisons prior to the enactment of

7  Zimmer that by not categorically banning NC-17 movies

8  and by not categorically banning R-rated movies, the

9  security and good order of institutions were being

10  eroded or adversely affected?

11      A      No.  I'm not aware of any.

12                [Plaintiff's Exhibit No. 19 was

13                identified for the record.]

14           BY MR. KRAKOFF:

15      Q      Okay.  I'd like to address--we're going

16  to skip ahead to Exhibit 19, and I'll represent to

17  you that this is something that we received in the

18  context of the appeal of this case in the Third

19  Circuit Court of Appeals.  This was attached to the

20  appeal pages, to the brief, and it shows--the heading

21  is 28 CFR 544.33, and then it has under that, Section

22  544.33, Movies, and then it says:  "If there is a

71

1  program to show movies, the Supervisor of Education

2  shall ensure that X-rated movies are not shown."

3              Now, the reason I'm focusing on this

4  document is I'd like to ask you first whether the

5  program statements that we've reviewed, are those

6  embodied in the Code of Federal Regulations?

7              MS. EDNEY:  That sounds like a legal

8  conclusion.  Only if you know.

9              MR. KRAKOFF:  Only if he knows,

10  obviously.

11             BY MR. KRAKOFF:

12     Q     This is program statement.  Correct?

13     A     Yes.

14     Q     And then do you know what the Code of

15  Federal Regulations is?

16     A     Yes.

17     Q     Do you know whether these program

18  statements are incorporated in the Code of Federal

19  Regulations?

20     A     No.  It would be the opposite.  The Code

21  of Federal Regulations would be incorporated into our

22  program statement.

72

1          Q     So then when it's making reference, for

2     example, in Exhibit 3, Purpose and Scope, Section

3     544.30, is that a reference to the Code of Federal

4     Regulations?

5          A     Yes, it is.

6          Q     Okay.  Now, are program statements

7     invariably linked to regulations.  Or are some of

8     them free-standing?

9          A     That's a good question.  I'm not sure.

10    Most of them are probably linked to federal

11    regulations.

12         Q     Is a federal regulation--and this might

13    be a legal question, and if you can't answer it, I'll

14    respect that, but as you understand it within your

15    work in the Bureau, are regulations of any higher

16    order than program statements?

17         A     Yes.

18         Q     Are they any more important?

19         A     Yes.  They would be.

20         Q     Okay.  And a regulation would have to go

21    through a more arduous process than a program

22    statement generally; is that right?

73

1          A     That's correct.

2          Q     Okay.  Do you have Exhibit 4 in front of

3   you?

4          A     Yes.

5          Q     Okay.  You'll note on the second page,

6   No. 3, it says "standards referenced", and then it

7   makes reference to various American Correctional

8   Association, either foundation or association,

9   standards.  Do you know what that means?

10         A     Yes.

11         Q     Okay.  What does that mean in making

12  those references?

13         A     The American Correctional Association is

14  an independent professional organization.  It's not a

15  government entity.  It's a non-government

16  organization.  They have a process by which

17  correctional facilities can be accredited.  That

18  accreditation is based on audits, and it compares the

19  practice of that particular facility to a list of

20  standards that are set by the professional body in

21  terms of whether you comply or don't comply with each

22  of these literally hundreds of standards.

74

1     Q   And these references here, A, B, and C,

2  does that mean--and I'm not suggesting an answer.  I

3  want you to answer in your own words, but does that

4  mean that what is embodied in the program statement

5  is consistent with those standards or embodies those

6  standards, or does it mean something else?

7     A   It references--these are the standards

8  that would be related to recreational programs for

9  inmates.

10    Q   Okay.

11    A   So if one were to comply with the tenets

12  of the program statement, it refers back to the

13  standards that they would be in compliance with.

14    Q   Okay.

15    A   Really, the reason they're mentioned is

16  for our convenience, that when we're getting ready

17  for audits, we know which programs are related to

18  which standard.

19    Q   Is it a way of saying what we're

20  providing for in this particular program

21  statement--and here, I'm referring to Exhibit 4.

22  Would that be a way of saying what we're providing

75

1  for in here would be consistent with the American

2  Correctional Association standards?

3          A    Yes.

4          Q    Are Federal Bureau of Prisons facilities,

5  are they accredited by the ACA?  Is that something

6  that the Bureau seeking to have done?

7          A    It is, and not all of the facilities are

8  accredited, but the vast majority are.  One thing toe

9  clarify to the American Correctional Association

10 standards come in two flavors, mandatory and

11 non-mandatory.  In order to be accredited, you have

12 to comply with 100 percent of the mandatory

13 standards, but only 90 percent of non-mandatory

14 standards.

