81

1  any other government funds for the purchase of

2  premium movie channels, video licenses, or video

3  rentals; however, S & E funds may be used to fund

4  basic cable television service."

5          So even prior to Zimmer, governmental

6  funds were not to be spent on renting videos; is that

7  right?

8          A    That's correct.

9          Q    And that's whether the video--no matter

10 what the rating was, whether it was a PG or PG-13 or

11 R or NC-17, no matter what, those funds weren't

12 supposed--government funds, appropriations, were not

13 supposed to be spent on videos.  Correct?

14         A    That's correct.

15         Q    Now, when you were in North Carolina, was

16 that policy in effect?

17         A    Yes.

18         Q    Okay.  What did you use down there?

19 Because I think you said in North Carolina, you did

20 show movies, not in Philadelphia.  Where did the

21 money come from?

22         A    It came from the inmate trust fund money.

82

1        Q      And those are monies that are generated
2   by what?

3        A      Sales to inmates in the commissary,
4   telephone--sales of telephone credits, sales of
5   photograph tickets in the visiting room, vending
6   machine profits.  That money goes into a separate pot
7   called the inmate trust fund.

8        Q      Because they don't come from the
9   government; they come from people purchasing things,
10  either the inmates or--

11       A      The inmates.

12       Q      Or social visitors, I suppose.  Those
13  vending machines too?

14       A      Yes.

15       Q      But governmental money was being spent to
16  some extent as long as an officer, a corrections
17  officer, was involved in picking up the movie or
18  paying for it, you know, sending the check out for
19  the movie rentals under the contract or screening the
20  movies?  In a technical sense, doesn't
21  the government--does not the Bureau view the services
22  provided by employees to be an expenditure of

83

1  governmental funds?

2          A     Yes.

3          Q     This also made reference to inmate

4  organizational funds.  If you look between pages 4

5  and 5, you'll see a two-line entry.  "At the warden's

6  discretion, an additional movie channel or a video

7  license or rentals may be purchased with inmate

8  organization funds."  And then it goes on from there.

9  That was another source, or is that the same as a

10 trust fund?

11         A     That was the another source at that time.

12 At the time, we allowed inmate JCs or junior chamber

13 of commerce--there were organizations that could

14 generate funds, and we've since cracked down on that

15 whole process, but at the time when this existed,

16 they could generate funds.  What this is saying is

17 the warden can allow those organizational funds to be

18 used.

19                      [Plaintiff's Exhibit No. 6 was

20                      identified for the record.]

21              BY MR. KRAKOFF:

22         Q     Now I refer you to Plaintiff's Exhibit 6,

84

1 which is a November 15, 1995 memo from Kathleen Hawk,

2 Director, Federal Bureau of Prisons, and it

3 apparently is directed to the Chief Executive

4 Officers, and the subject was guidelines from

5 implementation of the Zimmer Amendment.  By Chief

6 Executive Officers, do you know what that referred

7 to?

8        A      Wardens and regional directors.

9        Q      Do you recall seeing this memo at about

10 that time just before the Zimmer Amendment was

11 formally enacted?

12       A      Yes, vaguely.  I was in Florence at the

13 time.

14       Q      And you'll see in here--before I ask you

15 the question, why don't you read the first page to

16 yourself, and then I'll just ask you a question.

17              [Witness peruses exhibit.]

18              THE WITNESS:  Okay.

19              BY MR. KRAKOFF:

20       Q      In the second paragraph, Ms. Hawk said:

21 "I fully appreciate that the timing of this issue

22 could not be worse."  Do you know why the timing of

85

1  the issue could not have been worse?

2          A    Yes.

3          Q    What was it about the timing?

4          A    In October of '95, we had mass

5  disturbances at a number of our facilities, and, in

6  fact, it's the only time in the Bureau's history

7  where we've locked down the entire Bureau of Prisons.

8  Every single facility, we locked down.  These

9  disturbances were related to congressional debate

10 over the mandatory minimum sentencing on crack versus

11 powder cocaine, which is a very racially-charged

12 issue.  To be honest with you, the spark to the

13 disturbances came from television.  It came from

14 watching CSPAN, showing the impact the media can have

15 on the population.

16          I happened to be in Florence when they

17 threw an officer down a flight of steel steps up the

18 street, and we responded to that disturbance.  So

19 there was a lot of tension in the institutions.  We

20 were just coming off a national lock-down, and we

21 were afraid that when you begin to take amenities

22 away from inmates when you've got an already charged

86

1  situation, it doesn't make life any easier.

