121

1      A    I'm sure it is, yes.

2      Q    Okay.  To your knowledge, have the

3  prohibitions against the showing of X, NC-17, and

4  R-rated movies embodied in the Zimmer Amendment and

5  in the subsequent Zimmer Amendments been embodied in

6  a regulation?

7      A    I'm not sure if they are, no.  The

8  regulations set the ceiling or floor, remember, so

9  that--I'll give you a perfect example.  Forget movies

10 for a second.  The regulation requires--an inmate in

11 segregation is required to have one hour of

12 recreation a day outside.  If the Bureau provides two

13 hours of recreation, we're still in compliance with

14 that regulation.  So even if the amendment read no

15 X-rated movies, we would still have the latitude to

16 go above that.

17     Q    In fact, and I can show it to you if

18 you're interested, in one of institution supplements,

19 I noted that Mr. Luther, Dennis Luther, had

20 prohibited NC-17 as a category from being shown at

21 McKean.  Assuming that what I represented to you is

22 accurate, did the wardens have the authority to do

122

1  that consistent with Bureau of Prisons policy?

2          A    Yes.

3          Q    Okay.  Now we're almost at the end.  You

4  can skip ahead to Exhibit 20.

5                By the way, if there is--Ms. Edney, if

6  there is a more current--I know Exhibit 20 is a

7  document that, as I told you before, was attached to

8  the Bureau's appeal.  If there is a more recent

9  program statement on the recreation program involving

10 the movies, I would appreciate that.

11                MS. EDNEY:  Okay.

12                BY MR. KRAKOFF:  The same with respect

13 to--and I think that the questions and answers might

14 have been part of that, but if it's a separate

15 document, if there's been an update--

16                MS. EDNEY:  We'll get you the most recent

17 version.

18                MR. KRAKOFF:  Okay.

19                BY MR. KRAKOFF:

20         Q    If you turn to page--you'll see on the

21 bottom of this page, it's actually 6 of 20, if you

22 see the far left corner, and then it says A-8 in the

123

1 middle of the page, Item 11.  Do you have that?

2          A    Yes.

3          Q    Okay.  It says:  The Recreation

4 Supervisor will exercise good judgment and follow

5 statutory restrictions when selecting video movie

6 rentals.  No movies rated R, X, or NC-17 may be shown

7 to inmates."  And then there's bullets, and then:

8 "Institutions may show R and NC-17 movies that have

9 been edited for general public viewing."  And I take

10 it that that would be something that would be edited

11 for--something that would be on ABC or NBC would fall

12 within the category of general public viewing.  True?

13         A    Yes.

14         Q    Is that the same with respect to

15 airlines?

16         A    Yes.  I believe so.

17         Q    Okay.  Now, the next one says:  "Spanish

18 movies that are not rated may be shown if they do not

19 include profanity, graphic violence, or nudity."  I

20 think that more or less parallels the language of

21 Zimmer, doesn't it?

22         A    I'd have to look.

124

1           MS. EDNEY:  Only if you know.

2           MR. KRAKOFF:  Well, Zimmer speaks for

3    itself.

4           BY MR. KRAKOFF:

5      Q    Do you know whether there are any

6    guidelines in terms of what you're talking about in

7    terms of profanity?  Well, that's the first question.

8    I'll tell you why I'm asking it.  I mean, lots of

9    movies might have what would be considered profanity,

10   like son of a bitch or something like that.  Is that

11   what is prohibited here, or is it something else?

12     A    I'm not sure what the interpretation

13   would be.  Certainly my interpretation as a warden

14   would not be that strict.

15     Q    Do you know whether graphic violence is

16   defined anywhere in the Bureau of Prisons policy?

17     A    I don't believe it is.

18     Q    Okay.  Your interpretation as a warden,

19   would somebody pulling out a gun and shooting

20   somebody, is that graphic violence, or is it more

21   than that?  Does it have to be in the head?

22     A    It would be hard for me without actually

125

1  viewing a movie to make a determination.

2        Q    And that might vary from warden to

3  warden?

4        A    It could.

5        Q    And then nudity, I suppose in one

6  person's mind looking at an exposed breast with a

7  nipple of a woman, is that what is meant by nudity?

