U.S. Department of        ice



**Federal Bureau of Prisons**
*Federal Correctional Institution*
*McKean*

*Bradford, Pennsylvania 16701-0950*

Number : MCK        5370.08

Date    :
                    December 27, 1995

Subject :

**INMATE
RECREATION
PROGRAMS**

# Institution Supplement

1. **PURPOSE:** The Bureau of Prisons encourages inmates to make constructive use of leisure time and offers movies, sports, social activities, arts and hobbycrafts at the Federal Correctional Institution, (FCI), and Federal Prison Camp, (FPC), McKean, Pennsylvania.

2. **DIRECTIVES AFFECTED:**

   a. Directives Referenced:
   P.S. 5370.08, Recreation Programs

   b. Directives Rescinded:
   I.S. 5370.06, Inmate Recreation Program, dated November 29, 1994

3. **PROGRAM RESPONSIBILITY:** All Recreation Programs are under the supervision of the Supervisor of Education and under the immediate supervision of the Supervisor of Recreation. The Recreation Supervisor will participate in the Institution's Admission and Orientation Program as a means of providing guidelines and assistance for those inmates who demonstrate a need for a particular recreational activity program.

4. **RECREATION/LEISURE TIME ACTIVITIES:**

   a. The Recreation Supervisor will prepare schedules of available recreational activities.

   b. Tournament, League and Intramural activities will be scheduled throughout the year. Special tournaments and activities will be provided on holidays.

   c. Inmates using the recreation areas must observe all rules and regulations that are posted, listed by policy, or issued by the Recreation staff.

---

**DISTRIBUTION:**

| | | |
|---|---|---|
| Master File | Camp Administrator | AFGE Local |
| Associate Wardens | Superintendent of Industries | Department Heads |



PLAINTIFF'S
EXHIBIT
15

5.   **MUSIC PROGRAM**: Procedures for checking-out instruments can be obtained from the Recreation Department.  Individuals using the equipment must demonstrate knowledge and skill on the instrument to Recreation staff.

6.   **MOVIES**:  Movies are shown each weekend.  X-rated and NC movies will not be permitted.

7.   **INMATE RECREATION ASSISTANT PROGRAM**:  Inmates may serve as sporting officials through various clinics/workshops sponsored periodically by the Recreation Department.  Upon completion of each clinic workshop, a test will be administered to ensure proper training.  Additionally, inmate Recreation Assistants must possess good judgment, be in good physical condition, and be able to interpret the rules and regulations.

8.   **ART AND HOBBYCRAFT PROGRAMS**:  These programs are intended for the personal enjoyment of inmates and as an opportunity to learn a new leisure skill.   The programs are not for the mass production of art and hobbycraft items by artists, or as a means of supplementing an inmate's income.  Inmates will be assigned lockers for the storage of hobbycraft items and staff will not assume responsibility for any hobbycraft items lost or damaged while in these lockers.  Where space is limited and demand is high, a limit may be set on the amount of time an inmate may use a hobbycraft facility (e.g., limit an inmate's use of a ceramics classroom to six months to make room for new students).   An inmate may not give, lend or sell any hobbycraft items to another inmate.  The hobbycraft area is open daily from 7:30 a.m. to 8:30 p.m.

   a.   Participation in Hobbycraft:  Participation in hobbycraft activities is through enrollment only. Requests will be submitted to the Hobbycraft Specialist via form BP-148(70), "Inmate Request to Staff Member", with the area of interest noted.  An inmate can only be enrolled in one program at a time.  Once enrolled in a given area, an inmate may not switch unless he is already on a waiting list for a new area requested and a position is open in the requested area.  Enrollments will be restricted to available storage space or lockers.  Although enrollments are voluntary, assigned inmates are expected to attend on a regular basis.  A set of rules and  procedures governing the use of the hobbycraft shop will be posted in the Arts and Crafts rooms.  There will be routine inspections of all lockers. Failure to maintain the lockers neatly and orderly will result in removal from the Hobbycraft Program.  Inmates will be required to sign a copy of the rules upon enrollment indicating that they have read and understand them (Attachment A).

b.   Purchasing Limitations:  Special purpose orders must not exceed $250.00 per month.  All requests for the purchase of hobbycraft supplies will be approved by the Recreation Department and purchased through the SPO Program.  Only approved items may be purchased (Attachment B).

c.   Size and Number of Pictures:  Inmates are encouraged to paint small pictures to facilitate mailing and shipping requirements. In no case will an inmate paint a picture that is larger than 18" x 24".  An inmate will be limited to three pictures in his possession at any given time.  No obscene or lewd paintings and drawings are permitted.  Drawing or sketch pads will be counted as only one article as long as all drawings are retained in the pad.

d.   Disposal of Art Work:   All art work is to be disposed of through the Recreation Department for accountability and control. This includes all work done in the housing unit.

e.   Hobbycraft Programs:  Leather, acrylic painting and ceramic material may only be worked on in the hobbycraft area.  Items such as a knife or gun sheaves, model guns, power driven models or other similar items will be considered contraband and disciplinary action will be taken.

f.   Restrictions:

(1)   An inmate will be limited to three (3) hobbycraft items in his possession.  Ceramics that have the appearance of a matching set may be counted as one item.

(2)   Each inmate shall identify art or hobbycraft materials by showing the inmate's name and registration number on the reverse side of the item. The back of all art work must not be covered.

9.   **MATERIAL IN THE HOUSING UNITS**:

a.   In order to provide the inmate population with increased recreational opportunities, certain hobbycraft activities and items will be authorized in the inmate quarters by the Recreation Supervisor and Unit Manager. Permitted activities are as follows:

Knitting and Crocheting:  Plastic needles only. One project in progress. Maximum size of loom 18" x 24".  No more than fifteen (15) skeins of yarn are allowed in an inmate's possession at any one time.  All knitting and crocheting supplies must be stored in the locker.

Sketching: Limited to one project in progress. Maximum drawing surface and tripod easel to be 18" x 24". Chalks, sketching pencils and watercolors are permissible. All drawings and supplies will be stored in the locker.

Purchase of hobbycraft materials will occur through the Recreation Department and in accordance with policy. All hobbycraft materials will be randomly searched by staff. Safety and housekeeping concerns require all hobbycraft materials to be neatly stored and/or secured when not in use. Finished projects will not be allowed to accumulate and must be disposed of in accordance with policy.

