## Zimmer Amendment

Omnibus Consolidated Rescissions and Appropriations Act of 1996, § 611,
Pub. L. No. 104-134, 110 Stat. 1321 (1996)

SEC. 611. None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system –

    (1)    in-cell television viewing except for prisoners who are segregated from the general prison population for their own safety;

    (2)    the viewing of R, X, and NC-17 rated movies, through whatever medium presented;

    (3)    any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weight-lifting equipment of any sort;

    (4)    possession of in-cell coffee pots, hot plates, or heating elements; or

    (5)    the use or possession of any electric or electronic musical instrument.

A-1



PLAINTIFF'S EXHIBIT 18

## 28 C.F.R. 544.33

§ 544.33 Movies.

If there is a program to show movies, the Supervisor of Education shall ensure that X-rated movies are not shown.


PLAINTIFF'S EXHIBIT 19

**PS 5370.10 RECREATION PROGRAMS, INMATE**

OPI: FPI
NUMBER: 5370.10
DATE: 2/23/2000
SUBJECT: Recreation Programs, Inmate

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information

**1. [PURPOSE AND SCOPE §544.30. The Bureau of Prisons encourages inmates to make constructive use of leisure time, and offers movies, games, sports, social activities, arts and hobbycrafts, wellness, and other group and individual activities.]**

2. SUMMARY OF CHANGES. This revised Program Statement combines the Program Statements on Physical Fitness and Health Education and Inmate Recreation Programs.

Program objectives were added.

Two Review of Functions' recommendations were included:

- modified recreation staff's responsibilities in regard to "at-risk" inmates and
- changed the recreation report requirement from a monthly to a quarterly report.

The provisions of Public Law 105-277, Section 611, limiting the use of funds for certain types of recreation equipment and activities, are included.

Language on the use of trust fund for recreation programs has been removed and put in the Trust Fund Manual.

Limitations on commissary purchases are included.

The reference to the Program Statement, Health Promotion and Disease Prevention for Inmates has been removed, and a reference to the Health Services Manual has been added.

Language has been added concerning program rules for leisure programs.

A new section on Program Coordination and Supervision is included.

A question and answers Attachment A has been added which provides clarification on statutory requirements affecting recreation.

The requirement that department heads notify the Supervisor of Recreation prior to showing any general entertainment films/videos has been included.

3. PROGRAM OBJECTIVES. The expected results of this program are:

a. Recreation programs will be provided to keep inmates constructively occupied and to reduce idleness.

b. The physical, emotional, and social well being of inmates will be enhanced.

PLAINTIFF'S EXHIBIT 20

c. Inmates will be encouraged and assisted to adopt healthy daily lifestyle traits through participation in physical fitness and health education programs.

d. The need for inmate medical treatment will be decreased.

4. DIRECTIVES AFFECTED

a. Directives Rescinded

PS 5370.08 Inmate Recreation Programs (6/13/94)
PS 5370.09 Physical Fitness and Health Education (1/20/95)

b. Directives Referenced

PS 1600.08 Occupational Safety and Environmental Health Manual (8/16/99)
PS 4500.04 Trust Fund/Warehouse/Laundry Manual (12/15/95)
PS 5265.11 Correspondence (7/9/99)
PS 5270.07 Inmate Discipline and Special Housing Units (12/29/87)
PS 5300.17 Education, Training, and Leisure-Time Program Standards (9/4/96)
PS 5381.04 Inmate Organizations (3/19/96)
PS 5580.06 Personal Property, Inmate (7/19/99)
PS 5800.10 Mail Management Manual (8/19/98)
PS 6000.05 Health Services Manual (9/15/96)

c. Rules cited in this Program Statement are contained in 28 CFR 540.30-34 and 544.80-83.

5. STANDARDS REFERENCED

a. American Correctional Association 2nd Edition Standards for the Administration of Correctional Agencies: 2-CO-5C-01

b. American Correctional Association 3rd Edition Standards for Adult Correctional Institutions: 3-4423 through 3-4428 and 3-4363

c. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-5C-01 through 02 and 3-ALDF-4E-33

d. American Correctional Association Standards for Adult Correctional Boot Camp Programs: 3-ABC-5C-01 through 06

6. **[DEFINITIONS §544.31**

**a. Leisure activities are a wide range of activities in which inmates may participate when not performing assigned duties. Leisure activities include participation in organized and informal games, sports, physical fitness, table games, hobbycrafts, music programs, intramural activities, social and cultural organizations, movies, and stage shows. Religious activities, psychological services, and education classes are not included within this definition, except when they are used specifically to encourage knowledge, skills and attitudes related to leisure activity involvement.**

**b. Organized activities** are those activities accounted for by registration or roster of individual participants, and occur at a scheduled time and place. **c. Art work** includes all paintings and sketches rendered in any of the usual media (oils, pastels, crayons, pencils, inks, and charcoal).

