**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RICHARD JEWELL, et al., )
)
    Plaintiffs, )  Civil Action No. 97-408 Erie
)
  v. )
)
ALBERTO R. GONZALES, et al., )
)
    Defendants. )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., DISTRICT J.,

In this <u>Bivens</u> action,[1] a class of inmates at the Federal Correctional Institution ("FCI") in McKean, Pennsylvania challenges the constitutionality of a Program Statement issued by the U.S. Bureau of Prisons ("BOP"), as well as an "Institutional Supplement" issued by FCI-McKean, which prohibit the showing of unedited "R" rated movies to prisoners. Named as Defendants are Alberto Gonzales, in his official capacity as Attorney General of the United States, Harley G. Lappin, in his official capacity as Director of the Federal Bureau of Prisons, and Bernie D. Ellis, in his official capacity as the Warden of the FCI-McKean.[2] We have subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

Both Plaintiffs and Defendants have filed motions for summary judgment. On August 31, 2005, the United States Magistrate Judge to whom this case was referred recommended that the Plaintiff's motion for summary judgment be granted and the

---

[1] See <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

[2] In accordance with Fed. R. Civ. P. 25(d)(1), Defendants Gonzales, Lappin and Ellis have been substituted as successors to the public officers originally named as Defendants in the Complaint.

1

Defendants' motion be denied.  For the reasons that follow, we decline to adopt the Magistrate Judge's Report and Recommendation and conclude, instead, that Defendants' motion should be granted and the Plaintiffs' motion denied.

## I.  STANDARD OF REVIEW

Under well established principles, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion.  International Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  United States ex rel. Quinn v. Omnicare, Inc., 382 F.3d 432, 436 (3d Cir.2004).  Rule 56, however, mandates the entry of judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.  Celotex Corp. v. Cattrett, 477 U.S. 317, 322 (1986).

## II.  PROCEDURAL BACKGROUND

In 1996, Congress passed the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 611, 110 Stat. 1321 (April 26, 1996).  Section 611 of that Act, commonly known as the Zimmer Amendment (after its sponsor, Representative Dick Zimmer) provided, in relevant part, that:

> None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system –
> ***
> (2)  the viewing of R, X, and NC-17 rated movies, through whatever medium presented; ...

2

110 Stat. 1321-64 (April 26, 1996). Substantially identical versions of this amendment

have been enacted in annual appropriations bills since that time.[3]

At the time the Zimmer Amendment was proposed, the BOP already had in

place a regulation prohibiting the showing of X-rated movies[4] as well as a Program

Statement, PS 5370.08 (June 13, 1994), which directed the Supervisor of Education or

his/ her designee to "exercise good judgment" when selecting movie video rentals. PS

5370.08 § 7. With the Zimmer Amendment's enactment, the BOP updated its Program

Statement, which now provides:

> The Recreation Supervisor will exercise good judgment and follow
> statutory restrictions when selecting video movies rentals. No
> movies rated R, X, or NC-17 may be shown to inmates.
>
> a.    Institutions may show R and NC-17 movies that have been
>       edited for general public viewing.
>
> b.    Spanish movies that are not rated may be shown if they do
>       not include profanity, graphic violence, or nudity.
>
> c.    Not all edited movies may be appropriate for the correctional
>       setting; each institution must use caution in selecting
>       movies. (See Attachment A.)

PS 5370.10 (Feb. 23, 2000). FCI-McKean similarly updated its Institutional

Supplement, which now provides: "Movies are shown each weekend. Only contracted

movies rated PG-13, PG, G and airline edited will be shown." See IS 5370.08 (Sept.

15,1997).

---

[3] The Departments of Commerce, Justice, and State, the Judiciary, and Related
Agencies Appropriations Act, 2002, Pub. L. No. 107-77, § 611, 115 Stat. 748 (Nov. 28,
2001), amended the provision to read, "Hereafter, none of the funds appropriated ...
may be used to ....," thereby making the Zimmer Amendment's prohibitions permanent.
This provision has also been codified in the historical and statutory notes of 18 U.S.C.
§ 4042.

[4] See 28 C.F.R. § 544.33 (1996) ("If there is a program to show movies, the
Supervisor of Education shall ensure that X-rated movies are not shown.").

In December of 1997, three inmates at FCI-McKean commenced this action[5] on behalf of themselves and all other current and future FCI-McKean inmates asserting that their First Amendment rights are abridged by the prison's policy of categorically banning the showing of unedited R-rated movies.[6]  (See Complaint [Doc. # 1] at ¶¶ 30-36.)  Plaintiffs seek a judgment declaring the policy unconstitutional and enjoining its future enforcement.[7]

On April 14, 2000, following the resolution of various preliminary procedural issues, the Defendants moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (See Def.s' Mot. for Judg. on the Pleadings and Mem. in Supp. [Doc. # 34].)  Defendants' motion was premised upon their interpretation of Plaintiffs' complaint as challenging both the Zimmer Amendment and the implementing policies issued by the BOP and FCI-McKean.  (Id. at p. 7.)

Defendants began their Rule 12(c) analysis by acknowledging that restrictions on the First Amendment rights of prisoners are evaluated using the test set forth in Turner

---

[5] This lawsuit was originally filed by Plaintiffs Carl Wolf, Joseph Craveiero, Jr., and Douglas Nyhuis.  By order dated September 30, 2004, Richard Jewell and Louis Hodges were substituted as the named class representatives.

[6] Although the policy in question also prohibits the viewing by inmates of all movies rated X or NC-17, Plaintiffs do not challenge those particular restrictions in this litigation.

In addition to their attack on the R-rated movie ban, the Plaintiffs originally challenged the so-called "Ensign Amendment" to the Omnibus Consolidated Appropriations Act for fiscal year 1997, Act of 1997, Pub. L. No. 104-208, § 614, 110 Stat. 3009 (Sept. 30, 1996), and its implementing regulations, see 28 C.F.R. § 540.72, which restrict the use of federal funds "to distribute or make available any commercially published information or material to a prisoner" which "is sexually explicit or features nudity."  Plaintiffs have since abandoned this particular claim.

[7] Plaintiffs originally brought their claims as both a facial and an "as applied" challenge to the constitutionality of the R-rated movie ban.  To the extent, however, that the Plaintiffs' focus has been exclusively on the viability of the restriction as it relates to circumstances unique to FCI-McKean, we view this as an "as applied" challenge only.

v. Safley, 482 U.S. 78 (1987).  That test involves consideration of four factors to

determine whether the restriction in question is constitutional, *to wit*:

> whether the regulation has a "'valid, rational connection'" to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are "ready alternatives" to the regulation.  482 U.S. at 89-91.

Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

Applying this test, Defendants first asserted that deterrence, good order,

discipline, and rehabilitation are among the penological interests rationally furthered by

the Zimmer Amendment's proscription of R-rated films.  (See Mot. for Judg. on

Pleadings, *supra*, at pp. 10-11.)  The Defendants further argued:  that the Plaintiffs had

adequate alternative means by which to exercise their First Amendment rights

inasmuch as a broad range of movies (including those rated G, PG or airline edited)

remain available to them (id. at pp. 13-14); that the restricted category of movies could

be potentially detrimental to the safety of guards and other inmates (id. at p. 15); and

that Plaintiffs had failed to identify a ready alternative that would fully accommodate

their rights at *de minimis* cost to the government's valid penological interests (Id. at p.

15).

Defendants' Rule 12(c) motion was initially reviewed by the United States

Magistrate Judge.  Like the Defendants, she assumed the Plaintiffs' claims

encompassed challenges to the Zimmer Amendment itself as well as the Policy

Statement and Institutional Statement implementing the Amendment.[8]  The Magistrate

---

[8] The Magistrate Judge observed that, while the Complaint never mentions the Zimmer Amendment specifically, the parties had proceeded on the assumption that the Complaint is in actuality challenging the Zimmer Amendment as well as its implementing policies.  (See Report and Recommendation dated 12/1/00 [Doc. # 37] at p. 3, n. 5.)

Judge recommended that the Defendants' motion be granted insofar as Plaintiffs were challenging the Zimmer Amendment on its face; as to this point, she reasoned that the statute facially invoked only Congress' spending powers and therefore did not implicate any First Amendment issues because prisoners are not entitled to have the legislature fund their exercise of fundamental constitutional rights. (See Report and Recommendation (12/1/00 [Doc. # 37]) at pp. 8-10.) On the other hand, the Magistrate Judge recommended that the Rule 12(c) motion be denied insofar as the Plaintiffs were lodging a facial challenge to the administrative policies implementing the Zimmer Amendment. Recognizing that these restrictions do implicate First Amendment rights, as they facially impose an outright ban on the viewing of R-rated movies, the Magistrate Judge concluded that an evidentiary record would be required in order for the Court to perform a complete Turner analysis. The Magistrate Judge further recommended that a record be developed for purposes of assessing the Plaintiffs' "as applied" challenges, since these would involve a fact-intensive analysis. (See id. at pp.11-17.)

On March 15, 2001, this Court entered a Memorandum Order granting Defendants' Rule 12(c) motion in its entirety. (See Mem. Order (3/15/01 [Doc. # 41].) Unlike the Magistrate Judge, this Court concluded that Plaintiffs' facial challenge to the statute *did* implicate First Amendment rights, thus necessitating a Turner analysis. Nevertheless, we endorsed a "common sense" application of Turner relative to both the Zimmer Amendment and its implementing regulations, finding that the development of an evidentiary record was unnecessary in this case. We reasoned that such a "common sense" approach was consistent with the analysis undertaken by the District of Columbia Court of Appeals in Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998) (addressing a challenge to the constitutionality of the Ensign Amendment), and the Third Circuit Court of Appeals in Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999) (upholding a New Jersey statute similar to Ensign Amendment). We concluded that

6

"[a]pplying the <u>Turner</u> factors here, and for the reasons set forth in <u>Amatel</u>, 156 F.3d at

196-99, and <u>Waterman</u>, 183 F.3d at 214-18, ... the Ensign and Zimmer Amendments

and their implementing regulations [are] neutral and reasonable, and rationally related

to legitimate penological interests."  (<u>Id</u>. at p. 4.)

On direct appeal of our March 15, 2001 order, the Third Circuit Court of Appeals

reversed and remanded the case for further proceedings.  <u>See</u> <u>Wolf v. Ashcroft</u>, 297

F.3d 305 (3d Cir. 2002).  The court of appeals found that, in granting the Rule 12(c)

motion, this Court did not conduct a proper, thorough <u>Turner</u> analysis in that we "did not

articulate the relevant penological interest or the prohibition's relationship to it, and,

further, [we] considered only <u>Turner</u>'s first prong."  <u>Id</u>. at 307.  The appellate court

explained that:

> [i]n relation to the first factor, the [District] Court's opinion was
> deficient in that it never stated or described the interest purportedly
> served by the prison policy, nor did it determine whether the
> interest was neutral and legitimate.  The government offered
> several theories in general terms at different times, but the District
> Court opinion did not mention or discuss any such theories or
> interests.  We cannot tell, for instance, whether the Court credited
> the government's assertion that the movies posed security risks, or
> that the absence of such movies deterred people from committing
> crimes, or that denial of such movies fosters rehabilitation.
> Moreover, the District Court did not discuss how any of the
> particular interests offered by the government were "rationally
> connected to "the restrictions on movies rated R or NC-17.

<u>Id</u>. at 308.

The court of appeals concluded that a "common sense" approach may not

always "fit" for purposes of analyzing <u>Turner</u>'s first prong, and "an evidentiary showing

may be required in certain situations."  <u>Id</u>.  In so concluding, the court declined to take

any "categorical approaches" to a <u>Turner</u> analysis:

> while the connection may be a matter of common sense in certain
> instances, such that a ruling on this issue based only on the
> pleadings may be appropriate, there may be situations in which the
> connection is not so apparent and does require factual
> development.  Whether the requisite connection may be found

7

> solely on the basis of "common sense" will depend on the nature of the right, the nature of the interest asserted, the nature of the prohibition, and the obviousness of its connection to the proffered interest. The showing required will vary depending on how close the court perceives the connection to be. ... [T]he connection between the goal of rehabilitation and a ban on distributing sexually explicit magazines to "repetitive and compulsive" sexual offenders may well be, as we stated in *Waterman*, sufficiently obvious to be evaluated as a matter of common sense. But is it a matter of common sense, as was argued here, that prohibiting movies rated R or NC-17 deters the general public from committing crimes, lest they be sent to prison where they are not permitted to watch R-rated movies? We are not so sure. ...