15         Q    Okay.  And do you know based upon your

16 experience as the warden of a federal facility and I

17 believe a deputy warden--

18         A    Associate warden.

19         Q    Associate warden at one point and your

20 work in other capacities at the BOP, do you know

21 whether the ACA reviews the Bureau's program

22 statements as part of the accreditation process?

76

1      A    They would look at it if we're going
2   through accreditation, yes.
3      Q    But once an institution is accredited,
4   they might not review the policies, or is that--
5      A    We would not seek their approval of our
6   policies or a review of our policies prior to
7   issuance.
8      Q    Right.  I understand that.
9      A    But if they were accrediting, they would
10  come in and look at the policies that are driving
11  that particular institution.
12     Q    And after an institution receives
13  accreditation, does the ACA do follow-up assessments
14  in order to determine whether accreditation should
15  remain?
16     A    Yes.  There's a reaccreditation process.
17     Q    How often, generally, does that occur?
18     A    I think it's every three or four years.
19     Q    As part of that, does the ACA review the
20  body of program statements in the facility?
21     A    Yes.
22     Q    What about the--I think they're called

77

1  supplements at the facility.  What about the program

2  statements themselves; does the ACA come to

3  Washington and ask to see the program statements in

4  Washington?

5        A    Not that I'm aware of.  What happens is

6  for each standard, when the accreditation process

7  occurs, the local institution will reference the

8  relevant pieces of policy and the institution

9  supplements that support that standard.

10       Q    And generally, they're going to have a

11 copy of the program statements in any event?

12       A    At least excerpts from it that are

13 relevant to that standard.

14       Q    Okay.  Do you have five in front of you?

15       A    Yes.

16       Q    Okay.  If you turn to page--it doesn't

17 have a number, but it's between pages 2 and 3, Item

18 5, just kind of three sentences.  Do you have that?

19       A    Yes.

20       Q    This is goals, quote:  "The warden is to

21 ensure to the extent possible that leisure activities

22 are provided to meet social, physical, psychological,

78

1  and overall wellness needs of inmates." Then if you

2  go over to the next page, it says: "A, leisure

3  activities are designed to attract inmate

4  participation regardless of ethnic, racial, age, or

5  sex difference or handicap considerations and to

6  enhance the potential of post-release involvement."

7          Do you know what post-release involvement

8  means?

9      A    It means involvement back into the

10  community and with their family.

11      Q    Okay. Does that mean--by post-release

12  involvement, does that mean one of the objectives was

13  to enhance the ability of people after they've been

14  released from prison to be able to be involved in

15  things in the community when they're back on the

16  streets, so to speak, to use that term?

17      A    Yes. To successfully reintegrate.

18      Q    Thank you. If you turn to page 4 of

19  Exhibit 5, Item 7, the second paragraph after

20  "X-rated movies are barred", it says: The Supervisor

21  of Education or his, slash, her designee not below

22  the GS-9 level should exercise good judgment when

79

1  selecting video movie rentals.  By exercising good

2  judgment, was that another way of saying that they

3  were to look at such things as security and general

4  order?

5         A    Yes.

6         Q    Were they to look at anything else?  Were

7  there any other standards?  Would they look at how

8  this might impact on rehabilitation or how this might

9  affect punishment?

10        A    Yes.  I think all of the above.

11        Q    All those.  Is that right?

12        A    Yes.

13        Q    The GS-9 level, what does that mean?  Is

14  that some sort of a ranking officer, or what is a

15  GS-9?  How high do you have to be?

16        A    That is the general schedule grade level.

17  That's the federal equivalent to rank, if you will.

18        Q    Right.  Is that fairly high on the

19  pecking order?

20        A    In an Education Department, it would be a

21  supervisory level individual.

22        Q    Okay.  What is a licensing agreement,

80

1 generally speaking, in connection with movies?  Do

2 you understand that?

3         A     Um-hum.

4         Q     That term.  What did that entail?

5         A     In broad terms.  There's some questions

6 of whether--and I'll give you a perfect example.  If

7 you rent a movie from Blockbuster, do you have the

8 permission to show that to 1200 people over a

9 distributed system or over a number of days?  And the

10 attorneys have been involved in that.  That's what I

11 think they're getting into, licensing agreements, I

12 think.

13        Q     So some sort of an authorization from a

14 distributor to show it to like a group rather than

15 just you and your wife or your children?

16        A     That's my understanding.

17        Q     Okay.  And do you still have page 4 of

18 Exhibit 5?

19        A     Yes.

20        Q     This says, the fourth paragraph:

21 "Institutions are not to use salaries and expenses,

22 parentheses, S & E, closed paren, appropriations or