2      Q    Okay.  In the second paragraph, Ms. Hawk

3  said:  "I fully appreciate that the timing of this

4  issue could not be worse."  I just asked you about

5  that.  Then she went on to say:  "Nonetheless, all

6  indications are this legislation is inevitable.

7  Provisions of the Zimmer Amendment relate only to the

8  use of appropriated funds.  Given our understanding

9  of the intent, however, the guidance provided here

10 may vary slightly from a literal reading of the

11 amendment."  Do you know what was meant by that?

12     A    I do not.

13     Q    Okay.  And then she wrote:  "Regardless

14 of when the Fiscal Year 1996 budget is finally

15 adopted, the guidance in this memorandum is effective

16 immediately."  When you were in Florence at this

17 time, what were you doing in Florence?

18     A    I was Associate Warden at the maximum

19 security penitentiary.

20     Q    Okay.  After receipt of this memo, did

21 you begin to take any measures or any steps toward

22 the implementation of Zimmer before Zimmer was

87

1  actually enacted?

2        A     We didn't have to do much, because at the

3  maximum security penitentiary, all the inmates are

4  locked in their cells 23 hours a day.  So we didn't

5  have musical instruments.  We had no weight-lifting

6  equipment.  We didn't have some of the same issues

7  that a general population would typically have.

8        Q     Did you do anything with respect to

9  movies before Zimmer was actually implemented?

10        A     We did.  We did pipe--we had in-cell

11  televisions.  So we had to go back and look at what

12  we were piping through those in-cell televisions.

13        Q     At that juncture, did you begin to

14  proscribe, prohibit the showing of R-rated movies at

15  Florence?

16        A     I believe we did.

17        Q     Okay.  Do you know why implementation

18  began before Zimmer actually went into effect?

19        A     I do not.

20        Q     Was it because of the inevitability of

21  it?

22        A     I don't know.  I can only suppose.

88

1      Q    Why don't you suppose?

2      A    I would suppose that our director was

3 getting very clear guidance from either the

4 Department of Justice or from the Hill on what the

5 expectation was.

6      Q    Okay.  Now, do you know what the security

7 classification of FCI McKean is?

8      A    Yes.  It's medium.

9      Q    Medium?

10     A    With a camp attached.

11     Q    Which would be less than--

12     A    Which would be minimum.

13     Q    And the first item under the in-cell

14 television viewing, the BOP typically does not

15 provide in-cell television viewing for inmates, you

16 explained at least in the maximum security facility

17 in Florence, there was television, because those

18 inmates--I suppose because those inmates weren't

19 released from their cells.  If they were going to see

20 something, it was going to be on a television inside

21 the cell.  Correct?

22     A    That's correct.

89

1    Q    Has that changed?  Do inmates at

2 facilities such as FCI--and I know you told me at the

3 outset you can't really answer specific questions

4 about McKean, but in a medium security institution,

5 do they have television sets in their cells?

6    A    No.

7    Q    So when inmates see movies in a medium

8 security facility such as McKean, are those movies

9 shown over television sets that are in common areas?

10    A    There's probably a variety of ways that

11 they pipe them out, if you will.

12    Q    Generally, it will be a group of inmates

13 as opposed to an individual inmate sitting in a cell?

14    A    Yes, and my experience has been that most

15 of them are pushed over the televisions that are out

16 in the common area in the units.

17    Q    Okay.  If you would turn to page 3,

18 please.  Okay.  Under this policy, then, X-rated

19 remained categorically prohibited as it had been

20 before Zimmer.  True?

21    A    Yes.

22    Q    Okay.  And Item 3, it says:  "In FY 1996,

1  no S & E funds will be used to provide the showing of

2  R, X, or NC-17 rated movies.  In order to allow for

3  an effective transition from existing premium movie

4  contracts, the expenditure of inmate organization

5  monies, up until financial operations are closed out,

6  or trust fund monies for the showing of R-rated

7  movies will be permitted through FY 1996."

8          From somebody who is not familiar with

9  the Federal Government's fiscal years, when would FY

10  1996 have ended, in what month and what year?

11      A    September 30, 1996.  Is that right?

12  September 30th in 1997.  Yes.  Sorry.

13      Q    1997?

14      A    I don't know.  Yeah.  It would be October

15  1, '06--

16          MS. EDNEY:  Everything is October 1

17  through September 30th.

18          BY MR. KRAKOFF:

19      Q    So what year would it have ended?

20      A    '97.

21      Q    In October of '97?

22      A    The fiscal year would end in September of

91

1  '97.