8  Is viewing the buttocks, the naked buttocks, nudity?

9  What is nudity?  Is that defined anywhere?

10        A    It wouldn't be defined beyond what's in

11  here.

12        Q    And that might vary from warden to

13  warden?

14        A    It's possible.

15        Q    So people at the local level in viewing a

16  Spanish movie that has not no rating, they're to use

17  their own discretion in determining what kind of

18  nudity, how much nudity, what kind of violence, how

19  much violence, what kind of profanity, and how much

20  profanity rises to the equivalent of an R-rated

21  movie?

22        A    I think that would be fair.

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003
(202) 546-6666

127

1  really been R-rated?

2         A    Correct.

3         Q    Is that right?

4         A    Correct.

5         Q    If the Bureau--I know you're not a

6  lawyer.  You're a Ph.D. with a heavy emphasis in

7  mental health, but if you know, if the Bureau of

8  Prisons were to refuse to comply with Zimmer and were

9  to allow R-rated movies to be shown, is there

10 something that could happen to funds of the Bureau

11 were that to occur with respect to Congress?

12        A    I believe that there is a possibility of

13 that, yes.

14        Q    Do you know of any occasions where

15 Congress, any other areas where Congress, has

16 involved itself in prison programming other than

17 Zimmer during the time that you've been with the

18 Bureau?

19        A    Oh, yeah.  They are involved in prison

20 programming all the time.

21        Q    What kinds of things--is that through

22 legislation that they've been involved?

128

1      A     Through budget issues, primarily, budget
2  legislation.

3      Q     Situations where they've refused to
4  budget certain programs?

5      A     Where they've either reduced the
6  budgeting in programs or more commonly affirmatively
7  placed money and direct us to implement a particular
8  program, and I'll give you a perfect example.  We
9  have a directive to implement the residential
10  faith-based units.  It's a very clear directive.
11  Funds are specifically carved out to implement that
12  program.

13      Q     What does that involve, residential
14  faith-based?  Within the prisons?

15      A     Correct.  It required us to open up five
16  separate housing units where we operate a nine-month
17  program where men and woman go through a spiritual
18  journey, if you will.  They can be of any faith or no
19  faith at all.  It's a very structured program of
20  journalling and contacting a faith provider from
21  outside and mentoring and so forth.

22      Q     Staff members as well, ministers,

129

1 priests, rabbis, or are they from the outside?

2      A    We use our chaplains, but most of the

3 people that provide the services are contracted with

4 oversight by us.

5      Q    I understand the affirmative thing, but

6 can you think of any other situations in the last 20

7 years where Congress has said you can't use any

8 appropriations to have this program or have that

9 program; you can't spend any appropriations on this

10 program or that program other than Zimmer?

11      A    We had the Ensign Amendment.  We're not

12 permitted to use appropriated funds for pornographic

13 magazines and so forth.

14      Q    Other than those two, can you think of

15 any other occasions?

16      A    No.

17          MR. KRAKOFF:  That's it.

18          MS. EDNEY:  If we can take a five-minute

19 break, I might have a couple of questions for

20 redirect.

21          MR. KRAKOFF:  Sure.

22          [Recess.]

130

1              MS. EDNEY:   Just a couple of

2    clarifications.

3              EXAMINATION BY COUNSEL FOR THE DEFENDANTS

4              BY MS. EDNEY:

5         Q    John, I just want to clarify.   There was

6    some discussion about S & E funds and trust funds,

7    and I just want to clarify that the inmate trust fund

8    and S & E funds are considered appropriated funds?

9         A    Yes, they are.   It's technically

10   complicated, but our appropriation has a number of

11   buckets of money.   We have S & E and we have trust

12   funds.   So, yes, it is appropriated funds.

13        Q    Okay.   Thank you.   I also want to clarify

14   that earlier Mr. Krakoff asked you about the fact

15   that it's the director that issues the program

16   statements and you have to follow those program

17   statements.   Even if there was no program statement

18   issued in this case when the Zimmer Amendment was

19   enacted, would BOP have to follow the Zimmer

20   Amendment?

21        A    Absolutely.

22        Q    Also, in terms of whether something is a

131

1  program statement as opposed to a regulation, does

2  BOP personnel have to follow both program statements

3  and regulations?