Hobbycraft materials identified as a threat to security will be confiscated. Unit staff may directly dispose of hobbycraft materials if they become excessive or hazardous. Ceramic and leather items are not allowed in the unit.

b.    Release or Transfer: When an inmate has been released or transferred, the inmate will be permitted to take any unfinished or finished project with him, provided proof of ownership has been established through the Recreation Supervisor or from the Inmate Personal Property Form 40.

10.    **DISPOSITION**:

a.    Mailing Hobbycraft Items: All hobbycraft items must be disposed of within 30 days following completion. . The inmate must provide proof of ownership and completed Form 17, Request Authorization to Mail Inmate Package. Recreation Staff will inspect, supervise wrapping, and weigh the package. The inmate will affix the required amount of postage stamps. The package will be retained in the Recreation storage room until delivery is made to the Mail Room by Recreation Staff.

Hobbycraft items will be mailed only to those names on the inmate's visiting list. The names submitted by the inmate will be verified by Recreation Staff prior to delivering the package to the Mail Room.

11.    **OPI**:  Recreation

James A. Meko, Warden



U.S. Department of Justice

**Federal Bureau of Prisons**
*Federal Correctional Institution*
*McKean*

*Bradford, Pennsylvania 16701-0950*

Number : MCK    5370.08

Date    : September 15, 1997

Subject :    **Inmate Recreation Programs**

# Institution Supplement

1.   **PURPOSE:** The Bureau of Prisons encourages inmates to make constructive use of leisure time and offers movies, sports, social activities, arts and hobbycrafts at the Federal Correctional Institution (FCI), and Federal Prison Camp (FPC), McKean, Pennsylvania.

2.   **DIRECTIVES AFFECTED:**

   a.   Directives Referenced:
        P.S. 5370.08, Recreation Programs, Inmate
        I.S. 5580.05, Personal Property, Inmate

   b.   Directives Rescinded:
        I.S. 5370.08, Inmate Recreation Programs, dated December 27, 1995

3.   **PROGRAM RESPONSIBILITY:** All recreation programs are under the general supervision of the supervisor of education and under the direct supervision of the supervisor of recreation. The recreation supervisor will participate in the institution's admission and orientation program as a means of providing guidelines and assistance for those inmates who demonstrate a need for a particular recreational activity program.

4.   **RECREATION/LEISURE TIME ACTIVITIES:**

   a.   The recreation supervisor will prepare schedules of available recreational activities.

   b.   Tournament, league and intramural activities will be scheduled throughout the year. Special tournaments and activities will be provided on holidays.

   c.   Inmates using the recreation areas must observe all rules and regulations that are posted, listed by policy, or issued by the recreation staff.

DISTRIBUTION:
Master File             Camp Administrator          AFGE Local
Associate Wardens       Superintendent of Industries    Department Heads



PLAINTIFF'S
EXHIBIT
16

5.    **HEALTH PROMOTION/DISEASE PREVENTION PROGRAM**: Classes are offered to the general inmate population that promote the concept of personal well-being, thus encouraging inmate responsibility. This program also focuses on inmates who do not participate in recreational activities due to health related problems. These inmates are classified as "at-risk" inmates. "At-risk" inmates are identified through unit initial reviews, staff referrals and inmate surveys. Once an inmate is identified as "at-risk" he is interviewed by a recreation staff member, counseled and encouraged to participate.

6.    **MUSIC PROGRAM**: Procedures for checking-out instruments can be obtained from the recreation department. Individuals using the equipment must demonstrate knowledge and skill on the instrument to recreation staff.

7.    **MOVIES**: Movies are shown each weekend. Only contracted movies rated PG-13, PG, G and airline edited will be shown.

8.    **INMATE RECREATION ASSISTANT PROGRAM**: Inmates may serve as sporting officials through various clinics/workshops sponsored periodically by the recreation department. Upon completion of each clinic/workshop, a test will be administered to ensure proper training. Additionally, inmate recreation assistants must possess good judgement, be in good physical condition, and be able to interpret the rules and regulations.

9.    **ART AND HOBBYCRAFT PROGRAMS**: These programs are intended for the personal enjoyment of inmates and as an opportunity to learn a new leisure skill. The programs are not for the mass production of art and hobbycraft items by artists, or as a means of supplementing an inmate's income. Inmates will be assigned lockers for the storage of hobbycraft items and staff will not assume responsibility for any hobbycraft items lost or damaged while in these lockers. Where space is limited and demand is high, a limit may be set on the amount of time an inmate may use a hobbycraft facility. An inmate may not give, lend or sell any hobbycraft items to another inmate. The hobbycraft area is open daily from 7:30 a.m. to 8:30 p.m.

a.    Participation in Hobbycraft: Participation in hobbycraft activities is through enrollment only. Requests will be submitted to the hobbycraft specialist via form BP-148(70), "Inmate Request to Staff Member", with the area of interest noted. An inmate can only be enrolled in one program at a time. Once enrolled in a given area, an inmate may not switch unless he is already on a waiting list for a new area requested and a position is open in the requested area. Enrollments will be restricted to available storage space or lockers. Although enrollments are voluntary, assigned inmates are expected

to attend on a regular basis. A set of rules and procedures governing the use of the hobbycraft shop will be posted in the hobbycraft center. There will be routine inspections of all lockers. Failure to maintain the lockers neatly and orderly will result in removal from the hobbycraft program. Inmates will be required to sign a copy of the rules upon enrollment indicating that they have read and understand them (Attachment A).

b.    Purchasing Limitations: Special purpose orders may not exceed $250.00 per month. All requests for the purchase of hobbycraft supplies will be approved by the recreation department and purchased through the SPO Program. Only approved items may be purchased (Attachment B).

c.    Size and Number of Pictures: Inmates are encouraged to paint small pictures to facilitate mailing and shipping requirements. In no case will an inmate paint a picture that is larger than 18" x 24". An inmate will be limited to three pictures in his possession at any given time. No obscene or lewd paintings and drawings are permitted. Drawings on sketch pads will be counted as only one article as long as all drawings are retained in the pad.

d.    Disposal of Art Work: All art work is to be disposed of through the recreation department for accountability and control. This includes all work done in the housing units.

e.    Hobbycraft Programs: Leather, acrylic painting and ceramic material may only be worked on in the hobbycraft area. Items such as a knife or gun sheaves, model guns, power driven models or other similar items will be considered contraband and disciplinary action will be taken.

f.    Restrictions:

(1)    An inmate will be limited to three (3) hobbycraft items in his possession.

(2)    Each inmate shall identify art or hobbycraft materials by showing the inmate's name and register number on the reverse side of the item. The back of all art work must not be covered.