**d. Hobbycraft activities** include ceramics, leatherwork, models, clay, mosaics, crochet, knitting, sculptures, woodworking, lapidary, and other forms consistent with institution guidelines.

**e. Inmate wellness program activities** include screening, assessments, goal setting, fitness/nutrition prescriptions and counseling.]

f. An at-risk inmate is one who has been referred to the Recreation Department by Health Services, Psychology Services, or Unit Management on the basis that the inmate is reluctant to participate in recreational activities because he or she:

- is overweight;
- has a negative attitude toward physical fitness or exercise programs;
- is mentally, physically or emotionally disabled; and/or
- has other physical or psychological problems.

## 7. PROGRAM COORDINATION AND SUPERVISION

a. Recreation Programs must be supervised by a qualified person meeting the qualifications set in the Standards Handbook for General Schedule Positions.

b. Inmates may be used as recreation program assistants under the supervision of qualified staff members.

## 8. RECREATION/LEISURE TIME ADMINISTRATIVE RESPONSIBILITIES. The Recreation Supervisor must:

a. Develop and post a monthly activity schedule in recreation departments and housing units. The Recreation Supervisor is to retain these activity schedules for three years.

b. Complete a quarterly report, using the SENTRY Education/Recreation Report (ERR), with a narrative report that includes:

- a brief summary of any innovative programs,
- an explanation of any deviations from the monthly activity schedule, and
- any areas of concern.

The report is to be transmitted by the 10th of the month following each quarter, and copies of the narrative summary are to be sent to the:

- Supervisor of Education, (if the Recreation Supervisor reports to the Supervisor of Education)
- Associate Warden over recreation programs,
- Warden,

A-5

- Regional Education Administrator, and
- Education Administrator, Central Office.

The Recreation Supervisor is to retain these reports for three years.

c. Develop and provide a presentation for the Admission and Orientation program that encourages participation in physical and/or leisure activities, and explains consequences such as suspensions from programs that can result from inmate behavior that violates established rules.

d. Coordinate housing unit activities with Unit Managers.

e. Ensure that wellness and leisure activities are entered into the SENTRY Education Data System (EDS) accurately. Fiscal Year totals and other relevant information are to be included in the annual education report. Wellness and leisure activities may be entered into the EDS only if:

- The program or course has a curriculum,
- Attendance records are maintained,
- The program or course has completion criteria, and
- The program is instructional in nature; and ordinarily, "live" practice time does not exceed 10 percent of the total instructional course hours, and is limited to the minimum time required for the observation of the student by the instructor in order to assure skill mastery.

f. Participate in monthly staff meetings with education staff, unless Recreation is a separate department. If Recreation is a separate department, the Recreation Supervisor will conduct a monthly staff meeting and forward copies of the minutes to the:

- Warden,
- Associate Warden,
- Regional Education Administrator, and
- Education Administrator, Central Office.

g. Develop a written plan for meeting the needs of "at-risk inmates," to ensure that all those who are referred to recreation are interviewed, counseled, and recommended to participate in the appropriate structured or unstructured leisure, wellness, or recreation activities.

h. Develop guidelines for using protective equipment and clothing for inmates, as well as procedures to disseminate and enforce those guidelines.

i. Assign staff members to inspect recreation equipment and jogging areas weekly and hobbycraft equipment daily. Refer to the Occupational Safety and Environmental Health Manual for safety requirements concerning recreation.

The Supervisor of Recreation will develop a form (or forms) to document the inspection of recreation equipment, jogging areas, and hobbycraft equipment (grinders, saws, lathes, etc.). Such forms will include:

a list of equipment,
date inspected,
findings, and
any corrective action taken.

j. Some consideration should be given when planning activities and equipment purchase to ensure that, whenever possible, sufficient equipment is on hand to meet the inmate population's needs.