Id. at 308-09. The appellate court directed us on remand to (1) describe the penological interest served by the restriction; (2) consider whether the connection between the policy and the interest is obvious or attenuated – and, thus, the extent to which some foundation or evidentiary showing is necessary; and (3) in light of this determination, evaluate what the government has offered. Id. at 309.

Finally, the court of appeals directed that, even if the restriction at issue passed muster under the first Turner prong, we would need to consider the remaining prongs in order to fully evaluate the policy's overall reasonableness. Id. at 310. As to the latter three Turner factors, the court of appeals noted that "we have historically viewed these inquiries as being fact-intensive," requiring a "'contextual, record-sensitive analysis.'" Id. (citation omitted).

Following the appellate court's remand of this matter, Defendants filed a motion to dismiss the case for lack of subject matter jurisdiction. (See Def.'s Mot. to Dismiss for Lack of Juris. [Doc. # 49].) The Defendants' motion was premised on the fact that, at some point during the appeal of our March 15, 2001 order, Plaintiffs abandoned their challenge to the Zimmer Amendment itself, focusing their attack instead on the administrative policies implementing the Amendment. (See n. 9, *supra*; Wolf v. Ashcroft, 297 F.3d at 307.) Defendants argued that Plaintiffs' claims now lacked redressability, their theory being that, even if we were to enjoin enforcement of the

8

administrative ban on R-rated movies, the Zimmer Amendment would still stand as an independent prohibition.  Thus, Defendants reasoned, Plaintiffs' claims ultimately could afford them no relief and Plaintiffs therefore lacked standing to pursue them.  (Def.s' Mot. to Dismiss, *supra*, at pp. 6-8.)

On January 13, 2004, the Magistrate Judge issued a Report and Recommendation [Doc. # 52] in which she relied heavily on Amatel v. Reno, *supra*, in recommending that the Defendants' motion be denied:

> The reasoning advanced by Defendants necessarily assumes that the statute itself would be applied directly to the Plaintiffs to bar the viewing of R-rated movies in the absence of the implementing policy from which Plaintiffs seek relief.  Such an assumption, however, was soundly rejected by the D.C. Circuit Court in Amatel, 156 F.3d at 194.  In Amatel, federal prisoners brought a class action challenging the constitutionality of the Ensign Amendment and its implementing regulations.  The D.C. district court directed its analysis primarily toward the statute in finding that the Ensign Amendment violated the First Amendment.  On appeal, the D.C. Circuit Court rejected the district court's analysis, stating, "[t]he district court seemed to assume that the statute has been and will be applied to these plaintiffs; ...[b]ut there is no suggestion that any warden does or will apply the statute directly; so far as appears, all enforcement is mediated through the regulations ... In the statutory borderland beyond the implementing regulations... the prospect of enforcement appears completely insubstantial."  156 F.3d at 194.  Thus, the D.C. Circuit Court focused its analysis on "the substantive prohibitions of the regulations."  Id.
>
> Consistent with the D.C. Circuit Court's decision in Amatel, Plaintiffs have focused their constitutional challenge on the Zimmer Amendment's implementing policy, P.S. 5370.10, rather than the statute itself.  This policy specifically prohibits inmates from viewing R, X, and NC-17 movies and is directly applicable to them.  Although it is true that the Zimmer Amendment would remain in effect if Plaintiffs are successful in having the policy struck down as unconstitutional, the statute does not, by its terms, have any direct application to federal prisoners.  Instead, the Zimmer Amendment prohibits the BOP from using appropriated federal funds to provide federal prisoners with the means to view R, X, or NC-17 movies.  In Amatel, the D.C. Circuit Court held "[i]nsofar as plaintiffs attack the proscriptions of the statute not embodied in the regulations, they effectively pursue a pre-enforcement challenge.  Even in the First Amendment context, such a challenge presents a justiciable controversy only if the probability of enforcement is real and substantial."  156 F.3d at 194. ...
>
> In this case, there is no evidence of record to suggest that the Zimmer Amendment has been or will be applied directly to Plaintiffs to prohibit them from viewing R-rated movies in the same manner as P.S. 5370.10.  Thus, a challenge to the constitutionality of the Zimmer

Amendment by the Plaintiffs would be an impermissible pre-enforcement challenge. For standing purposes, a challenge to the BOP's implementing policy embodied in P.S. 5370.10 is the only means currently available to Plaintiffs to seek redress from the constitutional injuries they claim to have suffered. [ ] As a result, Defendants' motion to dismiss based on their assertion that Plaintiffs lack Article III standing to challenge only the constitutionality of P.S. 5370.10 should be denied.

(Id. at pp. 6-8 (internal footnote omitted).)

By order dated October 8, 2004, this Court adopted Magistrate Judge's Report and Recommendation and denied the Defendants' motion to dismiss on jurisdictional grounds. (See Order dated 10/8/04 [Doc. # 60].) Thereafter, a case management schedule was established and the parties conducted their discovery.

Defendants filed their motion for summary judgment on July 1, 2005 and Plaintiffs filed their cross-motion for summary judgment on August 1, 2005. On August 31, 2005 the Magistrate Judge entered a Report and Recommendation concluding that the Plaintiffs' motion should be granted and the Defendants' motion should be denied. Defendants' objections to the Report and Recommendation have been briefed and the matter is ripe for review.

### III. DISCUSSION

In support of their motion for summary judgment, Defendants assert two arguments. First, they have renewed their jurisdictional challenge, claiming that the Plaintiffs lack standing to pursue this lawsuit because the litigation cannot provide any redress for their injuries. Second, and assuming this Court has jurisdiction to address Plaintiffs' claims, Defendants argue that the policies being challenged pass constitutional muster under Turner. We will address each argument in order.

A.    Defendants' Jurisdictional Challenge[9]

Our jurisdiction is limited by Article III of the Constitution to adjudicating "Cases" or "Controversies."  See U.S. Const. art. III, § 2; Khodara Environmental, Inc. v. Blakey, 376 F.3d 187, 193 (3d Cir. 2004). A plaintiff possesses constitutional standing to pursue a claim only if he can establish:  (1) an injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision.  Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 290-91 (3d Cir. 2005) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Khodara Environmental, Inc. supra, at 193 (collecting cases)).  These requirements "ensure that plaintiffs have a 'personal stake' or 'interest' in the outcome of the proceedings, 'sufficient to warrant ... [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on ... [their]) behalf.' " Khodara, 376 F.3d at 193 (alterations in the original) (citation omitted).  A plaintiff bears the burden of proving standing.  Danvers Motor Co. at 291 (citation omitted).

Defendants challenge only the redressability element of standing.  Their argument is straightforward and goes as follows:

_____

[9] Defendants' first argument is a renewal of their prior challenge to this Court's jurisdiction. Although we previously rejected this challenge, it is one that we are free (and, in fact, required) to reconsider before proceeding to the merits of Defendants' summary judgment motion.  See Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82 (2d Cir. 2006) (a district court must establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits) (citing Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)); APCC Services, Inc. v. Sprint Communications Co., 418 F.3d 1238, 1242 (D.C. Cir. 2005) (because Article III standing is a jurisdictional requirement, analysis must begin there), petition for cert. filed, 74 U.S.L.W. 3371 (Dec. 12, 2005) (No. 05-766).

> There are two independent prohibitions on prisoners viewing R-rated movies:  (1) the Zimmer Amendment; and (2) the BOP Policy that implements the Zimmer Amendment.  Currently, plaintiffs are only challenging the BOP Policy and, therefore, even if this Court were to enjoin the BOP Policy, BOP still could not show R-rated movies because the Zimmer Amendment, which this Court previously found constitutional, independently prohibits BOP employees from using federal funds to show prisoners R-rated movies.  Hence, there is no longer a case or controversy because plaintiff's alleged injury is not redressable. ...  In short, there is no possible outcome on remand that can give plaintiffs the ultimate relief they seek – an order that permits BOP to show R-rated movies. ...

(Def.s' Mot. for Summ. Judg. [Doc. # 69] at pp. 8-9.)  Defendants' theory thus rests on several assumptions:  first, that there are two separate and legally independent proscriptions on the viewing of R-rated movies by prisoners; second, that the constitutional validity of the Zimmer Amendment has already been established for purposes of this litigation; and third, that the BOP would be required to enforce the Zimmer Amendment's proscription on R-rated movies regardless of the outcome of this litigation.

We find that the foregoing assumptions are unwarranted on this record.  First – notwithstanding the reasoning which we originally adopted in our October 8, 2004 order declining to dismiss this case on jurisdictional grounds –  we conclude, upon further considered reflection, that it makes little sense in the context of this case to view the Zimmer Amendment and the BOP's implementing policies as separate and distinct legal proscriptions on the viewing of R-rated movies.  All parties agree that the administrative "policy" of banning such films, which Plaintiffs expressly challenged in their complaint, has its genesis in the Zimmer Amendment.  As Defendants have consistently acknowledged throughout this litigation, the challenged prison policy does not reflect independent rule-making on the part of the BOP or FCI-McKean, but derives completely from the Zimmer Amendment and is, in effect, simply a restatement of the

statute's proscription.[10]  Thus, the prison policy at issue is nothing more than an attempt

by the Defendants to implement what Defendants view as a Congressionally mandated

ban on R-rated films.[11]  It necessarily follows – for reasons that will become more clear

_____

[10] See Def.s' Reply Mem. in Supp. of their Mot. for Protective Order [Doc. # 24] at pp. 2-3 ("In the instant case, the regulation at issue simply implements the statute..."); id. at n. 1 ("It is the statute which takes away the BOP's discretion regarding publications and imposes the alleged 'blanket prohibition' that plaintiff challenges."); Def.s' Objections to Mag. Judge's R & R [Doc. # 39] at pp. 5-6 ("Here ... it was Congress who made the determination that certain movies and publications should be prohibited – not BOP officials.  ...  The regulations at issue simply implement Congress' determinations..."); Def,s' Mot. to Dismiss for Lack of Juris. [Doc. # 49] at p. 3 n.1 ("...Congress passed the statute not the BOP.  BOP only modified its program statements in order to conform to the federal statute.  In fact, BOP did not take any position on the underlying policy; it was simply carrying out what Congress told it to do."); Def.s' Objections to Mag. Judge's R & R [Doc. # 56] at p. 9 (Zimmer Amendment and the BOP policy "both encompass the same ban on R-rated movies"); Def.s' Reply in Supp. of Mot. for Summ. Judg. [Doc. # 74] at pp. 2-3 n. 2 ("[I]n this particular case, the BOP Policy restricting access to R-rated movies is based on a statutory mandate which BOP had no discretion to ignore.").  See also Tr. of Hrg. on Def.s' Objections to R & R (3/10/04) [Doc. # 59] at pp. 21-22, 32-33.

[11] While the Amendment on its face proscribes only the expenditure of federal funds relative to the showing of R-rated movies, both Plaintiffs and Defendants agree that this operates in actuality as an outright ban inasmuch as it is technically not feasible for prison officials to make R-rated movies available to prisoners absent some degree of expenditure of federal monies.  (See Def.s' Objections to the Magistrate Judge's Report and Recommendation [Doc. # 39] at p. 3 ("[P]laintiffs are federal prisoners and are not free to go elsewhere to ... view the banned movies ... and thus, in this specific context, the refusal to fund activities operates the same as a prohibition on engaging in the activities."); Pl.s' Objections to the Magistrate Judge's Recommendation [Doc. # 40] at p. 2 ("[B]ecause the operation of federal prisons are entirely funded by Congress and any statutory prohibition against expending federal funds for a given purpose necessarily precludes the delivery of that particular service or program to inmates – such a statute is tantamount to a direct prohibition against such a service or program."); Def.'s Objections to Mag. Judge's R & R [Doc. # 56] at pp. 6-7 (explaining that Zimmer Amendment is an appropriations rider whose restriction on the use of federal funds includes, e.g., the use of federal salaries, employees, paper or buildings in furtherance of the prohibited purpose); id. at p. 9 (the Zimmer Amendment and the BOP policy "both encompass the same ban on R-rated movies"); Tr., Hrg. on Def.s' Objections to R & R (3/10/04) [Doc. # 59] at pp. 26-27, 37-38 (Plaintiffs acknowledging that to allow inmates to rent and view movies involves some degree of expenditure of public funds).  See also Amatel v. Reno, 156 F.3d 192, 194 n. 1 (D.C.

in our discussion applying the <u>Turner</u> factors – that our analysis of the challenged prison policy requires an analysis of the constitutionality *vel non* of the Amendment itself.  Practically speaking, irrespective of whether the Plaintiffs have directly challenged the constitutionality of the Zimmer Amendment, analysis of that statute is inherent in, and necessary to, our analysis of the derivative prison policy.[12]

Defendants assume that the constitutionality of the Zimmer Amendment has been definitively ruled on for purposes of this case,[13] but we find that this assumption,

_____

Cir. 1998) ("Where the government absolutely monopolizes the means of speech or controls a bottleneck ... a refusal to fund functions the same as an outright ban.")