2       Q    September 30, 1997?

3       A    [Gestures.]

4       Q    So they would have roughly nine more

5  months they were going to be allowed to--am I correct

6  in interpreting this, that for roughly for seven more

7  months through September of 1997, they were going to

8  be allowed to show R-rated movies and NC-17 movies?

9       A    That's my reading of it also.

10      Q    Okay.  And, obviously, organizational

11 funds, is that when organizational funds were drying

12 up also?

13      A    It would be close to that time, yes.

14      Q    I know you testified about what would

15 happen if Zimmer were eliminated today.  I think you

16 expressed an opinion that the Bureau of Prisons might

17 or would probably continue with the prohibition of

18 unedited R-rated movies; is that correct?

19      A    Yes.

20      Q    Another question:  But for Zimmer, if

21 Zimmer had not been enacted in 1996, would the Bureau

22 of Prisons at that time have prohibited R-rated

92

1  movies from being shown?

2          MS. EDNEY:  That's speculative.

3          BY MR. KRAKOFF:

4      Q    You can answer, and we'll argue about it

5  with the judge.

6      A    I would say probably not in 1996, but I

7  think you can tell when you look across these program

8  statements, regardless of Zimmer, you see a trend

9  from the late eighties to the nineties to slowly

10 contract and contract and contract inmate amenities

11 for a variety of reasons.  So I don't think it would

12 be that unthinkable that at some point we wouldn't be

13 begin contract this area just as we contracted a

14 large number of other areas of inmate amenities.

15     Q    I know that you said that you attended

16 warden meetings and that's how you met Mr. Luther.

17 Were you attending warden association meetings--was

18 it warden association?

19     A    Wardens conferences.

20     Q    Were you attending those when you were an

21 associate warden as well?

22     A    No.

93

1      Q    So in what year did you begin to attend

2  wardens conferences?

3      A    In 1900 when I was a director of staff

4  and would have had a break when I was the associate

5  warden.

6      Q    So beginning in 1988, you were attending,

7  and then there was a break, and when did you resume

8  attending them?

9      A    '96.

10      Q    Around the time that Zimmer was enacted.

11  Is that right?

12      A    That's correct.

13      Q    Okay.  And then how long after '96 did

14  you continue attending them?

15      A    Through the present.

16      Q    Okay.

17      A    When there is one.

18      Q    Okay.  Prior to--'95, you didn't attend;

19  is that correct?

20      A    That's correct, '94 and '95.

21      Q    So you don't know personally whether

22  there was any discussion at that time at that those

94

1  conferences about the showing of movies; is that

2  right?

3       A    That's correct.

4       Q    Okay.  Those conferences, is that a

5  professional association that you belong to by virtue

6  of being administrators in the Bureau of Prisons, or

7  is that something independent of working for the

8  Bureau?

9       A    No.  It would be an internal training

10 conference.

11      Q    Okay.  At those conferences, would issues

12 that were emerging or that had recently emerged,

13 would those issues be addressed at those conferences

14 generally?

15      A    Yes.

16      Q    When you attended the 1996 conference, do

17 you recall whether the Zimmer Amendment had already

18 been enacted?

19      A    Well, certainly this would have been in

20 place.

21      Q    The memo?

22      A    Yes.

95

1       Q    Okay.

2       A    And I believe the amendment would have

3 been enacted by then also, yes.

4       Q    Did Director Hawk address the conference

5 that year?

6       A    Yes.

7       Q    Did she discuss the Zimmer Amendment at

8 all at the conference?

9       A    I don't recall.

10      Q    Do you have a recollection of whether

11 anybody from the Bureau discussed--and I don't mean

12 in a conversation.  I mean somebody who is either

13 sitting at a table, a conference table, discussing

14 these things or is making an address to the

15 conference.  Do you have a recollection of anybody

16 doing that at the conference, discussing the impact

17 of Zimmer, the desirability of Zimmer, or any other

18 aspect of Zimmer?

19      A    I don't.  I would assume that we did, but

20 to be honest with you, I can't remember any of the

21 agenda items.

22      Q    Do you know whether those conferences are

96

1  videotaped or recorded in some fashion, like with a

2  stenographer or whatever?

3       A     Not the entire conference.  There are

4  times when the director gives a state of the Bureau

5  address, and sometimes those are recorded.

6       Q     Okay.  Was anybody from the Bureau

7  administration--by that, I define to mean based in

8  Washington, D.C., the director, the associate

9  director or assistant director--

10      A     Assistant director.

11      Q     The regional directors.  I realize

12 they're not in Washington, I suppose.