4         A    Yes.

5         Q    In the same manner?

6         A    Yes.

7         Q    This is my final question:  Going back to

8  the fact that the director gave some advanced notice

9  of the prohibitions of the Zimmer Amendment and

10  communicated those prohibitions in advance and said

11  it would be effective immediately, is there a valid

12  reason towards communicating that a little in advance

13  of the actual amendment being passed?

14        A    Yes.  It's good correctional practice.

15  What we've learned over the years is that inmates

16  will accept fairly significant changes if you

17  communicate with them far in advance of the change

18  and you listen to their concerns and work through an

19  issue.  Where we've had our biggest problems are when

20  we just walked in and immediately implemented a

21  change without walking and talking and diffusing some

22  of the issues.  So I think the worst thing that could

132

1 have happened, particularly in light of the October

2 1995 disturbances, is if we had waited just until the

3 amendment was issued and the next day had to turn it

4 on, if you will, I think that would have caused us

5 some problems.  It was good correctional management

6 to get ahead of the issue.  That's true not just on

7 this issue, but a lot of changes, smoking and so

8 forth.

9              MS. EDNEY:  Okay.  Thank you.  I have not

10 further questions.

11             MR. KRAKOFF:  I don't have any other

12 questions.

13             [Whereupon, at 1:35 p.m., the deposition

14 concluded.]

15                       [Signature not waived.]

16

17

18

19

20

21

22

133

1                    CERTIFICATE OF DEPONENT

2

3                    I have read the foregoing 132 pages which

4    contain the correct transcript of the answers made by

5    me to the questions therein recorded.

6

7

8                              _____

9                              John M. Vanyur

10

11                                  -   -   -

12

13                    Subscribed and sworn to before me this

14    _____ day of _____, 2005.

15

16

17

18                              _____

19

20                              Notary Public in and for

21

22    My Commission Expires:

# CERTIFICATE OF DEPONENT

I have read the foregoing _134_ pages which contain the

correct transcript of the answers given by me to the questions

therein recorded, unless amended by an Errata Sheet attached

hereto.

Subscribed and sworn before me

This _20th_ day of _May_____, 20_05_

_____
**Notary Public in and for**

\* \* \* \* \* \* \* \* \* \* \* \*

**My commission expires:** _____

DEBORAH A. TERRELL
Notary Public, District of Columbia
My Commission Expires March 31, 2008

972 43
04/06

133-B

# ERRATA SHEET

**EXECUTED BY AFFIANT:**  _John M. Vanyur_
                                    **(Print Name)**

The Affiant, having the right to make any changes deemed necessary, hereby incorporates the following changes and states the reason for each change accordingly:

| PAGE NO. | LINE NO. | CHANGE | (STATE REASON FOR CHANGE) |
|---|---|---|---|
| 15 | 10 | "1998" not "1978" | Typographical error, as can be seen in line 11. |
| 54 | 12 | "negotable issues" not "non-negotable" | Mistakenly characterized |
| 75 | 9 | "clarify is that the" no "clarify to the" | grammatical change to make more sense of statement. |
| 93 | 3 | "1988" not "1900" | Typographical error, as can be seen in line 6 |

**PURSUANT TO 28 U.S.C., SECTION 1746, I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT I AM THE AFFIANT AND THAT THIS ERRATA SHEET WAS PREPARED BY ME.**

**AFFIANT'S SIGNATURE**

## CERTIFICATE OF NOTARY PUBLIC

I, CATHERINE B. CRUMP, the officer before whom the foregoing deposition was taken, do hereby testify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me by stenographically and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially or otherwise interested in the outcome of the action.

CATHERINE B. CRUMP

Notary Public in and for
The District of Columbia

My Commission expires:  October 31, 2007

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PEENSYLVANIA**

RICHARD JEWELL, et al,

                  Plaintiff,

    v.

ALBERTO GONZALEZ, et al,

                  Defendants.