10.    MATERIAL IN THE HOUSING UNITS:

a.    In order to provide the inmate population with increased recreational opportunities, certain hobbycraft activities and items will be authorized in the inmate quarters by the recreation supervisor and unit manager. Permitted activities are as follows:

MCK 5370.08
Page 4

Knitting and Crocheting: Plastic needles only. One project in progress. Maximum size of loom 18" x 24". No more than fifteen (15) skeins of yarn are allowed in an inmate's possession at any one time. All knitting and crocheting supplies must be stored in the locker.

Sketching: Limited to one project in progress. Maximum drawing surface and tripod easel to be 18" x 24". Chalks, sketching pencils and watercolors are permissible. All drawings and supplies will be stored in the locker.

Purchase of hobbycraft materials will occur through the recreation department and in accordance with policy. All hobbycraft materials will be randomly searched by staff. Safety and housekeeping concerns require all hobbycraft materials to be neatly stored and/or secured when not in use. Finished projects will not be allowed to accumulate and must be disposed of in accordance with policy.

Hobbycraft materials identified as a threat to security will be confiscated. Unit staff may directly dispose of hobbycraft materials if they become excessive or hazardous. Paints, ceramics and leather items are not allowed in the housing units.

b.    Release or Transfer: When an inmate is released or transferred, he will be permitted to take any project with him, provided proof of ownership has been established through the recreation supervisor or from the Inmate Personal Property Form 40.

11.    **DISPOSITION:**  All hobbycraft items must be disposed of within 30 days following completion. The inmate must provide proof of ownership and completed Form 17, Request Authorization to Mail Inmate Package. Recreation staff will inspect, supervise wrapping, and weigh the package. The inmate will affix the required amount of postage stamps. The package will be retained until delivery is made to the mail room by recreation staff.

Hobbycraft items will be mailed only to those names on the inmate's approved visiting list. The names submitted by the inmate will be verified by recreation staff prior to delivering the package to the mail room.

12.    OPI:    Recreation

John E. Hahn, Warden

No. 01-1869

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

CARL WOLF, JOSEPH CRAVEIERO, JR., and DOUGLAS NYHUIS,
for themselves and all other inmates of the Federal Correctional Institution at McKean,

Plaintiffs-Appellants,

v.

JOHN ASHCROFT, in his official capacity as Attorney General of the United States,
KATHLEEN HAWK SAWYER, in her official capacity as Director, Bureau of Prisons, and JOHN
HAHN, in his official capacity as Warden of the Federal Correctional Institution at McKean,

Defendants-Appellees.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

## PETITION FOR PANEL REHEARING

---

ROBERT D. McCALLUM, Jr.
Assistant Attorney General

MARY BETH BUCHANAN
United States Attorney

BARBARA L. HERWIG
  (202) 514-5425
EDWARD HIMMELFARB
  (202) 514-3547
Attorneys, Appellate Staff
Civil Division, Room 9142
Department of Justice
601 D Street, N.W.
Washington, D.C. 20530-0001



PLAINTIFF'S EXHIBIT 17

# TABLE OF CONTENTS

**Page**

QUESTION PRESENTED · . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      THIS COURT, HAVING CONCLUDED THAT THE PLAINTIFFS HAD
      ABANDONED THEIR CONSTITUTIONAL CHALLENGE TO THE
      ZIMMER AMENDMENT, WAS REQUIRED TO AFFIRM DISMISSAL OF
      THE ACTION, SINCE THE STATUTE INDEPENDENTLY PROHIBITS BOP
      EMPLOYEES FROM ALLOWING PRISONERS TO VIEW R-RATED MOVIES
      AND THERE IS NO REMAINING CASE OR CONTROVERSY . . . . . . . . . . . . . . . . 7

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CERTIFICATE OF SERVICE

ADDENDUM – PANEL DECISION

# TABLE OF AUTHORITIES

**Cases:**                                                                        **Page(s)**

Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998), cert. denied,
    527 U.S. 1035 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 8, 11

Babbitt v. Oglala Sioux Tribal Public Safety Dept., 194 F.3d 1374
    (Fed. Cir. 1999), cert. denied, 530 U.S. 1203 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 10

Environmental Defense Ctr. v. Babbitt, 73 F.3d 867 (9th Cir. 1995) . . . . . . . . . . . . . . . . 4, 10

Fraise v. Terhune, 283 F.3d 506 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nordlinger v. Hahn, 505 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

OPM v. Richmond, 496 U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . 11

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . 11

Turner v. Safley, 482 U.S. 78 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 9, 11

Vermont Agency of Natural Resources v. United States ex rel. Stevens,
    529 U.S. 765 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 5, 6,8, 9, 11


**Constitution:**

Article III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5


**Statutes:**

Antideficiency Act:

      31 U.S.C. 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      31 U.S.C. 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, § 612,
    113 Stat. 1537-52 (Nov. 29, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

D.C. Appropriations, FY 2001, § 1(b), Pub. L. No. 106-553, 114 Stat.
    2762A-249 (Dec. 21, 2000) (incorporating H.R. 5548, § 611,
    114 Stat. 2762A-250) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Departments of Commerce, Justice, and State, the Judiciary, and Related
    Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 611,
    111 Stat. 2517 (Nov. 26, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Departments of Commerce, Justice, and State, the Judiciary, and Related
    Agencies Appropriations Act, 2002, Pub. L. No. 107-77, § 611,
    115 Stat. 800 (Nov. 21, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ensign Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

Omnibus Consolidated and Emergency Supplemental Appropriations Act,
    1999, Pub. L. No. 105-277, § 611, 112 Stat. 2681-132 (Oct. 21, 1998) . . . . . . . . . . . . . 1

## QUESTION PRESENTED

The Zimmer Amendment, a federal statute, prohibits the Bureau of Prisons (BOP) from using federal funds to make available to federal prisoners certain "amenities or personal comforts," including the viewing of R-, X-, and NC-17-rated movies. In response to the Zimmer Amendment, BOP added a provision to its relevant policy prohibiting the showing of such movies and giving guidance to BOP employees in following the statutory mandate. The plaintiffs brought a First Amendment challenge to the statute and the BOP policy focusing on the prohibition of R-rated movies. The district court dismissed the action, but this Court reversed and remanded for further proceedings.

The question presented is:

Whether the Court, having held that the plaintiffs had abandoned their challenge to the constitutionality of the statute on appeal, erred in not simply affirming on the ground that there was no remaining case or controversy given that the statute independently prohibits BOP employees from allowing federal prisoners to view such movies.