**9. [GOALS §544.32. The Warden is to ensure, to the extent possible, that leisure activities are provided to meet social, physical, psychological and overall wellness needs of inmates.]**

Recreation leisure programs provide a means for developing social and interpersonal skills.

- Uncooperative or other inappropriate behavior is not conducive to the development of these social skills.

- In order to meet these goals, recreation staff will ensure that written rules of conduct exists for leisure programs, including hobbycraft.

- These rules are to provide guidance on dealing with unsportsman-like and other inappropriate conduct for rule violations, including suspension from programs. These written program rules must be posted in prominent locations.
- Staff will make every effort to assure that inmates are aware of program rules before beginning the program. Additionally, the Admission and Orientation lecture by staff will include an explanation of the consequence of program rule violations, including actions such as suspension from a program. When applicable, suspensions will be made in progressive increments for repeated violations.

**a. Leisure activities are designed to attract inmate participation regardless of ethnic, racial, age, or sex difference, or handicap considerations, and to enhance the potential for post-release involvement.**

**b. Leisure activities are designed to ensure that an inmate with the need has the opportunity to complete one or more activities (see 28 CFR 544.81).]**

28 CFR 544.81 refers to the Program Statement on Education, Training and Leisure Time.

10. RECREATION PROGRAM LIMITATIONS. Funds may be expended from the Trust Fund as necessary to conduct recreation programs consistent with the Trust Fund/Warehouse/Laundry Manual.

a. Recreation items allowed as personal properties are listed in the Program Statement on Inmate Personal Property.

b. No funds, from any funding source, will be used for instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or any other martial art. (See Attachment A)

c. No body building or weightlifting equipment of any sort may be purchased. In-house minor repairs may be made to weightlifting benches, mats, and weightlifting belts (not cables) to ensure safety and prevent injuries. (See Attachment A)

d. No in-cell television viewing for inmates may be provided, whether funded with S&E funds, Trust Fund profits, or donations from community sources, except for inmates:

(1) segregated from the general prison population for their own safety (e.g., WITSEC)
(2) confined to cells or rooms at medical centers for serious, chronic medical conditions, or
(3) housed in cells on a regular and continuous basis (e.g., USP Marion, ADX Florence, etc.)

(4) participating in an already existing inmate incentive award program that uses in-cell viewing as the award; however, no funds of any type will be expended for the repair or upkeep of the televisions. Once inoperative, the program will cease. (See Attachment A)

e. Televisions for the inmate population may not exceed 30 inches.

f. Multi-purpose courts which are simple, functional, and cost effective are permitted.

11. **MOVIES §544.33. If there is a program to show movies, the Supervisor of Education shall ensure that x-rated movies are not shown.]**

The Recreation Supervisor will exercise good judgment and follow statutory restrictions when selecting video movies rentals. No movies rated R, X, or NC-17 may be shown to inmates.

- Institutions may show R and NC-17 movies that have been edited for general public viewing.

- Spanish movies that are not rated may be shown if they do not include profanity, graphic violence, or nudity.

- Not all edited movies may be appropriate for the correctional setting; each institution must use caution in selecting movies. (See Attachment A)

Recreation staff's use of videotapes in public performances without a licensing agreement is prohibited, and the Recreation Supervisor must enforce all videotape copyright and licensing requirements strictly.

12. **[INMATE RUNNING EVENTS §544.33. Running events will ordinarily not exceed 10 kilometers or 6.2 miles. Appropriate medical staff and fluid supplies (e.g., water) should be available for all inmate running events.]**

13. PHYSICAL FITNESS AND HEALTH EDUCATION. Institutions are encouraged to offer as many program components as staff and resources allow, but must offer:

- Component #1 - Structured Exercise, and
- Component #2 - Health Awareness Resource Area.

a. Component #1: Structured Exercise. These are activities that offer opportunities to participate in regular, moderate levels of exercise monitored by recreation staff through

exercise activity logs. Activity logs will include:

- the type of activity,
- the amount of time spent on the activity, and
- staff verification.

Institutions may offer The Presidential Sports Award Program, Cooper System of Aerobic Points, or any other structured exercise program that is monitored and based on regular, moderate levels of exercise.

These activities may include organized team and individual sports or physical fitness group activities that require registration of individual participants and occur at a scheduled time and place.