[12] Defendants contend that, in its decision reversing our March 15, 2001 order, <u>see</u> <u>Wolf v. Ashcroft</u>, 297 F.3d 305 (3d Cir. 2002), the Third Circuit "proceeded to address the constitutionality of the BOP Policy as if it were legally distinct from the Zimmer Amendment."  (Def.'s Mot. to Dismiss for Lack of Juris. [Doc. # 49] at p. 2.)  We do not agree.  It is true that, in discussing the deficiency of our analysis and providing direction for further proceedings on remand, the court of appeals referenced the <u>Turner</u> factors in their usual context – i.e., the analysis of administrative prison restrictions.  Perhaps this is because, as the Defendants recognize, the Plaintiffs had abandoned any formal challenge to the Zimmer Amendment during the course of their appeal and instead framed their First Amendment claim solely in terms of the prison "policy" enforced by the BOP.  But the Third Circuit did not go so far in <u>Wolf</u> as to decide, as a matter of legal principle, that our analysis of the challenged prison policy *must be distinct from, and independent of*, an analysis of the Zimmer Amendment itself.  The court of appeals simply did not address the interplay, if any, between examination of the prison policy and examination of its propagating statute.  Its main concern was to address in more general fashion the inadequacy of this Court's analysis and to clarify that federal courts must take a case-by-case approach to determining whether, in the context of a given prison restriction, evidence will be required for a complete and thorough <u>Turner</u> analysis.

[13] <u>See</u> Def.'s Objections to Mag. Judge's R & R [Doc. # 56] at p. 9 ("[T]his Court has already found that the Zimmer Amendment's prohibition on the viewing of R-rated movies is constitutional (and plaintiffs choose [sic] not to pursue this issue on appeal) and therefore, to the extent plaintiffs are challenging the fact that the BOP policy prohibits the identical activity, that challenge is now moot."); Def.s' Mot. for Summ. Judg. [Doc. # 69] at p. 11 n. 5 ("This Court previously held that the Zimmer Amendment, which the BOP policy mirrors, was constitutional under a <u>Turner</u> analysis."); Def.s' Objections to the Mag. Judge's R & R [Doc. # 77] at p. 5 ("Because the Zimmer Amendment, which uses the MPAA rating system, has already been held

too, is flawed.  It is true that our order of March 15, 2001 upheld both the Zimmer Amendment and its implementing regulations as constitutionally valid under <u>Turner</u>. Nevertheless, while the Plaintiffs abandoned any formal challenge to the statute on direct appeal, the Third Circuit's opinion in <u>Wolf v. Ashcroft</u>, *supra*, leaves no doubt that the appellate court found our analysis (which we applied without any distinction as between the statute and the implementing policy) to be deficient, thereby implicitly – if not expressly – undermining the integrity of our prior ruling.

Finally, unlike the Defendants, we are not convinced that the outcome of this litigation will be immaterial to the Plaintiffs' requests for relief.  Defendants have professed an intention to continue to apply the Amendment's proscription on R-rated movies, regardless of how this Court may ultimately rule on the constitutionality of the challenged prison policy.  However, as we have already suggested – and as our analysis below demonstrates – application of the <u>Turner</u> factors in the context of this case makes sense only to the extent that the Amendment itself and its implementing policy are examined in lock-step with one another, as effectively one proscription.  At the end of the day, this Court's ruling on the prison policy banning R-rated movies must necessarily reflect our view as to the constitutionality *vel non* of the statute itself.  In short, if this Court should enter a judgment favorable to the Plaintiffs, it would be difficult to conceive of any theory whereby the Zimmer Amendment could, consistent with our judgment, continue to be enforced against the Plaintiffs.

Defendants acknowledge that Plaintiffs need only show a "substantial likelihood" that the relief they request will remedy the alleged injury.  <u>See</u> <u>Vermont Agency of Natural Resources v. United States ex rel. Stevens</u>, 529 U.S. 765, 771 (2000) (quoted in Def.s' Mot. for Summ. Judg. at p. 9.)  Because we consider it likely that a judgment in

---

constitutional by this Court, this Court should rule that the BOP Policy, which uses the same ratings system, is constitutional as well.").

their favor would *ipso facto* cast doubt on the constitutionality of the Zimmer

Amendment itself, and because we assume that Defendants would abide by such a

ruling, we conclude that Plaintiffs' claims are redressable for Article III purposes and we

proceed now to address the merits of those claims.

B.    Defendants' Argument Under *Turner*

As we have previously recognized, the test for evaluating restrictions on the First

Amendment rights of prisoners is set forth in Turner v. Safley, 482 U.S. 78 (1987).[14]  In

Turner, "the Supreme Court recognized an enduring tension between two conflicting

principles in operation whenever a prisoner brings a constitutional challenge to a law or

regulation affecting prison policy."  Ramirez v. Pugh, 379 F.3d 122, 125-26 (3d Cir.

2004).  That is, the principal that "[p]rison walls do not form a barrier separating prison

inmates from the protections of the Constitution" must be balanced against the

competing principle, rooted in practical reality, that "the judicial branch is ill-suited for

running the country's prisons, a task committed to the particular expertise of the

legislative and executive branches."  Id. at 126 (citing Turner, 482 U.S. at 84-85)

(alterations in the original).

_____

[14] Defendants do not dispute that motion pictures are a form of expression
entitled to First Amendment protection.  See Schad v. Borough of Mount Ephraim, 452
U.S. 61, 65 (1981).  The Supreme Court has recognized films as a "significant medium
for the communication of ideas" which "may affect public attitudes and behavior in a
variety of ways, ranging from direct espousal of a political or a social doctrine to the
subtle shaping of thought which characterizes all artistic expression."  Joseph Burstyn,
Inc. v. Wilson, 343 U.S. 495, 501 (1952).  Moreover, First Amendment protection
applies not only to those who seek to distribute ideas and information but also those
who seek to receive them.  See Stanley v. Georgia, 394 U.S. 557, 564 (1969) (freedom
of speech protects the right to receive information and ideas); LaMont v. Postmaster
Gen. of the United States, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The
dissemination of ideas can accomplish nothing if otherwise willing addressees are not
free to receive and consider them.  It would be a barren market place of ideas that has
only sellers and no buyers.")

To accommodate these competing interests, the Supreme Court in <u>Turner</u> held that prison regulations implicating an inmate's constitutional rights are valid so long as they are "reasonably related to legitimate penological interests." 482 U.S. at 89. The Court established a four-part test for assessing the overall reasonableness of a challenged regulation, which our circuit court of appeals has summarized thus:

> As a threshold inquiry, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." ... Courts must then determine "whether there are alternative means of exercising the right that remain open" to prisoners, and "[what] impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." ... Finally, a regulation's reasonableness may be evidenced by "the absence of ready alternatives" that would fully accommodate the constitutional right "at de minimis cost to valid penological interests." ...

<u>Ramirez</u>, 379 F.3d at 126 (internal citations omitted) (alteration in the original).

While the <u>Turner</u> factors "serve as guides to a single reasonableness standard," the first factor "'looms especially large' because it 'tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions.'" <u>Id</u>. (quoting <u>Waterman v. Farmer</u>, 183 F.3d 208, 213-14 (3d Cir.1999)). If the connection between a prison policy and the government's asserted interests is too tenuous, the policy is "arbitrary or irrational" and "fails irrespective of whether the other factors tilt in its favor." <u>Wolf</u>, 297 F.3d at 309-10. <u>Accord</u> <u>Asker v. California Dept. of Corrections</u>, 350 F.3d 917, 923 (9th Cir. 2003) (holding that, if a policy fails the first <u>Turner</u> prong, the court need not address the other factors). The Supreme Court has made clear that the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." <u>Overton</u>, 539 U.S. at 132. <u>See also</u> <u>Williams v. Morton</u>, 343 F.3d 212, 217 (3d Cir. 2003) ("[T]he burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it.").

17

Here, Defendants have articulated numerous penological interests in support of the challenged policy, *to wit:* punishment, deterrence, prison security and institutional order, rehabilitation, the preservation of a safe and non-hostile work environment for BOP employees, and the promotion of efficiency and uniformity among federal prisons. In support of their position, Defendants have submitted the Declarations of Dennis Flatt, Supervisor of Education at FCI-McKean, and John M. Vanyur, Ph.D., a psychologist and Assistant Director of the Correctional Programs Division for the BOP.

Mr. Flatt's Declaration establishes that FCI-McKean is a medium security institution which currently houses approximately 1600 inmates. (See Declaration of Dennis Flatt [Doc. # 69, Attachment 1] at ¶ 4.) The general population is a diverse group comprised of individuals convicted of a wide range of offenses. More than 200 inmates are currently serving sentences in excess of 20 years, including 16 individuals serving life sentences for such crimes as murder, armed bank robbery, assault with the intent to kill, mayhem while armed, rape and drug possession and distribution offenses. (Id.) Some 100 inmates have been classified as sex offenders, while another 200 have mental health issues for which they receive treatment. (Id.) Inmates assigned to the general population housing units at FCI-McKean are not segregated into any particular housing unit based on the nature of their criminal offenses, "as to do so could affect their personal safety and security by identifying to other inmates this sometimes sensitive information." (Id. at ¶ 6.)

According to Mr. Flatt, the Movie Program at FCI McKean consists of showing movies over an internal television system to the common areas in each of the four units housing the general population of inmates. (Flatt Decl. at ¶ 7.) Each weekend, from approximately 5:00 pm on Friday to 12:00 noon on Sunday, two movies are shown to the inmate population. The movies are selected from a list or catalog provided by a local video store and consist of films rated G, PG, PG-13, and airline edited. (Id.) The

prison does not exclude any particular class of inmates from the viewing of any particular movie because, according to Mr. Flatt, "[t]he inherent security risks referenced above, the composition of the inmate population at FCI McKean, the method of showing movies at this institution, and the staff time such an intensive screening would require do not make this option a viable one." (Id. at ¶ 8.)

Dr. Vanyur notes in his declaration that the federal prison population is very different from that of the general public, as it contains a higher concentration of persons who have anti-social personalities, are violent, have mental health problems, and/or are sex offenders. (See Declaration of John M. Vanyur, Ph.D. [Doc. # 69, attachment 2] at ¶ 2.) Many of these inmates have trouble controlling their impulses. (Id.) Dr. Vanyur opines that R-rated movies tend to feed into certain "criminogenic risk factors" by exposing inmates to depictions of graphic violence, substance abuse, criminal behavior, victimization of others, violation of societal norms, and other themes which reinforce pro-criminal value systems and anti-social behaviors and beliefs. (Id. at ¶¶ 8-10.) Mr. Flatt and Dr. Vanyur collectively opine that the uniform banning of unedited R-rated movies in federal prisons furthers the various penological interests set forth above.

For the most part, Plaintiffs do not dispute that the government has a legitimate interest in advancing its stated penological goals.[15] (See Pl.s' Br. in Opp. to Def.s' Mot. for Summ. Judg. [Doc. # 71] at pp. 13-14 (citing Dehart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000); Procunier v. Martinez, 416 U.S. 396, 412 (1974)).) Instead, they argue that the link between these stated interests and the R-rated movie ban is so attenuated as to render the general ban arbitrary and irrational under Turner.

---

[15] Plaintiffs do, however, contest the legitimacy of the government's professed interest in ensuring that BOP employees are not offended by certain R-rated films. Plaintiffs claim that this concern has not been recognized as a valid penological objective for purposes of Turner. We address this contention in more detail below.

The Magistrate Judge agreed with the Plaintiffs and found the first <u>Turner</u> prong dispositive of the matter.  The "primary difficulty" with the R-rated movie ban, as she saw it, was "its use of the movie rating system established by the Motion Picture Association of America (MPAA) as the benchmark for determining what films may or may not be viewed by inmates."  (<u>See</u> Report and Recommendation (8/31/05) [Doc. # 76] at p. 9).  Based upon an article by Jack Valenti, President of the MPAA, entitled "MPAA Rating History and How it Works," the Magistrate Judge found that:

> [t]wo major points are evident ...:  (i) the MPAA ratings system is designed solely to guide parents' decisions regarding the type of movies their children should be allowed to see; and (ii) ratings decisions are wholly subjective and merely represent estimates of what "most parents" would consider to be appropriate. Neither of these points provides any logical basis for the BOP's imposition of a blanket ban on the showing of R-rated movies to adult inmates.  As noted above, the ratings have no meaning for anyone over the age of 18.  Thus, the rational relationship between a movie's rating and the penological interests sought to be served by Defendants is tenuous at best.  This is particularly true given the "ratings creep" that has occurred during the past several years, which blurs the line of distinction between the content of R-rated movies released over a decade ago and the content of PG-13 movies released today.