13      A     No, they're not.

14      Q     I'm not here to testify, but in any

15 event, but anybody from the director on down speaking

16 on behalf of the director, anybody asked by either

17 Representative Zimmer or by other member of Congress

18 to state the Bureau of Prisons' position with respect

19 to the Zimmer Amendment?

20      A     Not to my knowledge.

21      Q     Okay.  In that question, I want to be

22 clear.  That would include the amendment's impact on

97

1  the showing of movies.  To your knowledge, did

2  anybody from Congress request input from the Bureau

3  of Prisons with respect to the advisability or the

4  need for that policy?

5          A    Not that I'm aware of.

6          Q    To your knowledge, did anybody from the

7  Bureau present the Bureau's position either to

8  Representative Zimmer or other members of Congress

9  with respect to the Zimmer Amendment?

10         A    Not that I know of.

11         Q    The same question, more specifically with

12 respect to the issue of movies:  Same answer?

13         A    Yes.

14         Q    So that we understand, when I'm talking

15 about somebody from the Bureau presenting this, I

16 mean somebody that could be either the director, the

17 assistant director, or somebody on their behalf.

18 You're not aware of anybody presenting the Bureau's

19 position to Congress; is that correct?

20         A    Yes.  It could have occurred.  I'm not

21 aware of it.

22         Q    I understand that.  My question relates

98

1  not only to an oral communication, but it would also

2  include anything in writing.  Are you aware of either

3  going from the Bureau to Zimmer or other members of

4  Congress with respect to the Bureau's position on the

5  Zimmer Amendment?

6         A    No.

7         Q    Okay.  And since 1996 up to the present

8  fiscal year, has Zimmer, either the exact language of

9  Zimmer or some reasonably close facsimile of Zimmer,

10 been enacted in each of the fiscal years since then?

11        A    Yes.

12        Q    And so as a matter of the--strike that.

13 And has the policy, the written policy of the Bureau

14 of Prisons, remained the same since Zimmer with

15 respect to the sowing of NC-17, which this case

16 doesn't concern, and R-rated, unedited R-rated,

17 movies?

18        A    Is your question is that the Bureau's--

19        Q    Has that remained the same--has the

20 written policy as embodied in the program statements,

21 has that remained the same since Zimmer, i.e.,

22 prohibiting the showing of NC-17 and R-rated movies?

1       A     Well, I don't have the latest program

2  statement to confirm that, but certainly at least

3  from the director's--from Exhibit 6, the director's

4  directive, I would--it certainly has continued to be

5  followed.

6       Q     Let me refer you to--the most recent

7  policies that I have are the September 15, 1997.   I'm

8  sorry.   That's an institution supplement.

9  Plaintiff's Exhibit 20, maybe we can have an

10 agreement.   This appears to be a program statement,

11 although it doesn't have the title, but it says PS

12 5370.10.   This appears to be a program statement,

13 which I gather was issued on February 23rd of the

14 year 2000.

15              [Plaintiff's Exhibit No. 20 was

16                  identified for the record.]

17              BY MR. KRAKOFF:

18       Q     Does this appear to be a program

19 statement on recreation?

20       A     Yes.

21       Q     Are you aware of any program statement

22 since February 23, 2000 being issued in conjunction

100

1  with recreation, inmate recreation programs?

2       A    I don't know.  There could be.  I'm not

3  aware of any.  Every year, program statements have to

4  be reviewed and then a determination made whether

5  they will be modified or reissued or kept the same.

6  So it's a--the reason you see so many drafts or

7  changes over time is that's very typical of the

8  Bureau of Prisons' policies.  I don't know if there

9  has been one issued since here or not.

10                    [Plaintiff's Exhibit No. 21 was

11                    identified for the record.]

12            BY MR. KRAKOFF:

13       Q    You'll see and I'll represent to you that

14  this was Plaintiff's Exhibit 20 and then the one

15  right behind that, Plaintiff's Exhibit 21, those

16  embody the attachments to the Bureau's appeals brief

17  in the case of--it's called Wolfe v. Reno.  It might

18  have been Ashcroft at that point.  In any event, on

19  the first page toward the bottom--the first page says

20  A-3.  That was the reference in the appeals

21  attachment.  It says:  "A question and answers

22  Attachment A has been added which provides

101

1  clarification on statutory requirements affecting

2  recreation."  And this goes through--I just have

3  through A-11, and then Plaintiff's Exhibit 21,

4  contains what appears to be the questions and answers

5  document was referring to in 20.

6          Are you familiar with this question and

7  answer document?