C.A.  97-408 Erie

### NOTICE OF DEPOSITION

To:  ALL DEFENDANTS

Pursuant to Rules 26 and 30 (b)(6) of the Federal Rules of Civil Procedure, notice is given that on Wednesday, April 6, 2005, beginning at 10:00 A.M. Plaintiffs' counsel will take the deposition by oral examination of the person designated by the Attorney General and the Bureau of Prisons to testify on their behalf with respect to the following items:

1.    The <u>reason or reasons</u> federal prisoners were <u>not categorically</u> prohibited from viewing R-rated movies prior to enactment of the Zimmer Amendment.

2.    All <u>penological interests</u> that were impacted by the viewing of such movies by BOP inmates prior to enactment of the Zimmer Amendment.

3.    The <u>means</u> by which BOP prison officials (<u>prior</u> to Zimmer) could <u>control</u> or <u>regulate</u> the showing of R-rated movies to inmates (and, thereby, protect legitimate



PLAINTIFF'S
EXHIBIT

penological interests), such as prohibiting specific movies from being shown to prisoners.

4.    The <u>impact</u> that controlling or regulating R-rated movies (prior to Zimmer) had on prison resources, staff, or other aspects of the operations of BOP institutions.

5.    The <u>means</u> by which the BOP prison officials could <u>now</u> control or regulate the showing of R-rated movies to inmates short of categorically banning such movies if the Zimmer Amendment or other federal legislation did not preclude the showing of such movies.

6.    The <u>impact</u> that controlling or regulating the showing of R-rated movies to inmates rather than categorically banning such movies would <u>now</u> have on prison resources, staff, or other aspects of the operations of BOP institutions if the Zimmer Amendment or other federal legislation did not preclude the showing of such movies.

7.    The <u>identity</u> of the <u>legitimate penological interests</u> that are served by categorically banning the showing of R-rated movies in BOP prisons and the extent to which those interests are served.

8    Whether the categorical banning of R-rated movies in BOP prisons is an <u>exaggerated response</u> to legitimate penological interests.

9.    The existence of ready or easy alternatives available to BOP inmates in conjunction with the viewing of movies.

10.    Whether the BOP administration or other BOP officials were consulted by Representative Zimmer or other federal legislators prior to the inclusion in Zimmer Amendment of a ban against the showing of R-rated movies.

11.    The above questions (with the exception of item 10) will be asked in the context of BOP prisons, in general, and FCI McKean, in particular.

This deposition will be taken at the Department of Justice, 901 E. Street, N.W., Washington D.C.


Dated:  March 17, 2005

Jere Krakoff
I.D. 13701
1705 Allegheny Building
Pittsburgh, PA 15219
(412) 232-0276

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a copy of the attached Notice of Deposition was mailed via first class mail to the defense counsel Marsha Edney in care of the United States Department of Justice, Civil Division, Room 938, 901 E. Street, N.W., Washington, D.C. 20530.

Dated: March 17, 2005

Jere Krakoff

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CARL WOLF, ET AL )
)
    Plaintiffs, )
)
        v. )
)    C.A. No. 97-408E
JANET RENO, ET AL )    Judge McLaughlin
)    Magistrate Judge Baxter
    Defendants. )
)

## DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Federal Rules of Civil Procedure 33 and 34 defendant hereby responds to plaintiffs' First Set of Interrogatories and Requests for Production of Documents as follows:

### GENERAL OBJECTIONS

1.    Defendant objects to plaintiffs' Interrogatories and Requests for Production of Documents to the extent they request information not designed to lead to the discovery of relevant evidence and request information and documents beyond the requirements of the Federal Rules of Civil Procedure 33 and 34.

2.    Defendant objects to plaintiffs' Interrogatories and Requests for Production of Documents to the extent that they purport to seek the production of documents or information not within the defendants' possession, custody or control.

3.    Defendant objects to plaintiffs' Interrogatories and Requests for Production of Documents to the extent that they seek information which is protected by the provisions of the Privacy Act, 5 U.S.C. § 552a.


PLAINTIFF'S EXHIBIT 2

## RESPONSES

## INTERROGATORIES

1.    State the name and position of the FCI-McKean official who supervises the inmate film

program that is the subject of this lawsuit.

   **Response:**    Dennis J. Flatt, Supervisor of Recreation.

2.    State the name and position of the FCI-McKean official who determines which movies

will be leased for showing at the inmate film program that is the subject of this lawsuit.