## STATEMENT

1.     In 1996, Congress first enacted an appropriations rider known as the Zimmer Amendment, after its sponsor, Rep. Dick Zimmer, which barred the use of federal funds to provide, among other "amenities or personal comforts," "(2) the viewing of R, X, and NC-17 rated movies, through whatever medium presented; . . . ." 110 Stat. 1321-64. Substantially identical versions of this amendment have been enacted in annual appropriations bills since then.[1] Rep. Zimmer explained the reasons for his amendment:

---

[1]     See Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 611, 110 Stat. 3009-66 (Sept. 30, 1996); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 611, 111 Stat. 2517 (Nov. 26, 1997); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 611, 112 Stat. 2681-132 (Oct. 21, 1998); Consolidated Appropriations Act, 2000, Pub. L. No. 106-
(continued...)

"Prisons should be places of detention and punishment; prison perks undermine the concept of jails as deterrence. * * * We must make sure we are spending public funds wisely – not using them on amenities that have little bearing on institutional security." 141 Cong. Rec. H7768 (daily ed. July 26, 1995). According to the Motion Picture Association of America, an NC-17 rating means that the movie may contain "violence or sex or aberrational behavior or drug abuse" even if it is "not necessarily . . . 'obscene or pornographic' in the oft-accepted or legal meaning of those words." App. 58. The NC-17 rating is the same as the old X rating. See http://www.mpaa.org/movieratings/about/index.htm at 2. An R rating means that the movie "may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse or other elements, or a combination of some of the above." App. 58. The plaintiffs do not challenge the prohibition of X- and NC-17-rated movies; it is only the prohibition of R-rated movies that they contest here.

At the time the Zimmer Amendment was first enacted, BOP had in place not only a regulation prohibiting the showing of X-rated movies, 28 C.F.R. 544.33, but also a Program Statement, PS 5370.08 (June 13, 1994), that directed the Supervisor of Education or his or her designee to "exercise good judgement" when selecting movie video rentals. PS 5370.08, § 7.

The statute's prohibition of the use of federal funds to show such movies to prisoners acted directly upon BOP's employees. Accordingly, BOP issued guidance to its employees in implementing this portion of the Zimmer Amendment. FCI McKean updated its Institutional Supplement to provide: "Movies are

_____

[1](...continued)
113, § 612, 113 Stat. 1537-52 (Nov. 29, 1999); D.C. Appropriations, FY 2001, § 1(b), Pub. L. No. 106-553, 114 Stat. 2762A-249 (Dec. 21, 2000) (incorporating H.R. 5548, § 611, 114 Stat. 2762A-250); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-77, § 611, 115 Stat. 800 (Nov. 21, 2001).

shown each weekend. Only contracted movies rated PG-13, PG, G and airline edited will be shown."

MCK 5370.10 (May 2, 2000) (current version). BOP itself updated the Program Statement, which now

provides:

> The Recreation Supervisor will exercise good judgment and follow
> statutory restrictions when selecting video movies rentals. No movies
> rated R, X, or NC-17 may be shown to inmates.
>        Institutions may show R and NC-17 movies that have been edited
> for general public viewing.
>        Spanish movies that are not rated may be shown if they do not
> include profanity, graphic violence, or nudity.
>        Not all edited movies may be appropriate for the correctional
> setting; each institution must use caution in selecting movies. (See
> Attachment A).

PS 5370.10 (Feb. 23, 2000).

"Attachment A" provides a series of questions and answers to help the institutions understand the

rules of the Policy Statement. For example, the questions and answers make clear that some edited

versions of the movies may be shown:

> Yes, institutions may show edited movies. Many video public per-
> formance license providers have available popular video titles in special
> "edited" versions created especially for airline or television showings. The
> edited versions have had profanity, graphic violence and nudity edited out.
> Not all edited movies may be appropriate for the correctional setting, each
> institution must use caution in selecting edited movies. Discretion [as] to
> how many edited movies may be shown will be left up to the institution, as
> the cost may vary from title to title and company to company depending
> on the type of agreement.

Id., Viewing of R, X, or NC-17 Rated Movies, Answer to Question 2. Similarly, if an R-rated movie is

shown on regular prime-time TV, it is acceptable in that format: "Movies shown on regular network

stations are acceptable for inmate viewing." Id., Answer to Question 7.

These questions and answers also clarify that the ban in the Zimmer Amendment and the Policy

Statement do not depend on the source of funds used to provide the movies. Id., Answer to Question 12 ("No[.] R, X, NC-17 rated movies will not be shown regardless of funding source."); id., Answer to Question 16 ("R-rated movies cannot be donated to the institution for viewing by the inmate population."). Moreover, R-rated movies already in the prison libraries must be removed. Id., Answer to Question 15. As with appropriations riders generally, it is understood that payment of the salaries of prison personnel to "provide" such amenities to prisoners is enough to run afoul of the funding ban. See Environmental Defense Ctr. v. Babbitt, 73 F.3d 867, 871-72 (9th Cir. 1995) ("The use of any government resources – whether salaries, employees, paper, or buildings – to accomplish a final listing would entail government expenditure.").

2.     The named plaintiffs in this class action, Carl Wolf, Joseph Craveiero, Jr., and Douglas Nyhuis, were inmates at the Federal Correctional Institution at McKean, Pennsylvania.[2] App. 8. They filed this action on behalf of all inmates at FCI McKean, challenging both the Ensign Amendment, which prohibits the use of federal funds to distribute or make available to federal prisoners commercial publications that are sexually explicit or feature nudity, see Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998), cert. denied, 527 U.S. 1035 (1999) (upholding constitutionality of Ensign Amendment), and the Zimmer Amendment, as well as the BOP program statements implementing those statutes. App. 9-14.

Once the D.C. Circuit had decided Amatel in favor of the government, the defendants moved for judgment on the pleadings to dismiss the challenges to both statutes. The Magistrate issued a report and recommendation, concluding that the motion to dismiss the plaintiffs' facial challenges to both statutes should

_____

[2]     Wolf has since been transferred to a halfway house. App. 18. Since he is not subject to the challenged statute or BOP policy in a halfway house and is no longer a member of the class, he should have been removed as a named plaintiff. According to BOP, Craveiero and Nyhuis are now in institutions other than FCI McKean. They are no longer appropriate class representatives.

be granted but that the facial challenges to BOP's implementing regulations and program statements and the as-applied challenges to the statutes should be denied. On objections filed by both sides, the district court rejected the Magistrate's recommendation that the motion be denied in part, and it entered an order granting the motion in its entirety. Citing Turner v. Safley, 482 U.S. 78 (1987), as the "landmark case" setting forth the factors to be used in analyzing inmates' claims under the First Amendment, the court set forth the factors as follows:

> The first factor is whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest offered as a reason for the regulation. Second, alternative means of exercising the right by prisoners is to be examined. Third, a court should consider the "impact" that the exercise of the right by prisoners would have on guards and other prisoners, and prison resources in general. Finally, the Supreme Court reasoned that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation."