A system of non-cash incentives (such as certificates, recognition (non-Polaroid) photographs, or consumable items) may be established to encourage an inmate to pursue a program of regular exercise.

b. Component #2: "Health Awareness" Resource Area. This is a designated area in the recreation center or leisure library that contains pamphlets, brochures, magazines, health awareness videos, books, or other resource material promoting physical fitness and health education.

c. Component #3: Health Education Classes. These are structured classes, lead by Recreation staff, contractors, volunteers, or qualified inmates with staff oversight, on such topics as:

Introduction to Fitness
Fundamentals of Proper Nutrition
Smoking Cessation
Weight Management
Stress Management
Human Anatomy
Exercise Physiology
Prevention of Back Pain
Aerobic Exercise

To be officially recorded, each class must include: required attendance, a written curriculum (at least a course syllabus and lesson plans; these might be provided by the vendor) and, class completion criteria.

Such classes may be entered into the EDS under the wellness group code.

d. Component #4: Volunteers & Community Resources. This component involves ongoing program support at no cost to the Bureau through such community organizations or individuals as individuals from colleges, universities, fitness clubs, hospitals, or other agencies or organizations that contribute to overall program effectiveness.

e. Component #5: Health Appraisals, Fitness Assessments and Exercise Program Plans. This involves a formal approach to health appraisals, fitness assessments, and exercise program

plans including:

a review of health history;
a fitness assessment; and
a schedule of safe personal exercise.

A staff member who has received specialized training through a recognized certification program, or similar training through undergraduate or graduate studies must supervise this program.

An inmate's participation may be part of a treatment protocol and is ordinarily based on a referral from Health Services, Psychology Services, or the Unit Team.

Physical fitness assessments generally consist of:

cardiovascular endurance (1.5 mile run or 12 minute run/walk);
percentage of body fat (skin fold measurements);
flexibility (sit and reach test); and
dynamic strength (one minute sit-up/push-up tests).

Exercise program plans are ordinarily based on the results of health appraisals and fitness assessments. Careful consideration should be given to any restrictions or recommended training levels specified by Health Services.

f. Component #6: Special Events. These are special physical fitness and health education activities, such as:

health fairs;
health education book fairs;
participation in nationally recognized health events;
Walk-a-Thons; or
Aerob-a-Thons.

14. **[ART AND HOBBYCRAFT §544.34]**. The art and hobbycraft program enables inmates to make constructive use of their leisure hours, use their skills and creative abilities constructively, and gain a sense of accomplishment. Use of hobbycraft facilities is a privilege that the Warden or staff delegated that authority may grant or deny.

**[a. Obtaining Materials. An inmate engaged in art or hobbycraft activities may obtain materials through:**

**(1) The institution art program (if one exists);**

**(2) The commissary sales unit;**

**Special purchase commissary orders, if the sales unit is unable to stock a sufficient amount of the needed materials; or**

**(4) Other sources approved by the Warden.**

**b. Identification of Products. Each inmate shall identify completed art or hobbycraft**

A-10

products by showing the inmate's name and register number on the reverse side of the item.

c. Disposition. Completed or abandoned art or hobbycraft articles must be disposed of in one of the following ways:

(1) Upon approval of the Warden, by giving the item to an authorized visitor. The quantity of items will be determined by the Warden.

(2) By mailing the item to a verified relative or approved visitor at the inmate's expense.

(3) By selling, through an institution art and hobbycraft sales program, if one exists, after the institution price committee has determined the sale price.]

If an institution has a sales program, procedures for it must be included in the Institution Supplement on Recreation Programs.

[(4) Other methods established by the Warden.]

To reduce fire hazards and to conserve space, art and hobbycraft items that are not disposed of in any of the listed ways is contraband.

[d. Restrictions. Art and hobbycraft programs are intended for the personal enjoyment of an inmate and as an opportunity to learn a new leisure skill. They are not for the mass production of art and hobbycraft items by artists or to provide a means of supplementing an inmate's income.]

The Recreation Supervisor is responsible for developing a record-keeping system to control ongoing and completed projects.

[(1) The Warden may restrict, for reasons of security and housekeeping, the size and quantity of all products made in the art and hobbycraft program. Paintings mailed out of the institution must conform to both institution guidelines and postal regulations. If an inmate's art work or hobbycraft is on public display, the Warden may restrict the content of the work in accordance with community standards of decency.]