(<u>Id</u>. at p. 11 (discussing Jack Valenti, "MPAA Rating History and How it Works" (last revised in December 2000), published at <u>Http://www.filmratings.com,</u> at pp. 3-4).)  The Magistrate Judge therefore concluded that the Defendants' reliance on the MPAA rating system was not rationally connected to the advancement of any of its proffered penological interests.  She further concluded that, even if a logical connection could be established between the ratings system and the government's asserted penological goals, an absolute ban on all R-rated movies would run afoul of <u>Turner</u> because it constitutes an exaggerated response to the government's stated interests.  Accordingly, she recommended that the Defendants' motion for summary judgment be denied and the Plaintiffs' motion be granted.

Defendants fault the Magistrate Judge's analysis in three principle respects. First, they dispute her conclusion that the MPAA ratings system lacks definable standards and is an inappropriate tool for determining the propriety of certain films in a prison setting. They characterize the Magistrate Judge's focus on the MPAA rating system as "misguided," since the "BOP Policy in this case merely implemented a prohibition that was contained in a statute, specifically, the Zimmer Amendment." (Def.'s Objections to Mag. Judge's R & R [ Doc. # 77] at p. 4.) Defendants protest that "it was Congress, not the BOP, who determined that R-rated movies should not be shown in prison." (Id.)

Second, Defendants contend that the Magistrate Judge improperly shifted the burden of proof onto them, contrary to the Supreme Court's mandate in Overton v. Bazzetta, *supra*. Defendants object that the Magistrate Judge did not credit evidence proffered by their two prison officials regarding the penological interests served by the R-rated movie ban. At the same time, they claim, the Magistrate Judge failed to cite any evidence provided by Plaintiffs to prove that the restriction is *not* reasonably related to the stated penological interests.

Finally, the Defendants object to the Magistrate Judge's conclusion that the R-rated movie ban constitutes an "exaggerated response" to the asserted penological interests. According to Defendants, that inquiry is properly undertaken in conjunction with the fourth Turner prong rather than the first prong, which was the focus of the Magistrate Judge's analysis. Moreover, Defendants argue, the Plaintiffs have not pointed to "an alternative that fully accommodates the prisoners' rights at *de minimis* cost to valid penological interests, as the law requires. Defendants reason that the ban cannot be an "exaggerated response" if there are no obvious easy alternatives.

21

We turn then to an examination of the relevant Turner factors, applying de novo review of the Magistrate Judge's conclusions and recommendations and giving due regard to the Defendants' objections.

(i)

The first Turner prong requires us to consider whether the restriction at issue bears a valid, rational connection to the "legitimate and neutral" governmental interest put forward to justify it. Fraise v. Terhune, 283 F.3d 506, 513 (3d Cir. 2002) (citing Turner, at 91). A prison restriction "fails to satisfy this prong if [it] promotes an interest that is illegitimate or not neutral, or if the [restriction] bears no 'valid, rational connection' to the asserted interest." Waterman, 183 F.3d at 214 (citing Turner, 482 U.S. at 89-90). "Neutrality" in this sense simply means that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." Amatel v. Reno, 156 F.3d 192, 197 (D.C. Cir. 1998) (quoting Thornburgh v. Abbott, 490 U.S. 401, 415 (1989)).

In the context of this case, there does not appear to be any dispute about the "neutrality" of the challenged policy. All of the justifications proffered in support of the ban are unrelated to the suppression of ideas or expression. In addition, the Plaintiffs have conceded that punishment, deterrence, rehabilitation, and the preservation of security and institutional order are legitimate penological interests. As we have noted above, the dispute in this case centers on whether the policy of banning unedited R-rated movies rationally furthers the foregoing penological interests.

a.    Punishment/ Deterrence/ Efficient Resource Allocation

We begin by recognizing, as Defendants have consistently asserted, that the "policy" of uniformly banning unedited R-rated movies at FCI-McKean was the direct result of, and merely an attempt to enforce, a Congressional mandate set forth in the Zimmer Amendment. Enacted as a budgetary rider, the Amendment provided that:

22

[n]one of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system –

(1) in-cell television viewing except for prisoners who are segregated from the general population for their own safety;

(2) the viewing of R, X and NC-17 rated movies, through whatever medium presented;

(3) any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weightlifting equipment of any sort;

(4) possession of in-cell coffee pots, hot plates, or heating elements; or

(5) the use or possession of any electric or electronic musical instrument.

See Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 611, 110 Stat. 1321 (April 26, 1996).

That the Amendment was primarily aimed at reducing or eliminating public funding for perceived "prison frills" is supported by the legislative history, which consists of a statement made by Representative Dick Zimmer, the sponsor of the Amendment, on the floor of the House of Representatives:[16]

[T]his amendment deals with prison amenities. Prison perks are bad public policy and a waste of taxpayer dollars. My amendment is designed to start eliminating them from Federal Prisons.
In some prisons, inmate amenities are better than what law-abiding Americans have. Prisons should be places of detention and punishment; prison perks undermine the concept of jails as a deterrence. They also waste taxpayer money. ...
[M]y amendment would help end this taxpayer abuse by prohibiting funds from being spent in Federal prisons on luxuries such as martial arts instruction, weight rooms, in-cell televisions, sexually explicit or violent movies, and

---

[16] In the absence of other legislative history, "we must look to the statements of the sponsors of the bill as 'the only authoritative indications of congressional intent.'" Nat'l Sec. Archive v. United States Dep't of Def., 880 F.2d 1381, 1384-85 (D.C. Cir. 1989) (quoting North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 527 (1982)). See also Kimberlin v. U.S. Dep't of Justice, 318 F.3d 228, 232 (D.C. Cir. 2003), reh'g en banc denied, 351 F.3d 1165 and 1166 (D.C. Cir. 2003).

expensive electronic musical instruments.  We must make sure we are spending public funds wisely, not using them on amenities that have little or no bearing on institutional security and that far exceed basic standards of human dignity.  ...

[M]y amendment has won the support of the Law Enforcement Alliance of America, the Nation's largest coalition of law enforcement officers, crime victims, and concerned citizens.  This is a reasonable amendment.  It does not provide for a return of the chain gang.  It does provide for a return to common sense. ...

*** 

Earlier this year during consideration of the anti-crime component of the Contract with America, this House accepted a no-frills prison amendment I offered that requires the Attorney General to set specific standards governing conditions in the Federal prison system that provide the least amount of amenities and personal comforts consistent with constitutional requirements and good order and discipline in the Federal prison system.

That amendment also requires the Bureau of Prisons to submit an annual audit to Congress listing exactly how much is spent at each Federal prison for basics and how much is spent on extras, perks, and amenities.

This requirement will allow Congress to get a handle on whether we are spending taxpayers money on reasonable items to maintain and secure prisoners, or whether money is being wasted on luxuries that many law-abiding Americans cannot afford.

We must make sure we are spending public funds wisely-not using them on amenities that have little bearing on institutional security.

141 Cong. Rec. H7751-01 (quoted in <u>Kimberlin v. U.S. Dept. of Justice</u>, 150 F. Supp.2d 36, 39-40 (D.D.C. 2001), <u>aff'd</u> 318 F.3d 228 (D.C. Cir. 2003), <u>reh'g en banc denied</u>, 351 F.3d 1165 and 1166 (D.C. Cir. 2003)).  The record contains numerous press releases published by Representative Zimmer's office in connection with the Amendment's enactment, all of which further demonstrate that the law was designed to reduce expenditures of public monies on perceived prison luxuries.[17]

---

[17]  Plaintiffs have included the following press releases as part of their exhibits in support of their summary judgment papers:

*January 31, 1995 Press Release:* *"Legislation to End Prison Perks Wins Endorsements"*
Washington DC - U.S. Rep. Dick Zimmer's legislation aimed at stripping prisons of luxuries such as cable TV, Stairmasters and catered prime rib was endorsed Tuesday by two leading experts in the criminal justice field.
*** 
*February 9, 1995 Press Release:* *"Close the Door on Federal 'Glamour Slammers'"*

...Dear Colleague:

*  The federal penitentiary in Lompoc, Calif. offers an all-channel cable T.V., movies seven

Because the Amendment's mandate did not admit of any discretion on the part

---

days a week, pool tables, handball, tennis and miniature golf.

*  The federal prison camp in Duluth, Minn. provides a movie theater, musical instruments, a softball field, and game rooms.

*  The federal Correctional Institution in Estill, S.C., has "dormitories" with cathedral ceilings, carpeting, skylights, built in checker and chess tables, and handball courts.

*  The federal penitentiary in Lewisburg, PA. offers HBO and Cinemax to its resident drug dealers and killers.

Not all federal prisons fit these descriptions or provide such amenities.  But many do.  That's why I plan to offer an amendment today to the crime bill to stop this abuse of taxpayer money.

Under my amendment, federal prisons would be required to provide "the least amount of amenities and personal comforts consistent with Constitutional requirements and good order and discipline in the Federal prison system."  This provision is intended to eliminate luxuries such as in-cell televisions, pornographic materials, R, X, and NC-17 rated movies; personally owned computers; in-cell coffee pots and microwave ovens; and expensive electronic musical instruments.

I am not advocating a wholesale return to life on the chain gang, where circling a prison yard constituted recreation and a rock pile constituted work.  But, at a time when many Americans's [sic] are struggling to make ends meet and Congress is struggling to reduce federal spending, we should not be spending public money to pamper those who neither respect nor obey our laws.

***

*February 9, 1995 Press Release:  Zimmer's Ban on Prison Perks Approved in House*

Washington DC – U.S. Rep. Dick Zimmer's proposal to clamp down on prison luxuries like premium cable TV and miniature golf was approved on the House floor today.

By a voice vote, Zimmer's amendment, which is based on his "No Frills Prison Act," was added to the Contract with America crime bill.

"When you break the law of this land, you should pay the price for your crime – not be rewarded with a vacation watching premium cable on your personal TV," said Zimmer.  "There is no reason why we should be using taxpayer funds to finance inmate amenities." ...

"Some criminals have come to view jail as an almost acceptable lifestyle because amenities are better for them on the inside than on the outside[,]" said Zimmer.

***

*July 27, 1995 Press Release:  House Adopts Zimmer "No Frills Prison Amendment"*

...  "There is no reason why a criminal should be treated to state-of-the-art gyms or be permitted to watch premium cable television," said Zimmer.  "And there is certainly no reason why taxpayers should foot the bill for such luxuries." ...

(Pl.s' Exhibit Appendix [Doc. # 72-8], Ex. 6.)

of the BOP, the BOP did not promulgate any regulations relative to the Zimmer Amendment.  See Kimberlin, 150 F. Supp. 2d at 40 (citing remarks by the BOP's Rules Administrator that, "[b]ecause the provisions of the Zimmer Amendment do not allow the BOP any discretion in the provisioning of specific amenities, there is not need to initiate rulemaking under the [APA].").  Instead, the BOP updated Program Statement 5370.10 and issued internal memoranda to comply with the Amendment, while FCI-McKean updated Institutional Supplement 5370.08.

Both the Program Statement and the Institutional Supplement interpret and implement the Zimmer Amendment as a functional ban on various amenities, including unedited R-rated movies.  The parties agree that this is a reasonable interpretation of the Amendment.  See Amatel, 156 F.3d at 194 n. 1 (In prison, "[w]here the government absolutely monopolizes the means of speech or controls a bottleneck, ... a refusal to fund functions the same as an outright ban."); Kimberlin v. U.S. Dep't of Justice, 318 F.3d 228, 232 (D.C. Cir. 2003) (BOP's interpretation of Zimmer Amendment as imposing an outright ban of electrical instruments was reasonable; the restriction on using appropriated funds for the "use or possession" of electric and electronic instruments may reasonably be construed to prohibit paying for costs incidental to such use or possession, including costs incurred for storage, supervision and electricity), reh'g en banc denied, 351 F.3d 1165 and 1166 (D.C. Cir. 2003).  See also Environmental Defense Ctr. v. Babbitt, 73 F.3d 867, 871-72 (9th Cir. 1995) (holding that "[t]he use of any government resources – whether salaries, employees, paper, or buildings – to accomplish a final listing [of a species as endangered] would entail government expenditure" and thereby run afoul of statutory moratorium on spending for such purpose; "The government cannot make expenditures, and therefore cannot act, other than by appropriation.").