8      A    I've seen them before.  It's been a

9  while.

10     Q    Okay.  To your knowledge, does this

11 represent the policy of the Federal Bureau of Prisons

12 with respect to the viewing of R, X, or NC-rated

13 movies, the current policy?

14     A    Yes.  I believe it does.

15     Q    Okay.  Now, would it be accurate to say

16 that at the time Zimmer was originally enacted in

17 1996, that the Federal Bureau of Prisons

18 administration had not reached a conclusion that

19 R-rated movies categorically--and that would include

20 unedited R-rated movies--posed enough of a danger to

21 penological interests to bar them categorically?

22 Would that be a fair and accurate statement?

102

1       A    Yes.

2       Q    Okay.  And are you aware of any document

3  since 1996, since Zimmer was enacted, in which the

4  Bureau of Prisons administration expresses a belief

5  that showing unedited R-rated movies under the

6  procedure that existed prior to Zimmer, which allowed

7  a review by the warden or the education director,

8  posed a significant risk to any of the legitimate

9  penological interests, such as security, internal

10  order, rehabilitation, or punishment?

11      A    Well, the document would be the program

12  statement.  As we discussed earlier when we were

13  talking about what was added to program statements,

14  when we add things to it, we always look at them with

15  an eye towards correctional management and

16  penological interests.

17      Q    Well, is it your testimony that the 2002

18  program statement was something that was put together

19  with respect to movies independent of Zimmer?

20      A    No.

21      Q    Okay.  And do you have any reason to

22  believe as the designee of the Bureau of Prisons that

103

1  when Director Hawk issued the November 15, 1995 memo

2  that the Bureau had concluded that Zimmer was

3  necessary or appropriate because of some risk to

4  security or internal order, rehabilitation, or

5  punishment?

6       A    No.   I think it's fair that the Zimmer

7  Amendment pushed the Bureau to make a policy

8  decision.

9       Q    And your position is that if Zimmer were

10 to go away next year, for example were not to be

11 enacted, that the policy reflected in the November

12 15, 1995 memo from Director Hawk and the 2002

13 question and answer attachment embodied in Exhibit

14 21, that those would remain in tact; you feel that

15 fairly confidently?

16      A    That would be my opinion.   It certainly

17 would be my recommendation to the director.

18      Q    Okay.   Do you know what the director's

19 position is with respect to whether--and I'm really

20 talking--because this case isn't dealing with

21 weight-lifting equipment or magazines.   Focusing on

22 movies, do you know what the director's position is

104

1  with respect to whether the Bureau now supports the

2  policy that was animated by Zimmer?  Do you know

3  whether the director now supports that, such a

4  policy?

5        A     And specifically related to R-rated

6  movies?

7        Q     Yes.

8        A     I don't know that.

9        Q     One thing that I noted, Zimmer speaks in

10 terms of R-rated movies not being shown.  Am it

11 correct that--I think we've already talked about this

12 to some extent--edited R-rated movies can be shown,

13 such as R-rated movies that are shown on airlines?

14       A     That's correct.

15       Q     And edited movies that are shown on the

16 major networks, like ABC, CBS, and NBC, those can be

17 shown as well, the edited versions that have been

18 shown over the national networks?

19       A     Assuming that they would not threaten the

20 safety and orderly running of the institution?

21       Q     Right.  There's always going to be a

22 safety net.  Correct?

105

1          A     Correct.

2          Q     It certainly is possible that a

3    particular movie, even if it has been shown over

4    national TV, that the warden or an educational

5    director or somebody else at the--whatever that is,

6    Level-9.

7          A     Yes.

8          Q     That they might concludes for a

9    particular reason that this is not an appropriate

10   movie to be shown?

11         A     That's correct.

12         Q     Okay.  Now, is the showing of edited

13   R-rated movies--I take it that the Bureau views that

14   as being consistent with Zimmer, that at least it's

15   not inconsistent with Zimmer, if it's been edited and

16   the warden or his designee sees no risk, it can be

17   shown.  Correct?

18         A     Because it's no longer an R-rated movie.

19         Q     That's what I was going to ask.  The

20   Bureau is not going to view that--it isn't an R-rated

21   movie once it's been edited; is that right?

22         A     That's correct.

106

1          MR. KRAKOFF:  By the way, we don't have

2  too much longer.

3          [Discussion held off the record.]