   **Response:**    Dennis J. Flatt, Supervisor of Recreation.

3.    In what year did the inmate film program begin at McKean?

   **Response:**    The inmate film program was started in 1989, which is the year the

institution began operation.

4.    Prior to implementation of the Zimmer Amendment, were any categories of rated films

automatically prohibited (as a matter of Bureau of Prison or FCI-McKean policy) from

being shown to McKean inmates in the prison's inmate film program?  If so, please

identify each such category (i.e. X-Rated films; R-Rated films; NC-17 Rated films, etc.).

   **Response:**    Yes, X-rated films were not shown.

5.    Since implementation of the Zimmer Amendment, are any categories of rated films

automatically prohibited (as a matter of Bureau of Prison or FCI-McKean policy) from

being shown to FCI-McKean inmates in the prison's inmate film program?  If so, please

identify each such category (i.e. X-Rated films; R-Rated films; NC-17 Rated films, etc.).

   **Response:**    Yes,  R, X and NC-17 rated movies are not shown.

6.  Identify the funding source of the monies that are used to lease video cassettes for

showing in the inmate film program (ex. Inmates Benefit Fund, etc.) and describe, with

specificity, how the monies are generated (i.e. commissary purchases by inmates;

purchases from vending machines in the inmates visiting area, etc.).

**Response:**    The Inmate Trust Fund, which is funded through revenue from

commissary, vending and inmate telephone services.

7.  List the titles of all leased movies that were shown to McKean inmates as part of the

inmate film program during the two years that <u>preceded</u> the implementation of the

Zimmer Amendment and, if your records reflect, the rating of each movie.

**Response:**    This list is produced in response to Request for Production 8.

8.  List the titles of all leased movies shown to McKean inmates as part of the prison's film

program <u>since</u> implementation of the Zimmer Amendment and, if your records reflect, the

rating of each movie.

**Response:**    This list is produced in response to Request for Production 9.

9.  State the name and address of the company from which FCI-McKean currently leases

movie cassettes for the showing of films to McKean inmates.

**Response:**    Swank Motion Pictures, Inc.
211 South Jefferson Ave.
St. Louis MO 63103-7008

Movie World
10 Davis Street
Bradford, PA 16701

10.  State the name and address of each company from which FCI-McKean has leased movies

cassettes over the past three years for the showing of films to McKean inmates.

- 3 -

**Response:**     See response to Interrogatory 9.

11.     State the name of the deputy warden who has primary responsibility for security (as opposed to programming matters).

**Response:**     There is no position designated "deputy warden." Mr. M.E. Nuss is the Associate Warden responsible for security.

12.     State the name and position of the FCI-McKean's highest ranking uniformed security officer.

**Response:**     The Chief Correction Supervisor (Captain) is the highest ranking security officer but it is not a uniformed position. His name is Captain Donald Reich. The highest ranking uniformed position is a GS-11 lieutenant and there are 7 GS-11 lieutenants assigned to FCI McKean.

## REQUEST FOR DOCUMENTS

1.     All policy statements, rules, regulations, administrative directives, memoranda, correspondence and other such documents promulgated or issued by FCI-McKean officials since passages of the Zimmer Amendment related to the showing of movies at the prison as part of the inmate film program.

**Response:**     Institutional Supplement 5370.08 dated September 15, 1997 is produced as responsive to this request.

2.     All policy statements, rules, regulations, administrative directives, memoranda, and other such documents promulgated or issued by FCI-McKean officials prior to passages of the Zimmer Amendment related to the showing of films at the prison to in the context of the inmate film program.

- 4 -

**Response:**   The following documents are produced:

Institutional Supplement 5370.06 dated May 15, 1990

Institutional Supplement 5370.06 dated July 15, 1991

Institutional Supplement 5370.06 dated March 10, 1993

Institutional Supplement 5370.08 dated November 29, 1994

Institutional Supplement 5370.08 dated December 27, 1995

3.   All policy statements, rules, regulations, administrative directives, memoranda,
correspondence and other such documents received by FCI-McKean officials from the
Federal Bureau of Prisons, the United States Department of Justice, or other federal
executive agencies, bureaus or departments related to the  showing of films to BOP
inmates since the opening of FCI-McKean.