App. 2 (citing Turner, 482 U.S. at 89-90). It upheld the Ensign Amendment based on the analysis of the D.C. Circuit in Amatel, which applied those factors in detail. The court noted that both Amatel and this Court's decision in Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999), stood for the proposition that "expert testimony, however scientific or convincing, must not supplant contrary common sense policy decisions of the legislature when enacting a statute." App. 3. It added that every court to have faced challenges to "these and similar enactments" has upheld them. App. 3-4 (citing cases). Thus, "[a]pplying the Turner factors here," and for the reasons set forth in Amatel and Waterman, the court found that the two statutes and their implementing regulations were "neutral and reasonable, and rationally related to legitimate penological interests." App. 4.

       3.    This Court reversed and remanded for further proceedings. It observed that the plaintiffs had abandoned their challenge to the constitutionality of the Zimmer Amendment: "Although the Complaint

attacks the underlying legislation, on appeal the prisoners attack only the [BOP] policy." Slip op. at 3.

Nevertheless, the Court proceeded to address the constitutionality of the BOP policy as if it were legally

distinct from the Zimmer Amendment. It criticized the district court for "not perform[ing] the necessary

analysis" under Turner, because that court "never stated or described the interest purportedly served by

the prison policy, nor did it determine whether the interest was neutral and legitimate." Slip op. at 4. Thus,

this Court stated that it could not tell whether the district court credited the government's reliance on prison

security, deterrence, or rehabilitation, and noted that the district court did not discuss how such interests

were rationally related to the movie restrictions. Id.

The Court rejected the government's argument and the district court's holding that "common sense"

supported the policy and that no evidentiary record was required. While explicitly refusing to reach the

government's argument that the first Turner factor is equivalent to rational-basis review in the equal-

protection context, id. at 5 n.2, the Court nevertheless concluded that an evidentiary record may be

required in order to "'demonstrate' that the policy's drafters 'could rationally have seen a connection'

between the policy and the interests" asserted by the government. Id. at 5 (quoting Waterman v. Farmer,

183 F.3d at 217, 218 n.9). Although the Court rejected the inmates' categorical approach of always

requiring evidence, it held that "there may be situations in which the connection is not so apparent and does

require factual development." Id. The Court expressed its skepticism of the "common sense" behind one

of the three independent rationales for the Zimmer Amendment policy: "But is it a matter of common sense,

as was argued here, that prohibiting movies rated R or NC-17 deters the general public from committing

crimes, lest they be sent to prison where they are not permitted to watch R-rated movies? We are not so

sure." Id. at 6. It did not address the common sense behind the other two.

Ultimately, the Court reversed and remanded to the district court to "describe the interest served",

6

decide whether the connection between the policy and the interest is "obvious or attenuated," and "evaluate

what the government has offered." Id. It also instructed the district court to consider the final three Turner

factors, noting that if "the Turner analysis cannot be undertaken on an undeveloped record," the district

court should "rule only after considering the factual basis developed by affidavits or depositions." Id. at 8.

**ARGUMENT**

**THIS COURT, HAVING CONCLUDED THAT THE PLAINTIFFS HAD ABANDONED THEIR CONSTITUTIONAL CHALLENGE TO THE ZIMMER AMENDMENT, WAS REQUIRED TO AFFIRM DISMISSAL OF THE ACTION, SINCE THE STATUTE INDEPENDENTLY PROHIBITS BOP EMPLOYEES FROM ALLOWING PRISONERS TO VIEW R-RATED MOVIES AND THERE IS NO REMAINING CASE OR CONTROVERSY.**

This case was litigated as a challenge to the constitutionality of the Zimmer Amendment, a statute

enacted by Congress and signed by the President. In the panel opinion, however, this Court concluded

that the plaintiffs had abandoned their challenge to the statute on appeal and were challenging only the BOP

policy that implemented the statute. Once it reached that conclusion, the Court was compelled to affirm

the dismissal of the case by the district court. The Zimmer Amendment independently prohibits BOP

employees from allowing federal prisoners to view R-rated movies, and the relief the plaintiffs seek in this

action will not redress their alleged injury. There is no case or controversy.

      **A.**     This action was originally brought as a challenge to the Zimmer Amendment, to a second

federal statute known as the Ensign Amendment, and to the BOP program statements that implemented

those two statutes. See Supp. App. 3-6 (Magistrate's opinion); App. 4 (district court opinion). The plain-

tiffs dropped their challenge to the Ensign Amendment on appeal. Pls. Br. 5 n.2. Thus, the government

litigated this appeal as a challenge to the constitutionality of the Zimmer Amendment, a statute prohibiting

the use of federal funds to make available to federal prisoners certain "amenities and personal comforts,"

7

including the viewing of R-, X-, or NC-17-rated movies.

The government's brief on appeal focused on the fact that this prison policy was enacted as a federal statute. First, it argued that the deference required in reviewing a statute was at least as great as that ordinarily given to a prison policy. Govt. Br. 16-17. Second, the brief argued that the government was not required to produce evidence to support the constitutionality of a statute under Turner. The brief cited Amatel and Waterman, which were statutory cases; it explained that the first Turner factor was equivalent to rational-basis review under equal protection, a standard under which a court must uphold the statute if there is any conceivable basis for it; and the brief also distinguished cases requiring evidentiary support for a prison policy as involving challenges not to statutes but to prison regulations, consistent with fundamental principles of administrative law. Govt. Br. 29-32.

Accordingly, when the government's brief analyzed the justifications for the statute, it explained why Congress reasonably could have believed the statute would further the legitimate penological interests in rehabilitation, prison security, and deterrence, not why BOP officials could have believed that. Govt. Br. 24-28. The reason for this approach was that it was Congress that passed the statute, not BOP. Congress has abundant constitutional authority to enact legislation addressing the rehabilitation of federal prisoners, security within federal prisons, and the deterrence of federal crime. It is not required to wait for a specific request from BOP, nor is it even required to agree with BOP's position on those matters; to the contrary, BOP is required to accept Congress's position once it is enacted into law. And that is exactly what happened here. Congress passed the Zimmer Amendment, and BOP was required to comply with the statute.