The Warden is to consult with Regional Counsel prior to restricting the public display of inmate art work or hobbycraft, to ensure that appropriate legal standards are met.

[(2) The Warden may set limits, in compliance with commissary guidelines, on the amount of money an inmate may spend on art or hobbycraft items or materials.]

The limit may not exceed $300 per quarter through commissary, special purchase order, or a combination of the two.

[(3) The Warden may restrict for reasons of security, fire safety, and housekeeping, the use or possession of art and hobbycraft items or materials.

(4) Appropriate hobbycraft activities shall be encouraged in the inmate living areas. However, the Warden may limit hobbycraft projects in the cell/living areas to those

and Other Recreation Issues

**Viewing of R, X, or NC-17 Rated Movies**

**1. Is it acceptable to "block out" R, X, or NC-17 rated movies on premium movie channels, e.g., HBO, Showtime or Cinemax? How is this done?**

Yes, it is acceptable to "block out" the movies if the institution can ensure that these prohibited movies will not be shown accidently. Depending on the sophistication of their equipment, some cable companies have the capability to block out movies. Smaller cable companies may not have this capability. A memo should be provided to the company requesting these specific rated movies not be shown to the inmate population.

**2. May R and NC-17 rated movies edited for profanity, sex, violence be shown, e.g., edited movies similar to those shown on airlines?**

Yes, institutions may show edited movies. Many video public performance license providers have available popular video titles in special "edited" versions created especially for airline or television showings. The edited versions have had profanity, graphic violence and nudity edited out. Not all edited movies may be appropriate for the correctional setting, each institution must use caution in selecting edited movies. Discretion to how many edited movies may be shown will be left up to the institution, as the cost may vary from title to title and company to company depending on the type of agreement.

**3. May an institution have both a premium cable television movie channel and a video license and rental agreement for public performance?**

No. The Trust Fund Manual allows for trust funds to be used to purchase a single premium cable television movie channel or a video license and video rentals but not both.

**4. Will trust funds be available for edited movie rentals?**

If edited movie rentals are used (see question 2), trust funds would be the funding source.

**5. May trust fund monies be used to purchase a public performance license and movie/video rentals?**

Yes, public performance licenses and movie/video rentals may be purchased with trust fund monies, (recreation operating monies or profit sharing monies) and only trust fund monies.

**6. May we use two vendors for video agreements, but use only one at a time, i.e., use one vendor for six months and another vendor for the other six months to increase the number of movies to select from?**

Yes, an institution may contract with one vendor for six months and a different vendor during the next months, e.g., a contract with Swank from October to March and another available company from April to September. An institution should not have more than one contract at the same time.

**7. Prime time public television often shows R rated movies. How do we handle this type**

PLAINTIFF EXHIBIT 21

A-14

of situation?

Movies shown on regular network stations are acceptable for inmate viewing.

**8. Many Spanish movies are not rated. Should we show them?**

Spanish movies that are not rated may be shown if they do not include profanity, graphic violence and nudity. Swank Motion Pictures, Inc. has rated and edited movies available in a Spanish version. Unrated movies must be screened by a staff member to ensure that they are in compliance with legislation effecting recreation.

**9. May we show unrated movies? Many older films are not rated.**

Although these older films do not have ratings, the movie industry had stricter and more conservative standards. Common sense should be used, but most movies of this type are acceptable.

**10. What constitutes basic cable service? Cable services are available at different pricing packages. Is it acceptable to pay for ESPN, MTV, etc. which require funds in addition to basic cable? If yes, should trust fund monies be used?**

Trust funds should be used to purchase basic cable and for any additional cable services such as ESPN, MTV, Black Entertainment Television (BET), etc. Because trust fund profits may vary from year to year, institution staff must be careful not to create the expectation to the inmate population that extra cable services will always be provided. Only institutions that have not purchased a video license may purchase a premium movie channel. The institution will still be limited to one premium movie channel. (if the institution does not purchase a video license and rentals.)

**11. Some institutions get Univision (Spanish channel) as part of their basic cable. Other institutions have to pay extra in order to receive this service. Is it acceptable to pay for this service?**

Yes; However, only trust fund monies should be used to purchase the Univision Channel.

**12. If trust fund monies, rather than appropriated funds, are currently funding a public performance license, are R-rated movies permitted?**

No R, X, NC-17 rated movies will not be shown regardless of funding source.