Given the context in which the challenged policy came into existence – i.e., without any input, rule-making, or discretion on the part of the BOP – we conclude that the most sensible way of performing a <u>Turner</u> analysis is to first consider the Congressional directive which gave rise to the policy.  As we have seen, the most obvious rationale underlying the Zimmer Amendment's *de facto* ban on R-rated movies is the government's interests in reducing public expenditures on allegedly excessive amenities and personal comforts for federal prisoners.  By reducing these expenditures, Congress sought to enhance the punitive aspect of federal prisons, thereby furthering the goal of deterrence by making prison a less desirable place, while at the same time promoting a more efficient allocation of federal prison resources.  We consider these interests in turn.

      (i)    <u>Punishment/ Deterrence</u>

"[P]unishment and deterrence are unquestionably among the fundamental 'goals of the penal function in the criminal justice system.'"  <u>Kimberlin v. U.S. Dep't of Justice</u>, 318 F.3d at 239 (Tatel, J., concurring in part and dissenting in part) (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 352 (1981)).  <u>See</u> <u>also</u> <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974) ("An important function of the corrections system is the deterrence of crime.  The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses.").  Though conceptually distinct, these goals are also closely related; in theory, any condition which makes prison life less desirable, and therefore inflicts greater punishment on the criminal, ought to discourage the criminal and other like-minded individuals from engaging in conduct which would result in future imprisonment.

Plaintiffs insist that it is "absurd" to believe there is any meaningful punitive or deterrent value to be derived from the policy of uniformly banning R-rated films.  They

27

point out that FCI-McKean's current recreational program allows inmates to watch other categories of movies as well as a variety of cable TV programming, such that the punitive value of the R-rated movie ban is substantially watered down.  In addition, Plaintiffs argue, the punitive aspect of prison derives overwhelmingly from the loss of freedom and personal liberties that inmates must endure consistent with their status as prisoners, not the least of which are the loss of contact with family and friends outside the institution and confinement in a cell.

Defendants counter, however, that the Plaintiffs are viewing the issue out of context to the extent they ask whether the lack of R-rated films in and of itself inflicts punishment or deters crime.  Defendants suggest that, instead, we should consider the deterrent value of the Zimmer Amendment as a whole.  They conclude "it is not irrational to believe that banning a broad spectrum of amenities and thereby making prison harsher and less desirable may produce a deterrent effect."  (Def.'s Reply in Supp. of Mot. for Summ. Judg. [Doc. # 74] at p. 6.)

At first blush, Defendants' argument has some appeal.  In Kimberlin v. U.S. Dep't of Justice, *supra*, the district court addressed the BOP's policy of banning electronic musical instruments in federal prisons, a restriction also rooted in the Zimmer Amendment.  In upholding the ban, the district court noted that, "Congress took away several amenities that, in the aggregate, it perceived would make prisons more of a deterrent.  While banning musical instruments, by itself, may not actually deter anyone, it is possible that BOP (and Congress) thought the ban would indicate to society that prison is a harsh place where one does not want to be."  150 F. Supp. 2d at 45.  "The supposition that exclusion of electric instruments will have much of an impact on this perception may be optimistic," the court wrote, "but it is not irrational," especially when the ban on other amenities (including, among other things, R, X, and NC-17 rated movies, weightlifting equipment, martial arts training, in-cell coffee pots and in-cell

28

televisions) is considered.  Id.  In a *per curiam* opinion, the D.C. Circuit Court of Appeals affirmed the district court's ruling on different grounds, see Kimberlin, 318 F.3d at 233-34 (holding that for purposes of Turner's first prong, the BOP's ban rationally furthered the government's legitimate interest in conserving correctional departmental funds), but one circuit judge on the panel would have upheld the ban for the reasons articulated by the district court – i.e., that the ban is reasonably related to the asserted goal of *deterrence through punishment*.  See id. at 234-35 (Henderson, J., concurring).

This theory, however, becomes problematic when taken to its logical conclusion. The concern was cogently explained by Judge Tatel, the dissenting circuit judge in Kimberlin:

> ... Does the goal of enhancing the punitive and deterrent value of prison by making prison conditions more onerous justify limiting prisoners' constitutional rights? As long as *[Turner v.] Safley* is the law – that is, as long as prisoners generally retain their constitutional rights – the answer must be no, for there is no discernable limit to the government's ability to invoke punishment or deterrence as reasons for adopting regulations that restrict constitutional rights. The BOP's rationale for banning electric guitars could also justify banning all musical instruments, or all music, or even all books, including the Bible and the Koran, on the ground that denying these "perks" will make prison more onerous and "more of a place of deterrence and punishment." ... Under this theory, the government could, subject only to whatever limitations the Eighth Amendment imposes, reduce prisons to places of virtually silent, solitary confinement, where prisoners may not read, write, or engage in any other expressive activity.

318 F.3d at 239-40 (Tatel, J., dissenting in part) (internal citation omitted).  As Judge Tatel succinctly observed, "regulations that deprive prisoners of their constitutional rights will *always* be rationally related to the goal of making prison more miserable."  Id. at 240.

Moreover, Turner's deferential standard of review is rooted in a judicial aversion to meddling in fundamental matters of prison administration such as "the preservation of internal order or discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners," – all matters peculiarly

29

within the expertise of prison officials.  Id. at 240 (quoting Procunier v. Martinez, 416

U.S. 396, 412 (1974)).  These operational, security, and management concerns have

little to do with measures that would restrict First Amendment rights in the interest of

punishment for its own sake.  Id.  Perhaps that is why, as the district court noted in

Kimberlin, "the government has never defended a [First Amendment] restriction solely

on deterrence or punishment grounds," despite Congress' well-recognized and

legitimate interest in those goals.  See 150 F. Supp. 2d at 44 ("This appears to be the

first instance where the government asserts only deterrence and/or punishment as a

legitimate reason for limiting a prisoner's First Amendment rights.  The government

usually asserts internal order, security, and/or rehabilitation as the legitimate objective.")

(citations omitted).  It is debatable, therefore, whether punishment and/or deterrence

are legitimate governmental interests in and of themselves for purposes of a Turner

analysis.  See Kimberlin, 318 F.3d at 240 (Tatel, J., dissenting) ("[Turner v.] Safely does

not contemplate punishment as one of the interests that justifies restriction on

prisoners' constitutional rights.")

     That debate is further fueled by the fact that the remaining Turner factors make

little sense in the context of a regulation for which punishment and deterrence are the

only asserted justifications.  Id.  Turner's second, third, and fourth inquiries "are

designed to ensure that legitimate management and security considerations do not

unnecessarily limit prisoners' constitutional rights."  Id.  However,

> if the government's very purpose is to make prison more onerous,
> then why ask whether there are alternative means of expression
> available or less costly ways to accommodate the constitutional
> rights at issue? After all, the greater the deprivation, the stronger
> the connection between the restriction and the government's goal
> of punishment and deterrence.

Id.

     In expressing our concern about upholding the challenged movie ban based on

the government's interest in punishment and deterrence, we do not suggest that these

interests are generally invalid or can never support the reduction of prison amenities. Nor do we mean to imply that prisons should be places of luxury. On the contrary, a regulation which, consistent with the Eighth Amendment, reduces purely physical or recreational comforts unrelated to free speech might easily pass muster as a reasonable restriction that rationally furthers the government's legitimate interests in punishment and deterrence. See Kimberlin, *supra*, at 239 (Tatel, J., dissenting) ("I have no doubt that the government may enhance prison's punitive and deterrent value by eliminating weightlifting equipment, in-cell coffee pots, and other "perks" not protected by the First Amendment.). Moreover, Turner does not necessarily preclude the executive or legislative branches from restricting prisoners' constitutional rights as a means of addressing misconduct that occurs within the correctional institution. In such instances, a restriction on prisoners' constitutional rights may well be undertaken to inflict punishment on the wayward inmate and deter future misconduct, but it will not be for the sake of punishment or deterrence alone; rather, the loss of privileges will almost inevitably be designed to serve the broader and more obvious penological interests of preserving institutional order and discipline, maintaining institutional security, and rehabilitating prisoners – all of which are fundamentally tied to the effective administration of prisons and which lie at the heart of Turner's deferential standard of review. See Kimberlin, 318 F.3d at 240 (Tatel, J., dissenting in part). Whether the restriction passes muster will, of course, depend on its connection to these valid penological interests.

Our point is simply that, to justify a regulation which restricts the First Amendment rights of prisoners on the basis that it rationally advances punishment and deterrence *for their own sake* is to espouse a principle with potentially no boundaries and one which could conceivably lead to the complete evisceration of many, if not most, constitutional rights. Thus, the ban on unedited R-rated films cannot be upheld under

31

the theory that it is reasonably related to the goal of furthering punishment and deterrence.

(ii)    Efficient Allocation of Prison Resources

As we have seen, however, Representative Zimmer expressed another rationale for banning R-rated movies and other prison "perks": a desire to re-direct the public funding of prisons in a more efficient manner. As articulated by Representative Zimmer, his Amendment was aimed at ensuring that taxpayers' money is spent on "reasonable measures" to maintain and secure prisoners rather than unnecessary "luxuries."

Promoting the efficient allocation of prison resources has been recognized as a legitimate governmental interest. See, e.g., Williams v. Morton, 343 F.3d 212 (3d Cir. 2003) (prison's policy of providing Muslim inmates vegetarian meals, rather than Halal meals with meat in conformance with the Muslim inmates' religious beliefs, was rationally related to legitimate penological interests in, among other things, simplified food service and staying within the prison's budget). See also Orafan v. Goord, 411 F. Supp. 2d 153 (N.D.N.Y. 2006) (recognizing prison's legitimate penological interest in efficient and economical operations in the context of an alleged Establishment Clause violation); Breakiron v. Neal, 166 F.Supp. 2d 1110 (N.D.Tex. 2001) (County's act of deducting payments from prisoner's inmate trust account for medical services rendered was rationally related to county's legitimate interest in the efficient use of prison resources for purposes of Equal Protection Claim). Thus, the question becomes whether that interest is rationally furthered by the ban on unedited R-rated movies.

In Kimberlin, the Court of Appeals for the District of Columbia upheld the Zimmer Amendment's ban on electrical instruments on the theory that it bears a reasonable relationship to the legitimate governmental interest of conserving correctional departmental funds. 318 F.3d at 233. In finding a rational connection, the court

observed: "[c]ommon sense tells us ... that a prisoner's possession and use of an electric guitar costs correctional institutions money for electricity, upkeep, storage and supervision." Id.

Such a rationale is not so easily transposed to the facts of this case, however, where the Amendment and implementing policy do not ban films in their entirety, but ban only a broad category of films. Whatever institutional costs might otherwise have been incurred by FCI-McKean as an incident of showing of R-rated movies (e.g., electricity, gas money to obtain the films, the expense of maintaining VCR equipment, etc.) must nevertheless be incurred, in any event, given the fact that G, PG, PG-13, and airline edited movies continue to be shown at the Institution. Thus, in one respect, the banning of R-rated movies does not rationally advance the Amendment's apparent goal of saving tax-payer dollars by curbing spending on prison "luxuries" – unless one accepts the proposition that unedited R-rated movies are somehow a distinct "luxury" in and of themselves simply by virtue of their rating. We are not prepared to accept that proposition, as there is no apparent basis from which to rationally conclude, on this record, that R-rated movies constitutes more of a "luxury" than, e.g., movies with a G, PG or PG-13 rating.

Importantly, however, Defendants have argued that the challenged policy helps conserve BOP resources in other respects. Dr. Vanyur states in his declaration that the R-rated movie ban "benefits the administration of the federal prisons" in that "[s]taff no longer pre-screen R-rated movie titles and contents, nor view videos sent by mail; tasks which were time-consuming and staff intensive." (Vanyur Decl. at ¶ 15.) Mr. Flatt adds in his declaration that:

> [p]rior to the Zimmer Amendment, when select R-rated movies were still permitted to be shown, the decision to show a movie involved a multi-level review process. First, the Recreation Department staff member, usually a recreation specialist, would determine if the content of the movie was appropriate. If questionable, the approval of the movie could have been referred

33

> through various levels of supervisors, including correctional
> supervisors, to determine the appropriateness of showing such a
> movie at FCI McKean.  Since the Zimmer Amendment and the
> reduction in the discretion of the movie titles available, although
> such a process could still in [sic] place, it is infrequently utilized,
> thus saving significant staff resources.