4          BY MR. KRAKOFF:

5      Q    After our break, I believe that the

6  witness now has clarified in his own mind the fiscal

7  year, when it would end.  In connection with that

8  November 1995 memo from the director where she said

9  that there could be, I think, movies, R-rated movies,

10  until the end of the fiscal year--is that right?  I

11  think you said--

12     A    Well--

13     Q    Go ahead.  You can clarify it.

14     A    Thank you.  I appreciate that.  The

15  Fiscal Year 1996 would run from October 1, 1995

16  through September 30, 1996, and I think I was off

17  from that earlier.  So thank you for the opportunity

18  to clarify.

19          MR. KRAKOFF:  Sure.  Okay.

20          The other thing, Ms. Edney, maybe at some

21  point--we don't have to do it today, but maybe you

22  can confer with the appellate counsel in Wolfe, and

1  we can confirm what I believe to be the case, but I'm

2  not certain, that Exhibit 21 was part of the program

3  statement that's embodied in Exhibit 20, so we'll

4  know whether that was the questions and answers that

5  we referred to.

6          MS. EDNEY:  Okay.  No problem.

7          BY MR. KRAKOFF:

8      Q    Okay.  In connection with the subsequent

9  what I'll refer to as the Zimmer Amendments, even

10  though I don't think they refer to it as the Zimmer

11  Amendments anymore, the ones that came after the

12  original 1996, to your knowledge, beginning in '97

13  and continuing up to the present, has Congress sought

14  input from the Federal Bureau of Prisons as to

15  whether the prohibitions of the Zimmer Amendment

16  should be continued?

17      A    Not that I'm aware.

18      Q    Same question, more specifically with

19  respect the movies:  Same answer?

20      A    Yes.

21      Q    And to your knowledge, has the Federal

22  Bureau of Prisons expressed a position to Congress,

1  either in writing or orally, as to whether the Zimmer

2  Amendment should continue to be enacted?

3          A    Not that I'm aware of.

4          Q    Same answer specifically with respect to

5  the showing of movies?

6          A    Yes.

7          Q    And by movies, I meant R-rated.

8          A    Yes.

9          Q    You understood that?

10         A    Yes.

11         Q    Okay.  Now if I can take your back to the

12 Hawk memo which is Plaintiff's Exhibit 6--by the way,

13 before answering this, you certainly are free to read

14 the entire memo to yourself.  I don't want to take

15 anything out of context or confuse you.  Let me read

16 something and then put a question to you, and then if

17 you need time to review the entire memo, let me know.

18 You can do so.

19         The next to the last paragraph, it's

20 referring to--well, let me just read it.  It says:

21 "The detail and examples provided in this memo are

22 intended to address as many questions as possible and

109

1  to ensure a consistent implementation.  It is not

2  intended to substitute for the application of good

3  judgment and reason.  I know that these developments

4  are of concern to all of us.  I'm certain, however,

5  that with your personal commitment and direction, the

6  Bureau of Prisons can successfully implement this

7  public policy decision."

8              And within this bureaucracy that the

9  Bureau of Prisons is functioning, do you know what

10  the phrase "public policy decision" means?

11        A    I can only suppose the intent of the

12  director.

13        Q    What do you think was meant by that?

14        A    I think it was meant public policy

15  decision meaning decision made by those on the Hill.

16        Q    Rather than internally than by the Bureau

17  and Justice Department?

18        A    Yes, if I had to suppose.

19        Q    Where were you again--you had so many

20  positions.  Every two or three years, you were moved

21  somewhere.  In '96, were you in North Carolina?

22        A    I was in two places.  I was in North

110

1  Carolina from, I think May on in '96, and I was in

2  Colorado prior to that.

3        Q    Okay.  Do you remember how--strike that.

4  Did you know how the administration reacted to the

5  fact that Congress through a public policy decision

6  was changing--was requiring changes in the operation

7  of programs that the Bureau of Prisons had

8  established and maintained over the years?

9        MS. EDNEY:  I'm going to make a relevance

10 objection.  You can answer the question.

11       THE WITNESS:  I can attest to the opinion

12 of--my opinion and the wardens' that I talked to

13 opinions.

14       BY MR. KRAKOFF:

15       Q    What was that?

16       A    And that was a belief that Congress was

17 getting too intimately involved in day-to-day prison

18 management rather than broader issues, but I can't

19 say that was the administration's view.  I can only

20 tell you that was my view.

21       Q    Was it your view and people you spoke

22 with--were those administrators?

111

1       A       Yes.

2       Q       Were those administrators only in the

3  prisons where you were working, or was it a wider--

4       A       My peers that I talked to regularly.

5       Q       Outside of the institution?

6       A       Um-hum.

7       Q       Is that right?

8       A       Yes.  Sorry.

9       Q       Was it generally expressed that this was

10 a political decision that was occurring here with the

11 Zimmer Amendment rather than something that was based

12 upon penological considerations?