**Response:**   The following documents are produced:

Program Statement 5370.06 dated September 27, 1986

Program Statement 5370.07 dated December 16, 1993

Program Statement 5370.08 dated June 13, 1994.

Memorandum from Kathleen Hawk, Director to Chief Executive Officers
dated November 15, 1995 re: Guidelines for Implementation of Zimmer
Amendment.

Program Statement 5381.04 dated March 19, 1996.

Memorandum from Kathleen Hawk, Director to All Regional Directors
and All Wardens  dated August 27, 1996 re: Zimmer Amendment
Questions and Answers.

Memorandum from Steve Schwalb, Assistant Director, Industries,
Vocational Training and Education to All Regional Directors and All

- 5 -

Wardens dated September 23, 1996 re: Follow-up to Zimmer Amendment Questions and Answers.

4.  All policy statements, rules, regulations, administrative directives, memoranda, correspondence and other such documents promulgated or issued by FCI-McKean officials, the Federal Bureau of Prisons, or the United States Department of Justice, since passage of the Zimmer Amendment related to the showing of films to BOP.

    **Response:**    See documents produced in response to Requests 1 and 3.

5.  All Bureau of Prison policy statements, rules, regulations and other such documents in effect at the time of the passage of the Zimmer Amendment which governed the showing of films to inmates of federal correctional institutions.

    **Response:**    See documents produced in response to Requests 2 and 3.

6.  All modifications, amendments, changes and alterations to the Bureau of Prison policy statements, rules, regulations, and other such documents governing the showing of films to inmates of federal correctional institutions after the passage of the Zimmer Amendment.

    **Response:**    See Response to Requests 1 and 3.

7.  All documents prepared by FCI-McKean, Federal Bureau of Prison, or Department of Justice officials which list, reflect, or discuss security or other anticipated penological purposes to be served or advanced by the prohibition against the showing of R rated or NC-17 rated films at federal correctional institutions.

**Response:**    No responsive documents other than the Program Statements and Memorandums which have been produced in response to Requests 1 and 3. Defendant did not search any litigation files maintained by the Department of Justice.

8.    All lists, rental invoices, receipts, and other such documents which reflect the titles of the films shown to FCI-McKean inmates over the three years prior to the passage of the Zimmer Amendment.

   **Response:**    Responsive documents are produced.

9.    All lists, rental invoices, receipts, and other such documents which reflect the titles of the films shown to inmates at FCI-McKean over the three years <u>since</u> passage of the Zimmer Amendment.

   **Response:**    Responsive documents are produced.

10.    All documents confirming or reflecting the allocations of monies from the Inmate Benefit Fund or other inmate generated sources toward the rental of films for showing to FCI-McKean inmates.

   **Response:**    Responsive documents are produced.

11.    All memos, letters and other correspondence prepared by or issued in the name of Kathleen Hawk or her BOP administrative subordinates which have criticized, questioned, or expressed concerns about the merits of the Zimmer Amendment as it relates to federal correctional facility programs.

   **Response:**    There are no documents responsive to this Request.

12.    All memos, letters and other correspondence prepared by or issued in the name of John Hahn or his administrative subordinates which have criticized, questioned, or expressed

- 7 -

concerns about the merits of the Zimmer Amendment as it relates to federal correctional

facility programs.

**Response:**    There are no documents responsive to this Request.

13.    All administrative grievances submitted by FCI-McKean inmates and the responses

thereto related to the prohibition against the showing of R and NC-17 rated movies at the

prison in the context of the inmate film program.

**Response:**    There are documents responsive to this request but they are not being

produced because they are protected from disclosure by the Privacy Act. Upon entry of a waiver

and\or an appropriate protective order, defendants will turn over these documents.

14.    All invoices, lease orders, receipts and other documents reflecting the rental of movies for

showing to McKean inmates over the past three years as part of the inmate film program.

**Response:**    See Response to Request 9.


As to Objections:

Dated: May 28, 1999                    Respectfully submitted,

                                       FRANK W. HUNGER
                                       Assistant Attorney General

                                       HARRY LITMAN
                                       United States Attorney

                                       TINA M. OBERDORF
                                       Assistant U.S. Attorney

                                       VINCENT M. GARVEY
                                       MARSHA S. EDNEY
                                       Attorneys, Department of Justice
                                       Civil Division
                                       901 E Street, N.W., Room 938
                                       Washington, D.C. 20530
                                       Telephone: (202) 514-4520
                                       Attorneys for Defendants

- 8 -

I declare that the answers to the Interrogatories are true and correct.