When BOP modified its Program Statement, PS 5370.08, in light of the Zimmer Amendment, and when FCI McKean modified its own institution policy, there was one reason for doing so – to ensure that

8

BOP employees would know how to comply with the statute. The Zimmer Amendment by itself prohibited BOP employees from using federal funds to let federal prisoners view R-rated movies. The changes to the BOP policy merely tracked the Zimmer Amendment's rule and explained to BOP employees how they were required to implement the statutory policy. In making those changes, BOP did not take any position on the underlying policy; it was simply carrying out what Congress told it to do.

This Court's opinion, however, did not analyze the statute at all. In a footnote, slip op. at 5 n.2, it expressly avoided the question whether Turner's first factor – whether the policy is rationally related to a legitimate and neutral penological interest – requires a rational-basis analysis, an issue that is especially relevant to a statutory case.[3] Instead, it concluded that the plaintiffs had abandoned their attack on the statute: "Although the Complaint attacks the underlying legislation, on appeal the prisoners attack only the policy." Id. at 3. The Court went on to consider whether "the policy" – the prison policy that BOP modified to comply with the Zimmer Amendment – satisfied Turner. Because the Court determined that the district court's analysis was deficient, it reversed and remanded for further proceedings on whether "the policy" was constitutional under Turner. Id. at 3-8.

**B.**     Assuming this Court was correct that the plaintiffs abandoned their challenge to the Zimmer Amendment on appeal (the plaintiffs' appeal briefs being at best ambiguous on this point), it erred in failing to affirm dismissal of the case.

---

[3]     Waterman already held that the standard in the first Turner factor "is similar to rational-basis review, under which a statutory classification can be declared unconstitutional only where the relationship of the classification to its asserted goal is 'so attenuated as to render the distinction arbitrary or irrational.'" 183 F.3d at 215 (quoting Nordlinger v. Hahn, 505 U.S. 1, 11 (1992)). The author of the Court's opinion in this case has previously expressed agreement with that holding. Fraise v. Terhune, 283 F.3d 506, 524 (3d Cir. 2002) (Rendell, J., dissenting) ("We went on to explain [in Waterman]: 'This standard is similar to rational-basis review * * *.'").

1.    First, the Zimmer Amendment is independently binding on BOP, and it directly prohibits the use of appropriated federal funds to permit the viewing of R-rated movies by federal prisoners. When an appropriations rider prohibits the use of federal funds for specified purposes, the payment of federal salaries is included in that prohibition as well: "The use of any government resources – whether salaries, employees, paper, or buildings – to accomplish a final listing would entail government expenditure." Environmental Defense Ctr. v. Babbitt, 73 F.3d at 871-72. Appropriated funds must "be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." OPM v. Richmond, 496 U.S. 414, 428 (1990). Thus, even without the BOP policy implementing the Zimmer Amendment, BOP employees are directly prohibited by the statute itself from allowing federal prisoners to view R-rated movies. Indeed, contravention of such an appropriations rider could constitute a violation of the Antideficiency Act, 31 U.S.C. 1341, a statute that prohibits the expenditure or obligation of unappropriated funds. See Environmental Defense Ctr. v. Babbitt, 73 F.3d 871-72 ("The government cannot make expenditures, and therefore cannot act, other than by appropriation. 31 U.S.C. §§ 1341-1342. Pursuant to Public Law No. 104-06, no appropriated funds are available to the Secretary to make a final listing that a species is disabled. Accordingly, the Secretary may not take final action on the California red-legged frog listing proposal at this time.") (footnote omitted); see also Babbitt v. Oglala Sioux Tribal Public Safety Dept., 194 F.3d 1374, 1378 (Fed. Cir. 1999), cert. denied, 530 U.S. 1203 (2000) ("an agency can only spend as much money as has been appropriated for a particular program").

Once the Court concluded that the plaintiffs abandoned their statutory challenge on appeal, that should have been the end of this case. Given that the Zimmer Amendment itself was no longer under attack, BOP employees would remain statutorily prohibited from allowing federal prisoners to view R-rated

10

movies. This would be true no matter what happened to the BOP policy that implemented the statute. The Zimmer Amendment itself would bar the showing of R-rated movies to federal prisoners even if BOP unilaterally rescinded its policy or even if the court ultimately held the BOP policy to be unconstitutional on remand. In short, there is no longer a case or controversy here, because the plaintiffs' alleged injury is not redressable in this action. Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (plaintiff lacks standing without showing of "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact") (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 45 (1976)); Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."); Simon, 426 U.S. at 38 (absent redressability of alleged injury, "exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation"). There is no possible outcome on remand that can give the plaintiffs the ultimate relief they seek – an order that requires BOP to allow them to view R-rated movies.

The conclusion that the plaintiffs abandoned their challenge to the Zimmer Amendment may have allowed the Court to avoid addressing our argument about rational-basis review, slip op. at 5 n.2; it may have allowed the Court to distinguish Waterman and Amatel, two statutory cases providing the correct framework for analysis under Turner, slip op. at 6; and it may have allowed the Court to authorize and even encourage the district court to demand "evidence" from the government to support a policy that suddenly was administrative and not statutory, id. at 5-6. But the result was that this became a totally artificial case infused with an air of unreality. No case or controversy existed once the Court concluded that the plaintiffs had abandoned their statutory challenge.

      **2.**      The second reason the Court erred in sending the case back for further proceedings is that

11

the inquiry it directed the district court to conduct on remand was incorrect. Contrary to the Court's opinion, the inquiry cannot be whether the BOP policy was supported by common sense, slip op. at 5, nor can it be "the interest served" by the BOP policy, the obviousness of the "connection between the policy and the interest," and, in light of these and some "evidentiary showing" by the government, the constitutional validity of the BOP policy. Id. at 6. That cannot the correct inquiry, because the only reason for the BOP policy was that Congress enacted the Zimmer Amendment. BOP modified the policy to explain to its employees how to comply with the statute. The Court's opinion has forced the parties and the district court on remand to address two irrelevant and unreal questions – what penological interests justified the BOP policy and what penological evidence BOP officials had for adopting it. The only proper issues in this case are what interests might have justified the Zimmer Amendment and whether Congress could reasonably have believed the statute would further those interests. Those issues were addressed at length in the government's brief on appeal. Once the Court took those issues out of the case by concluding that the plaintiffs had abandoned their challenge to the statute, there was no basis whatsoever for a remand.

In light of the plaintiffs' abandonment of their statutory challenge, the Court was bound to affirm the dismissal of the case.