**13. May we use trust funds and only trust funds for pay-for-view sporting events?**

Yes. Trust funds may be used for pay-for-view sporting events.

**14. Is there an acceptable amount per year for pay-for-view sporting events?**

Excessively high expenditures could be an embarrassment to the Bureau and result in the use of trust funds in ways that are not representative of the interests of the inmate population.

For these reasons, decisions on the use of Trust fund for pay-per-view events should be made prudently. Common sense and market prices should determine the amount to be used for

pay-for-view sporting events.

**15. Our institution has a video library that the inmates use in the leisure center on individual video monitors and some of the movies in the library are R rated. Will these R rated movies have to be removed from the library?**

Yes, they must be removed.

**16. If we retain an appropriate public performance license, can R-rated videos, be donated to the institution and viewed by the population?**

No, R-rated movies cannot be donated to the institution for viewing by the inmate population.

**17. How do we educate all departments in the institution about R rated movies, movie copyright issues, and legislation effecting recreation.**

Supervisors of Recreation will notify department managers of procedures, laws and regulations for showing films within the institution. Thereafter, other department heads will notify the Supervisor of Recreation prior to showing any general entertainment film/videos by the departments to ensure compliance of copyright laws and legislation.

**Instruction or Training for Boxing, Wrestling, Judo, Karate or Other Martial Arts or any Body Building or Weightlifting Equipment**

**1. What items are allowed in replacing weight lifting equipment and are there any cost restrictions?**

**a. Chin up bar**

No. (Upper body conditioning)

**b. Lift bar (lat pull bar)**

No. (Upper body conditioning)

**c. Partner facilitated resistant (isometric exercises)**

No. (Even though this does not involve equipment, it does enhance upper body strength.)

**d. Big thick rubber bands or bull workers**

No. (Upper body conditioning)

**e. Push up bar**

No. (Upper body conditioning)

**f. Trail fitness stations or Par fit courses**

Yes. (Stations must not include equipment for upper body conditioning.)

A-16

**g. Roman chair**

Yes. (Works stomach muscles)

**h. Health rider, exercise rider or equivalent**

Yes.

**i. Stair climber**

Yes.

**j. Rowers**

Yes.

**k. Exercise bicycles**

Yes.

**l. Heavy bags/speed bags**

No. (Boxing related activity)

**m. Ergo equipment**

No.

**n. Exercise wheel or ab cruncher**

Yes.

**o. Medicine balls**

Yes, abdominal and lower back exercise only.

**2. How can we be supportive of "wellness" if all upper body development is prohibited?**

We will try to be as supportive of as many health promotion and disease prevention activities as possible within the constraints of this policy.

**3. How can the development of exercise prescriptions under the Health Promotion and Disease Prevention Program Statement be met under Zimmer? (Policy conflict)**

See the answer to question 2.

**4. a. May cables be replaced on otherwise operational (and sometimes costly) weightlifting and related exercise equipment?**

No.

A-17

**b. May we replace cables on weight machines for safety reasons?**

No.

**c. May bushings to weight equipment be purchased and replaced?**

No.

**d. May stock cable be used for repairs?**

No.

**5. May protective covers for weight training machines be installed if it is identified as a safety concern?**

Yes.

**6. a. May weight benches be tacked (spot welded)?**

No, minor repairs to weight benches are allowable provided the nature of the repair has been approved by the Safety Manager.

**b. May weight benches be recovered?**

Yes.

**7. What is your definition of in-house repairs for weight lifting equipment?**

Repairs to weight lifting equipment, regardless of how minimal are not allowed. In-house minor repairs may be made to weightlifting benches, mats and weightlifting belts provided that the expenses are minimal and the repairs are performed only so as to ensure that the use of existing equipment is conducted in a manner which is safe and prevents injury.

**8. May replacement parts purchased prior to Fiscal Year 1996 be used to repair weightlifting equipment?**

No. Replacement parts purchased prior to Fiscal Year 1996 would still require the use of staff salaries for replacement and installation of parts; therefore, parts should be returned for credit or refund.

**9. If equipment cannot be repaired, what should the institution do with the otherwise usable equipment?**

Recreation equipment that is operational or in need of minor repairs cannot be donated directly to nonprofit organizations. Institutions must follow property management procedures with property declared as excess.

**10. a. May exercise equipment with basic electronic displays (e.g., those that display calories burned, distance, time) be purchased?**

Yes.