(Flatt Decl. ¶ 11.)

Although Plaintiffs do not directly address this asserted governmental interest in the context of <u>Turner</u>'s first prong, they indirectly join issue with Defendants in connection with their analysis under <u>Turner</u>'s fourth prong.  That is, in arguing that the prohibition on R-rated films fails <u>Turner</u>'s fourth inquiry – an issue which we take up below – Plaintiffs challenge the Defendants' assertion that the ban conserves significant staff resources.  Plaintiffs claim, for example that, because only two movies are shown each week (Flatt Depo. at pp. 22-23), with an average running time of 90 to 120 minutes each, the time needed to review the two movies would be, at most, four hours per week.

Plaintiffs further argue that, while there is a review mechanism in place at FCI-McKean whereby final decisions about movies can be made by higher administrative officials, including the Associate Warden of Operations and Programs, this degree of administrative oversight was not typically invoked in the years preceding the Zimmer Amendment's enactment.  As described by Mr. Flatt, the Recreation Department is a component of the Education Department and consists of seven full-time positions – six recreation specialists and one Supervisor of Recreation.  (Flatt Depo. at 14-16.)  Recreation specialists are involved in coordinating a variety of inmate events, such as sporting events, hobbies and crafts, various tournaments, the music program, unit activities, and the movie program.  (<u>Id</u>. at pp. 11-12.)  Recreation specialists are managed by the Supervisor of Recreation, who in turn reports to the Supervisor of Education.  Movies for inmate viewing are initially selected by recreation

specialists from various film catalogs.  (Id. at 36-37.)  Between 1991 and 1995, when

Mr. Flatt was the Supervisor of Recreation and before passage of the Zimmer

Amendment, if a recreation specialist had questions about the propriety of a movie, he

would gather the relevant information and present it to the Supervisor of Education, with

input from the Recreation Supervisor.  (Id. at 48-49.)  The Supervisor of Education

could make a final decision or might seek further guidance from the Superintendent of

Industries or even the Associate Warden of Operations and Programs.  (Id. at 48-50.)

Mr. Flatt estimates that, from May 1991 to January 1996, FCI-McKean showed

approximately 300-400 R-rated movies to inmates in unedited form.  (Id. at 45-56.)

Although Mr. Flatt believed that there were occasions when decisions about films had to

be resolved by the Associate Warden, he also recalled consulting his own supervisor

(the Supervisor of Education) less than a half dozen times during this time period.  (Id.

at 48-50.)

Assuming the R-rated ban saves only 3 or 4 hours per week in terms of man-

hours, Defendants nevertheless contend that the ban rationally furthers the

government's interest in ensuring that prison resources are allocated efficiently.  Dr.

Vanyur testified that, even if the Zimmer Amendment were repealed, he would support

a continuation of the ban on R-rated movies, partly on efficiency grounds.  (Vanyur

Depo. at 62-63.)  He believes the time that would otherwise be spent reviewing

individual movies could be better spent focusing on higher priority security issues, such

as conducting more phone monitoring:

> What I'm saying is those resources could be better spent.  Inmates
> on average — let me give you an example.  The longest phone call
> they can make is 15 minutes.  We know they're running criminal
> enterprises, some inmates, from inside institutions.  If I had a staff
> member available for three hours, I'd rather have them listen to 12
> or 15 more phone calls that we've targeted them to listen to than
> watching movies and making determinations as to whether it's
> appropriate or not.

(Id. at 66.)

Plaintiffs suggest that this rationale lacks merit because, at FCI-McKean, recreation specialists are not generally employed to conduct monitoring or other intelligence activities.  Mr. Flatt testified that all staff at FCI-McKean are assigned to jobs according to their area of expertise.  Recreation specialists have special training in the field of recreation and are not assigned to security posts as such.  (Flatt Depo. at 16-17, 27-28.)  In addition, Donald Reich, a Security Captain at FCI-McKean, testified that the monitoring of inmate telephone calls at McKean is not conducted by members of the Recreation Department but by uniformed officers.  (Reich Depo. [Doc. 75, Ex. 14] at 25-27.)  Plaintiffs contend that the record is devoid of any evidence suggesting that Recreation Department personnel are involved in the gathering of intelligence or any other intelligence function.

Even accepting Plaintiffs' evidence at face value, we do not believe that it renders the Defendants' proffered justification irrational.  We can reasonably infer that a recreation specialist freed from the responsibility of reviewing films several hours a week could save the Institution costs and/or resources in other respects.  For example, the Institution might opt to reduce the working hours of an employee in the Recreation Department in favor of increasing the hours of a different staff member assigned to the monitoring of phone calls.  In addition, the fact that a recreation specialist has three or four extra hours during the week in which to perform other duties is an inherent form of cost-savings to the Institution; it presumably means that the employee can attend to new tasks previously not performed or attend to current tasks in a more effective manner.  More broadly speaking, the elimination of the need for reviewing the films on a weekly basis provides prison administrators with greater flexibility in the allocation of resources within their departments.

Plaintiffs bear the burden of proving that the regulation at issue is unreasonable and not rationally related to the furtherance of a legitimate governmental interest. William v. Morton, 343 F.3d at 217 (the burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it) (citing Overton v. Bazzetta, *supra*). We find that Plaintiffs have failed to carry their burden, on this record, of proving that the challenged movie ban does *not* rationally further the government's legitimate interest in the efficient allocation of prison resources. To accept Plaintiffs' theory – that the saving of a few hours per week in staff man-hours does nothing to further the BOP's interests in higher priority issues – requires us to make certain assumptions about the manner in which federal prisons are administered, an area where federal courts lack expertise and in which we are uniquely ill-suited to meddle. Accordingly, we find that the challenged policy passes muster under Turner's first prong inasmuch as it rationally furthers the government's interest in the efficient allocation of correctional resources.

b.      Security and Order/ Rehabilitation

In addition to those governmental interests articulated by Representative Zimmer in support of his Amendment, the Defendants have asserted that the policy of banning R-rated films serves other legitimate interests as well. (See Def.s' Mot. for Summ. Judg. [Doc. # 69] at 12 ("Even though[ ] Congress, not the BOP, initiated the prohibition on R-rated movies, the BOP accepts that there are a number of legitimate penological interests for restricting inmates['] access to R-rated movies.").) Among the other governmental interests that are allegedly furthered by the R-rated movie prohibition are institutional security and order as well as inmate rehabilitation.

It is well recognized that maintaining prison security and order and furthering the rehabilitation of inmates are legitimate governmental interests. See Fraise, 283 F.3d at

516 ("It is ... beyond dispute that New Jersey has a legitimate penological interest in maintaining order and security within the prison system.")(citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 350-51 (1987), and Turner, 482 U.S. at 91-92); Ramirez, 379 F.3d at 128 (recognizing governmental interest in rehabilitation) (quoting O'Lone, 482 U.S. at 348). Indeed, our circuit court of appeals has acknowledged that the deference normally accorded to our legislative and executive branches with respect to matters of prison administration is especially appropriate where issues of prison security are implicated. See Fraise, 283 F.3d at 516. Rehabilitation, on the other hand, while a legitimate governmental interests, has never been defined by the Supreme Court and its contours therefore remain "quite amorphous." See Banks v. Beard, 399 F.3d 134, 140 (3d Cir. 2005) (citation omitted), cert. granted, 126 S. Ct. 650 (Nov. 14, 2005).

In support of their claim that the R-rated movie prohibition rationally advances prison security, order and rehabilitation, Defendants rely primarily on the declaration supplied by Dr. Vanyur which states, in relevant part:

8.    ... Over the past decade, research has ascertained that there are a number of criminogenic risk factors that should be taken into account when designing programing [sic] for inmates. Criminogenic risk factors are those factors that increase the likelihood that an individual will be involved in criminal behavior. The theory is that if you design programming that reduces these factors when inmates are in prison, then there will be less recidivism. Research on correctional programs has demonstrated that programs which directly target and reduce these risk factors during prison confinement, [sic] result in lower recidivism rates upon return to the community. Some inmates bring into the prison system a cultural milieu that is fundamentally criminogenic – they have engaged in other criminal behaviors, chronically bent and broken rules, collaborated with other criminals and antisocial peers in criminal endeavors, and have been immersed in "cultures" that support the criminal lifestyle. While incarcerated, some inmates continue and further develop the cultural milieu of criminal behavior.

9.    The three most common criminogenic risk factors are (1) anti-social, pro-criminal belief or value systems; (2) exposure to criminals/lack of positive role models; and (3) temperament or personality flaws such as excessive risk-taking, impulse control, psychopathy and egocentric behavior. R-rated movies often

contain messages that feed into these criminogenic risk factors by exposing inmates to depictions of graphic violence, substance abuse, criminal behavior, victimization and devaluation of others, violation of societal norms and the rights of others, and other themes which reinforce pro-criminal value systems and anti-social behaviors and beliefs.

10.    R-rated movies provide visual stimuli which reinforce violence, substance abuse, racial stereotypes, and misogynist attitudes, and promote negative role models that reinforce gang or criminal reference group ideas and norms.

11.    Showing R-rated movies negatively affects security and order in a prison in a number of specific ways.  First, repeated exposure to violence can lead to desensitization to aspects of violent behavior which would otherwise be unpleasant or abhorrent.  As persons become more desensitized to violent behavior, inhibitions to violence are more readily overcome.  Stated differently, exposure to violent behavior increases the risk of impulsive violence toward others.  Research has shown that exposure to depictions of violence increases the likelihood of violent behavior in teens and young adults, a population known to be at greater risk of violence toward others in a correctional setting.  Second, for persons who have engaged in repetitive violent acts over time, viewing depictions of violence can lead to mental and emotional rehearsal of their violent histories.  Prison populations contain a higher incidence of persons with histories of violence than normally found in society at large.  For this population, repeated exposure to graphic violence, criminal behavior, victimization and devaluation of others, entrenches mental rehearsal of past violence, criminal acts, and victimization, and reinforces an anticipatory mind set regarding future violence, crime and victimization.  Third, for persons who have histories of substances abuse, research has shown simply viewing depictions of others using drugs can trigger heightened activity in pleasure centers in the brain and associated cravings for substances.

***

(Vanyur Decl. at ¶¶ 8-11.)

Plaintiffs insist that the record here does not support a rational connection between the ban on unedited R-rated films and the government's goals of security, order and rehabilitation.  They lodge several arguments as to why the ban is an irrational measure, none of which we ultimately find persuasive.

First, Plaintiffs argue that the asserted connection between R-rated movies and prison security is rebutted by historical evidence.  Plaintiffs point out that, for a number

of years prior to the passage of the Zimmer Amendment (between May of 1991 and January of 1996), approximately 300-400 unedited R-rated movies were shown to the general prison population at FCI-McKean, apparently without incident.  (Depo. of Dennis Flatt at pp. 44-46.)  As a matter of "pre-Zimmer" policy, the prison would consider the propriety of an R-rated film on an individualized basis and generally would not show a movie containing prison escape scenes, violence toward law enforcement, or other materials that could possibly incite inmates.  (Id. at 51-52.)  While films containing scenes of consensual sex were often permitted, movies depicting incidents of rape were banned.  (Id. at 52.)  Films containing profane language were permitted, but those containing racial slurs or degradation of other racial groups were not.  (Id. at 53.)  Some of the films contained significant violence, including shootings and stabbings.  (Id. at 56-57.)  Among the films shown by FCI-McKean during these years were:  ***Chinatown, Cape Fear, Goodfellas, In Cold Blood, Scarface, Sea of Love, Reservoir Dogs, Boyz-n-the-Hood, Fatal Attraction, Prizzi's Honor, Texas Chainsaw Massacre, Silence of the Lambs, Terminator II, The Onion Field, Helter Skelter,*** and ***Taxi Driver.***  Plaintiffs posit that there is no evidence in the record to suggest that FCI-McKean ever experienced a disturbance among its inmates or violent acts toward its officials as the result of showing unedited R-rated films.  They argue that this lack of evidence is relevant in assessing the regulation's rationality.

We do not necessarily disagree with the proposition that this historical evidence may be considered in judging the rationality of the R-rated movie ban under Turner's first prong.  On the other hand, we do not find this evidence to be dispositive of the inquiry.  The fact that the record contains no evidence of past disturbances related to the viewing of R-rated films does not thereby prove, definitively, that security problems will likely *never* arise.  Neither Congress nor policy-making prison officials are required to wait for problems to develop before taking steps to counteract them.  See Fraise, 283

F.3d at 518 (demanding proof that members of the Five Percent Nation are required by the tenets of their religion to engage in violence and/or "hard statistical proof" that FPN members commit proportionally more acts of violence as compared to members of other religious groups as a prerequisite to allowing prison officials to classify FPN members as a "Security Threat Group" would be contrary to the demands of Turner and "would in all likelihood be paralyzing").