13      A       No.  I don't think so.  I mean, I think

14 that there was a belief that Congress--it depends on

15 what the word "political" means, but I think there

16 was a belief that Congress thought inmates had too

17 many amenities.  So that's a penological question as

18 much as a political question.

19      Q       From the standpoint of punishment?

20      A       Yes.  Deterrence.

21      Q       Okay.  Short of a categorical across the

22 board prohibition against the showing of what came to

1    be unedited R-rated movies as in Zimmer, were there

2    ways that the Bureau of Prisons officials could

3    adequately have addressed penological needs, such as

4    security and internal order?  Short of barring them

5    across the board, were there things in place that

6    could have occurred within the institutions that

7    could have protected the security interests and the

8    internal order interests that the Bureau is concerned

9    with?

10           A     Yes.

11           Q     Okay.   What were those?

12           A     Well, probably a variety.   One way would

13   be for us to screen all the R-rated movies and make

14   an individualized determination of that fact.   I

15   addressed that earlier in terms of my belief, that

16   that's not a very wise use of resource for what the

17   payoff is.   I also think that there are alternatives.

18   If there is a particular message that you're trying

19   to get across to an inmate that exists in an R-rated

20   movie, I think there's many ways or alternatives you

21   could use to get that message across short of showing

22   that movie, whether is an edited version of that

113

1  movie or whether it's other materials that are

2  related to the same topics.

3        Q    You mean like written materials?

4        A    It could be written materials.  It could

5  be other movies that don't have the profanity or

6  violence or other issues that are in that particular

7  movie.

8        Q    In the federal system, I suppose that it

9  makes a difference whether you're talking about a

10  maximum security or a medium security or a minimum

11  security or whether you're talking about a particular

12  institution, but is there a problem with respect to

13  the literacy rates of inmates in the federal system?

14  In any of those levels, maximum, medium, and minimum,

15  and if they differ, let me know.

16        A    What type of problem?

17        Q    Well, I'll put to you that in the State

18  of Pennsylvania, there are a fair number of

19  illiterate inmates, meaning inmates who read at, say,

20  a fifth or sixth grade level so that books are not a

21  good way for prisoners to gather information.  Is

22  that a significant problem within the federal system?

114

1     A     There is a percentage of inmates that

2 have low literacy levels.  It's not the majority.

3     Q     But in answer to my question, short of a

4 categorical across the board prohibition against

5 unedited R-rated movies, the same procedures that had

6 been in effect since at least 1986 could have been

7 utilized to address the internal security and good

8 order objectives.  True?

9     A     That's true.

10     Q     Okay.  Now, you mentioned earlier about

11 the terrorism, the incidents of terrorism, becoming

12 something that the Federal Bureau of Prisons has

13 become increasingly involved with.  Are there

14 particular similarities in which suspected

15 terrorists, alleged terrorists, are confined?  And

16 I'm not talking about anything associated with Iraq

17 and so forth or in Cuba, in Guantanamo--I guess

18 that's not Cuba.  But I'm talking about within the

19 traditional federal system.  Are suspected terrorists

20 or alleged terrorists, are they scattered throughout

21 the system or are there are certain facilities?

22     A     They're scattered throughout.  We have

115

1   over 150 international terrorists.  The real

2   high-management level are housed, obviously, at

3   higher security levels, but many of them are involved

4   in--some of them in white collar fraud.  You've seen

5   some the press on different foundations that were

6   supported.

7        Q    Like laundering?

8        A    Correct.  And they'll end up in lower

9   security facilities.  For example, FCI McKean had an

10  international terrorist probably up until 90 days

11  ago.  He was relocated, but he was housed in that

12  facility.  So they are spread throughout the system.

13       Q    Okay.  And given the fact that that has

14  become an increasing problem, are these similarities

15  given any extra resources to--you talked about the

16  telephone situation, monitoring the phone calls and

17  so forth.  Have these facilities not been given any

18  additional resources?

19       A    Unfortunately, we have not received any

20  funds despite requests for counter-terrorism funding.

21            MR. KRAKOFF:  I don't know how much I

22  want to go into now.  I don't know how much is too

1  sensitive.

2           MS. EDNEY:  I don't understand the

3  relevance of this line of questioning at all.