Toni Brown
Assistant Regional Counsel
Federal Bureau of Prisons
Northeast Regional Office

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 1999, I served a copy of the foregoing Defendants' Response to Interrogatories and Requests for Production of Documents via federal express to:

Jere Krakoff
Pennsylvania Institutional Law Project
1705 Allegheny Building
Pittsburgh, PA 15219


MARSHA S. EDNEY

**U.S. Department of Justice**
Federal Bureau of Prisons

| | |
|---|---|
| OPI | : EDUCATION |
| Number | : 5370.6 |
| Date | : September 16, 1986 |
| Subject | : INMATE RECREATION PROGRAMS |

# Program Statement

EFFECTIVE DATE: October 27, 1986

1. [PURPOSE AND SCOPE §544.30: The Bureau of Prisons encourages inmates to make constructive use of leisure time and offers movies, sports, social activities, arts and hobbycrafts, and other group and individual activities.]

Recreation programs in the Federal Bureau of Prisons are intended to help reduce idleness and to keep inmates constructively occupied; to reduce personal stress and institution tension; to increase physical fitness and positive life styles both in prison and after release; and to contribute to personal and institution stability through maximum participation in formal and informal programs.

2. DIRECTIVES AFFECTED:

   a. Directives Rescinded:

      P.S. 5370.5 Recreation Programs - Inmates, Administration Guidelines.

   b. Directives Referenced:

      P.S. 4500.2, Chapter 4510 - Trust Fund Management Manual.
      P.S. 5300.12 - Education, Training, and Leisure-time Program Standard.

   c. Rules cited in this Program Statement are contained in 28 CFR 544.30-34 and 28 CFR 544.81.

3. STANDARDS REFERENCED:

Commission on Accreditation for Corrections Standards for Adult Correctional Institutions (2nd Edition): 2-4452, 2-4456, 2-4457, and 2-4459.

4. [DEFINITIONS §544.31:

   a. Leisure Activities - are a wide range of activities in which inmates may participate when not performing assigned duties.   Leisure activities include participation in organized and informal sports, physical fitness, table games, hobbycrafts,   music programs,   intramural   activities,   social   and   cultural organizations, movies and stage shows.   Religious activities, psychological services, and education classes are not included within this definition.

   b. Organized Activities - are those activities accounted for by registration or roster of individual participants.

   c. Art Work - includes all paintings and sketches rendered in any of the usual media (oils, pastels, crayons, pencils, inks, and charcoal).]

[Bracketed Bold - Rules]

PLAINTIFF'S
EXHIBIT

[d. Hobbycraft Activities - include leatherwork, models, clay, mosaics, crochet, knitting, sculptures, woodworking, lapidary, and other forms consistent with institution guidelines.

5. GOALS §544.32: The Warden is to insure, to the extent possible, that leisure activities are provided to meet social, physical, and psychological needs of inmates.

   a. Leisure activities are designed to attract inmate participation regardless of ethnic, racial, age, or sex difference, or handicap considerations, and to enhance the potential for post-release involvement.

   b. Leisure activities are designed to ensure that an inmate with the need and desire has the opportunity to complete one or more activities (see 28 CFR 544.81).]

Leisure-time goals and objectives are included in annual institution plans.  In addition, recreation supervisors are involved in key institution meetings, as appropriate, to communicate with all departments.

6. RECREATION/LEISURE-TIME RESPONSIBILITIES:

   a. The Recreation Supervisor in consultation with the Supervisor of Education will:

   (1) Develop a general plan of action to identify those inmates who are not participating in recreational activities and to identify programs to be initiated to encourage them to participate in some activity.  The Recreation Supervisor's plan of action will include structured and organized recreational activities.

   (2) Coordinate with the Unit Management Staff the unit and institution recreation activities.

   (3) Make a presentation to the admission and orientation inmates which includes encouragement to participate in physical and/or leisure-time activities.