12

## CONCLUSION

For the foregoing reasons, the panel should rehear the case, vacate its opinion, and instead affirm

the judgment of the district court.

Respectfully submitted,

ROBERT D. McCALLUM, Jr.
Assistant Attorney General

MARY BETH BUCHANAN
United States Attorney

BARBARA L. HERWIG
(202) 514-5425
EDWARD HIMMELFARB
(202) 514-3547
Attorneys, Appellate Staff
Civil Division, Room 9142
Department of Justice
601 D Street, N.W.
Washington, D.C. 20530-0001

SEPTEMBER 2002

13

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2002, I served the foregoing Petition for Panel Rehearing by causing two copies to be sent by Federal Express, for overnight delivery, to the following counsel for the plaintiffs-appellees:

> Jere Krakoff, Esq.
> Pennsylvania Institutional Law Project
> 1705 Allegheny Building
> Pittsburgh, PA 15219

I also certify that I filed the Petition by causing an original and three copies to be sent by Federal Express, for overnight delivery, to the Clerk, United States Court of Appeals for the Third Circuit.

Edward Himmelfarb
Attorney for the Appellees

**ADDENDUM – PANEL DECISION**

PRECEDENTIAL

Filed July 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

NO. 01-1869

---

CARL WOLF; JOSEPH CRAVEIERO, JR.; DOUGLAS
NYHUIS, for themselves and all other inmates of the
Federal Correctional Institution at McKean,
Appellants

v.

JOHN ASHCROFT, ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF THE UNITED
STATES; KATHLEEN M. HAWK, DIRECTOR-BOP, IN HER
OFFICIAL CAPACITY AS DIRECTOR OF THE FEDERAL
BUREAU OF PRISONS; JOHN E. HAHN, WARDEN, IN HIS
OFFICIAL CAPACITY AS THE WARDEN OF THE FEDERAL
CORRECTIONAL INSTITUTION AT MCKEAN

---

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 97-cv-00408E)
District Judge: Honorable Sean J. McLaughlin

---

Argued January 7, 2002

Before: MANSMANN,* RENDELL and FUENTES,
*Circuit Judges*

(Filed July 24, 2002)

---

*The Honorable Carol Los Mansmann participated in the oral argument
and conference in this case, but died before she could join or concur in
this Opinion.

2

Jere Krakoff, Esq. [ARGUED]
Pennsylvania Institutional
 Law Project
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219
*Counsel for Appellants*

Laura S. Irwin, Esq.
Office of U.S. Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA 15219

Edward Himmelfarb, Esq. [ARGUED]
U.S. Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, DC 20530-0001
*Counsel for Appellees*

---

## OPINION OF THE COURT

---

RENDELL, *Circuit Judge*:

A class of federal prisoners challenges a prison policy that prevents them from viewing movies rated R or NC-17. The District Court granted the government's motion for judgment on the pleadings, reasoning that the prison policy met the requirement that restrictions on First Amendment rights of inmates be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). However, we conclude that the District Court did not conduct a proper, thorough analysis under *Turner* in that it did not articulate the relevant penological interest or the prohibition's relationship to it, and, further, it considered only *Turner*'s first prong. Also, the Court found that it could rely on "common sense" in determining whether *Turner*'s first prong had been satisfied, but we conclude that this approach may not always "fit" and an evidentiary showing may be required in certain situations. Accordingly, we will reverse and remand for further consideration in accordance with this opinion.

3

We have jurisdiction under 28 U.S.C. § 1291 and our review of a dismissal under Rule 12(c) is plenary. We will view the facts in the complaint and any reasonable inferences that can be drawn from them in favor of the non-moving party, here the class of prisoners, and will affirm the dismissal only if no relief could be granted under any set of facts that could be proved. *E.g., Allah v. Al-Hafeez*, 226 F.3d 247, 249-50 (3d Cir. 2000).

At issue here is a prison policy that provides that "[n]o movies rated R, X, or NC-17 may be shown to inmates." Program Statement 5370. Only the ban on movies rated R and NC-17 represented a recent change in policy; X-rated movies have long been banned. *See* 28 C.F.R. § 544.33. The policy was designed to implement the Zimmer Amendment, which prevents the expenditure of funds for the viewing of movies rated R, X, or NC-17 in prison. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 611, 110 Stat. 3009 (1996). Although the Complaint attacks the underlying legislation, on appeal the prisoners attack only the policy. In their Complaint, the prisoners also challenged the Ensign Amendment, which bars the expenditure of federal funds to distribute or make available to prisoners any commercially published material that is sexually explicit or features nudity. *See id.* at § 614. The District Court granted the government's motion for judgment on the pleadings regarding plaintiffs' attack on the Ensign Amendment. The inmates' Ensign Amendment claims are not part of this appeal.

Whether the policy restricting R-rated and NC-17-rated movies imposes permissible limitations on the inmates' First Amendment rights depends on the four factors set forth in *Turner*.[1] There, the Supreme Court directed courts first to assess whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. If the interest is legitimate and neutral, and the connection is valid and rational, then courts should engage in the inquiries under the succeeding

---

1. The government has conceded the First Amendment implications of this prohibition.

4

three prongs: whether "alternative means of exercising the right . . . remain open to prison inmates," "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and, finally, whether there are "ready alternatives" to the rule that would accommodate prisoners' rights at *de minimus* cost to penological interests. *Id.* at 90-91.

It is our view that, while the District Court acknowledged that *Turner* established the applicable standard and recited all four *Turner* factors, it did not perform the necessary analysis. The Court's four-page order discussed the facial challenges to the Ensign Amendment, to the Zimmer Amendment, and to the Amendments' implementing regulations and policies, as well as the as-applied challenges to all of these. Focusing on *Turner*'s first factor and on *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999), in which we cited *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998), *cert. denied*, 527 U.S. 1035 (1999), with approval, the District Court concluded that no evidentiary record was required because we endorsed a "common sense" approach in *Waterman*. It then proceeded to rule in conclusory fashion that the Amendments and their implementing regulations were "neutral and reasonable, and rationally related to legitimate penological interests."

In relation to the first factor, the Court's opinion was deficient in that it never stated or described the interest purportedly served by the prison policy, nor did it determine whether the interest was neutral and legitimate. The government offered several theories in general terms at different times, but the District Court opinion did not mention or discuss any such theories or interests. We cannot tell, for instance, whether the Court credited the government's assertion that the movies posed security risks, or that the absence of such movies deterred people from committing crimes, or that denial of such movies fosters rehabilitation. Moreover, the District Court did not discuss how any of the particular interests offered by the government were "rationally connected to" the restrictions on movies rated R or NC-17.