A-18

**b. May exercise equipment with more sophisticated computer components be used if the sophisticated computer components are removed?**

Yes.

**c. What other specific enhancements are allowed or disallowed?**

Basic guidance was provided in the November 15, 1995, Guidelines for Implementation of the Zimmer Amendment memorandum from the Director. Institution staff should use good judgment in these matters.

**11. Will traditionally held weight lifting competitions, such as the Northeast powerlifting competition, be allowed?**

No.

**12. May inmates buy weight belts?**

Yes.

**13. Will there be a consistent bureau-wide removal of weight equipment?**

No. Most institutions will slowly phase out weight equipment when it becomes inoperable.

**14. If inmates are breaking free weights and equipment at a steady rate, does an institution have the local discretion to remove the equipment and provide a replacement?**

Inoperable free weight and equipment should be removed and replaced with alternate equipment. Generally institutions should not remove equipment in good condition unless there are special circumstances, e.g., a disturbance or incident where the equipment was used as a weapon.

**Are pool tables considered an appropriate replacement?**

Yes, unless pool tables were removed after an incident where the pool cues were used as weapons.

**15. a. Weight areas occupied a large number of inmates. To occupy equivalent numbers, may we return to the use of outside entertainment (competitions with community based teams, musical entertainment, etc.)?**

Yes, if these activities will not pose a security issue or create public perception problems because of the costs or publicity involved.

**b. May we obligate funds to these efforts?**

Yes, but funding should be used prudently.

A-19

**16. How should we handle inmates who fabricate equipment to perform exercises?**

If there is destruction of government property, an incident report should be written.

**17. Often, basic cable (ESPN) and public television have programs which provide instruction in weight lifting and upper body development. Are such programs considered restricted? Should we limit inmate access to such programs?**

It would be difficult to restrict such programs. To try to restrict such programs is going beyond the intent of this policy.

### Electronic and Electric Instruments

**1. Do all musical instruments (electrical and nonelectrical) need to be eliminated?**

No. This policy only prohibits the use of funds to purchase, maintain or repair electric and electronic musical instruments. Acoustic guitars, drums, horns, etc. are acceptable to purchase and maintain in the institution.

**2. May inmates use their own money to buy electric or electronic instruments as personal property?**

No.

**3. a. May recreation staff purchase or repair microphones and amplifiers?**

Yes.

**b. May repairs be made to PA systems?**

Yes.

**4. Are electronic instruments limited to keyboards, electric guitars, etc., or do they include amplifiers, speakers, microphones, patch cords, tape players and record players?**

Electronic and electric musical instruments are keyboards, electric guitars and any other electric instrument that produces music.

Speakers, microphones, tape players and record players are not considered electric musical instruments and they may be repaired and purchased.

**5. May recreation staff purchase acoustic guitars, percussion instruments, etc.?**

Yes.

**6. a. May recreation staff purchase guitar strings for electric guitars?**

No.

**b. May recreation staff use guitar strings that were already on hand prior to Fiscal Year 1996?**

No.

**7. When do we get rid of the electrical guitars? When the body breaks or when the strings breaks?**

The guitar should be removed whenever the body or the guitar strings break.

**8. What do we do with musical instruments that cannot be repaired (with appropriated funds)?**

Since electronic musical instruments can not be repaired by recreation, the instruments may be donated to the religious services departments if the electronic musical instruments are used as part of the religious service.

Staff should follow property management procedures for disposal of excess property.

**9. Is it acceptable to purchase woodwinds and supplies (reeds, etc.)?**

Yes.

**10. Are Karoke machines considered electrical musical instruments?**

Institutions should use or purchase basic Karoke machines without expensive visual components.

**11. When does the new program statement on Inmate Personal Property require inmates to mail home their musical instruments?**

November 1, 1997, unless an institution implements Program Statement 5580.04 prior to November 1, 1997, and then at the date of implementation.

**Other Issues**

**Are the following items/activities permitted?**

**1. All purpose courts?**

Yes

**2. Fly fish lure tying in hobby craft?**

Yes

**3. Ice skating?**

Yes

A-21

**4. Pool tables and horseshoes?**

Yes

**5. Karoke singing machines?**

Yes

**6. Outside entertainment?**

Yes, but cost and potential for unfavorable publicity, public reaction or security concerns should be a consideration.