Similarly, the fact that officials at FCI-McKean formerly considered the showing of certain R-rated films to be compatible (or at least, *not incompatible*) with prison security and rehabilitation goals is not dispositive because administrative viewpoints can evolve. The evidence of record reflects that concern about criminogenic risk factors, and their effect on prison security and rehabilitation, is a newer phenomenon within the corrections profession since approximately the mid-1990s. (See Vanyur Depo. at 28.) That administrative strategies can change over time is reflected in Dr. Vanyur's testimony: he opines that, while Congress' directive to ban R-rated films was initially viewed by some executive officials as legislative meddling in the day-to-day affairs of prison management, it is likely the BOP would opt to retain the movie ban, and he would personally advocate doing so, even if the Zimmer Amendment were repealed. (Id. at 103.)

Moreover, the fact that there is no record of prior security breaches directly connected to the viewing of R-rated films like *Scarface, Texas Chainsaw Massacre,* and *Helter Skelter* tells us nothing about the more subtle, long-term effects that such films may have on inmate rehabilitation or security issues. As Dr. Vanyur explains, showing R-rated films may have deleterious effects on prison security over time: repeated exposure to violence can lead to an inmate becoming desensitized toward violence or can lead to mental or emotional rehearsals of the inmate's prior violent acts. For an inmate with substance abuse problems, viewing depictions of drug usage can trigger pleasure centers in the brain and associated cravings for substances. (Vanyur Decl. at

41

¶ 11.)  Similarly, rehabilitation can be impeded by negative messages that feed into criminogenic risk factors, including messages involving graphic violence, substance abuse, criminal behavior, victimization and devaluation of others, violation of societal norms, and other pro-criminal or anti-social themes.  (Id. at ¶¶ 8-10.)  Because these trends may be more subtle and harder to document, we do not find the lack of overt prison disturbances dispositive on the issue of whether the government's security and rehabilitation interests are rationally related to the challenged movie ban.

Plaintiffs next suggest that, to the extent Dr. Vanyur opines R-rated films may undermine the goals of prison security and rehabilitation, his declaration is inherently insufficient to demonstrate a rational connection between the movie ban and the proffered governmental interests.  Plaintiffs note that, when Dr. Vanyur was asked at his deposition whether movies are related to criminogenic risk factors, he responded "[t]hey possibly are."  Dr. Vanyur further testified that he was not aware of any literature specifically addressing the relationship between films and their impact on criminogenic factors.  (Vanyur Depo. at pp. 26-27.)

Notwithstanding these alleged shortcomings in Dr. Vanyur's testimony, we find that his opinion is sufficient to establish a rational connection between the R-rated movie prohibition and the goals of prison security and rehabilitation.  Dr. Vanyur's declaration and deposition make clear that he has reviewed literature and/or research within his area of expertise, the basic premise of which is that it is desirable from a penological viewpoint to design inmate programs that target and reduce various criminogenic risk factors.  Dr. Vanyur reasonably extrapolates from this principle that it is desirable to minimize inmates' exposure to stimuli which feed into these criminogenic factors.  Dr. Vanyur further postulates that R-rated films are one type of medium that often contain messages and/or visual stimuli which reinforce criminogenic risk factors.  The fact that he did not cite studies or literature precisely buttressing this opinion goes

perhaps to the weight of his testimony, but not its legal sufficiency.  We find that Dr. Vanyur's declaration supports the rationality of the ban on R-rated movies.

Finally, and most fundamentally, Plaintiffs challenge the use of the MPAA rating system as a measurement of what films are appropriate for viewing by inmates in the federal prison system.  They insist that it is misguided for the BOP to rest its programming decisions on the MPAA rating system because that system was designed to guide the parents of children; the ratings are "merely <u>estimates</u> culled from parents as to what movies they believe are appropriate for children of certain ages to see..." (Pl.'s Br. in Opp. to Def.s' Mot. for Summ. Judg. at 22.)

It is undeniable that the MPAA ratings system is a system designed specifically to guide parents in making decisions about what films may or may not be appropriate for viewing by their children.  Jack Valenti, President of the MPAA, in describing the purpose of the rating system, writes that:

> [t]he basic mission of the rating system is a simple one:  to offer to parents some advance information about movies so that parents can decide what movies they want their children to see or not to see.  The entire rostrum of the rating program rests on the assumption of responsibility by parents.  If parents don't care, or if they are languid in guiding their children's moviegoing, the rating system becomes useless.  Indeed, if you are 18 or over, or if you have no children, the rating system has no meaning for you.  Ratings are meant for parents, no one else.

Jack Valenti, *How it All Began*, p. 3 ("The Purpose of the Rating System"), <u>http://www. filmratings.com.</u>  The individuals involved in assigning movie ratings are parents and members of the industry organizations that govern the rating system, not professionals in the field of prison administration.  <u>See</u> <u>id</u>. at pp. 3-4 ("How the Ratings Are Decided").  Moreover, there is a certain inherent subjectivity to the ratings system, as it is difficult to quantify concepts like violence, sexuality, or other factors that affect a movie's rating assignment:

> In any appraisal, what is "too much?" becomes very controversial.  How much is "too much" violence?  Are classic war films too violent with

> scenes of marines storming a beach and slaying hundreds, wounding thousands?  Is it the graphic cop killing, the gangster shoot-out, or the slap across the face of a woman that determines "too much"?  How much is "blood spilled" to be given emphasis?  Where is the line to be drawn between "this is alright" and "this is not alright"?
>
> The same vexing doubts occur in sex scenes or those where language rises on the Richter scale, or where behavior not considered "normal" is revealed on the screen.  What follows is disagreement, inevitable, inexorable, and oftentimes strident.  That is what the rating system has to endure and confront.  We understand that.  We try to do our level best so that most parents would find our ratings mostly accurate and mostly useful.

See id. at p. 5 ("What the Ratings Mean")

Therefore we acknowledge, as one inevitably must, that the ratings system is at best an imprecise tool for judging the propriety of films relative to their prospective audiences.  The question, however, is not whether it is imprecise, but whether it is so imprecise that to rely on it in the context of the BOP movie program becomes a wholly irrational exercise.  To put a finer point on it, the relevant query is not whether the MPAA ratings system is one administered by parents for parents — it obviously is.  Rather, the question for our purposes is whether the ratings system, such as it is, is a rational means by which to screen out messages and/or stimuli which are potentially harmful in the prison setting.

According to Dr. Vanyur, for inmates possessing criminogenic risk factors, exposure to certain messages or stimuli – such as significant violence, substance abuse, victimization, racial stereotypes, misogynist attitudes, and the like – tends to feed into those risk factors, thereby undermining the goals of rehabilitation and prison security.  Clearly, the MPAA ratings system is not designed to specifically identify or quantify all potentially negative content within a movie and, as Plaintiffs fairly point out, there presumably are many R-rated films which contain little or none of the material which Dr. Vanyur finds objectionable.  Nevertheless, if we accept (as we do) Dr. Vanyur's assertion that prisons can more effectively manage and rehabilitate inmates

44

who are not exposed to depictions of, e.g., significant violence, substance abuse, criminal behavior, devaluation of others and the like, then we must next consider whether an R-rating is a logical mechanism by which to screen out those types of negative influences.

We conclude that the use of the R-rating as a screening tool is rational within the context in which it is utilized by the BOP.  According to the Motion Picture Association of America, a film with an R-rating "may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse or other elements, or a combination of some of the above."  See www.mpaa.org/ movieratings/about/index/htm at 5.  Thus, by definition, R-rated films may depict strong violence and/or drug abuse – both stimuli which, according to Dr. Vanyur, can feed into criminogenic risk factors.  Apart from the MPAA's definition, however, it is virtually beyond dispute as a matter of common experience for regular moviegoers that R-rated films commonly contain references to or depictions of more mature and graphic thematic elements, including significant violence, drug use, sexuality, criminal or aberrant behavior, and the like.  Otherwise stated, if messages or images containing graphic violence, substance abuse, criminal behavior, victimization or devaluation of others, violation of societal norms, racial stereotyping, misogynist attitudes, and/or negative role modeling are indeed detrimental to the penological goals of prison security and rehabilitation – and for present purposes we accept that they are – then we do not believe it is irrational for the BOP to conclude that these negative messages appear with sufficient frequency in R-rated films to warrant a general ban of those films in the prison context.

Plaintiffs view this as a grossly over-inclusive and irrational means of advancing penological goals because, in their view, there are too many R-rated films now banned which "pose no risk to penological objectives."  (Pl.'s Br. in Opp. to Def.s' Mot. for Summ. Judg. at p. 7.)  However, we cannot accept Plaintiffs' premise without injecting ourselves into the realm of administrative decision-making.  By way of example, we

note the following summaries of just two of the films Plaintiffs insist "pose <u>no</u> risk to penological objectives":

### Black Hawk Down

A Story of Modern War, this is the story of the Battle of Mogadishu, October 3, 1993, during the Somalian Civil War. An elite force of Delta units and Ranger infantry went into Mogadishu on that day to abduct two Somalian warlords. The operation, expected to last one hour, lasted 15, making it the longest sustained ground battle for Americans since the Viet Nam war. In the end, 18 Americans and nearly 1,000 Somalians died. The MPAA has rated this film "R" for intense, realistic, graphic war violence and for language. Strong language, including some profanity, is prevalent throughout the movie. Weapons include automatic rifles, handguns, grenades, ground-to-air rockets, and machine guns. Soldiers are faced with the difficulty of determining whether the people they encounter are militia or innocent civilians. Two helicopter crashes occur. During one crash scene, a soldier is hanging by his hands as the chopper spins out of control. Following a crash, Somalians remove the pilot's body, beat it and parade it through the streets in mob fashion. Numerous battle scenes contain realistic wartime carnage with large amounts of blood. A soldier looks down at his hand and sees that his fingers have been blown off. Trapped behind enemy lines with no immediate hope of rescue, a medic performs an invasive medical procedure on a soldier using no anesthetic.

### Garden State

When a young man returns to his hometown for the first time in ten years to attend his mother's funeral, he is reconnected to the world he left behind. The MPAA has rated this movie "R" for language, drug use and a scene of sexuality. Strong language is used throughout this movie. The main characters regularly use alcohol, marijuana and ecstacy simultaneously for recreational purposes. The central character is over-medicated on prescription anti-depressants prescribed by his father. A drug fencing ring works at a cemetery to steal jewelry from caskets before interment. A hotel manager makes extra money by running a peep show out of the hotel. Unwitting hotel guests are viewed through holes in the wall while they engage in sex. Two scenes include frontal female nudity and a man and woman engaging in sex.

http://moviereports.com/archives.cfm

We do not suggest that these films in any way lack artistic merit merely because they portray aspects of violence, lawlessness, drug abuse or anti-social behavior; nor do we suggest these films are necessarily inappropriate in a prison setting. Our point is simply that neither this Court nor Plaintiffs are qualified to determine, e.g., how much violence is too much violence or whether the depiction of drug use or a criminal enterprise in a particular context is detrimental from a penological standpoint. On this record, we cannot conclude that penologically unobjectionable films are so prevalent

within in the R-rated category that the general ban on R-rated films fails to rationally advance the government's asserted goals.

In finding a rational connection between the R-rated movie ban and the government's interests in rehabilitation and security, we are cognizant that the moviegoers at FCI-McKean (being comprised of the general inmate population) do not necessarily consist *solely* of individuals with violent histories, or inmates with drug abuse problems, or convicted sex offenders.  In fact, there may be inmates at FCI-McKean who do not possess criminogenic risk factors to any significant degree.  We therefore recognize that not every inmate at FCI McKean who would view a particular R-rated film, even a graphic one, would necessarily be negatively affected by the viewing.