4           MR. KRAKOFF:  Well, I think--I don't want

5  to argue against myself, but I think as I understand

6  it, he's testifying that he would rather see

7  resources spent on monitoring telephone calls

8  involving suspected terrorists rather than reviewing

9  tapes, movie cassettes, and that's the only reason I

10 was getting into that.

11          In any event, I'm going to move on.

12          BY MR. KRAKOFF:

13      Q    Wouldn't it also be feasible for somebody

14 on the regional level or even on the national level,

15 you could have--there could be a published list of

16 R-rated movies that would be permitted throughout the

17 system.  Correct?  I mean, that would be something

18 that could be done so that it wouldn't have to

19 replicated at FCI McKean or a particular facility.

20 There could be a list of R-rated movies.  I'm talking

21 about unedited ones, because you said once they're

22 edited, they're really not considered R-rated.  Isn't

117

1  that something that could be done?

2      A    It's possible.  Our practice has been

3  when you look at all the policy statements on the

4  whole, and let's get away from movies, on rejection

5  of correspondence, on how we control religious

6  activities in prisons, those judgments are left up

7  the warden in that facility because the population

8  vary.  The security needs of that particular facility

9  vary.

10      Q    But it is something that is possible to

11  do?

12      A    It would be possible.

13              [Plaintiff's Exhibit No. 7 was

14              identified for the record.]

15          BY MR. KRAKOFF:

16      Q    Let me refer you to Plaintiff's Exhibit

17  7, which is dated March 19, 1996 related to inmate

18  organizations, and these rules were to go into effect

19  on April 18, 1996.  On page 8, Item C, uses of trust

20  fund, profit-sharing funds for inmate activities,

21  which is about halfway down on that page, do you see

22  that?

118

1      A    Yes.

2      Q    Then it says:  "C-1, Beginning in Fiscal

3 Year 1997, no trust funds may be used for premium

4 movie cable television channel or video rentals which

5 provide for the view of R, X, or NC-17 unless

6 procedures have been implemented to prohibit these

7 types of rated movies from being viewed by the inmate

8 population."  Does that policy remain in effect?

9      A    Yes.

10     Q    Okay.  I had asked you earlier about the

11 edited R-rated movies which are shown on the national

12 networks like CBS, NBC, ABC.  Do you know whether

13 R-rated movies from the cable outlets such as Home

14 Box Office, and I don't remember the--there are some

15 other cable networks that have movies.  Do you know

16 whether those are allowed to be seen?  And I don't

17 mean are inmates allowed to watch HBO.  I'm asking

18 about movies that have been shown on HBO; is that

19 something that has been adequately edited for

20 purposes of showing to inmates?

21     A    I mean, if it's rated "R", it's rated

22 "R".

119

1    Q    Right.

2    A    If it's rated "R" and it's on HBO, then

3 it would not be permitted in the institution.

4    Q    The R-rated movies that are shown over

5 the national regular networks, the non-cable

6 networks, are those automatically sufficiently edited

7 to show to the inmates?

8    A    Well, they're not R-rated anymore.  I

9 would disagree with your terms.

10    Q    Once they've been shown on--

11    A    If it's an edited "R" movie, it's no

12 longer an "R".  So I wouldn't term it an R-rated

13 movie.

14    Q    All right.  So ipso facto, if it's been

15 shown on ABC, it was manufactured and it was given an

16 "R" rating and then it was shown on ABC by virtue of

17 the fact it was shown on ABC or NBC or CBS, it no

18 longer is R-rated for purposes of the Bureau; is that

19 correct?

20    A    I believe that is the case.

21    Q    But that is not the case when you're

22 talking about HBO and Show Time and things of that

120

1  that sort.  Those are R-rated movies remain R-rated,

2  don't they?

3       A    Some do, yes.

4       Q    Item 16--let me refer you to Exhibit 8,

5  which is an August 27, 1996 document from Director

6  Hawk.  These contain Zimmer Amendment questions and

7  answers.

8                      [Plaintiff's Exhibit No. 8 was

9                      identified for the record.]

10          MS. EDNEY:  Sorry.  Which exhibit are we

11  on?

12          MR. KRAKOFF:  Eight.

13          MS. EDNEY:  Okay.

14          BY MR. KRAKOFF:

15       Q    If you can turn to page 4, Question 16,

16  this says:  "Our institution has a video library that

17  the inmates utilize in a leisure center on individual

18  video monitors, and some of the movies in the library

19  are R-rated.  Commencing in Fiscal Year 1997, will

20  these R-rated movies have to be removed from the

21  library?  Answer:  Yes.  They must be remove."  Does

22  that continue to be the policy?