   (4) Submit a proposed monthly schedule to the Supervisor of Education which may be published for inmate use if appropriate.  In addition, submit a one page report to the Supervisor of Education each month which indicates the types of programs available and the level of participation.

   (5) Be responsible for preparation of the recreation budget and maintenance of records of expenditures from Cost Center 313.

   (6) Use contracts to assist and/or expand recreation programs if the budget permits.

   (7) Review the recreational items which inmates can purchase through the

commissary.  If the security level and institution criteria are not compromised, an expansion of these items will be considered.

(8) Serve as a consultant to Federal Bureau of Prisons staff regarding inmate physical fitness and related areas.

b.  The Supervisor of Education will review with the appropriate Associate Warden, the possibility of correctional coverage of unstructured activities (i.e. yard, gym) and for coverage during leave periods to maintain programs and activities.

c.  The Supervisor of Education will work closely with the institution Business Manager to seek maximum support from commissary in providing for inmate direct and special order purchase of recreation items.

7.  [MOVIES §544.33:  The Warden or designee may approve the showing of movies at the institution.  X-rated movies are not permitted.  Where the institution receives premium movie channels through cable television subscription, regular movie rentals ordinarily will be limited to special events or holidays.]

This selection authority may not be delegated below the level of the Supervisor of Education.   Movies will  be  disapproved when the  Warden  determines  that showing/viewing them would pose a threat to the security or good order of the institution.

8.  [ART AND HOBBYCRAFT §544.34:

a. An inmate engaged in art or hobbycraft activities may obtain materials through:

(1) The institution art program (if one exists);

(2) The commissary sales unit;

(3) Special purchase commissary orders, if the sales unit is unable to stock a sufficient amount of the needed materials; or

(4) Other sources approved by the Warden.

b. Each inmate shall identify art or hobbycraft materials by showing the inmate's name and register number on the reverse side of the item.

c. Completed or abandoned art or hobbycraft articles may be disposed of in the following manner:

(1) Upon approval of the Warden, by giving the item to an authorized visitor;]

The quantity of items will be determined by the Warden.

[(2) By mailing the item to a verified relative or approved visitor at the inmate's expense.]

PAGE 4
5370.6
September 16, 1986

[(3) By selling through an institution art and hobbycraft sales program, if one exists, after the institution price committee has determined the sale price.]

Prices are determined in compliance with provisions of the Trust Fund Management Manual, P.S. 4500.2, Chapter 4510, Page 1-3.

[(4) Other methods established by the Warden.

d. Restrictions: Art and hobbycraft programs are intended for the personal enjoyment of an inmate and as an opportunity to learn a new leisure skill. They are not for the mass production of art and hobbycraft items by artists or to provide a means of supplementing an inmate's income.

(1) The Warden may restrict, for reasons of security and housekeeping, the size of inmate paintings. Paintings mailed out of the institution must conform to both institution guidelines and postal regulations. If an inmate's art work or hobbycraft is on public display, the Warden may restrict the content of the work in accordance with community standards of decency.

(2) The Warden may set limits, in compliance with commissary guidelines, on the amount of money an inmate may spend on art or hobbycraft materials.

(3) The Warden may restrict for reasons of security, fire safety, and housekeeping, the use or possession of art and hobbycraft items or materials.]

In order to reduce fire hazards and to conserve space, art and hobbycraft items that are not disposed of in any of the listed ways are subject to removal and disposal at the discretion of an institution's administration.

[(4) The Warden may limit hobbycraft projects in the cell/living areas to those which can be contained/stored in designated personal property containers. Exceptions may be made for such items as a painting where the size would prohibit placement in a locker. Hobbycraft items must be removed from the living area when completed.

(5) The Warden shall require the inmate to mail completed hobbycraft articles out of the institution at the inmate's expense, or to give them to an authorized visitor within 30 days of completion, or to dispose of them through approved sales. However, articles offered for sale must be sold within 90 days of completion, or must be given to an authorized visitor or mailed out of the institution at the inmate's expense.

(6) Where space and equipment are limited and demand is high, the Warden may set limits on the amount of time an inmate may use a hobbycraft facility, e.g. the Warden may limit an inmate's use of a ceramics classroom to six months to make room for new students.]

NORMAN A. CARLSON
Director