5

We have noted that the party defending the policy should "demonstrate" that the policy's drafters "could rationally have seen a connection" between the policy and the interests, and that this burden, though slight, must "amount[] to more than a conclusory assertion." *Waterman*, 183 F.3d at 217, 218 n.9.[2] Part of the court's inquiry under *Turner* is whether the government has satisfied this requirement. While we recognize that the court need not necessarily engage in a detailed discussion, still the brief, conclusory statement set forth in the District Court's opinion falls short, and makes it difficult for us to conclude that its approach to the first *Turner* prong passes muster.

The inmates also attack the District Court's ruling that the connection between the prohibition and the interests to be advanced was a matter of "common sense," arguing, instead, that evidence is necessary to support such a finding and the Court erred in ruling based on the pleadings alone. Declining to follow the Magistrate Judge's recommendation that an evidentiary record should be developed before ruling based on *Turner*, the District Court stated, somewhat categorically, that a "common sense approach to the *Turner* reasonableness test has been accepted by the Third Circuit." The inmates seek a similarly categorical ruling that evidence must be presented to establish the necessary connection.

We eschew both categorical approaches and hold, instead, that while the connection may be a matter of common sense in certain instances, such that a ruling on this issue based only on the pleadings may be appropriate, there may be situations in which the connection is not so apparent and does require factual development. Whether the requisite connection may be found solely on the basis of "common sense" will depend on the nature of the right, the nature of the interest asserted, the nature of the prohibition, and the obviousness of its connection to the

2. We do not reach the issue pressed by the government in its brief as to how the "reasonable relationship" aspect compares to the "rational basis" test for equal protection, nor do we see the need to elaborate on the nature of the government's burden, as our statement in *Waterman* that it must "demonstrate" the necessary relationship should suffice.

6

proffered interest. The showing required will vary depending on how close the court perceives the connection to be.[3] A prohibition on inmate gatherings in prison common areas after 11-o'clock at night might have an obvious relationship to security concerns, as would a prohibition on publications that featured escape plans, *Amatel*, 156 F.3d at 206 (Wald, J., dissenting), or instructions on assembling weapons, *Giano v. Senkowski*, 54 F.3d 1050, 1059-60 (2d Cir. 1995) (Calabresi, J., dissenting). Likewise, the connection between the goal of rehabilitation and a ban on distributing sexually explicit magazines to "repetitive and compulsive" sexual offenders may well be, as we stated in *Waterman*, sufficiently obvious to be evaluated as a matter of common sense. But is it a matter of common sense, as was argued here, that prohibiting movies rated R or NC-17 deters the general public from committing crimes, lest they be sent to prison where they are not permitted to watch R-rated movies? We are not so sure. On remand, the District Court must describe the interest served, consider whether the connection between the policy and the interest is obvious or attenuated — and, thus, to what extent some foundation or evidentiary showing is necessary — and, in light of this determination, evaluate what the government has offered.

We also note that while a court can bolster its finding of a connection by reference to decisions of other courts on the same issue, here the District Court referenced how other courts had viewed one of the two types of restriction — namely, the Ensign Amendment and its prohibitions on

---

3. *See, e.g., Bazzetta v. McGinnis*, 286 F.3d 311 (6th Cir. 2002) (striking down prison restrictions on visitors in absence of evidence justifying restriction on First Amendment rights); *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002) ("minimal showing" required to demonstrate relationship between restriction on special Kosher meals and prison budgetary and inmate relations goals); *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001) (striking down requirement that prisoners receive only first or second class incoming mail in absence of evidence demonstrating rational connection between postage rate and risk of contraband). In *Fraise v. Terhune*, 283 F.3d 506, 518 (3d Cir. 2002), we found that the "expert judgment" of correctional officers regarding the threat to security posed by the Five Percent Nation provided adequate grounds for purposes of the "rational connection" test.

7

distributing sexually explicit publications in prison.[4] Therefore, the District Court's conclusion that "other Courts have tackled the precise regulations presented here" and "every court facing challenges to these and similar enactments have upheld them" does not really support a finding as to the policy implementing the Zimmer Amendment.

Further, although the District Court recited the final three *Turner* factors, it never applied them to the circumstances presented by the claims of the inmate class. Instead, its ruling turned exclusively on *Turner*'s first factor. We have stated clearly that the determination that there is a rational relationship between the policy and the interest "commences rather than concludes our inquiry" as "not all prison regulations that are rationally related to such an interest pass *Turner*'s 'overall reasonableness standard.'" *DeHart v. Horn*, 227 F.3d 47, 53 (3d Cir. 2000) (en banc). The first factor is "foremost" in the sense that a rational connection is a threshold requirement — if the connection is arbitrary or irrational, then "the regulation fails, irrespective of whether the other factors tilt in its favor." *See Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001). But, as we made clear in *DeHart*, we do not view it as subsuming the rest of the inquiry. On remand, if the District Court again concludes that the first factor is satisfied, it must then proceed to consider the remaining *Turner* factors in order to draw a conclusion as to the policy's overall reasonableness.[5]

---

4. The one case that involved the Zimmer Amendment turned on grounds not at issue here. *See Cuoco v. Hurley*, 2000 WL 1375273 (D. Colo. Sept. 22, 2000).

5. The government's argument that Appellants waived argument based on the three other *Turner* factors by failing to press it on appeal is without merit. Appellants devoted a section of their brief to the argument that "there is no indication that the District Court actually applied the *Turner* factors to the facts of this case." Clearly this raises — and does not waive — the issue. Appellants do not need to argue that the District Court *misapplied* the factors to their case and that, actually, they should be applied in some other way, when the District Court clearly *did not apply* the factors at all. Moreover, we are not weighing these factors on appeal, but rather remand for the District Court to do so in the first instance.

8

As to the need for a foundation for these three prongs, it is worth noting that we have historically viewed these inquiries as being fact-intensive. We have said that evaluations of prison restrictions under *Turner* require "a contextual, record-sensitive analysis." *DeHart*, 227 F.3d at 59 n.8 (remanding "so that the parties may more fully develop the record"). We have also indicated that courts of appeals ordinarily remand to the trial court where the *Turner* factors cannot be assessed because of an undeveloped record. *Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001). If the District Court concludes that the *Turner* analysis cannot be undertaken on an undeveloped record, then the Court should treat the matter as on summary judgment, and rule only after considering the factual basis developed by affidavits or depositions.

For the above reasons, we will REVERSE and REMAND for further consideration and proceedings in accordance with this opinion.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*