Nevertheless, the evidence of record provides a sufficient basis from which to conclude that individuals with criminogenic risk factors are prevalent within the BOP's inmate population and that the general population of McKean is no exception.  The evidence also establishes that it is not feasible for administrators at FCI-McKean to make movie-viewing decisions on an inmate-by-inmate basis.  As noted above, we accept Dr. Vanyur's unrebutted opinion that it is desirable from a penological standpoint to design programming which targets and reduces criminogenic risk factors and undesirable to allow programming which reinforces criminogenic risk factors, since the latter can retard rehabilitation and detract from institutional order and security.  We have determined that the government could reasonably view R-rated films as a medium which often contains the type of negative messages, references or stimuli that reinforce criminogenic risk factors.  Accordingly, we conclude that the BOP's policy of prohibiting R-rated films is a rational, albeit imprecise, mechanism for advancing its interests in prisoner rehabilitation and institutional security.

c.      Safe, Non-Hostile Work Environment

Finally, Defendants posit that the ban on R-rated films furthers the government's interest in providing a safe and non-hostile work environment for BOP employees.[18] Their theory is that a BOP employee, whether it be a Correctional Officer, Recreation Specialist, or anyone else assigned to the task of monitoring the areas in which movies are being shown, may find R-rated movies offensive.

Unlike the government's arguments relative to resource allocation, rehabilitation and security, we do not find this rationale supportable on this record.  First, it is not clear whether courts have recognized this particular concern as a legitimate penological interest.  But moreover, given the rigors normally associated with conditions in the prison setting – not the least of which is regular interaction with hardened criminals – it strains credulity to believe that individuals who have chosen corrections work as an avocation would be strongly offended by the showing of an R-rated film.  Though there may be employees within the BOP who possess particularly delicate sensibilities, we find the likelihood of an employee taking serious offense to an R-rated film to be so low as to render the general ban irrational as a means of ensuring a non-hostile working environment.  The prohibition therefore cannot withstand scrutiny under this theory.

(ii)

The second Turner prong requires us to consider whether alternative means are open to inmates to exercise the asserted right.  Overton, 539 U.S. at 135.  "If other avenues are open for the inmate to exercise the right in question, the court should exhibit deference to the judgment of corrections officials, while if no other avenues are

_____

[18] In part, Defendants argue that staff members may be placed in a dangerous situation if required to control an area in which inmates with a history of violence or sexual offenses are watching a movie that has violent or sexually explicit scenes.  To the extent this theory partakes of concerns about institutional security and order, we have adequately addressed the issue above and will not revisit it here.

available, the inmate's right is given greater weight in the Turner balancing process."

Banks, 399 F.3d at 144.  Evidence that no alternative means exist, though not

conclusive, is some evidence that the regulation at issue is unreasonable.  Overton,

539 U.S. at 135.  Available alternatives need not be ideal; they need only be available.

Id.

How we apply this prong of Turner depends on how the relevant First

Amendment right is defined.  See Banks, 399 F.3d at 144 n. 15.  In this regard, we are

directed to view the relevant right "sensibly and expansively."  Fraise, 283 F.3d at 518

(quoting DeHart v. Horn, 227 F.3d at 53).  See also Thornburgh v. Abbott, 490 U.S. at

417.  For example, in the context of a prison ban on certain written publications, this

criterion is met if the regulations "permit a broad range of publications to be sent,

received, and read."  Thornburgh, supra, at 418.  See also Banks, 399 F.3d at 145

(defining First Amendment right at issue as the "right of access to a reasonable amount

of newspapers, magazines, and photographs.")

Plaintiffs contend that their ability to access ideas and information through

movies is significantly burdened by the challenged policy since they have no access,

through any avenue, to unedited R-rated films.  However, Plaintiffs do not have a First

Amendment right to R-rated movies *per se*.  Instead, Plaintiffs' First Amendment right,

most narrowly defined, is the right to receive information and ideas through a broad

range of movies.  Here, the record here is uncontradicted that Plaintiffs have access to

films that are rated G, PG, and PG-13, as well as programming available on cable

television, including non-premium channels such as the American Movie Classics.  In

addition, prisoners have access to at least some R-rated films that have been edited for

standard television programming or airline viewing.  We conclude that, because the

Plaintiffs have alternative means available by which to exercise their asserted First

Amendment rights, this factor weighs in favor of the Defendants.

(iii)

We next consider the impact that accommodation of the asserted right would have on guards, other inmates, and allocation of prison resources.  We are instructed that "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."  Fraise, 283 F.3d at 520 (quoting Turner, 482 U.S. at 90).  See id. ("Because increased freedom for the [plaintiffs] would come 'only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' we are particularly reluctant to interfere with the judgment of the (prison officials) in this case.") (quoting In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 470 (4th Cir. 1999)).

Defendants point out that, at FCI-McKean, movies are viewed in a common area by the general population which includes offenders of all types, including those with more violent tendencies.  According to the Defendants, there is no practical way to prevent any particular category of inmates from viewing films made available to the general population, since the inmate population is not segregated into particular housing units based on the nature of their offenses and since, in Defendants' opinion, it would be impractical and/or undesirable to bar certain groups from participation in the movie program.[19]  Given these limitations, Defendants maintain that the showing of R-rated movies "can pose a threat to the safety of guards and other inmates."  (Def.'s Mot. for Summ. Judg. at p. 19.)  They argue that, since correctional officers and other prison staff must monitor the areas where the movies are shown, "having to control an area in which violent criminals are watching movies depicting violence can place these BOP employees in a potentially dangerous situation."  (Id.)

---

[19] Defendants contend, e.g., that a policy of barring sex offenders from movie showings could effectively reveal their status as sex offenders to the general population, thereby compromising their security and safety.

Nevertheless, we must remember that Plaintiffs do not seek unrestricted access to *all* R-rated movies; rather they seek a return to the prison's former policy of showing a broad range of unedited R-rated movies, subject to an individualized determination by prison officials that a given film will not compromise prison security, institutional order or other legitimate penological goals. As we noted above, hundreds of unedited R-rated movies were shown to the general prison population at FCI-McKean in the years preceding the Zimmer Amendment. (Depo. of Dennis Flatt at pp. 44-46.) Plaintiffs protest that there is "no explanation in the record as to why, if there was no negative impact on prison security and order when R-rated films were routinely shown at the prison, showing R-rated films now would pose a threat to the safety of guards or other inmates." (Pl.'s Br. in Opp. to Def.s' Mot. for Summ. Judg. [Doc. # 71] at p. 26 (emphasis in the original).)

To address this argument we must first acknowledge the Defendants' unrebutted evidence that, since the mid-1990s, there has been a trend in the corrections profession toward focusing attention on the role that criminogenic risk factors play in relation to, *inter alia,* prisoner rehabilitation. As we previously discussed above, the fact that there is no evidence of overt prison disturbances directly associated with FCI-McKean's pre-Zimmer movie program does not necessarily inform as to the more long-term and subtle effects which the viewing of R-rated films may have had on prisoners in the past. Therefore, to the extent Plaintiffs advocate a return to the BOP's pre-Zimmer policy of showing films like ***Scarface***, ***Texas Chainsaw Massacre***, ***Silence of the Lambs***, and the like, we cannot necessarily conclude that there will be no significant "ripple" effect on inmates and guards within the institution.

If, on the other hand, inherent in Plaintiffs' request for relief is the suggestion that prison officials would retain the discretion to ban any R-rated films deemed unsuitable for the general prison population– taking into account the effect which a film's message or content may have in terms of reinforcing criminogenic risk factors among the general

51

population – then it may be that the potential "ripple effect" will be insignificant or even non-existent.  Even under this scenario, however, we are still required to consider how accommodation of the Plaintiffs' First Amendment rights would impact the allocation of prison resources.  Because attention to the effect of a film on criminogenic risk factors would seem to require a more sensitive analysis than was utilized by FCI-McKean in the past, a return to individualized movie screening would most definitely involve a certain time commitment on the part of prison staff.   In this respect, accommodation of the Plaintiffs' rights *would* have some impact on the allocation of prison resources.[20]  To this extent, factor three weighs in favor of the government.

(iv)

Finally, we must consider whether the presence of ready alternatives undermines the reasonableness of the restriction.  Turner does not impose any requirement that the alternative in question be the "least restrictive alternative"; instead, we must ask "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  Overton, 539 U.S. at 136 (citing Turner, 482 U.S. at 90-91).  See also Fraise, 283 F.3d at 521 ("[O]ur inquiry is not whether the state could have adopted a less restrictive alternative but rather whether it could have adopted an alternative that imposed only 'de minimis cost to legitimate penological interests.'")  The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns."  Banks, 399 F.3d at 146 (citing Thornburgh v. Abbott, 490 U.S. at 418).

---

[20] We recognize that, even under the present policy which permits the showing only of G, PG, PG-13 and airline edited movies, administrative oversight and judgment have to be exercised in determining whether a particular film is appropriate for viewing by the general inmate population.  However, as Dr. Vanyur states, the extent of that review is much narrower in scope.  (Vanyur Depo. at 64.)  Accordingly, the record suggests that accommodation of the Plaintiffs' rights in this case would have an overall negative impact on the allocation of prison resources.

52

Defendants maintain that the "most obvious alternative – determining prisoner-by-prisoner who can watch certain movies so as not to disrupt security and order in the prison or damage their rehabilitation – involves costs that are 'far from de minimis.'" (Def.'s Mot. for Summ. Judg. at p. 20 (citations omitted).)  Although we agree that this alternative would likely place an undue burden upon administrators at FCI-McKean, this argument is beside the point because Plaintiffs do not advocate such an arrangement.

Instead, Plaintiffs contend that their interests can be fully accommodated by a return to the policy under which FCI-McKean operated prior to the Zimmer Amendment's passage – i.e., evaluating movies on an individual basis to determine whether they are appropriate for showing, consistent with institutional order and security.  Plaintiffs argue that a return to the Institution's previous policy would impose no more than a *de minimis* burden upon the Defendants' asserted interests.  They maintain that, under the prison's former policy, the decision about a particular film's propriety was usually made by the Supervisor of Recreation and ended there.  On rare occasions, the decision would be made on a higher administrative level.  Plaintiffs also contend that, at most, the time needed to review a movie would be three to four hours a week and the typical time is likely to be less than that, since PG-13, PG, G and airline edited films would also still be shown.

As we noted in our discussion of Turner's first and third prongs, the Defendants have produced unrebutted evidence showing that there has been a trend within the corrections profession over the last decade toward developing prison programs which focus on reducing criminogenic risk factors.  The evidence suggests that this new philosophical approach may well require a more sensitive analysis than was utilized in the past when judging the effect that films and/or other media are likely to have on a prison population.  Thus, while it may true that the process of individualized film screening would require no more than several hours of staff time each week, it is not unreasonable to infer that the time commitment could be far greater.  For example, it is

53

conceivable that an employee might have to review *more* than two movies during certain weeks if, e.g., a particular film – having been already pre-screened by a staff member – is prohibited from being shown by higher prison administrators, or if a recreation specialist screens most of a film only to discovery material toward the middle or end that is determined to be manifestly inappropriate for viewing (e.g., graphic violence or terror, depictions of substance abuse, a rape scene, scenes glorifying criminal behavior or showing victimization of others, etc.).  In fact, given the prevalence of violence and drug references in modern R-rated films, it is conceivable that several movies would have to be reviewed in a given week in order to find one that is compatible with the BOP's rehabilitative goals, as outlined by Dr. Vanyur.

However, even accepting Plaintiffs' assumption that a return to the Institution's pre-Zimmer policy would involve no more than 3 or 4 hours of staff time each week, we cannot conclude that such a commitment of resources is *de minimis.*  Accordingly, this prong of our Turner analysis weighs in favor of the government.

## IV.  CONCLUSION

Based upon the foregoing discussion, we find that the challenged prohibition on R-rated films is a rational and reasonable means of advancing the government's legitimate interests in ensuring the efficient allocation of prison resources, promoting rehabilitation of federal inmates, and promoting institutional security and order.  We therefore decline to adopt the Report and Recommendation filed by the Magistrate Judge.  Instead, we will grant the Defendants' motion for summary judgment and deny the Plaintiffs' cross motion for summary judgment.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD JEWELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 97-408 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| ALBERTO R. GONZALES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

AND NOW, to wit, this 17th day of March, 2006, for the reasons set forth in the accompanying Memorandum Opinion, after *de novo* review of the complaint and documents in this case, together with the Report and Recommendation entered by the United States Magistrate Judge on August 31, 2005 [Doc. # 76] and objections thereto, the Court declines to adopt the Report and Recommendation and, instead,

IT IS HEREBY ORDERED that the Defendants' motion [Doc. # 69] for summary judgment is GRANTED and the Plaintiffs' cross-motion [Doc. # 73] for summary judgment is DENIED.

JUDGMENT is hereby entered in favor of the Defendants and against the Plaintiffs.


s/    Sean J. McLaughlin
      SEAN J. McLAUGHLIN
      UNITED STATES DISTRICT JUDGE


cm:    All counsel of record